# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CASE NO.: 3:25-CV-318-MOC-SCR

MINA EZIKPE, Esq., EBONI EXCEUS, XAVIER TORRES de JANON, Esq., DR. JULIANNE LIEBENGUTH, and WILLIAM STANLEY,

       Plaintiffs,

       v.

CENTRAL PIEDMONT COMMUNITY COLLEGE, CENTRAL PIEDMONT COMMUNITY COLLEGE BOARD OF TRUSTEES, JIM DUNN, in his official capacity as Chair of the Central Piedmont Community College Board of Trustees, CALDWELL ROSE, in his official capacity as Vice Chair of the Central Piedmont Community College Board of Trustees, WESTON ANDRESS, in his official capacity as a member of the Central Piedmont Community College Board of Trustees, CARRIE BAKER, in her official capacity as a member of the Central Piedmont Community College Board of Trustees, GABRIEL J. ESPARZA, in his official capacity as a member of the Central Piedmont Community College Board of Trustees, LUCIA ZAPATA GRIFFITH, in her official capacity as a member of the Central Piedmont Community College Board of Trustees, MICHAEL S. HAWLEY, in his official capacity as a member of the Central Piedmont Community College Board of Trustees, ARRINGTON MIXON, in her official capacity as a member of the Central Piedmont Community College Board of Trustees, CHRIS PATERSON, in his

**FIRST AMENDED COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION**

official capacity as a member of the
Central Piedmont Community College
Board of Trustees, KHALIF J. RHODES,
in his official capacity as a member of the
Central Piedmont Community College
Board of Trustees, BERTRAM SCOTT, in
his official  capacity as a member of the
Central Piedmont Community College
Board of Trustees, ALISON
SUMMERVILLE, in her official capacity
as a member of the Central Piedmont
Community College Board of Trustees,
Dr. KANDI DEITEMEYER, in her
official capacity as President of Central
Piedmont Community College, OFFICER
CLARK HOPKINS and OFFICER
CHASE HUDSON of CPCC Campus
Security, in their official capacities,

       Defendants.

Plaintiffs, by and through counsel, file this action seeking preliminary injunctive relief, pursuant to Rule 65 of the Rules of Civil Procedure and N.C.G.S. §§ 1-485 and 143-318.16; a declaratory judgment pursuant to N.C.G.S. § 1-253 *et seq*.; an order declaring certain acts by Defendants null and void pursuant to N.C.G.S. § 143-318.16A; and an order declaring certain acts by Defendants to be in violation of the First Amendment to the U.S. Constitution.

## **INTRODUCTION**

1.      North Carolina law guarantees the public an opportunity to have access to any public body's deliberations and actions and requires public bodies to act in good faith to adhere to these protective rules. North Carolina governance relies upon these laws to ensure that governmental decisions, at all levels, reflect the values and priorities of the people. Defendant Central Piedmont Community College ("CPCC"), by and through its Board of Trustees ("CPCC Board" or "the Board"), based in Mecklenburg County, has failed to abide by these obligations through flagrant disregard of North Carolina's Open Meeting Laws. As detailed below, they have conceived, negotiated, and approved a controversial Public Safety Training Facility,

(recently renamed the "Community Lifeline")[1] in stark contravention of the law of this state. Consequently, the public has been kept in the dark, unlawfully, about this significant undertaking. When news of the development's existence publicly emerged in late 2024, community members began seeking more information. In response, Defendants have redoubled efforts to shield its plans from public view. And when community members attended CPCC Board's public meetings, requested documents, and asked questions, CPCC took retaliatory actions against Plaintiffs.

2.      Plaintiffs, who primarily live in Mecklenburg County, ask this Court to restrain Defendants from these violations of North Carolina Open Meetings Laws, the First Amendment, and any related actions. Requested relief includes, but is not limited to, an injunction prohibiting any decisions in furtherance of a Public Safety Training Facility on Central Piedmont Community College property without full compliance with the laws requiring public disclosure of these conversations and decisions; and an order declaring null and void, and to set aside, certain actions and agreements entered into by Defendants, separately and together, in violation of the North Carolina Open Meetings Law, North Carolina Public Records Law, and the First Amendment. Plaintiffs further move herein for a preliminary injunction to restrain CPCC from committing violations at any future public meetings and other relief necessary to prevent irreparable harm.[2] Additionally, Plaintiff Ezikpe and Plaintiff Exceus seek damages for Defendant CPCC's violation of their First Amendment rights.

## THE PARTIES

3.      Plaintiff Mina Ezikpe lives in Charlotte, Mecklenburg County, North Carolina. Ms. Ezikpe is an attorney employed at the Mecklenburg County Public Defender's Office since September 2023. Ms. Ezikpe is a graduate of Duke University and Harvard Law School. Ms. Ezikpe attended CPCC Board of Trustee Meetings to see how the Public Safety Training Facility would impact her clients' lives and her representation of her clients. Ms. Ezikpe is Black.

4.      Plaintiff Eboni Exceus lives in Charlotte, Mecklenburg County, North Carolina. Ms. Exceus is employed by Atrium Health-Sardis Oaks. Ms. Exceus is a graduate of Winston Salem State University. Ms. Exceus is a CPCC visiting student taking Anatomy II. Ms. Exceus seeks to better understand CPCC's involvement in the Public Safety Training Facility. Ms. Exceus is Black.

---

[1] The training facility has many names including, but not limited to, Public Safety Training Facility, First Responder Training Facility, Cop City, and Community Lifeline. This complaint will refer to the development as the "Public Safety Training Facility."

[2] There is a Central Piedmont Community College Board of Trustees meeting on May 14, 2025. *See Board of Trustees*, Central Piedmont Community College, https://www.cpcc.edu/about-central-piedmont/college-leadership/board-trustees (last visited Apr. 23, 2025).

5.      Plaintiff Xavier Torres de Janon lives in Charlotte, Mecklenburg County, North Carolina. Mr. de Janon is an attorney, employed as Director of Mass Defense at the National Lawyers Guild. Mr. de Janon is a graduate of Hampshire College and Golden Gate University School of Law. Mr. de Janon's legal work includes supporting community responses to state repression and researching publicly-funded development of police training centers, referred to as Cop Cities, and the potential for increased police militarization, environmental destruction, and harm to marginalized communities nationally. Mr. de Janon is a brown immigrant from South America.

6.      Plaintiff Julianne Liebenguth lives in Durham, Durham County, North Carolina. Dr. Liebenguth is an Assistant Professor of Political Science and Public Policy at Elon University. Dr. Liebenguth studies power dynamics that shape global environmental issues and attended the March 12, 2025, meeting to learn more about the training facility and its environmental impact. Dr. Liebenguth is white.

7.      Plaintiff William Donovan Stanley lives in Charlotte, Mecklenburg County, North Carolina. Mr. Stanley graduated from Cox Mill High School.  He has lived in Charlotte his whole life. Mr. Stanley has experienced harassment from the police and wants to learn more about the Public Safety Training Facility. Mr. Stanley is Black.

8.       Defendant Central Piedmont Community College ("CPCC") is a public institution of the State of North Carolina governed by Defendant Central Piedmont Community College Board of Trustees ("CPCC Board"). Defendant CPCC Board is organized and existing under the laws of the State of North Carolina, including, but not limited to, N.C.G.S. Chapter 115D. The CPCC Board is a "public body" as defined by N.C.G.S. § 143-318.10(b). *See, e.g.*, *Sigma Constr. Co. v. Guilford Cty. Bd. Of Educ.*, 144 N.C. App. 376, 379, 547 S.E.2d 178, 180 (2001).[3]

9.      Defendants Jim Dunn, Caldwell Rose, Weston Andress, Carrie Baker, Gabriel J. Esparza, Lucia Zapata Griffith, Arrington Mixon, Chris Paterson, Khalif J. Rhodes, Bertram Scott, Alison Summerville, and Michael S. Hawley are members of CPCC's Board of Trustees, which is the CPCC's governing body. These individuals are named in their official capacities.

10.     Defendant Kandi Deitemeyer is President of CPCC and Secretary of the CPCC Board.  She is named in her official capacity.

---

[3] CPCC admits that they are a public body subject to public record laws. *See Article VI Meetings - Board of Trustees Bylaws*, Central Piedmont Community College, https://www.cpcc.edu/about-central-piedmont/policies-and-procedures/board-trustees/article-vi-meetings (last visited Apr. 23, 2025).

11.     Defendants Officer Clark Hopkins and Officer Chase Hudson are CPCC representatives employed as CPCC campus security. Additionally, Officer Chase Hudson is the Director of CPCC Campus Security. These individuals are named in their official capacities.

## JURISDICTION, STANDING, AND VENUE

12.     This is an action for declaratory relief, injunctive relief, and damages brought under 42 U.S.C. § 1983, N.C.G.S. § 143-318.16, and N.C.G.S. § 143-318.16A.

13.     This court has subject matter jurisdiction in this action pursuant to Chapter 7 of the North Carolina General Statutes, N.C.G.S. §§ 1-253, 7A-240, 7A-243, 132-9, 143-318.16, and 143-318.16A.

14.     This court has personal jurisdiction over the parties pursuant to N.C.G.S. § 1-75.4.

15.     Plaintiffs have standing to institute and pursue this action pursuant to N.C.G.S. §§ 143-318.16, 143-318.16A, and 1-253.

16.     Venue for this action is proper in the Superior Court of Mecklenburg County pursuant to N.C.G.S. §§ 1-77 and 1-82.

17.     This action is commenced within the applicable statutes of limitation, including the 45-day limitation prescribed by N.C.G.S. § 143-318.16A(b) for nullification of actions taken at the March 12, 2025, meeting of the CPCC Board. Other requested relief is not limited by this 45-day statute of limitations, and therefore this action is commenced within the applicable statutes of limitations.

## FACTS

## DESCRIPTION OF THE LAND IN QUESTION

18.     The land in question (hereinafter, "the land") includes two parcels of land located in the City of Matthews, North Carolina. The parcels bookend CPCC's Levine Campus to the east and west. *See* Exhibit 1 (CPCC Campus Map).



Exhibit 1 (CPCC Campus Map).

19.     The first parcel on the east side of CPCC's Levine campus, which bears Parcel ID Number 21524108, is located at 2625 Campus Ridge Road, Matthews, NC 28105 ("Parcel 1").

20.     This property is just over 23 acres, roughly the size of 17 football fields.

21.     The eastern two-thirds of the property is densely forested, including a wide variety of trees known to support wildlife, such as quaking aspen, red maple, poplar, ash, black cherry, and oak trees. Nearly 70 species of birds call this range home at various points in the year.

22.     Upon information and belief, Hendrick Automotive Group ("Hendrick") owned Parcel 1 for approximately 30 years until they gifted the land to CPCC in 2023. *See* Exhibit 2, at pp. 6-15 (Deed Information).

23.     At present day, Hendrick and HEP Investment Company, LLC—managed by Hendrick—still owns other forested property near the southern end of Parcel 1 for development of their future "Advanced Manufacturing Campus." *See* Exhibit 3 (Map of Hendrick Properties); Exhibit 4 (Hendrick Slideshow).



Exhibit 3 (Map of Hendrick Properties).

24.     The second parcel on the west side of CPCC's Levine campus bears Parcel ID Number 21506115 ("Parcel 2").

25.     Three addresses are located at this property: 1800 CPCC Lane, Matthews, NC 28105; 1820 CPC Lane, Matthews, NC 28105; and 1932 CPCC Lane, Matthews, NC 28105.

26.     This property is approximately 14 acres, roughly the size of 11 football fields.

27.     While this parcel is also densely forested on the southern and northern thirds, a parking lot sits within the middle third of this property.

28.     Mecklenburg County conveyed this land to CPCC in 2013. *See* Exhibit 2, at pp. 1—3 (Deed Information).

## HISTORY OF THE PUBLIC SAFETY TRAINING FACILITY

29.     The following information came to light when the Town of Matthews responded to a public records request that Plaintiffs received, through counsel, on April 11, 2025. The assertions below are based upon information and belief.

30.     The idea for a Public Safety Training Facility arose in conversations between CPCC President Dr. Kandi Deitemeyer and the Town Manager for the Town of Matthews, Becky Hawke. *See* Exhibit 5 (July 24, 2023 Email).

31.     In early 2022, the Matthews Police Chief, Clark Pennington, and Fire & EMS Chief, Rob Kinniburgh, discussed their mutual interest in creating a Public Safety Training Facility near or on CPCC Campus with Central Piedmont Community College staff. *See* Exhibit 6 (May 2, 2022 Email Thread).

32.     In May 2022, the Matthews Police Chief Clark Pennington, Matthews Fire & EMS Chief Rob Kinniburgh, Matthews Town Manager Becky Hawke, and Matthews Planning Director Jay Camp met with CPCC staff, including CPCC President Dr. Deitemeyer, to discuss building the facility on/near CPCC Campus. *See id.*

33.     Following the May 2022 meeting, Matthews Planning Director Jay Camp reached out to Hendrick to facilitate a meeting between CPCC, Matthews, and Hendrick, as Hendrick owned (or was in the process of acquiring) property near CPCC campus—including Parcel 1— that could be used for development. *See* Exhibit 7 (May 23, 2022 Email); Exhibit 2 (Deed Information).

34.     Upon information and belief, this meeting occurred on September 28, 2022. *See* Exhibit 8 (Sept 28, 2022 Meeting).

35.     Upon information and belief, Matthews Commissioner Mark Tofano privately met with Hendrick staff on June 10, 2022 at Hendrick's offices. *See* Exhibit 9 (June 10, 2022 Meeting).

36.     On December 14, 2022, Matthews Town Manager Becky Hawke sent an email, marked "CONFIDENTIAL," to the Matthews Commissioners and Mayor for "small groups" to meet with Hendrick's team and CPCC leadership to "share their vision" for the land proposed to be rezoned: Parcel 1 and other land south of Parcel 1, also owned by Hendrick. *See* Exhibit 10 (December 14, 2022 Email Thread); Exhibit 1 (CPCC Campus Map); Exhibit 2 (Deed Information).

37.     Commissioner Tofano stated the purpose of the meeting was to "level set with all parties involved prior to the rezoning." Exhibit 11 (December 19, 2022 Email).

38.     Three consecutive meetings were scheduled for Hendrick and CPCC to meet with Matthews Commissioners on CPCC's Levine campus on January 23, 2023:
- 8:30am—9:45am: meeting for two Matthews Commissioners;
- 10:15am—11:45am: meeting for two other Matthews Commissioners; and
- 12:45pm—2:00pm: meeting for the remaining three (including the Mayor).

*See* Exhibit 10 (December 14, 2022 Email).

39.     Upon information and belief, these meetings occurred on January 23, 2023, and were not open to the public.

40.     Later that same day, the Matthews Board of Commissioners held a regularly scheduled public meeting. In this meeting, they moved to closed session to discuss the "acquisition of real property" pursuant to N.C.G.S. 143-318.12(a)(5). *See* Exhibit 12 (January 23, 2023 Matthews BOC Minutes).

41.     Upon information and belief, the public still had no information about the plans for a Public Safety Training Facility.

42.     Critically, Hendrick either owned or was in the process of acquiring land near CPCC's Levine campus in early 2023 to build a massive Hendrick "Advanced Manufacturing Campus." *See* Exhibit 13 (May 11, 2023 Email); Exhibit 5.

43.     Hendrick's gift of Parcel 1 to CPCC for the Public Safety Training Facility was contingent upon the Matthews BOC approving the Hendrick rezoning application (to allow for the construction and operation of the Hendrick Advanced Manufacturing Campus).

44.     Jeff Lowrance, a CPCC employee, told Matthews government employees in March 2023 that "[t]he land gift [of Parcel 1 from Hendrick] won't become official until the rezoning takes place." *See* Exhibit 14 (March 3, 2023 Email).

45.     In February 2023, Jay Camp coordinated with CPCC to present the rezoning of Hendrick's land, including Parcel 1, as a Town-led zoning motion: Zoning Motion 2023-1. *See* Exhibit 15 (February 3, 2023 Email).

46.     This rezoned land, except for Parcel 1, would be used to build Hendrick's Manufacturing Campus. *See* Exhibit 4 (Hendrick Slideshow).

47.     On February 13, 2023, the Matthews Board of Commissioners approved their Consent Agenda, which included a call for a public hearing on Zoning Motion 2023-1. *See* Exhibit 16 (February 13, 2023 Matthews BOC Minutes).

48.     The Zoning Motion was scheduled to appear before the Planning Board on April 25, 2023, and the Board of Commissioners was scheduled to make a final decision on May 8, 2023. *See* Exhibit 15 (February 3, 2023 Email).

49.     In April 2023, one month before the rezoning decision, Hendrick invited the Matthews BOC to Hendrick's facilities to tour their Hendrick Motorsports Race Facility, the GM

Charlotte Technical Center, and the Hendrick Heritage Center (showcasing rare automobiles). *See* Exhibit 17 (April 10, 2023 Email).

50.     In May 2023, the Matthews BOC approved the rezoning of Hendrick's land, allowing Hendrick to construct their Acceleration Advanced Manufacturing Campus. *See* Exhibit 18 (May 8, 2023 Matthews BOC Minutes).

51.     Upon information and belief, all members of the Matthews BOC took the Hendrick tour after approving the rezoning as three separate tours of small groups to avoid triggering North Carolina Open Meetings law.  *See* Exhibit 17.

52.     On August 17, 2023, HEP Investment Company, Hendrick Automative Group, Central Piedmont Community College, and Central Piedmont Community College Foundation entered an agreement whereby a portion of the rezoned land was donated to Central Piedmont Community College Foundation. *See* Exhibit 19 (Gift Agreement).

53.     In the Gift Agreement, the purpose of the donation was described as being for the CPCC Foundation to "construct and operate a facility with the purpose of providing training and teaching of public safety to law enforcement, fire department, emergency medical technician personnel and other first responders on the property." *See id*.

54.     Upon information and belief, several meetings occurred over the next year between various CPCC, Hendrick, and Town of Matthews staff, including, but not limited, to a three-day meeting in May 2024 to discuss plans for the Public Safety Training Center. *See* Exhibit 20 (May 5, 2024 Email).

55.      Two of those days, in the three-day meeting, solely involved CPCC staff, faculty, and leadership. *See id*.

56.     Due to incomplete information provided, it is impossible to know if the May meetings included a quorum of any official public body of CPCC and/or the Matthews BOC, thereby triggering North Carolina Open Meetings Laws.

57.     On July 17, 2024, CPCC announced that Hendrick gifted land to CPCC for a new public safety training center, of approximately 23 acres, to build a first responder training facility.

58.     In September 2024, CPCC communicated amongst themselves and with the Charlotte-Mecklenburg Police Department (CMPD) regarding increased public awareness and opposition to the facility. At that time, CPCC staff described this as "not overly concerning." *See* Exhibit 21 (September 25, 2024 Email).

59.     On an unknown date, Mecklenburg County appropriated $116 million dollars to fund this Public Safety Training Facility. *See* Exhibit 22 (Funding Source Screenshot).[4]

60.     On October 28, 2024, the Town of Matthews initiated a town-led zoning motion, Zoning Motion 2024-3, to rezone 1932 CPCC Lane, a portion of Parcel 2, to a Residential/Institutional District to, upon information and belief, allow Parcel 2 to be used for the Public Safety Training Facility. *See* Exhibit 23 (October 28, 2024 Matthews BOC Minutes).

61.     This was approved in early 2025, despite the lack of information available to the public. *See* Exhibit 24 (January 13, 2025 Matthews BOC Minutes).

62.     On April 9, 2025, Plaintiff de Janon contacted Mecklenburg County Commissioner Laura Meier to obtain more information about the Public Safety Training Facility. In response to Plaintiff de Janon's request, Commissioner Meier received an overview of the project from Defendant Deitemeyer outlining permitting and construction. *See* Exhibit 25 (April 9, 2025 Email Thread).

## 2024 CPCC Board of Trustees Meetings

63.     In the Fall of 2024, community members, including but not limited to the Plaintiffs named in this lawsuit, tried to attend the CPCC Board's public meetings to obtain more information about the Public Safety Training Facility.

64.     CPCC Board meetings are open to the public by statute, and the CPCC Board specifically states their meetings are subject to open meetings laws.[5]

65.     CPCC Board meetings are held at the Disher Building in the Dowd Boardroom, just off of East 4th Street in Charlotte. It is a multi-story building located on Central Campus in Mecklenburg County, North Carolina. There is a parking lot outside of the Disher Building where meeting attendees can park. There is also a parking garage across the street where some meeting attendees choose to park. *See* Exhibit 26 (CPCC Board Meeting Map).

---

[4] *See Community Lifeline*, Central Piedmont Community College, https://www.cpcc.edu/about-central-piedmont/community-lifeline (last visited Apr. 23, 2025).
[5] *See Article VI Meetings - Board of Trustees Bylaws*, Central Piedmont Community College, https://www.cpcc.edu/about-central-piedmont/policies-and-procedures/board-trustees/article-vi-meetings (last visited Apr. 23, 2025).



Exhibit 26 (CPCC Board Meeting Map).

*November 13, 2024 CPCC Board Meeting*

66. On November 13, 2024, CPCC held a Board of Trustees meeting.

67. Although approximately 20 to 30 community members attempted to attend the public meeting, only 14 people were allowed into the meeting, as captured on a video recording. *See* Exhibit 27 (November 13, 2024 CPCC Board Recording).

68. A CPCC campus security guard stated that the limitation on the number of people permitted was due to fire safety.

69. The meeting started off with a CPCC representative stating that anyone who disrupts the meeting will be charged with a misdemeanor.

70. After about 7 to 10 minutes, the Board transitioned to a closed meeting and everyone was escorted out.

71. No agendas were provided to the community members.

72. Both CPCC campus security and CMPD officers were present. *See* Exhibit 28 (November 13, 2024 CPCC Board Photo).



Exhibit 28 (November 13, 2024 CPCC Board Photo).

73.    CPCC campus security escorted community members out of the meeting room and building.

*December 18, 2024 CPCC Committee Meeting*

74.    On December 18, 2024, CPCC Board of Trustees held a Committee meeting.

75.    Around three to five community members attempted to attend the public meeting.

76.    All were allowed to enter the meeting.

77.    No agendas were provided to the community members.

78.    CPCC campus security was present.

79.    After about 10 to 15 minutes, CPCC Board transitioned to a closed session.

80.    CPCC campus security escorted community members out of the meeting room and building.

## March 12, 2025 CPCC Board of Trustees Meeting

81.    On March 12, 2025, CPCC held another regularly schedule Board of Trustees public meeting.

*Request for Identification prior to Entry into Disher Building*

82.    When community members arrived at the Disher Building, there were two CPCC campus security guards blocking the entrance to the building.

83.    One of the CPCC campus security guards told members of the public they must provide identification to be let in to the meeting.

84.    Plaintiff Liebenguth presented her ID.

85.    Plaintiff Ezikpe was not asked to present her ID.

86.    Plaintiff Stanley was not asked to present his ID.

87.    Plaintiff Exceus was not asked to give her ID.

88.    Plaintiff de Janon refused to give his ID.

*Entry into CPCC Board meeting*

89.    After entering the Disher building, CPCC campus security escorted Plaintiffs and other community members up a flight of stairs to a meeting room.

90.    Once in the meeting room, Plaintiffs and community members were told to sit in chairs toward the back of the room.

91.    There was a partition separating Plaintiffs and community members from the Board members as captured on video recording. *See* Exhibit 29 (March 12, 2025 CPCC Closed Session Video).

92.    Plaintiffs and community members were not allowed to speak throughout the whole meeting. *See* Exhibit 30 (March 12, 2025 CPCC Audio Recording Part 1, at 00:05 – 00:30).

*Agenda*

93.     At the beginning of the March 12, 2025, meeting, CPCC Board members were told, "in front of you, you'll see your agenda." *Id.* at 00:45 – 00:55.

94.     The CPCC Board subsequently made and passed a motion to "approve the attached agenda," as captured on audio recording. *Id.*

95.     Additionally, CPCC Board members approved a "Consent Agenda," which included several "Finance and Facilities Committee Items." *Id.* at 1:00-1:20.

96.     The CPCC Board approved the Consent Agenda without listing, identifying, or explaining the items under the Consent Agenda. *Id.*

97.     No agenda was made available to the public.

98.     When Plaintiff de Janon asked a CPCC representative for an agenda, given the repeated references to a non-public agenda having been circulated to members of the Board, a CPCC representative refused to provide one and claimed "We don't have one." *Id.* at 09:20 – 09:30.

*Closed Session*

99.     After approximately one hour, the CPCC Board moved to enter into a closed session pursuant to N.C.G.S. § 143-318.11(a)(9). *See* Exhibit 31 (March 12, 2025 CPCC Audio Recording Part 2, at 52:00 – 52:30).

100.     Before the motion was approved, members of the public who had been present were told to leave.  *See* Exhibit 29 (March 12, 2025 CPCC Closed Session Video).

101.     Once the motion was approved, members of the public were told to leave. *Id.*

102.     Upon information and belief, the CPCC Board has entered into closed session at previous meetings to discuss plans for the Public Safety Training Facility.

*CPCC bans Plaintiff Ezikpe and Plaintiff Exceus from Campus*

103.     Plaintiff Exceus left the March 12, 2025 CPCC Board meeting around 8:38am. She left before the meeting moved into a closed session.

104.     Plaintiff Exceus was followed out of the meeting room and the Disher building by CPCC campus security.

105.     Plaintiff Exceus walked to her car in the parking lot right outside the Disher Building.

106.     As Plaintiff Exceus was driving out of the parking lot, she saw a CPCC campus security guard taking a picture of her license plate.

107.     Plaintiff Exceus pulled over her car, exited, and went to speak with Officer Clark Hopkins about what she observed.

108.     Plaintiff Ezikpe left the CPCC Board of Trustees meeting shortly after Plaintiff Exceus.

109.     Just like Plaintiff Exceus, Plaintiff Ezikpe was followed out of the meeting room and Disher building by CPCC campus security.

110.     As Plaintiff Ezikpe was walking to her car, she saw Officer Clark Hopkins filming and went to investigate.

111.     Plaintiff Ezikpe knew Plaintiff Exceus had just left the CPCC Board meeting and wanted to make sure Plaintiff Exceus was safe.

112.     Plaintiff Ezikpe and Plaintiff Exceus asked the Officer Clark Hopkins  why he was filming them, but he did not answer. He drove off in his golf cart.

113.     Plaintiff Ezikpe and Plaintiff Exceus crossed the street to Plaintiff Exceus' parked car. Officer Chase Hudson and one other CPCC campus security guard stood next to her car.

114.     Plaintiff Exceus asked if they would move so she could get into her car.

115.     Officer Chase Hudson told her she was banned from campus. *See* Exhibit 32 (Campus Ban Video).

116.     Plaintiff Ezikpe asked Officer Chase Hudson why Plaintiff Exceus was banned, but neither CPCC campus security guard stated a reason, as captured on video recording. *Id.*

117.     Officer Chase Hudson said Plaintiff Exceus would be arrested if she did not leave campus. Plaintiff Ezikpe asked why Plaintiff Exceus was banned from CPCC, again. *Id.*

118.    Officer Chase Hudson told Plaintiff Ezikpe that she was now banned from campus and if she did not leave CPCC, then she would be arrested as well. *Id.*

119.    Afraid of being arrested, Plaintiff Ezikpe and Plaintiff Exceus got into their cars and left campus.



Exhibit 33 (Three Officers).

*CMPD calls Plaintiff Ezikpe's Employer*

120.    On either April 2, 2025 or April 3, 2025, Plaintiff Ezikpe's employer received a phone call from CMPD Officer Senate stating that Plaintiff Ezikpe had been banned from CPCC's campus. *See* Exhibit 34 (April 16, 2025 Email).

121.    Upon information and belief, CPCC filed an incident report with CMPD.

122.    CMPD Officer Senate stated that Plaintiff Ezikpe was identified as one of the individuals "who was swearing in a disrespectful and abusive manner toward the board members and/or CPCC security."

123.    Plaintiff Ezikpe and all other members of the public were not allowed to speak at the CPCC Board meeting.

124.    Plaintiff Ezikpe did not swear at CPCC staff or CPCC campus security, as captured by video recording. *See* Exhibit 32 (Campus Ban Video).

## CLAIMS FOR RELIEF

### CLAIM I
### Violation of North Carolina Open Meetings Law

125.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

126.    Defendants' actions, as described above, violate the North Carolina Open Meetings Law. This illegal conduct occurred during Defendants' various and multiple closed meetings and sessions, including the March 12, 2025 meeting.

127.    "[I]t is the public policy of North Carolina that the hearings, deliberations, and actions" of public bodies "be conducted openly." N.C.G.S. § 143-318.9. "[C]ourts generally consider many factors to determine if a meeting is truly open to the public. These factors may include the notice for meetings, distribution of agendas, preparation and availability of minutes of meetings, location and characteristics of the meeting place, recordation of minutes, and the like." *Garlock v. Wake Cty. Bd. Of Educ.*, 211 N.C. App. 200, 217, 712 S.E.2d 158, 170 (2011).

128.    The March 12, 2025, meeting of the CPCC Board was not truly open as a whole, therefore violating North Carolina law. As alleged herein, *inter alia*, agendas were used but not provided to the public; meeting minutes were not available at the meeting or online; no notice was given of the CPCC Board's requirement to provide identification to attend the meeting; and the meeting was not formally recorded. This claim is separate and distinct from the CPCC Board's related but individualized violations of the Open Meetings Law, as elaborated upon below.

129.    "A public body may exclude the public by conducting a closed session "only when required to permit a public body to act in the public interest as permitted in this section." N.C.G.S. § 143-318.11(a). "A public body may hold a closed session only upon a motion duly made and adopted at an open meeting" that cites one of the permissible purposes for a closed session. N.C.G.S. § 143-318.11(c). Once discussions extend beyond those justifying the closed session, the closed session cannot continue. *Multimedia Publ'g of N.C., Inc. v. Henderson County*, 136 N.C. App. 567, 576, 525 S.E.2d 786, 792 (2000).

130.    The CPCC Board's excluded the public from hearing any information about the Public Safety Training Facility during their March meeting by citing N.C.G.S. § 143-318.11(a)(9), which only allows a public body to conduct a closed session for anti-terrorism

19

planning. To the extent the Board met in closed session to discuss the Public Safety Training Facility pursuant to N.C.G.S. § 143-318.11(a)(9), the Council met in closed session unlawfully. Subsection (a)(9) was added to NC Gen Stat 143-318.11(a) through North Carolina 2003 Senate Bill 692, in the wake of 9/11.[6]

131.    The public has a vested interest in the discussions surrounding the Public Safety Training Facility. Shielding such discussions from public scrutiny undermines public trust and violates the duty of the public body to conduct business openly. The public body has the burden of justifying this closed session. *Multimedia Publ'g of N.C., Inc. v. Henderson Cty.*, 145 N.C. App. 365, 371, 550 S.E.2d 846, 850 (2001). Further, to the extent that Defendants met in closed session to discuss procedure or process, those reasons do not fall under any of the exceptions to the law. *See Knight v. Higgs*, 189 N.C. 696, 659 S.E.2d 742 (2008). The closed session must be limited to the reasons expressly permitted under the law, and continuance of the closed session during discussion of other matters is a violation thereof. *See, e.g.*, *Multimedia Publ'g of N.C., Inc. v. Henderson County*, 136 N.C. App. 567, 576, 525 S.E.2d 786, 792 (2000).

132.    The CPCC Board also failed to provide proper notice for these meetings; such notice must include any requirements for entry. N.C.G.S. § 143-318.12; *Garlock v. Wake County Bd. of Educ.*, 211 N.C. App. 200, 226, 712 S.E.2d 158, 176 (2011) (instituting a ticketing requirement improperly without notice). The employment of an additional photo ID requirement to attend a public meeting, without proper notice of this requirement, is violative of the plain language of North Carolina's Open Meetings Law, which allows any member, regardless of identification, to attend a public meeting. *Id.*; N.C.G.S. § 143-318.10(a).

133.    "Every public body shall keep full and accurate minutes of all official meetings, including any closed sessions held pursuant to G.S. 143-318.11." N.C.G.S. § 143-318.10(e). Furthermore, a public body "shall keep a general account of the closed session so that a person not in attendance would have a reasonable understanding of what transpired." *Id.* "Such minutes and accounts shall be public records within the meaning of the Public Records Law, G.S. 132-1 et seq.; provided, however, that minutes or an account of a closed session conducted in compliance with G.S. 143-318.11 may be withheld from public inspection so long as public inspection would frustrate the purpose of a closed session."

---

[6] For additional context, 2003 Senate Bill 692 also amended the definition of "public records" to clarify that public records "do not include plans to prevent or respond to terrorist activity, *to the extent such records set forth vulnerability and risk assessments, potential targets, specific tactics, or specific security or emergency procedures*[.]" 2003 Senate Bill 692 (emphasis added). In short, subsection (a)(9) was designed to protect specific, imminent planning related to preventing terrorist attacks. In no way was subsection (a)(9) added to allow school boards to exclude the public from discussion of any details of financing, construction, and/or operation of a Public Safety Training Facility.

134.     The minutes of the CPCC Board meetings are not kept online or otherwise reasonably accessible; to acquire the minutes of the March 12, 2025 CPCC Board meeting, Counsel for Plaintiffs called CPCC's staff by phone (because no staff email addresses are publicly displayed on CPCC's website) to find out who to email. Counsel for Plaintiffs were told to email another individual, Mark Short, Chief of Staff for CPCC, who then refused to produce the March meeting minutes until May when they would be officially approved; once Counsel for Plaintiffs informed CPCC staff that draft meeting minutes are a matter of public record, they finally provided the draft meeting minutes after multiple weeks. CPCC does not record these meetings, either.

135.     These minutes of the March 2025 CPCC Board meeting kept by Defendants were insufficient to give someone not in attendance "a reasonable understanding of what transpired" during the closed session as required by law. N.C.G.S. § 143-318.10(e). Instead, the March meeting minutes simply state that the CPCC Board entered into a closed session pursuant to N.C.G.S. § 143-318.11(a)(9). The September 2024 and November 2024 meeting minutes of the CPCC Board had even less information—both simply state that a board member "motioned to move to a closed session" without any further statements, including whether the motion passed or why the closed session was necessary. Minutes during a closed session must state any action taken; to any extent that actions were taken during the closed sessions at the September 2024, November 2024, and/or March 2025 meetings, the resulting minutes improperly failed to mention those actions and therefore violated North Carolina's Open Meetings Laws. *Maready v. City of Winston-Salem*, 342 N.C. 708, 733, 467 S.E.2d 615, 631 (1996).

136.     To the extent that Defendants claim these minutes should be withheld from public inspection because disclosure would frustrate the purpose of the closed session, the scope of this exemption should be determined by the reviewing Court—not the public body—through an *in camera* review of the full unredacted minutes. *Times News Publ'g Co. v. Alamance-Burlington Bd. of Educ.*, 242 N.C. App. 375, 376, 774 S.E.2d 922, 924 (2015). This exemption should extend "no further than necessary." *News & Observer Pub. Co. v. Poole*, 330 N.C. 465, 480, 412 S.E.2d 7, 16 (1992). Lastly, to the extent the public body failed to keep a detailed record of the closed session in their minutes for this *in camera* review, therefore preventing the Superior Court from conducting this in camera review, this further violates the law. *Multimedia Publ'g of N.C., Inc. v. Henderson Cty.*, 145 N.C. App. 365, 369, 550 S.E.2d 846, 850 (2001).

137.     As a result of all of these actions, Defendants failed to meet their respective obligations to create a "general account of the closed session" in their meeting minutes for their September 2024, November 2024, and March 2025 meetings. *Multimedia Publ'g of N.C., Inc. v. Henderson County*, 145 N.C. App. 365, 372-73, 550 S.E.2d 846, 851 (2001); N.C.G.S. § 143-318.10(e) (the public body must keep "full and accurate minutes" of the closed session).

138.    Furthermore, N.C.G.S. § 143-318.13(c) states: "The members of a public body shall not deliberate, vote, or otherwise take action upon any matter by reference to a letter, number or other designation, or other secret device or method, with the intention of making it impossible for persons attending a meeting of the public body to understand what is being deliberated, voted, or acted upon. However, this subsection does not prohibit a public body from deliberating, voting, or otherwise taking action by reference to an agenda, if copies of the agenda, sufficiently worded to enable the public to understand what is being deliberated, voted, or acted upon, are available for public inspection at the meeting."

139.    The CPCC Board also improperly utilized and took action upon an agenda during their March 12, 2025 meeting, including, but not limited to, approving a Consent Agenda that members of the public could not reasonably be expected to understand the contents thereof. Mr. de Janon asked for a copy of the agenda and was told that they did not have one. As plainly stated in N.C.G.S. § 143-318.13(c), copies of an agenda must be available for public inspection at an open meeting when a public body takes action by reference to that agenda. N.C.G.S. § 143-318.13(c). Accordingly, the CPCC Board violated this provision of North Carolina's Open Meetings Law by failing to provide copies of an agenda that they took action upon.

140.    Pursuant to N.C.G.S. § 143-318.16A, this Court is authorized to enter a judgment declaring that the actions taken by Defendants were in violation of the Open Meetings Law.

141.    Additionally, under the same statute, this Court is empowered to declare any action taken, considered, discussed, or deliberated in violation of the Open Meetings Law to be null and void. N.C.G.S. § 143-318.16A(c). In making this determination, the Court shall weigh various factors that effectively ask whether Defendants negatively affected Plaintiffs through these violations of the Open Meetings Law. *Id.* These factors—including the CPCC Board's repeated concealment of public information and actions taken to discourage attendance at these meetings—weigh heavily in favor of nullification. *Id.* Only this nullification provision of the Open Meetings Law is limited by the 45-day statute of limitations; other relief requested herein is not similarly limited. *See N.C. Citizens for Transparent Gov't, Inc. v. Vill. of Pinehurst*, 290 N.C. App. 127, 16 (2000) (unpublished).

142.    The North Carolina Open Meetings Law further authorizes this Court to grant injunctive relief to prevent the recurrence of similar violations, including any future closed session or non-public discussion about the future of the Public Safety Training Facility. N.C.G.S. § 143-318.16. We therefore request injunctive relief, as this Court deems appropriate, to prevent further violations of the Open Meetings Law.

143.    Pursuant to N.C.G.S. § 143-318.16B, the Court is authorized to award attorney's fees and costs to Plaintiffs upon prevailing in this action. Defendants' disregard for these critical

transparency laws warrants such an award to ensure accountability and adherence to transparency statutes moving forward.

## CLAIM II
### Violation of Public Records Law

144.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

145.    "The public records and public information compiled by the agencies of North Carolina government or its subdivisions are the property of the people. Therefore, it is the policy of this State that the people may obtain copies of their public records and public information free or at minimal cost unless otherwise specifically provided by law." N.C.G.S. § 132-1(b).

146.    These public records include documents made in connection with the transaction of public business in North Carolina. N.C.G.S. § 132-1(a). Accordingly, the minutes and agendas from meetings of the CPCC Board of Trustees are public records that the public is entitled to. N.C.G.S. § 143-318.10(e); N.C.G.S. §§ 143-318.13(c) (clarifying that members of a public body may use an agenda to take action if it is available for public inspection at the meeting).

147.    Plaintiff de Janon requested an agenda at the March meeting, as the CPCC Board repeatedly referenced—and even passed a motion to approve—their March meeting agenda, but the CPCC Board of Trustees stated outright that they did not have one. It's unclear whether they were stating that they did not have copies of the agenda for the public, in violation of N.C.G.S. §§ 143-318.13(c), or falsely stating that an agenda did not exist, in violation of N.C.G.S. § 132-1(b). Accordingly, plaintiff allege both claims, as both of these interpretations are plainly violative of state law.

## CLAIM III
### Writ of Mandamus

148.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

149.    Plaintiffs seek a writ of mandamus to compel Defendants to comply with the requirements of the Open Meetings Law and Public Records Law.

150.    Defendants have a clear legal duty to conduct their meetings in compliance with these statutes, and their failure to do so constitutes a violation of this duty.

151.    Plaintiffs and the public have no adequate remedy at law to ensure compliance with this law, making mandamus relief necessary and appropriate.

## CLAIM IV
## 42 U.S.C § 1983 Claim for First Amendment Violation

152.    Plaintiffs Ezikpe and Exceus reallege and incorporate by reference all preceding paragraphs of this Complaint.

153.    Plaintiffs Ezikpe and Exceus were engaging in protected speech in a designated public forum.

154.    CPCC is a designated public forum. A designated public forum is "public property which the State has opened for use by the public as a place for expressive activity." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The Disher Building, which hosts Board of Trustees public meetings, typically requires access with a CPCC ID. The building and campus become open to the public during the Board of Trustee's public meetings.

155.    "The government may designate other property—lacking that historical association with free expression—as a public forum by opening the property for expressive activity." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022); *see also Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992).

156.    The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985).

157.    Because CPCC is a designated public forum, Defendant's restrictions on Plaintiffs' speech must satisfy strict scrutiny and be narrowly tailored to serve a compelling government interest and provide an ample alternative channel of communication. They do not meet this stringent test.

158.    Defendants' decision to ban Plaintiff Ezikpe and Plaintiff Exceus from CPCC's campus after they both attended the March 12, 2025 Board of Trustee's public meeting was not a narrowly tailored restriction that serves a compelling or substantial government interest.

159.    CPCC campus security guards never specified a reason for their ban from CPCC's campus. No information was provided to Plaintiff Ezikpe and Plaintiff Exceus about the length of the ban or any appeal process.

160.    Plaintiff Exceus is a CPCC Visiting Student enrolled in Anatomy II. This ban from campus negatively impacts her ability to travel to campus to supplement her virtual class. *See* Exhibit 35 (Eboni Visiting Student Email).

161.    "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

162.    Defendants' use of uniformed law enforcement guarding the entrance to the Disher Building, requiring meeting attendees present ID, and the reading of a criminal statute prior to the start of the public meeting, having CPCC campus security escorting meeting attendees as they exit the building, filming the license plates of meeting attendees, and calling Plaintiff Ezikpe's employer are examples of retaliation that infringe on protected speech.

163.    Defendants' actions were substantially motivated by Plaintiff Ezikpe and Plaintiff Exceus' decision to attend the CPCC Board of Trustee's public meeting.

164.    As a direct and proximate result of the Central Piedmont Community College officials and their actions, Plaintiffs were prohibited from engaging in protected activity in a designated public forum. Plaintiffs have been chilled from exercising their First Amendment rights out of fear of retaliation.

165.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violation of the First Amendment rights of Plaintiffs Mina Ezikpe and Eboni Exceus. Plaintiffs Mina Ezikpe and Eboni Exceus request compensatory damages for the campus ban and related retaliation taken against them for attending the March 12, 2025, meeting of the CPCC Board.

## MOTION FOR PRELIMINARY INJUNCTION

166.    Pursuant to Rule 65 of the North Carolina Rules of Civil Procedure and N.C.G.S. § 1-485, Plaintiffs move this Court for a Preliminary Injunction to enjoin and preliminarily restrain Defendants from continuous and future violations of the Open Meetings Law, as well as restraining Defendants from taking actions based on decisions made improperly at the March 12, 2025 meeting of the CPCC Board.

167.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

168. As set forth more fully above, and upon information and belief, Defendants' plans for the Public Safety Training Facility were secretly conceived, negotiated, and approved by Defendants in direct violation of North Carolina's Open Meetings Law.

169. As a result of the actions of Defendants as herein alleged and those actions which Defendants have threatened to undertake in the very near future, Plaintiffs have been, and will continue to be, seriously and irreparably harmed unless an injunction is issued; issuance is "necessary for the protection of [their] rights during the course of the litigation." *Setzer v. Annas*, 286 N.C. 534, 537, 212 S.E.2d 154, 156 (1975).

170. Further, Plaintiffs have demonstrated a likelihood of success on the merits of each of their claims for relief.

171. Plaintiffs have no adequate remedy at law and irreparable harm will continue without an order from this Court enjoining Defendants' unlawful acts.

**WHEREFORE**, Plaintiffs pray as follows:

1. For an entry of preliminary injunctive relief with respect to all claims, including but not limited to, nullifying March 12, 2025 meeting and enjoining any actions contingent upon decisions at the March 12, 2025 meeting and any other actions that deem irreparable harm.

2. For a judgment declaring that any and all closed sessions, meetings, or discussions conducted by Defendants, individually and/or jointly, in violation of the North Carolina Open Meetings Law are null and void, including any actions taken, considered, discussed, or deliberated in such sessions.

3. For a declaratory judgment affirming that Defendants' actions in holding closed, non-public meetings to discuss and take action regarding the Public Safety Training Facility violate the North Carolina Open Meetings Law.

4. For a judgment, under the Open Meetings Law ordering Defendants to disclose the full, unredacted minutes of any closed, non-public meeting that occurred in violation of the Open Meetings Law.

5. For a declaratory judgment that the Defendant Central Piedmont Community College Board of Trustees violated the North Carolina Open Meetings and Public Records Law by failing to hold a truly open meeting, improperly discussing the Public Safety Training Facility in closed session pursuant to N.C.G.S. § 143-318.11(a)(9), keeping improper

minutes, failing to provide agenda copies to members of the public, and failing to provide proper notice of an identification requirement to attendees.

6. For a writ of mandamus or, in the alternative, temporary, preliminary, and permanent injunctions enjoining Defendants from holding closed sessions and excluding the public for any purpose not permitted under N.C.G.S. § 143-318.11.

7. For an order declaring that Defendants violated the First Amendment of the United States Constitution when they banned Plaintiff Ezikpe and Exceus from CPCC campus.

8. For an award of compensatory damages for Plaintiffs Ezikpe and Exceus pursuant to 42 U.S.C. § 1983, as well as Plaintiffs' costs and attorneys' fees, pursuant to 42 U.S.C. § 1988.

9. For an award of attorney's fees and costs incurred in securing the requested relief, as authorized by N.C.G.S. §§ 132-9, 143-318.16B, and 42 U.S.C. § 1988.

10. For such other and further relief as the Court may deem just and proper.


This 22th day of May, 2025.

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

/s/ James Huey
James Huey
N.C. Bar No. 60933
james@scsj.org
SOUTHERN COALITION FOR SOCIAL JUSTICE
PO Box 51280
Durham, NC 27717
Telephone: (919) 323 – 3380 ext. 120

NORTH CAROLINA

MECKLENBURG COUNTY

## **VERIFICATION**

I, Mina Ezikpe, being first duly sworn, depose and says that I am a plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and know the contents thereof; that the same is true of my own knowledge, except as to those matters and things stated therein upon information and belief, as to those I believe them to be true.

This is 21 day of April, 2025

_____
Name

Sworn to subscribed before me

this 21 day of April, 2025

_____
Notary Public

My commission expires: 7.14.26

KELSI D HALL
NOTARY
MY COMMISSION EXPIRES
7.14.26
PUBLIC
MECKLENBURG COUNTY, N.C.

NORTH CAROLINA

MECKLENBURG COUNTY

## <u>VERIFICATION</u>

I, Eboni Exceus, being first duly sworn, depose and says that I am a plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and know the contents thereof; that the same is true of my own knowledge, except as to those matters and things stated therein upon information and belief, as to those I believe them to be true.

This is 22 day of April, 2025

Eboni Exceus

Name

Sworn to subscribed before me

this 22 day of April, 2025

Notary Public

My commission expires: March 20, 2027



NORTH CAROLINA

MECKLENBURG COUNTY

### **VERIFICATION**

I, Xavier Torres de Janon, being first duly sworn, depose and says that I am a plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and know the contents thereof; that the same is true of my own knowledge, except as to those matters and things stated therein upon information and belief, as to those I believe them to be true.

This is 21ˢᵗ day of April, 2025

Name _Xavier Torres de Janon_

Sworn to subscribed before me

this 21 day of April, 2025

Notary Public

My commission expires: _October 3, 2028_



NORTH CAROLINA

MECKLENBURG COUNTY

## **VERIFICATION**

    I, Julianne Liebenguth, being first duly sworn, depose and says that I am a plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and know the contents thereof; that the same is true of my own knowledge, except as to those matters and things stated therein upon information and belief, as to those I believe them to be true.

This is _22_ day of April, 2025

Name _Julianne Liebenguth_

Sworn to subscribed before me

this _22_ day of April, 2025

_Katie Crisp_

Notary Public

My commission expires: _October 3, 2028_

Katie Crisp
NOTARY
PUBLIC
Orange COUNTY, NC

NORTH CAROLINA

MECKLENBURG COUNTY

## **VERIFICATION**

I, William Stanley, being first duly sworn, depose and says that I am a plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and know the contents thereof; that the same is true of my own knowledge, except as to those matters and things stated therein upon information and belief, as to those I believe them to be true.

This is __21__ day of April, 2025

_____

Name

Sworn to subscribed before me

this __21__ day of April, 2025

Notary Public

My commission expires: __7.14.26__

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF MECKLENBURG                  SUPERIOR COURT DIVISION
                                              FILE NO. _____

MINA EZIKPE, Esq., et al.,

        Plaintiffs,

        v.

CENTRAL PIEDMONT COMMUNITY
COLLEGE, et al.,

        Defendants.

---

## <u>INDEX OF EXHIBITS TO PLAINTIFFS' COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION</u>

EXHIBIT 1      CPCC Campus Map (Plaintiffs' Complaint 000001)

EXHIBIT 2      Deed Information (Plaintiffs' Complaint 000002 – 000029)

EXHIBIT 3      Map of Hendrick Properties (Plaintiffs' Complaint 000030)

EXHIBIT 4      Hendrick Slideshow (Plaintiffs' Complaint 000031)

EXHIBIT 5      July 24, 2023 Email (Plaintiffs' Complaint 000032 – 000033)

EXHIBIT 6      May 2, 2022 Email Thread (Plaintiffs' Complaint 000034 – 000037)

EXHIBIT 7      May 23, 2022 Email (Plaintiffs' Complaint 000038)

EXHIBIT 8      September 28, 2022 Meeting (Plaintiffs' Complaint 000039 – 000040)

EXHIBIT 9      June 10, 2022 Meeting (Plaintiffs' Complaint 000041)

EXHIBIT 10     December 14, 2022 Email Thread (Plaintiffs' Complaint 000042 – 000044)

EXHIBIT 11    December 19, 2022 Email (Plaintiffs' Complaint 000045 –
              000046)

EXHIBIT 12    January 23, 2023 Matthews BOC Minutes (Plaintiffs' Complaint
              000047 – 000057)

EXHIBIT 13    May 11, 2023 Email (Plaintiffs' Complaint 000058 – 000059)

EXHIBIT 14    March 3, 2023 Email (Plaintiffs' Complaint 000060 – 000063)

EXHIBIT 15    February 3, 2023 Email (Plaintiffs' Complaint 000064 – 000066)

EXHIBIT 16    February 13, 2023 Matthews BOC Minutes (Plaintiffs' Complaint
              000067 – 000097)

EXHIBIT 17    April 10, 2023 Email (Plaintiffs' Complaint 000098)

EXHIBIT 18    May 8, 2023 Matthews BOC Minutes (Plaintiffs' Complaint
              000099 – 000124)

EXHIBIT 19    Gift Agreement (Plaintiffs' Complaint 000125 – 000137)

EXHIBIT 20    May 5, 2024 Email (Plaintiffs' Complaint 000138 – 000141)

EXHIBIT 21    September 25, 2024 Email Thread (Plaintiffs' Complaint 000142 –
              000146)

EXHIBIT 22    Funding Source Screenshot (Plaintiffs' Complaint 000147)

EXHIBIT 23    October 28, 2024 Matthews BOC Minutes (Plaintiffs' Complaint
              000148 – 000158)

EXHIBIT 24    January 13, 2025 Matthews BOC Minutes (Plaintiffs' Complaint
              000159 – 000174)

EXHIBIT 25    April 9, 2025 Email Thread (Plaintiffs' Complaint 000175 –
              000179)

EXHIBIT 26    CPCC Board Meeting Map (Plaintiffs' Complaint 000180)

2

EXHIBIT 27 November 13, 2024 CPCC Board Meeting Entrance Video (Plaintiffs' Complaint 000181)

EXHIBIT 28 November 13, 2024 CPCC Board Photo (Plaintiffs' Complaint 000182)

EXHIBIT 29 March 12, 2025 CPCC Closed Session Video (Plaintiffs' Complaint 000183)

EXHIBIT 30 March 12, 2025 CPCC Audio Recording Part 1 (Plaintiffs' Complaint 000184)

EXHIBIT 31 March 12, 2025 CPCC Audio Recording Part 2 (Plaintiffs' Complaint 000185)

EXHIBIT 32 Campus Ban Video (Plaintiffs' Complaint 000186)

EXHIBIT 33 Three Officers (Plaintiffs' Complaint 000187)

EXHIBIT 34 April 16, 2025 Email (Plaintiffs' Complaint 000188 – 000189)

EXHIBIT 35 Eboni Visiting Student Email (Plaintiffs' Complaint 000190)

# EXHIBIT 1



# EXHIBIT 2

## Identity

| Parcel ID | GIS ID |
|-----------|--------|
| 21506115 | 21506115 |

## Postal Address on property (Only 1 shown)

| 1800 CPCC LN MATTHEWS NC 28105 |
|---|

## Property Characteristics

| Legal Desc | NA |
|------------|-----|
| Land Area | 14.000 AC |
| Fire District | Matthews |
| Special District | Fire Service E |
| Account Type | Exempt |
| Municipality | Matthews |
| Land Use | Commercial |

## Land Analysis - Jurisdiction

| Matthews | 13.395 GIS AC (100.00%) |
|----------|------------------------|

## Land Analysis - Zoning

| R-20 | 0.000 GIS AC (0.00%) |
|------|---------------------|
| R/I | 13.395 GIS AC (100.00%) |

## Land Analysis - Other

| Layer | IN | OUT |
|-------|-----|------|
| Utility ROW | 0.000 GIS AC (0.00%) | 13.395 GIS AC (100.00%) |
| Railroad ROW | 0.000 GIS AC (0.00%) | 13.395 GIS AC (100.00%) |
| FEMA Floodplain | 0.000 GIS AC (0.00%) | 13.395 GIS AC (100.00%) |
| Post Const Buffers | 0.000 GIS AC (0.00%) | 13.395 GIS AC (100.00%) |
| SWIM Buffers | 0.000 GIS AC (0.00%) | 13.395 GIS AC (100.00%) |

## Site Location

| ETJ Area | Matthews |
|----------|----------|
| Historic District | No |
| Census Tract # | 58.35 |
| Inside BIP Opportunity Area | No |

## Ownership

| Owner Name | Mailing Address |
|------------|-----------------|
| TRUSTEES OF CENTRAL PIEDMONT COMMUNITY COLLEGE | PO BOX 35009 CHARLOTTE NC 28235 |

## Deed Reference(s) and Sale Price

| Deed | Sale Date | Sale Price |
|------|-----------|------------|
| 28713-1 | 09/20/2013 | $0.00 |
| 05732-799 | 04/06/1988 | $0.00 |

## Situs Addresses tied to Parcel

| CPCC LN MATTHEWS NC |
|---|

## Environmental Information (View map to verify)

| FEMA Panel | 3710449900K (02/20/2014) |
|------------|--------------------------|
| FEMA Flood Zone | OUT |
| Comm Flood Zone | OUT |
| Water Quality Buffer | OUT |
| Post Construction District | Catawba |
| Stream Watershed District | FOUR MILE |


South View on 02/03/2025

*This map or report is prepared for the inventory of real property within Mecklenburg County and is compiled from recorded deeds, plats, tax maps, surveys, planimetric maps, and other public records and data. Users of this map or report are hereby notified that the aforementioned public primary information sources should be consulted for verification. Mecklenburg County and its mapping contractors assume no legal responsibility for the information contained herein.*

FOR REGISTRATION
J. David Granberry
REGISTER OF DEEDS
Mecklenburg County, NC
2013 SEP 20 01:06:31 PM
BK:28713 PG:1-4
FEE:$26.00
INSTRUMENT # 2013150368

MILLSES



2013150368

| Excise Tax $-0- EXEMPT | | Recording Time, Book and Page |
|---|---|---|

Parcel Identifier No. Portion of 215-061-06
Verified by _____ County on the ___ day of _____, 2013; By: _____

Mail after recording to Johnston, Allison & Hord, P.A. (R/D Box 50)
This instrument was prepared by: Johnston, Allison & Hord, P.A. (JWA)

| Brief Description for the index | 14 Acres – CPCC Lane, Matthews, NC |
|---|---|

### NORTH CAROLINA SPECIAL WARRANTY DEED

THIS DEED made this 22nd day of August, 2013, by and between

| GRANTOR | GRANTEE |
|---|---|
| MECKLENBURG COUNTY<br>A political subdivision of the State of North Carolina<br><br>Mailing Address:<br>720 East Fourth Street<br>Charlotte, NC 28202 | THE TRUSTEES OF CENTRAL PIEDMONT<br>COMMUNITY COLLEGE<br><br>Mailing Address:<br>P.O. Box 35009<br>Charlotte, NC 28235 |

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g., corporation or partnership.

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple all that certain lot or parcel of land situated in the Town of Matthews, Mecklenburg County, North Carolina and more particularly described as follows (the "Property"):

### SEE ATTACHED EXHIBIT A FOR LEGAL DESCRIPTION

The Property herein conveyed does not include the primary residence of a Grantor.

609053 v.3

The property hereinabove described was acquired by Grantor by instrument recorded in Book 5732 at Page 799.

Grantor reserves the right to obtain water, sewer and electrical power through the Property for its development and use of the adjoining property owned by Grantor (the remainder of tax parcel 215-061-06), and Grantee, by its acceptance and recordation of this Deed, agrees to execute such easement agreements as might be necessary to allow Grantor to obtain such services through the Property at a location or locations mutually acceptable to Grantor and Grantee.

By its acceptance and recordation of this Deed, Grantee represents to Grantor that Grantee will support any request that Grantor might make in the future to use the adjoining property owned by Grantor (the remainder of tax parcel 215-061-06) as the site for a full service recycling center/yard waste convenience site, including supporting any requests made by Grantor to the Town of Matthews and to the State of North Carolina for any necessary rezoning or permits necessary to allow such use on the adjoining property owned by Grantor.

TO HAVE AND TO HOLD the aforesaid Property and all privileges and appurtenances thereto belonging to the Grantee in fee simple subject to the retained rights of Grantor as provided herein.

And the Grantor covenants with the Grantee, that Grantor has done nothing to impair such title as Grantor received, and Grantor will warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor.

IN WITNESS WHEREOF, the Grantor has duly executed the foregoing as of the day and year first above written.

MECKLENBURG COUNTY
a political subdivision of the State of North Carolina

(COUNTY SEAL)

By: _____
Name: Bobbie Shields
Title: Interim County Manager

APPROVED AS TO FORM

Attest: _____
Name: Janice S. Paige
Title: Clerk to the Board of County Commissioners

_____
County Attorney

State of North Carolina -- County of Mecklenburg
I, the undersigned, a Notary Public of the County and State aforesaid, certify that Janice S. Paige personally appeared before me this day and acknowledged that she is the Clerk to the Board of County Commissioners of Mecklenburg County, a political subdivision of the State of North Carolina, and that by authority duly given and as the act of Mecklenburg County, the foregoing instrument was signed in its name by Bobbie Shields as Interim County Manager, sealed with its seal and attested by her as Clerk to the Board of County Commissioners.

Witness my hand and official seal, this the 22nd day of August, 2013.

_____
Notary Public

Mary Jean Davidson
Printed Name of Notary
My Commission Expires: 5/30/2016

609053 v.3

THENCE, WITH A NEW PROPERTY LINE WHICH IS OFFSET 622.76 FEET NORTHEAST OF AND PARALLEL TO THE SOUTHWESTERLY PROPERTY LINE OF THE PREVIOUSLY CITED MECKLENBURG COUNTY 36.647 ACRE PARENT TRACT , N 45°07'018" W, 1,317.90 FEET TO A SET #4 REBAR IN THE SOUTHERLY RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. I-485, THE NEW, MOST WESTERLY CORNER OF THE TRACT HEREIN DESCRIBED;

THENCE, WITH SAID SOUTHERLY RIGHT OF WAY, N 66°06'38" E, 75.19 FEET TO A FOUND #5 REBAR WITH NCDOT ALUMINUM RIGHT OF WAY DISK WITNESSED BY A CARSONITE MARKER;

THENCE, CONTINUING WITH SAID RIGHT OF WAY, N 66°39'24" E, 343.08 FEET TO **THE POINT OF BEGINNING** AND CONTAINING 14.00 ACRES OR 609,873 SQUARE FEET OF LAND, MORE OR LESS, AS SHOWN ON THAT "BOUNDARY SURVEY OF 1800 CPCC LANE" PREPARED BY THE SURVEY COMPANY INC., SIGNED AND SEALED BY MICHAEL C. SAWHILL, NCPLS L-3223, WITH AN ISSUE DATE OF MARCH 28, 2013, LAST REVISED ON JUNE 6, 2013 (TSC File Number "CPC37_1.DWG), TO WHICH REFERENCE IS HEREBY MADE.

609053 v.3

## Identity

| Parcel ID | GIS ID |
|---|---|
| 21524108 | 21524108 |

## Postal Address on property

| 2625 CAMPUS RIDGE RD MATTHEWS NC 28105 |
|---|

## Property Characteristics

| Legal Desc | L1 M73-216 |
|---|---|
| Land Area | 23.157 AC |
| Fire District | Matthews |
| Special District | Fire Service E |
| Account Type | Exempt |
| Municipality | Matthews |
| Land Use | Office |

## Land Analysis - Jurisdiction

| Matthews | 23.100 GIS AC (100.00%) |
|---|---|

## Land Analysis - Zoning

| I-2(CD) | 23.100 GIS AC (100.00%) |
|---|---|

## Land Analysis - Other

| Layer | IN | OUT |
|---|---|---|
| Utility ROW | 0.000 GIS AC (0.00%) | 23.100 GIS AC (100.00%) |
| Railroad ROW | 0.000 GIS AC (0.00%) | 23.100 GIS AC (100.00%) |
| FEMA Floodplain | 0.000 GIS AC (0.00%) | 23.100 GIS AC (100.00%) |
| Post Const Buffers | 0.044 GIS AC (0.19%) | 23.056 GIS AC (99.81%) |
| SWIM Buffers | 0.000 GIS AC (0.00%) | 23.100 GIS AC (100.00%) |

## Site Location

| ETJ Area | Matthews |
|---|---|
| Historic District | No |
| Census Tract # | 58.35 |
| Inside BIP Opportunity Area | No |

## Ownership

| Owner Name | Mailing Address |
|---|---|
| TRUSTEES OF CENTRAL PIEDMONT COMMUNITY COLLEGE | PO BOX 35009 CHARLOTTE NC 28235 |

## Deed Reference(s) and Sale Price

| Deed | Sale Date | Sale Price |
|---|---|---|
| 38552-534 | 12/22/2023 | N/A |
| 38552-505 | 12/22/2023 | N/A |
| 38552-498 | 12/22/2023 | N/A |

## Situs Addresses tied to Parcel

| CAMPUS RIDGE RD UNINC NC |
|---|

## Environmental Information (View map to verify)

| FEMA Panel | 3710449900K (02/20/2014) |
|---|---|
| FEMA Flood Zone | OUT |
| Comm Flood Zone | OUT |
| Water Quality Buffer | IN |
| Post Construction District | Catawba |
| Stream Watershed District | FOUR MILE |



East View on 02/03/2025

*This map or report is prepared for the inventory of real property within Mecklenburg County and is compiled from recorded deeds, plats, tax maps, surveys, planimetric maps, and other public records and data. Users of this map or report are hereby notified that the aforementioned public primary information sources should be consulted for verification. Mecklenburg County and its mapping contractors assume no legal responsibility for the information contained herein.*

JUDITH A GIBSON REG OF DEEDS MECK NC
FILED FOR REGISTRATION 01/31/96 12:21
BK: 08445 PG: 0019/0022 #:0359 14.00
**** NC EXCISE TAX: 3778.00 ***

**MECKLENBURG COUNTY**

3778.00




STATE OF
NORTH
CAROLINA

JAN 31.96
Real Estate
Excise Tax

| Excise Tax | | Recording Time, Book and Page |
|---|---|---|

Tax Lot No. 215-071-22 .......... Parcel Identifier No. ...... ... ..... .... ....
Verified by ..... .. ..... .... ...... .. .. ...... County on the .. .. day of ....... .. ......, 19 .........
by .. ......... ... .. ........ ... ........ .. .. ...... .... ...... ... ... ....................... ... ................. ...........

Mail after recording to Moore & Van Allen, PLLC (MCG), Box 39 .......... ... ...... ... .. ... .....

This instrument was prepared by Moore & Van Allen, PLLC (MCG) ...... ...... ... ... ... .. ....

Brief description for the Index

# NORTH CAROLINA GENERAL WARRANTY DEED

THIS DEED made this 31st day of January ., 19 96 , by and between

| GRANTOR | GRANTEE |
|---|---|
| Margaret E. Phillips and Mary Louise Phillips P.O. Box 265 Matthews, NC 28106 | HEP Investment Company, LLC, a North Carolina limited liability company 230 South Tryon Street, Suite 1400 Charlotte, NC 28202 |

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g. corporation or partnership.

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot or parcel of land situated in the ~~City~~ Town of Matthews ... ... ... , Morningstar Township, Mecklenburg County, North Carolina and more particularly described as follows:

See Exhibit A attached hereto and incorporated herein.

A. C. Bar Assoc. Form No. 3 © 1976, Revised © 1977 — James Williams & Co., Inc., Box 127, Yadkinville, N. C. 27055
Printed by Agreement with the N. C. Bar Assoc. 1981

3778

Plaintiffs' Complaint 000007

The property hereinabove described was acquired by Grantor by instrument recorded in ......Will Book 29 at...............

Page 263 of the Mecklenburg County Registry ..................................................................................................

A map showing the above described property is recorded in Plat Book ...... ... ....... ....... page ..... ...............

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against the lawful claims of all persons whomsoever except for the exceptions hereinafter stated. Title to the property hereinabove described is subject to the following exceptions:

1. Ad valorem real property taxes for the year 1996 not yet due and payable.

2. Easements, conditions, and restrictions of record affecting title to the above-described property.

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal, or if corporate, has caused this instrument to be signed in its corporate name by its duly authorized officers and its seal to be hereunto affixed by authority of its Board of Directors, the day and year first above written.

| (Corporate Name) | | *Margaret E. Phillips* ...............(SEAL) |
| | | Margaret E. Phillips |
| By: ................................................ | | *Mary Louise Phillips* ...............(SEAL) |
| ................................President | | Mary Louise Phillips |
| ATTEST: | | ................................................(SEAL) |
| ................................................ | | |
| ................................Secretary (Corporate Seal) | | ................................................(SEAL) |

USE BLACK INK ONLY

NORTH CAROLINA, ......Mecklenburg............County.

I, a Notary Public of the County and State aforesaid, certify that ......Margaret E. Phillips...... and Mary Louise Phillips ................................................................ Grantor,

personally appeared before me this day and acknowledged the execution of the foregoing instrument. Witness my hand and official stamp or seal, this 31ˢᵗ day of ......January......, 19 26.

My commission expires: 12-5-99 ......Joyce J. Schmidt...... Notary Public

SEAL-STAMP

NORTH CAROLINA, ................................County.

I, a Notary Public of the County and State aforesaid, certify that ................................................................

personally came before me this day and acknowledged that .... he is ................................ Secretary of

................................................................ a North Carolina corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its ................................

President, sealed with its corporate seal and attested by ................ as its ................................ Secretary.

Witness my hand and official stamp or seal, this ........day of ................................, 19........

My commission expires: ................................ ................................ Notary Public

The foregoing Certificate(s) of ................................................................

................................................................

................................................................

is/are certified to be correct. This instrument and this certificate are duly registered at the date and time and in the Book and Page shown on the first page hereof.

................................................REGISTER OF DEEDS FOR................................COUNTY

By ................................................................Deputy/Assistant - Register of Deeds

N. C. Bar Assoc. Form No. 3 © 1976, Revised © 1977 – James Williams & Co., Inc., Box 127, Yadkinville, N. C. 27055.
Printed by Agreement with the N. C. Bar Assoc. 1981

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 44 of 259
Plaintiffs' Complaint 0000008

## EXHIBIT A

Lying and being in Mecklenburg County, North Carolina, and being more particularly described as follows:

Beginning at the intersection of the centerline of the 60-foot right-of-way of Ridge Road (S.R. 3457) and the centerline of the 60-foot right-of-way of Indian Trail-Matthews Road (S.R. 3453) and running thence with the centerline of the 60-foot right-of-way of Ridge Road the following three (3) courses and distances: (1) N 16 49 49 E 737.27 feet to a point; (2) with the arc of a circular curve to the right having a radius of 1987.95 feet an arc length of 375.85 feet (chord bearing N 22 14 48 E and chord distance of 375.29 feet) to a point; (3) N 27 39 47 E 538.83 feet to a point; thence leaving the centerline of the 60-foot right-of-way of Ridge Road (S.R. 3457), S 42 44 40 E 31.84 to an iron set located in the easterly margin of the 60-foot right-of-way of Ridge Road (S.R. 3457), said point also being the southwest corner of the property owned now or formerly by Sarah Robinson described in Deed Book 2285 at Page 209, Mecklenburg County Registry; thence leaving the easterly margin of the 60-foot right-of-way of Ridge Road (S.R. 3457) and with the southerly margin of the property owned by Sarah Robinson S 42 44 40 E 244.80 feet to a bent old iron; thence S 64 15 30 E 438.99 feet to an old iron located in the southeast corner of the property of Sarah Robinson; thence with the easterly property line of Robinson N 09 15 00 W 773.45 feet to an iron set located in the southerly margin of I-485 (under construction); thence with the right-of-way of I-485 the following three (3) courses and distances: (1) with the arc of a circular curve to the right having a radius of 2436.16 feet an arc length of 1628.82 feet (chord bearing S 59 41 17 E and a chord distance of 1598.66 feet) to a highway right-of-way disk; (2) S 56 17 08 E 145.71 feet to an iron set; (3) S 23 13 33 E 150.33 feet to a new PK nail located in the northerly margin of the property owned now or formerly by D. M. Rawlins described in Deed Book 5502, Page 398 Mecklenburg Public Registry; thence with the property line of D. M. Rawlins S 66 46 27 W 35.00 feet to a iron set located in the westerly margin of a strip of asphalt pavement; thence running with the westerly margin of the asphalt pavement which is adjacent to the properties of D. M. Rawlins, P.M. Hinson (now or formerly) described in Deed Book 4750, Page 242 Mecklenburg Registry and Alma Deason (now or formerly) described in Deed Book 5502, Page 398 Mecklenburg Registry S 23 13 33 E 664.40 feet to an iron set located in the northerly margin of the 60-foot right-of-way of Indian Trail-Matthews Road (S.R. 3453); thence with the northerly margin of the 60-foot right-of-way of Indian Trail-Matthews Road (S.R. 3453) the following three (3) courses and distances: (1) with the arc of a circular curve to the right having a radius of 1105.92 feet an arc distance of 434.28 feet (chord bearing S 73 37 03 W and a chord distance of 431.50 feet) to a highway right-of-way disk; (2) S 84 52 02 W 726.17 feet to a highway right-of-way disk; (3) S 81 03 15 W 150.34 feet to a highway right-of-way disk; thence S 05 07 58 E 30.00 feet to the centerline of said Indian Trail-Matthews Road

CHAR_1\F:\DOCS\JLS\REALESTA\172063_1

(S.R. 3453); thence with the centerline of of the 60-foot right-of-way of Indian Trail Road (S.R. 3453) the following four (4) courses and distances: (1) S 84 52 02 W 219.84 feet to a point; (2) with the arc of a circular curve to the right having a radius of 9734.02 feet, an arc distance of 366.92 feet (chord bearing S 85 56 49 W and a chord distance of 366.89 feet) to a point; (3) S 87 01 37 W 791.60 feet to a point; and (4) with the arc of a circular curve to the right having a radius of 255.62 feet an arc distance of 217.54 feet (chord bearing N 68 35 37 W and a chord distance of 211.03 feet) to the Point and Place of Beginning. Containing 80.780 acres, total area and 78.571 acres, net of right-of-way, as shown on survey by Carolina Surveyors Inc., dated November 21, 1995, last revised January 25, 1996, ACAD; 1995041.

State of North Carolina, County of Mecklenburg

The foregoing certificate(s) of _____ *Joyce L. Schmidt*

Notary(ies) Public is/are certified to be correct. This **31st** day of **January** 19 **96**.

JUDITH A. GIBSON, REGISTER OF DEEDS    By: *Valerie O. White* _____ Deputy Register of Deeds

Case 3:25-cv-00318-MOC-WCM   Document 1-2   Filed 05/23/25   Page 46 of 259



FOR REGISTRATION
Fredrick Smith
REGISTER OF DEEDS
Mecklenburg County, NC
2023 DEC 22 12:26:01 PM
BK:36552 PG:505-511
FEE:$26.00
INSTRUMENT # 2023119932

TAYLORD



2023119932

## NORTH CAROLINA NON-WARRANTY GIFT DEED

| | |
|---|---|
| Excise Tax: | $0.00* |
| Parcel ID: | 21524105, p/o 21524107 and p/o 21524104 |
| Mail/Box to: | Grantee |
| Prepared by: | Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202-4003 (Miriam A. Dixon, Esq.) **No title search performed, no title opinion given or implied nor closing conducted by preparer.** |
| Brief description for the Index: | 23.16 acres – Campus Ridge Road |

THIS NON-WARRANTY GIFT DEED ("Deed") is made on the 22nd day of December, 2023, by and between:

| GRANTOR | GRANTEE |
|---|---|
| **HEP INVESTMENT COMPANY, LLC,** a North Carolina limited liability company and **HENDRICK AUTOMOTIVE GROUP, LLC,** a North Carolina limited liability company (formerly Hendrick Automotive Group, a North Carolina general partnership, which was formerly Hendrick Automotive Group, a New York general partnership)<br><br>6000 Monroe Road, Suite 100 Charlotte, NC 28210 | **CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.,** a North Carolina non-profit corporation<br><br>Address:  P.O. Box 35009 Charlotte, NC 28235 |

*Enter in the appropriate block for each Grantor and Grantee their name, mailing address, and, if appropriate, state of organization and character of entity, e.g. North Carolina or other corporation, LLC, or partnership. Grantor and Grantee includes the above parties and their respective heirs, successors, and assigns, whether singular, plural, masculine, feminine or neuter, as required by context.*

---

\* Under N.C.G.S. Section 105-228.29(5), no excise tax is due with a transfer of real property by gift.

13433748v2

FOR NO CONSIDERATION paid by Grantee and as a gift from Grantor to Grantee, Grantor by this Deed does hereby grant, bargain and convey to Grantee, in fee simple, all that certain lot, parcel of land in Mecklenburg County, North Carolina and more particularly described as follows (the "Property"):

See Exhibit A attached hereto and incorporated herein by reference.

"AS IS, WHERE IS" CONVEYANCE: GRANTEE AGREES THAT GRANTEE HAS ACQUIRED AND ACCEPTED THE PROPERTY IN ITS CURRENT, "AS IS," "WHERE IS" CONDITION AND "WITH ALL FAULTS" WITHOUT REPRESENTATION OR WARRANTY BY GRANTOR, EXPRESS OR IMPLIED, WHATSOEVER AS TO (1) THE VALUE, CONDITION, NATURE, CHARACTER, SUITABILITY, MERCHANTABILITY, HABITABILITY, MARKETABILITY, PROFITABILITY OR FITNESS OF THE PROPERTY; (2) THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR OTHER ENVIRONMENTAL CONDITION, PROVIDED THAT IF GRANTEE SHALL DISCOVER A PRE-EXISTING ENVIRONMENTAL CONDITION OR THE PRESENCE OF HAZARDOUS MATERIALS, GRANTEE SHALL HAVE NO LIABILITY FOR THE REMEDIATION THEREOF IF GRANTEE: (A) IMMEDIATELY STOPS ALL WORK WITH RESPECT TO THE INSTALLATION IN THE AREA WHERE SUCH CONDITION OR HAZARDOUS MATERIALS IS PRESENT AND PROVIDES GRANTOR NOTICE IN WRITING ABOUT SUCH DISCOVERY AND (B) DOES NOT NEGLIGENTLY CONTRIBUTE TO ANY FURTHER CONTAMINATION OR RELEASE OF THE HAZARDOUS MATERIALS; (3) THE COMPLIANCE OF THE PROPERTY WITH OR VIOLATION OF ANY LAW, STATUTE, ORDINANCE, RULE OR REGULATION; OR (4) ANY OTHER MATTER AFFECTING OR RELATING TO THE PROPERTY. GRANTOR AND GRANTEE EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PROPERTY IS SUITABLE FOR GRANTEE'S INTENDED PURPOSE. THIS PROVISION SHALL SURVIVE THE RECORDATION OF THIS DEED.

See instruments recorded in Book 17914, Page 377, Book 9555, Page 243 and Book 8445, Page 19, for chain of title.

All or a portion of the Property ☐ includes or ☒ does not include the primary residence of a Grantor.

TO HAVE AND TO HOLD the Property and all privileges and appurtenances thereto belonging to Grantee in fee simple. **Grantor makes no warranty of title to the Property.**

[remainder of page intentionally blank]

13433748v2

IN WITNESS WHEREOF, Grantor has duly executed this North Carolina Non-Warranty Gift Deed, if an entity by its duly authorized representative.

GRANTOR:

**HEP INVESTMENT COMPANY, LLC,**
a North Carolina limited liability company

By: _____
Name: A. Scott Ennis
Title: Senior Vice President

STATE OF NORTH CAROLINA

COUNTY OF Mecklenburg

I certify that the following person personally appeared before me this day and acknowledged to me that he or she signed the foregoing document: A. Scott Ennis.

Date: December 21 , 2023     _____

            DEANNA MILITO , Notary Public

            (Print or Type Name)

[NOTARIAL STAMP OR SEAL]     My Commission Expires: 3/22/24

DEANNA MILITO
Notary Public, North Carolina
Union County
My Commission Expires
3-22-24

[signatures continue on following page]

CHAR\2860144

*13433748v2*

**GRANTOR:**

**HENDRICK AUTOMOTIVE GROUP, LLC,**
a North Carolina limited liability company

By: _____

Name: A. Scott Ennis
Title: Senior Vice President

STATE OF NORTH CAROLINA

COUNTY OF Mecklenburg

I certify that the following person personally appeared before me this day and acknowledged to me that he or she signed the foregoing document: A. Scott Ennis.

Date: December 21 , 2023

_____

DEANNA MILITO , Notary Public

(Print or Type Name)

[NOTARIAL STAMP OR SEAL]

My Commission Expires: 3/22/24

DEANNA MILITO
Notary Public, North Carolina
Union County
My Commission Expires
3-22-24

[end of signatures]

CHAR\2860144

*13433748v2*

## Exhibit A

SITUATED IN THE STATE OF NORTH CAROLINA, COUNTY OF MECKLENBURG, TOWN OF MATTHEWS AND BEING ALL OF TRACT I AS CONVEYED TO HEP INVESTMENT COMPANY, LLC AND A PORTION OF TRACT II AS CONVEYED TO HEP INVESTMENT COMPANY, LLC BY DEED OF RECORD IN DEED BOOK 9555, PAGE 243 AND A PORTION OF THAT 78.571 ACRE TRACT AS CONVEYED TO HEP INVESTMENT COMPANY, LLC BY DEED OF RECORD IN DEED BOOK 8455, PAGE 19 (ALL REFERENCES REFER TO THE RECORDS OF THE REGISTER OF DEEDS OFFICE, MECKLENBURG COUNTY, NORTH CAROLINA) AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A RIGHT-OF-WAY MONUMENT FOUND MARKING THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY LINE OF CAMPUS RIDGE ROAD AS DEFINED IN MAP BOOK 9, PAGE 135 AND THE SOUTHERLY CONTROLLED ACCESS RIGHT-OF-WAY OF I-485 AS DEFINED ON THE RIGHT-OF-WAY PLAN NUMBER 8.U670121;

THENCE WITH SAID SOUTHERLY CONTROLLED ACCESS RIGHT-OF-WAY LINE, WITH THE ARC OF A CURVE TO THE RIGHT (PASSING A #4 REBAR FOUND AT A DISTANCE OF 256.61 FEET) HAVING A DELTA OF 37° 06' 34", A RADIUS OF 2,436.48 FEET, AN ARC LENGTH OF 1,578.06 FEET, HAVING A CHORD BEARING AND DISTANCE OF SOUTH 68° 16' 59" EAST, 1,550.62 FEET TO A #4 REBAR SET (CAPPED, INSCRIBED "ACRO", TYPICAL);

THENCE ACROSS SAID HEP INVESTMENT COMPANY, LLC TRACTS, THE FOLLOWING COURSES AND DISTANCES:

SOUTH 29° 57' 59" WEST, A DISTANCE OF 337.23 FEET TO A #4 REBAR SET;

NORTH 80° 02' 01" WEST, A DISTANCE OF 890.87 FEET TO A #4 REBAR SET;

SOUTH 19° 57' 59" WEST, A DISTANCE OF 172.87 FEET TO A #4 REBAR SET;

SOUTH 89° 57' 59" WEST, A DISTANCE OF 402.86 FEET TO A #4 REBAR SET; AND

NORTH 70° 02' 01" WEST, PASSING A #4 REBAR SET AT A DISTANCE OF 283.15 FEET, A TOTAL DISTANCE OF 313.30 FEET TO A MAGNETIC NAIL WITH A WASHER STAMPED "ACRO" IN THE EASTERLY LINE OF THAT 47.311 ACRE TRACT AS CONVEYED TO THE TRUSTEES OF CENTRAL PIEDMONT COMMUNITY COLLEGE BY DEED OF RECORD IN DEED BOOK 8460, PAGE 260, BEING THE CENTERLINE OF SAID CAMPUS RIDGE RD.;

THENCE NORTH 25° 41' 05" EAST, WITH SAID EASTERLY LINE AND SAID CENTER LINE, A DISTANCE OF 393.74 FEET TO A MAGENETIC NAIL FOUND MARKING THE SOUTHERLY TERMINUS OF SAID CAMPUS RIDGE ROAD AS DEFINED ON SAID MAP BOOK 9, PAGE 135;

THENCE SOUTH 44° 42' 24" EAST, WITH THE SOUTHERLY TERMINUS THEREOF, A DISTANCE OF 31.85 FEET TO A #4 REBAR FOUND MARKING THE EASTERLY RIGHT-OF-WAY LINE OF SAID CAMPUS RIDGE ROAD;

*13433748v2*

THENCE NORTH 25° 41' 05" EAST, WITH SAID EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 202.00 FEET TO A #4 REBAR FOUND MARKING A POINT OF CURVATURE TO THE LEFT;

THENCE CONTINUING WITH SAID EASTERLY RIGHT-OF-WAY LINE, WITH THE ARC OF SAID CURVE, HAVING A DELTA OF 15° 51' 55", A RADIUS OF 963.26 FEET, AN ARC LENGTH OF 266.73 FEET, HAVING A CHORD BEARING AND DISTANCE OF NORTH 17° 45' 07" EAST, 265.88 FEET TO THE POINT OF BEGINNING, CONTAINING 23.423 ACRES OF LAND, MORE OR LESS, OF WHICH 0.266 ACRES IS CURRENT OCCUPIED RIGHT-OF-WAY, LEAVING A NET OF 23.157 ACRES.

THE ABOVE -DESCRIBED PROPERTY BEING ALSO DESCRIBED AS LOT 1 ON THAT CERTAIN PLAT ENTITLED "PLAT FOR CPCC PUBLIC SAFETY TRAINING FACILITY" RECORDED CONTEMPORANEOUSLY HEREWITH.

13433748v2

# PAGE(S) ASSIGNED IN ERROR

(NO DOCUMENT ASSOCIATED WITH THESE PAGE NUMBERS)

INSTRUMENT#: __2023119932_____

BOOK: _____ 38552_____

PAGE: _____511_____

DEPUTY_ *April Jones* _____

FOR REGISTRATION
Fredrick Smith
REGISTER OF DEEDS
Mecklenburg County, NC
2023 DEC 22 12:26:41 PM
BK:38552 PG:498-504
FEE:$26.00
INSTRUMENT # 2023119931

TAYLORD



2023119931

## NORTH CAROLINA SPECIAL WARRANTY GIFT DEED

| | |
|---|---|
| Excise Tax: | $0.00* |
| Parcel ID: | 21524105 and p/o 21524107 |
| Mail/Box to: | Grantee |
| Prepared by: | Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202-4003 (Miriam A. Dixon, Esq.) **No title search performed, no title opinion given or implied nor closing conducted by preparer.** |
| Brief description for the Index: | 6.070 acres – Campus Ridge Road |

THIS SPECIAL WARRANTY GIFT DEED ("Deed") is made on the 22nd day of December, 2023, by and between:

| GRANTOR | GRANTEE |
|---|---|
| HENDRICK AUTOMOTIVE GROUP, LLC, a North Carolina limited liability company (formerly Hendrick Automotive Group, a North Carolina general partnership, which was formerly Hendrick Automotive Group, a New York general partnership)<br><br>AS TO A 76% UNDIVIDED INTEREST<br><br>6000 Monroe Road, Suite 100<br>Charlotte, NC 28210 | CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC., a North Carolina non-profit corporation<br><br>Address: P.O. Box 35009<br>Charlotte, NC 28235 |

*Enter in the appropriate block for each Grantor and Grantee their name, mailing address, and, if appropriate, state of organization and character of entity, e.g. North Carolina or other corporation, LLC, or partnership. Grantor and Grantee includes the above parties and their respective heirs, successors, and assigns, whether singular, plural, masculine, feminine or neuter, as required by context.*

---

* Under N.C.G.S. Section 105-228.29(5), no excise tax is due with a transfer of real property by gift.

13432687v3

FOR NO CONSIDERATION paid by Grantee and as a gift from Grantor to Grantee, Grantor by this Deed does hereby grant, bargain and convey to Grantee, in fee simple, a **76% UNDIVIDED INTEREST** in all that certain lot, parcel of land in Mecklenburg County, North Carolina and more particularly described as follows (the "Property"):

See Exhibit A attached hereto and incorporated herein by reference.

"AS IS, WHERE IS" CONVEYANCE: GRANTEE AGREES THAT GRANTEE HAS ACQUIRED AND ACCEPTED THE PROPERTY IN ITS CURRENT, "AS IS," "WHERE IS" CONDITION AND "WITH ALL FAULTS" WITHOUT REPRESENTATION OR WARRANTY BY GRANTOR, EXPRESS OR IMPLIED, WHATSOEVER AS TO (1) THE VALUE, CONDITION, NATURE, CHARACTER, SUITABILITY, MERCHANTABILITY, HABITABILITY, MARKETABILITY, PROFITABILITY OR FITNESS OF THE PROPERTY; (2) THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR OTHER ENVIRONMENTAL CONDITION, PROVIDED THAT IF GRANTEE SHALL DISCOVER A PRE-EXISTING ENVIRONMENTAL CONDITION OR THE PRESENCE OF HAZARDOUS MATERIALS, GRANTEE SHALL HAVE NO LIABILITY FOR THE REMEDIATION THEREOF IF GRANTEE: (A) IMMEDIATELY STOPS ALL WORK WITH RESPECT TO THE INSTALLATION IN THE AREA WHERE SUCH CONDITION OR HAZARDOUS MATERIALS IS PRESENT AND PROVIDES GRANTOR NOTICE IN WRITING ABOUT SUCH DISCOVERY AND (B) DOES NOT NEGLIGENTLY CONTRIBUTE TO ANY FURTHER CONTAMINATION OR RELEASE OF THE HAZARDOUS MATERIALS; (3) THE COMPLIANCE OF THE PROPERTY WITH OR VIOLATION OF ANY LAW, STATUTE, ORDINANCE, RULE OR REGULATION; OR (4) ANY OTHER MATTER AFFECTING OR RELATING TO THE PROPERTY. GRANTOR AND GRANTEE EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PROPERTY IS SUITABLE FOR GRANTEE'S INTENDED PURPOSE. THIS PROVISION SHALL SURVIVE THE RECORDATION OF THIS DEED.

See instruments recorded in Book 17914, Page 377 and Book 9555, Page 243 for chain of title.

All or a portion of the Property □ includes or ☒ does not include the primary residence of a Grantor.

Grantor is conveying to Grantee Grantor's 76% undivided interest in the Property. The remaining 24% undivided interest in the Property is being conveyed to Grantee by North Carolina Special Warranty Gift Deed by HEP Investment Company, LLC, a North Carolina limited liability company, of even date herewith and recorded contemporaneously herewith.

TO HAVE AND TO HOLD the Property and all privileges and appurtenances thereto belonging to Grantee in fee simple.

Grantor covenants with Grantee that Grantor has done nothing to impair such title as Grantor received, and Grantor shall warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor, other than the following exceptions:

1. 2024 ad valorem taxes, and taxes for subsequent years, not yet due and payable.

2. All easements, covenants, conditions, restrictions and other matters of record

13432687v3

3. Such state of facts as would be disclosed by a current, accurate, physical survey and/or inspection of the subject property.

4. All local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect.

[remainder of page intentionally blank]

13432687v3

IN WITNESS WHEREOF, Grantor has duly executed this North Carolina Special Warranty Gift Deed, if an entity by its duly authorized representative.

**GRANTOR:**

**HENDRICK AUTOMOTIVE GROUP, LLC,**
a North Carolina limited liability company

By: _____

Name: A. Scott Ennis
Title: Senior Vice President

STATE OF NORTH CAROLINA

COUNTY OF _Mecklenburg_

I certify that the following person personally appeared before me this day and acknowledged to me that he or she signed the foregoing document: A. Scott Ennis.

Date: _December 21_ , 2023

_Deanna Milito_

DEANNA MILITO ____, Notary Public

**(Print or Type Name)**

[NOTARIAL STAMP OR SEAL]

My Commission Expires: _3/22/2024_

DEANNA MILITO
Notary Public, North Carolina
Union County
My Commission Expires
3-22-24

[end of signatures]

*13432687v3*

Exhibit A

# GRANTOR'S 76% UNDIVIDED INTEREST IN THE PORTION OF THE BELOW DESCRIBED LAND:

Lying and being in the Town of Matthews, Mecklenburg County, North Carolina, and more particularly described as follows:

## TRACT I:

BEGINNING at a right of way disc located in the easterly right of way margin of Ridge Road (Public 60' R/W) and the southerly right of way margin of I-#485 Charlotte Outer Loop; thence with the aforesaid southerly margin of the right of way of I-#485 Charlotte Outer Loop, with the arc of a circular curve to the right having a radius of 2436.48 feet, an arc distance of 256.70 feet (chord bearing and distance of S 81-44-34 E 256.58 feet) to an existing iron pin in the northwesterly most corner of property of H.E.P. Investments Co. as the same is described in deed recorded in Book 8445 Page 19 of the Mecklenburg Public Registry; thence S 09-15-00 E 386.69 feet to a point; thence by a new line N 63 27-20 W 438.66 feet to a point in the easterly right of way margin of Ridge Road (Public 60' R/W); thence with the aforesaid easterly margin of the right of way of Ridge Road, with the arc of a circular curve to the left having a radius of 1006.48 feet, an arc distance of 235.75 feet (chord bearing and distance of N 18-56-25 E 235.21 feet) to the point and place of beginning; containing 2.248 acres and labeled "Lot 1" on survey prepared for Erwin Capital by Jack R. Christian & Associates, dated January 21, 1998, reference to which survey is hereby made for a more particular description of the property.

## TRACT II:

To find the point and place of beginning, begin at a right of way disc located in the easterly right of way margin of Ridge Road (Public 60' R/W) and the southerly right of way margin of I-#485 Charlotte Outer Loop and proceed in a southwesterly direction with the arc of a circular curve to the right having a radius of 1006.48 feet, an arc distance of 235.75 feet (chord bearing and distance of S 18-56-25 W 235.21 feet) to the TRUE POINT AND PLACE OF BEGINNING; thence by a new line S 63-27-20 E 438.66 feet to a point in the property line of H.E. P. Investments Co. as the same is described in deed recorded in Book 8445 Page 19 of the Mecklenburg Public Registry; thence S 09-15-00 E 386.69 feet to an existing iron pin; thence N 64-15-17 W 439.11 feet to an existing iron pin; thence N 42-43-39 W 244.78 feet to an existing iron pin located in the easterly right of way margin of Ridge Road (Public 60' R/W); thence with the aforesaid easterly margin of the right of way of Ridge Road two (2) calls and distances as follows: (1) N 27-26-45 E 201.62 feet to a point; and (2) with the arc of a circular curve to the left having a radius of 1006.48 feet, an arc distance of 31.54 feet (chord bearing and distance of N 26-32-54 E 31.54 feet) to the point and place of beginning; containing 3.821 acres and labeled Lot 2 on survey prepared for Erwin Capital by Jack R. Christian & Associates, dated January 21, 1998, reference to which survey is hereby made for a more particular description of the property.

**THE ABOVE TWO TRACTS BEING ALSO DESCRIBED AS FOLLOWS:**

Lying and being in the Town of Matthews, Mecklenburg County, North Carolina, and being the same property described in that certain North Carolina General Warranty Deed recorded in Book 17914, Page 377 and also described as follows:

BEGINNING at a right of way disc located in the easterly right of way margin of Ridge Road (Public 60' R/W) and the southerly right of way margin of I-#485 Charlotte Outer Loop; thence with the aforesaid southerly margin of the right of way of I-#485 Charlotte Outer Loop, with the arc of a circular curve to the right having a radius of 2,436.48 feet, an arc distance of 256.70 feet (chord bearing and distance of S 81-44-34 E 256.58 feet) to an existing iron pin in the northwesterly most corner of property of H.E.P. Investments Co. (now or formerly), as the same is described in deed recorded in Book 8445, Page 19 of the Mecklenburg County Registry; thence S 09-15-00 E 773.37 feet to an existing iron pin; thence N 64-15-17 W 439.11 feet to an existing iron pin; thence N 42-43-39 W 244.78 feet to an existing iron pin located in the easterly right of way margin of Ridge Road (Public 60' R/W); thence with the aforesaid easterly margin of the right of way of Ridge Road two (3) calls and distances as follows: (1) N 27-26-45 E 201.62 feet to a point; (2) with the arc of a circular curve to the left having a radius of 1,006.48 feet, an arc distance of 31.54 feet (chord bearing and distance of N 26-32-54 E 31.54 feet); and (3) with the arc of a circular curve to the left having a radius of 1,006.48 feet, an arc distance of 235.75 feet (chord bearing and distance of N 18-56-25 E 235.21 feet) to the point and place of beginning; containing 6.070 acres and as shown on survey prepared for Erwin Capital by Jack R. Christian & Associates, dated January 21, 1998, reference to which survey is hereby made for a more particularly description of the property.

**LESS AND EXCEPT FROM THE ABOVE-DESCRIBED LAND THE FOLLOWING:**

SITUATED IN THE STATE OF NORTH CAROLINA, COUNTY OF MECKLENBURG, TOWN OF MATTHEWS, BEING A PORTION OF TRACT II AS CONVEYED TO HEP INVESTMENT COMPANY, LLC BY DEED OF RECORD IN DEED BOOK 9555, PAGE 243 AND HENDRICK AUTOMOTIVE GROUP BY DEED OF RECORD IN DEED BOOK 17914, PAGE 377 (ALL REFERENCES ARE TO THE RECORD OF THE REGISTER OF DEED'S OFFICE, MECKLENBURG COUNTY, NORTH CAROLINA) AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHERLY CORNER OF SAID TRACT II, BEING A CORNER TO THAT 78.571 ACRE TRACT AS CONVEYED TO HEP INVESTMENT COMPANY, LLC BY DEED OF RECORD IN DEED BOOK 8455, PAGE 19;

THENCE NORTH 66° 13' 14" WEST, WITH A NORTHERLY LINE OF SAID 78.571 ACRE TRACT, A DISTANCE OF 35.63 FEET TO A POINT;

THENCE NORTH 19° 57' 59" EAST, ACROSS SAID TRACT II, A DISTANCE OF 56.39 FEET TO A POINT IN A WESTERLY LINE OF SAID 78.571 ACRE TRACT;

THENCE SOUTH 11° 12' 46" EAST, WITH SAID WESTERLY LINE, A DISTANCE OF 68.68 FEET TO THE POINT OF BEGINNING, CONTAINING 1,002 SQUARE FEET OF LAND, MORE OR LESS.

13432687v3

The above-described tract consists of the following:

(i)     All of Mecklenburg County Parcel 21524105, containing approximately 2.248 acres, and being Tract I of that certain North Carolina General Warranty Deed recorded in Book 17914, Page 377 of the Office of the Register of Deeds of Mecklenburg County, North Carolina; and

(ii)     Most, but not all of Mecklenburg County Parcel 21524107, and being most, but not all, of Tract II of that certain North Carolina General Warranty Deed recorded in Book 17914, Page 377 of the Office of the Register of Deeds of Mecklenburg County, North Carolina.

[end of document]

13432687v3



FOR REGISTRATION
Fredrick Smith
REGISTER OF DEEDS
Mecklenburg County, NC
2023 DEC 22 12:26:01 PM
BK:36552 PG:534-538
FEE:$26.00
INSTRUMENT # 2023119935

TAYLORD

2023119935

## NORTH CAROLINA SPECIAL WARRANTY GIFT DEED

Excise Tax:      $0.00*

Parcel ID:      21524105, p/o 21524107 and p/o 21524104

Mail/Box to:      Grantee

Prepared by:      McGuireWoods LLP, 201 North Tryon Street, Suite 3000, Charlotte, NC 28202 (William N. Harris)

Brief description for the Index:      23.16 acres – Campus Ridge Road

THIS SPECIAL WARRANTY GIFT DEED ("Deed") is made on the **22nd** day of December, 2023, by and between:

| GRANTOR | GRANTEE |
|---|---|
| **CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.,** a North Carolina non-profit corporation<br><br>Address:    P.O. Box 35009<br>               Charlotte, NC 28235 | **THE TRUSTEES OF CENTRAL PIEDMONT COMMUNITY COLLEGE**<br><br>Address:    P.O. Box 35009<br>               Charlotte, NC 28235 |

*Enter in the appropriate block for each Grantor and Grantee their name, mailing address, and, if appropriate, state of organization and character of entity, e.g. North Carolina or other corporation, LLC, or partnership. Grantor and*

---

* Under N.C.G.S. Section 105-228.29(5), no excise tax is due with a transfer of real property by gift.

182802211_3

*Grantee includes the above parties and their respective heirs, successors, and assigns, whether singular, plural, masculine, feminine or neuter, as required by context.*

FOR NO CONSIDERATION paid by Grantee and as a gift from Grantor to Grantee, Grantor by this Deed does hereby grant, bargain and convey to Grantee, in fee simple, all that certain lot, parcel of land in Mecklenburg County, North Carolina and more particularly described as follows (the "Property"):

**See Exhibit A attached hereto and incorporated herein by reference.**

The property hereinabove described was acquired by Grantor by instrument recorded in Book 38552, Page 469 and Book 38552, Page 498.

All or a portion of the Property ☐ includes or ☒ does not include the primary residence of a Grantor.

A map showing the above-described property is recorded in Map Book 73, Page 216.

TO HAVE AND TO HOLD the Property and all privileges and appurtenances thereto belonging to Grantee in fee simple.

Grantor covenants with Grantee that Grantor has done nothing to impair such title as Grantor received, and Grantor shall warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor, other than the following exceptions:

2024 ad valorem taxes, and taxes for subsequent years, not yet due and payable, and all easements, covenants, conditions, restrictions and other matters of record.

182802211_3

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 62 of 259

IN WITNESS WHEREOF, Grantor has duly executed this North Carolina Special Warranty Gift Deed, if an entity by its duly authorized representative.

**GRANTOR:**

**CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.,**
a North Carolina non-profit corporation

By: *Lisa Schlachter*

Name: Lisa Schlachter
Title: Chief Philanthropy Officer

STATE OF NORTH CAROLINA

COUNTY OF Mecklenburg

I certify that the following person personally appeared before me this day and acknowledged to me that he or she signed the foregoing document: Lisa Schlachter.

Date: December 21, 2023

*Linda J. Bryant*
Linda J. Bryant , Notary Public

(Print or Type Name)

[NOTARIAL STAMP OR SEAL]

My Commission Expires: 1-10-2025



182802211_3

## Exhibit A

All of that certain parcel of property located in Mecklenburg County, North Carolina and described as follows:

SITUATED IN THE STATE OF NORTH CAROLINA, COUNTY OF MECKLENBURG, TOWN OF MATTHEWS AND BEING ALL OF TRACT I AS CONVEYED TO HEP INVESTMENT COMPANY, LLC AND A PORTION OF TRACT II AS CONVEYED TO HEP INVESTMENT COMPANY, LLC BY DEED OF RECORD IN DEED BOOK 9555, PAGE 243 AND A PORTION OF THAT 78.571 ACRE TRACT AS CONVEYED TO HEP INVESTMENT COMPANY, LLC BY DEED OF RECORD IN DEED BOOK 8455, PAGE 19 (ALL REFERENCES REFER TO THE RECORDS OF THE REGISTER OF DEEDS OFFICE, MECKLENBURG COUNTY, NORTH CAROLINA) AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A RIGHT-OF-WAY MONUMENT FOUND MARKING THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY LINE OF CAMPUS RIDGE ROAD AS DEFINED IN MAP BOOK 9, PAGE 135 AND THE SOUTHERLY CONTROLLED ACCESS RIGHT-OF-WAY OF I-485 AS DEFINED ON THE RIGHT-OF-WAY PLAN NUMBER 8.U670121;

THENCE WITH SAID SOUTHERLY CONTROLLED ACCESS RIGHT-OF-WAY LINE, WITH THE ARC OF A CURVE TO THE RIGHT (PASSING A #4 REBAR FOUND AT A DISTANCE OF 256.61 FEET) HAVING A DELTA OF 37° 06' 34", A RADIUS OF 2,436.48 FEET, AN ARC LENGTH OF 1,578.06 FEET, HAVING A CHORD BEARING AND DISTANCE OF SOUTH 68° 16' 59" EAST, 1,550.62 FEET TO A #4 REBAR SET (CAPPED, INSCRIBED "ACRO", TYPICAL);

THENCE ACROSS SAID HEP INVESTMENT COMPANY, LLC TRACTS, THE FOLLOWING COURSES AND DISTANCES:

SOUTH 29° 57' 59" WEST, A DISTANCE OF 337.23 FEET TO A #4 REBAR SET;

NORTH 80° 02' 01" WEST, A DISTANCE OF 890.87 FEET TO A #4 REBAR SET;

SOUTH 19° 57' 59" WEST, A DISTANCE OF 172.87 FEET TO A #4 REBAR SET;

SOUTH 89° 57' 59" WEST, A DISTANCE OF 402.86 FEET TO A #4 REBAR SET; AND

NORTH 70° 02' 01" WEST, PASSING A #4 REBAR SET AT A DISTANCE OF 283.15 FEET, A TOTAL DISTANCE OF 313.30 FEET TO A MAGNETIC NAIL WITH A WASHER STAMPED "ACRO" IN THE EASTERLY LINE OF THAT 47.311 ACRE TRACT AS CONVEYED TO THE TRUSTEES OF CENTRAL PIEDMONT COMMUNITY COLLEGE BY DEED OF RECORD IN DEED BOOK 8460, PAGE 260, BEING THE CENTERLINE OF SAID CAMPUS RIDGE RD.;

Page 4 of 5

182802211_3

THENCE NORTH 25° 41' 05" EAST, WITH SAID EASTERLY LINE AND SAID CENTER LINE, A DISTANCE OF 393.74 FEET TO A MAGNETIC NAIL FOUND MARKING THE SOUTHERLY TERMINUS OF SAID CAMPUS RIDGE ROAD AS DEFINED ON SAID MAP BOOK 9, PAGE 135;

THENCE SOUTH 44° 42' 24" EAST, WITH THE SOUTHERLY TERMINUS THEREOF, A DISTANCE OF 31.85 FEET TO A #4 REBAR FOUND MARKING THE EASTERLY RIGHT-OF-WAY LINE OF SAID CAMPUS RIDGE ROAD;

THENCE NORTH 25° 41' 05" EAST, WITH SAID EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 202.00 FEET TO A #4 REBAR FOUND MARKING A POINT OF CURVATURE TO THE LEFT;

THENCE CONTINUING WITH SAID EASTERLY RIGHT-OF-WAY LINE, WITH THE ARC OF SAID CURVE, HAVING A DELTA OF 15° 51' 55", A RADIUS OF 963.26 FEET, AN ARC LENGHTH OF 266.73 FEET, HAVING A CHORD BEARING AND DISTANCE OF NORTH 17° 45' 07" EAST, 265.88 FEET TO THE POINT OF BEGINNING, CONTAINING 23.423 ACRES OF LAND, MORE OR LESS, OF WHICH 0.266 ACRES IS CURRENT OCCUPIED RIGHT-OF-WAY, LEAVING A NET OF 23.157 ACRES.

Said Property also being described as all of "Lot 1," consisting of approximately 23.423 acres (Gross) as shown on a Plat entitled "Plat for CPCC Public SafetyTraining Facility" being recorded contemporanerously herewith.

182802211_3

# EXHIBIT 3



# EXHIBIT 4

## Overview

# Development

Planned Advanced
Manufacturing Campus (AMC)

Town of Matthews, NC located
in the premium quadrant of
Charlotte MSA

Co-located with a campus of
Central Piedmont Community
College (CPCC)

Approximately 192 acres

Hendrick-owned

Industrial zoning (I-2)



**EXHIBIT 5**

Hello Wendy:

A few items of note for Matthews:

Rick Hendrick has announced plans to develop a 200 acre site along Independence Boulevard as an Advanced Manufacturing Campus. The idea was born from talks our Town Manager Becky Hawke had with CPCC President Dr. Kandi Deitemeyer about securing a portion of the property for use as a public safeyy training facility. The property was rezoned for Haendrick's use in May. This is the most exciting economic development news in Matthews in quite some time as it will bring hundreds of high paying jobs to our community.

Over the last few years, Matthews has brought two new parks into its inventory of green space - approximately 30 acres off Chipwood Lane and another called Williams Olmstead Park at the confluence of Weddington and Pleasant Plains roads and South Trade Street.

September 1st - 4th we will welcome our 31st Matthews Alive festival - one of the largest Labor Day celebrations in the southeast.

Thanks,

John

On Sun, Jul 23, 2023 at 5:42 PM Wendy Herkey <wherkey@wfae.org> wrote:

Mayors Edwards, Higdon and Simmons,

I'm really looking forward to having you on Charlotte Talks with Mike Collins this coming Wednesday on WFAE. I'll send a Zoom invite for the interview in the next day or so.

In the meantime, if you have just a moment to share with me a few of the most important issues your city/ town is currently facing, as well as regional issues that hit your town specifically, I'd appreciate that. I'll be doing some research on my end, but I want to make sure we get to the issues most important to you.

Many thanks!

**Wendy Herkey**
Executive Producer
*Charlotte Talks with Mike Collins*
704-549-9323 MAIN
704-668-6064 CELL
90.7 FM WFAE | www.wfae.org



--
John F. Higdon, PE
Matthews Mayor
(704) 661-0146

Plaintiffs' Complaint 000933

# EXHIBIT 6

That is fine.

On Tue, May 3, 2022 at 10:22 PM Becky Hawke <bhawke@matthewsnc.gov> wrote:

I apologize, I want you to be a part of this meeting but am now running into scheduling issues with everyone else. CPCC can meet this coming Monday the 9th, otherwise my next availability for everyone is going to be in June. Do you mind if staff (Rob, Clark, Jay, me) attend the meeting and then I can fill you in? I can also see if Ken or another Board member is available to attend.

Thanks - and sorry for the hassle.

Becky

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

 Virus-free. www.avg.com

On Tue, May 3, 2022 at 10:31 AM John Higdon <mayorhigdon@matthewsnc.gov> wrote:

Good Miorning Becky:

I have a fairly clear schdule the following Tuesday and Thursday. Either of those afternoons would work.

John

On Mon, May 2, 2022 at 9:35 PM Becky Hawke <bhawke@matthewsnc.gov> wrote:

No problem. Do you have any dates/times that work better for you

the following week?

Thanks,

Becky

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

 Virus-free. www.avg.com

On Mon, May 2, 2022 at 7:14 PM John Higdon <mayorhigdon@matthewsnc.gov> wrote:
> I will be in Colorado all next week. Can we meet the following week?

>> On May 2, 2022, at 5:39 PM, Becky Hawke <bhawke@matthewsnc.gov> wrote:

>> Update: CPCC sent some availability for next week. Cross referencing that with our staff's availability, Monday 5/9 any time in the afternoon looks good. Do you have any availability then?

>> Thanks,

>> Becky

>> Becky Hawke
>> Town Manager
>> Town of Matthews
>> 232 Matthews Station Street
>> Matthews, NC 28105
>> Town Hall: 704-847-4411
>> Direct: 704-708-1231

Plaintiffs' Complaint 000185

Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

---------- Forwarded message ----------
From: **Becky Hawke** <bhawke@matthewsnc.gov>
Date: Mon, May 2, 2022 at 4:56 PM
Subject: Meeting Dates Requested
To: John Higdon <mayorhigdon@matthewsnc.gov>

Hi Mayor,

CPCC reached out because they would like to continue some conversations the Chiefs have had with them about a public safety training facility on or very close to the Levine campus. They have requested a meeting that their college President will also be attending and I thought it prudent to include you to make sure you are aware of the conversations and all so staff doesn't get too far ahead of the Board.

Can you please provide me with a few dates/times over the next few weeks when you would be available to meet at the Levine campus?

Thanks,

Becky

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any

electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

 Virus-free. www.avg.com

--
John F. Higdon, PE
Matthews Mayor
(704) 661-0146


--
John F. Higdon, PE
Matthews Mayor
(704) 661-0146

# EXHIBIT 7

| From: | Jay Camp |
|---|---|
| To: | Howell, Alyssa; Cocchi, Gene |
| Subject: | Meeting with CPCC |
| Date: | Monday, May 23, 2022 8:47:55 AM |

Good Morning Gene,

I hope you've been doing well since we last met. Town staff recently met with President Deitemeyer at CPCC to discuss some of the plans they have for the Levine Campus in Matthews. She asked if we could facilitate a meeting with Hendrick Automotive to discuss the land holding you all have in Matthews.

Do you have some availability between 5/31 and 6/10? I realize we are getting into summer vacation time so it may be difficult to make calendars work. The folks at CPCC are happy to host at the central campus off of 4th Street in downtown Charlotte.

Let me know what dates and times would work for you all. Thanks!

Jay

--



Jay Camp, AICP
Planning Director
Town of Matthews
232 Matthews Station St.
Matthews NC 28105
(704) 708-1226
jcamp@matthewsnc.gov

Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review

 Virus-free. www.avg.com

# EXHIBIT 8

| From: | Google Calendar on behalf of jana.sampson@cpcc.edu |
|---|---|
| To: | bhawke@matthewsnc.gov; kandi.deitemeyer@cpcc.edu; jcamp@matthewsnc.gov; gene.cocchi@hendrickauto.com; kent.reid@cpcc.edu; dylan.mcknight@charlottenc.gov; mike.whiteman@cpcc.edu; heather.hill@cpcc.edu; amanda.capobianchi@cpcc.edu; m.carlson@hmsracing.com; alyssa.howell@hendrickauto.com; rick.sanderson@charlottenc.gov; jenna.nichols@charlottenc.gov; andrew.mock@charlottenc.gov; susanne.ndovva@charlottenc.gov |
| Cc: | kristi.douglas@cpcc.edu |
| Subject: | Updated invitation with note: Full Group-Proposed Public Safety Center @ Wed Sep 28, 2022 10am - 11am (EDT) (bhawke@matthewsnc.gov) |
| Date: | Thursday, August 18, 2022 3:36:07 PM |
| Attachments: | invite.ics |

**This event has been updated with a note:**
"The conference room has been booked and is specified in this invite. See you all on September 28th! Thank you, Jana"

**Changed:** description, attachments

**Description** CHANGED

Hello Everyone,

We will be meeting at the Central Piedmont Community College Levine Campus, Levine III Building, 2nd Floor, Conference Room 2510. Attached is a Levine Campus map for your reference.

Please email or call me with any questions. Thank you.

Jana Sampson
704.330.6717
jana.sampson@cpcc.edu

**When**

Wednesday Sep 28, 2022 · 10am – 11am
(Eastern Time - New York)

**Location**

Central Piedmont Community College - Levine Campus, 2800 Campus Ridge Rd Suite 1113, Matthews, NC 28105, USA
**View map**

**Organizer**

jana.sampson@cpcc.edu

**Attachments** CHANGED

☐ 23898-

**Guests**

kandi.deitemeyer@cpcc.edu
jcamp@matthewsnc.gov
bhawke@matthewsnc.gov
gene.cocchi@hendrickauto.com
kent.reid@cpcc.edu
dylan.mcknight@charlottenc.gov
mike.whiteman@cpcc.edu
heather.hill@cpcc.edu
amanda.capobianchi@cpcc.edu
m.carlson@hmsracing.com
alyssa.howell@hendrickauto.com
rick.sanderson@charlottenc.gov
jenna.nichols@charlottenc.gov
andrew.mock@charlottenc.gov
susanne.ndovya@charlottenc.gov
kristi.douglas@cpcc.edu - optional

**View all guest info**

**Reply** for bhawke@matthewsnc.gov

| Yes | No | Maybe |

| More options |

Invitation from Google Calendar

You are receiving this email because you are subscribed to calendar notifications. To stop receiving these emails, go to Calendar settings, select this calendar, and change "Other notifications".

Forwarding this invitation could allow any recipient to send a response to the organizer, be added to the guest list, invite others regardless of their own invitation status, or modify your RSVP Learn more

# EXHIBIT 9

| From: | Google Calendar on behalf of mtofano@matthewsnc.gov |
| --- | --- |
| To: | Howell, Alyssa |
| Subject: | Accepted: Introduction Meeting - Mark Tofano Commissioner Town of M... @ Fri Jun 10, 2022 9:30am - 10:30am (EDT) (Howell, Alyssa) |
| Date: | Wednesday, June 8, 2022 8:20:15 AM |
| Attachments: | invite.ics |

**mtofano@matthewsnc.gov has accepted this invitation.**

## Introduction Meeting - Mark Tofano Commissioner Town of Matthews

| When | Fri Jun 10, 2022 9:30am – 10:30am Eastern Time - New York |
| --- | --- |
| Where | Hendrick Automotive Group (6000 Monroe Road, Suite 100, Charlotte, NC 28212) (map) |
| Calendar | Howell, Alyssa |
| Who | |

- Howell, Alyssa - organizer
- mtofano@matthewsnc.gov - creator
- Cocchi, Gene

CONFIDENTIALITY NOTICE

This e-mail is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message from your inbox.

Invitation from Google Calendar

You are receiving this courtesy email at the account alyssa.howell@hendrickauto.com because you are an attendee of this event.

To stop receiving future updates for this event, decline this event. Alternatively you can sign up for a Google account at https://calendar.google.com/calendar/ and control your notification settings for your entire calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. Learn More

# EXHIBIT 10

| | |
|---|---|
| **From:** | Becky Hawke |
| **To:** | Larry Whitley |
| **Subject:** | Fwd: Date Hold: January 23 |
| **Date:** | Monday, December 19, 2022 1:22:51 PM |

Hi Larry,

I wanted to check with you directly about the meetings on 1/23 at CPCC Levine. I've heard from all other Board Members and you have the pick of which time will work best for you. Here is how they are scheduling out so far:

Meeting 1: 8:30-9:45 a.m. - Gina and Mark
Meeting 2: 10:15-11:45 a.m. - Ken and Renee
Meeting 3: 12:45-2:00 p.m. - John H. and John U.

Which meeting time would you like to attend?

Thank you,

Becky

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

---------- Forwarded message ---------
From: **Becky Hawke** <bhawke@matthewsnc.gov>
Date: Sun, Dec 18, 2022 at 1:15 PM
Subject: Re: Date Hold: January 23
To: Becky Hawke <bhawke@matthewsnc.gov>

Good afternoon Mayor and Board Members,

Please let me know your availability/order of preference for the following meeting times at CPCC Levine Campus on Monday, 1/23.

Meeting 1: 8:30-9:45 a.m.
Meeting 2: 10:15-11:45 a.m.
Meeting 3: 12:45-2:00 p.m.

I will confirm everyone's meeting times once I hear back from all of you and can ensure we have appropriate numbers in each group.

Thank you in advance,

Becky

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

On Wed, Dec 14, 2022 at 3:55 PM Becky Hawke <bhawke@matthewsnc.gov> wrote:
**CONFIDENTIAL**

Good afternoon Mayor and Board,

A proposal to rezone the 200+- acres of Hendrick properties near CPCC Levine Campus is in the works.

Hendrick/CPCC would like to share their vision for that area prior to submitting a rezoning application, which is planned for February 1.

We don't have confirmed times yet, but the plan would be for small groups of you to meet with members of Hendrick's team, as well as CPCC's leadership, at the CPCC Levine Campus on Monday, January 23 during the day.

If you are able, please go ahead and hold that date now. I will have more specific time options as soon as possible. Each meeting should only last an hour or so.

Thank you,

**Becky**

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail
message and any attachments hereto, as well as any electronic mail message(s) that may be
sent in response to it may be considered public record and as such are subject to request and
review.

# EXHIBIT 11

| From: | Mark Tofano |
| To: | Becky Hawke |
| Subject: | Re: CPCC/Town of Matthews/Hendrick Meeting |
| Date: | Monday, December 19, 2022 5:37:02 PM |

Hi Becky.

The purpose for this meeting is a meet and greet with Mr. Hendrick who will be attending for the main purpose of meeting with the mayor and, also, to take the opportunity to level set with all parties involved prior to the rezoning.

Will you be in your office tomorrow morning before 10:00 AM?

If yes, I can stop by and explain the backstory to all of this. I had a meeting with the mayor on Sunday during which I did the same.

Mark

On Mon, Dec 19, 2022 at 1:25 PM Becky Hawke <bhawke@matthewsnc.gov> wrote:

Hi Mark,

I hope you are well. When you have a moment, can you please give me a call to fill me in on this meeting? I'm happy to attend, but I'm not sure how it will differ from the meetings the prior day and I'd like to make sure I am prepared.

Regards,

Becky

Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

---------- Forwarded message ---------
From: **Howell, Alyssa** <Alyssa.Howell@hendrickauto.com>
Date: Mon, Dec 19, 2022 at 10:11 AM
Subject: CPCC/Town of Matthews/Hendrick Meeting

To: Christian Smith <csmith@hmsracing.com>, Carlson, Marshall
<m.carlson@hmsracing.com>, Medina, Roberto <rmedina@hmsracing.com>, Cocchi, Gene
<Gene.Cocchi@hendrickauto.com>, kandi.deitemeyer@cpcc.edu
<kandi.deitemeyer@cpcc.edu>, Mark Tofano <mark.e.tofano@gmail.com>,
mtofano@matthewsnc.gov <mtofano@matthewsnc.gov>, bhawke@matthewsnc.gov
<bhawke@matthewsnc.gov>, mayorhigdon@matthewsnc.gov
<mayorhigdon@matthewsnc.gov>, jhigdon@matthewsnc.gov <jhigdon@matthewsnc.gov>

CONFIDENTIALITY NOTICE

This e-mail is intended only for the addressee named above. It contains information that is privileged, confidential or
otherwise protected from use and disclosure. If you are not the intended recipient, you are hereby notified that any review,
disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, or other use is
strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and
permanently delete this message from your inbox.

# EXHIBIT 12


Town of
**Matthews**
North Carolina

**MINUTES**
**BOARD OF COMMISSIONERS SPECIAL MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**JANUARY 23, 2023 – 5:30 PM**

**PRESENT:**      Mayor John Higdon; Mayor Pro Tem Ken McCool; Commissioners Renee Garner, Gina Hoover, Mark Tofano, John Urban and Larry Whitley

**ALSO PRESENT:** Town Attorney Charles Buckley; Town Manager Becky Hawke; Assistant Town Manager Melia Gordon; Planning Director Jay Camp; Planner Darin Hallman; Communications Coordinator Maureen Keith; Town Clerk Lori Canapinno

The Board met with representatives from development firm Proffitt Dixon Partners (PDP) to discuss Proffitt Dixon's Midfield Station project and with Town staff to discuss the Entertainment District Overlay.

PDP representatives Wyatt Dixon, Ashley Peterson, Marissa Markham and Casey Gephart and partners Richard Petersheim with Land Design and Travis Anderson of the capital markets division of JLL Carolina addressed the Board. Mr. Anderson works with developers across the nation on capitalizing projects and ensuring projects are feasible. Mr. Dixon reviewed PDP's existing projects in Matthews and the company's involvement in the ENT (Entertainment District.) He explains PDP owns/controls almost 84% of the undeveloped property within the ENT. He wants to be sure he and his team are working in collaboration with the Town to fulfill the Town and Proffitt Dixon's collective vision for the ENT. He explained that PDP refers to various areas of the overall plan as the Matthews Mixed Use plan, Brigman West and Brigman East portions. A lot of commercial development is planned for the area.

Mr. Petersheim reviewed the plan for the proposed Midfield Station development. The success of the private and public components hinges on each other. The infrastructure needs to be jointly designed and built. PDP anticipates the Silver Line and Independence Pointe Parkway extension transportation projects coming to fruition in the future. They're planning a deliberate bookending of the east-west road from Sports Parkway and eventually connecting all the way to Crestdale, going right by the station. They're creating a dumbbell approach of activity with Elevation Church and the church's reorientation of activity to the back of the church and tied to that with a commercial hub and the heart of the plan, which would include the greatest diversity of uses at the station, and residential options in between, all together with a network. Opportunities identified in phases I and II off Matthews-Mint Hill Road will probably come first and the heart will develop later. Retail and commercial uses will develop there first as the interior area won't drive the uses yet, so the heart will come later.

Mr. Dixon said PDP is 100% engaged with the idea of entertainment in the Entertainment District. He noted they don't know what it will be yet but they're working on a plan to make that happen. Mr. Petersheim said if and when the Town lands some significant entertainment user or a larger platform activator, there will be spaces that can accommodate them in the PDP plan. He noted they've been thinking more broadly about the connections that need to be made beyond the borders of their plan and the partnerships needed to get that done. They've made greenway and bikeway trail connections as well as accommodations for the future Silver Line station.

Mr. Dixon discussed the need to catalyze the area to make it something bigger. In 2019 the Sportsplex had 780,000 annual visitors. Those numbers can be capitalized upon, not just by PDP but others as well. Connectivity is an important issue and one of the challenges that need to be overcome. Mr. Petersheim discussed the need for interconnections between various developments - Midfield Station, Matthews Gateway, and Matthews Lofts – so they can tie together to leverage Mathews' investments. Dashed red lines on the plan indicate gaps that require a strategy and partnerships to fulfill. He noted it's particularly important for develop a strategy for Independence Pointe Parkway to catalyze the mixture of uses everyone is looking for. Mr. Dixon explained that the question now is how we all of the partners collectively overcome the challenges and fill the gaps to make the vision a reality.

Mayor Higdon noted that the thousands of Sportsplex visitors who often leave Matthews to eat and stay overnight, due to lack of local facilities. Mr. Dixon explained that the road network is critical to the future development of those types of uses. Mr. Tofano asked about the total number of residential units that will be constructed between all the existing and upcoming projects; Mr. Dixon said there would be approximately 1,500 residential units and about

350,000 square feet of commercial space in total. Mr. Tofano asked for the square footage ratio for commercial versus residential uses. Mr. Dixon explained that is a part of the collaboration that PDP is engaging in. Mr. Tofano asked if they were modeling the development along the Silver Line to mimic the development of the Blue Line in Charlotte. Mr. Petersheim said it would be a completely different dynamic as the South End market has a much stronger pull for investment than this does. There will be different challenges, opportunities and scales of densities in Matthews. The lack of the interconnected road network here is a significant factor. Employment for Class A will be a bit of a challenge, and Matthews has a finite amount of uses that would be attracted to the area. The market demand Matthews has can be driven to different nodes. If PDP was very confident that transit was coming and by when, they'd be in a much stronger position with investors. Until then, it's a much different discussion.

Mr. Dixon explained that whatever happens first in scale here needs to be a destination. PDP's vision is something that will occur in the central area. The activities are fluid in the center area until then. He's had a lot of conversations with retailers about this. One of the challenges they face is from people who don't know this market are influenced by the impact of the tired retail and the B and C class hotels they see coming down Independence Boulevard. Mr. Petersheim said it will take patience and perhaps reserving blocks for an evolution of the market, but that something has to be planted pretty soon at the heart of the area to bring the project to life. Mr. Dixon noted everything they did with the Briley development was done to the stage for everything else that was going to happen after it.

Mr. Tofano noted his ongoing concern - that the Board has been constantly told that residential development is needed first, which results in all the traffic and things people complain about in town, but it doesn't bring the entertainment of the ENT district. He is very concerned that this is going to wind up being just a residential community.

Planning Director Jay Camp and Planner Darin Hallman then reviewed the Entertainment District Overlay (ENT-O). Mr. Hallman recapped the discussions the Board has had so far, which has focused on the residential to commercial ratio. The current text limits the ENT-O area to 600 new residential units until 40,000 square feet of new commercial is built. After the 40,000 square foot requirement is met, there are no limits. The residential cap is nearly reached and beginning to prevent new projects, and concerns have been expressed about the current lack of commercial development in the area. Staff provided several options for Board consideration and after feedback is presenting the latest proposal, which includes the following as options:

- Create a list of primary and secondary streets based on the Small Area Plan
  - Require new buildings fronting the main streets to either
    - Provide first floor commercial space
    - Provide public amenities
- First floor commercial space requirements would be as percent of new construction
  - Downtown uses 50% retail requirement
- Public amenities would be listed with linear foot requirements
  - Benches, art, food truck spaces, pop-retail, etc.
- Primary streets would have stricter requirements than secondary streets
- Conditional notes and requirements would be used to dictate the scale, size, and specific uses of certain properties.

Mr. Camp discussed the hierarchy of streets, noting that 50% ground floor commercial has been mandated in the Historic Urban Core (HUC) district for years. It's common across the globe to see housing on top of ground floor commercial space. Planners are mostly interested in the ground floor, and the residential floors allow for the vibrancy needed for the commercial uses. Staff feels a similar approach would be a good solution here for the ENT district.

Mr. Urban discussed the importance of the road network, with primary, secondary and tertiary roads. He's in favor of a requirement for 50% activation on the street level, but would add on a requirement for those instances when a primary street intersects a secondary street, which would trigger the need to activate the corner. He also recommended listing seven bullet points for amenities and requiring five of them. He suggested the Board visit the Kingsley and Riverwalk developments in Rock Hill to see local examples of mixed use developments. Ms. Garner

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 94 of 259

noted there are multiple documents that influence this policy, and the Board needs to be aware of that. She was hoping to hear an overview tonight of what's already in place and then discussion of what else is needed. This Board and future Boards need to be able to understand what the policies say, and the Board needs to understand what decisions are being made that involves a lot more language than a map with streets.

Mr. Urban said the question is between getting overly restrictive or setting the bar and let things organically develop and let the market dictate things. He recommends the latter. He explained that he was looking more for something high level that the Board could refine over time, but since these are conditional zonings the Board can handle each as they come up, while also setting parameters for a minimum standard. He said staff's points about activating the street level are fine, but the Board should look at the characteristics of how Matthews and southern towns are developed and include some language to let the architects to come up with their solutions - give them some boundaries of good, common place ways to develop architecture in the streetscape and let them respond.

Mr. Hallman noted the area plan, overlay district, and zoning district all come into play here. The overlay district talks about commercial ratios so staff thinks that's a good place for this new ratio, if approved, to be placed. Architectural requirements are already in there but perhaps they could be strengthened. Ms. Garner noted there are other documents that point to what the vision of the Entertainment District is and requested what they all say in summary form so everyone is on the same page, in case they didn't read all of the documents.

Mr. McCool asked what would prevent empty storefronts from sitting around if the direction was retail on the ground floor and residential above, saying he doesn't want empty storefronts making it look like Matthews is dying when it's a thriving community. Mr. Camp said that's a good point – some cities mandate it and then they sit empty. Matthews would need to ensure it's required only where it's feasible/makes sense. Mr. Urban noted Mr. Dixon's comments about giving him a spot at that intersection and let him be the catalyst, with the rest filling in over time. Mr. Tofano said he is still concerned that this will be nothing but a residential area with a small amount of retail since there's nothing about large scale development or entertainment. Mr. Camp noted Mr. Dixon's earlier comments about 350,000 square feet of commercial space being planned. Mr. Tofano expressed doubts that will actually happen. Restaurants and shops aren't entertainment uses – they're places to go to spend money but not a place to go to have fun. Mr. Urban said he doesn't think the Board will be able to point to locations and specify exact uses, but it can set the base plan and catalyst in place to grow in that direction.

Mr. Camp asked if the Board was willing to consider the ground floor language. By consensus the group said yes. Mr. Urban suggested adding incentives for anyone bringing in an entertainment-type venue, such as a density bonus or an additional floor.

MINUTES
BOARD OF COMMISSIONERS REGULAR MEETING
HOOD ROOM, MATTHEWS TOWN HALL
JANUARY 23, 2023 - 7:00 PM

**PRESENT:**     Mayor John Higdon; Mayor Pro Tem Ken McCool; Commissioners Renee Garner, Gina Hoover, Mark Tofano, John Urban and Larry Whitley

**ALSO PRESENT:** Town Attorney Charles Buckley; Town Manager Becky Hawke; Assistant Town Manager Melia Gordon; Finance Director Teresa Fulk; Planning Director Jay Camp; Senior Planner Nadine Bennett; Cultural Recreation Coordinator Melissa Johnson; Special Events Coordinator Lee Anne Moore; Town Engineer Susan Habina Woolard; Communications Coordinator Maureen Keith; Town Clerk Lori Canapinno

**REGULAR MEETING CALLED TO ORDER**

Mayor Higdon called the meeting to order at 7:00 pm.

**INVOCATION/MOMENT OF REFLECTION**

Mr. McCool recognized Reverend Martin Luther King, Junior and quoted him, saying, "the time is always right to do what is right."

**PLEDGE OF ALLEGIANCE**

Mayor Higdon led participants in the Pledge.

**ADOPT AGENDA**

Motion by Mr. Urban to remove item 10C - revision to Matthews Veteran Advisory Committee bylaws – from the Consent Agenda for discussion as a New Business item. The motion was seconded by Ms. Garner and unanimously approved.

Motion by Mr. Tofano to adopt the agenda as modified. The motion was seconded by Mr. Urban and unanimously approved.

**PRESENTATION – GOVERNMENT FINANCE OFFICERS ASSOCIATION AWARD**

Finance Director Teresa Fulk, Senior Finance Specialist Michael Garrison and Finance Specialist Donna Pitts were recognized for their achievement in winning the department's 24th consecutive GFOA (Government Finance Officers Association) award for excellence in financial management.

**PRESENTATION – MATTHEWS VETERAN OF THE YEAR**

Matthews Veteran Advisory Committee (MVAC) Chair Jack Santaniello and Mayor Higdon presented the Matthews Veteran of the Year award to Greg Smith. Mr. Smith, a longtime Matthews resident, served in the US Coast Guard for over 20 years and is a founding member of the Matthews Veterans Advisory Committee. He is very active in the community and volunteers with several local organizations, including Rainbow Express Ministries, Roof Above, the Matthews HELP Center, and his church. He also serves as the Athletic Director for Hooks-Orr Matthews American Legion Post 235 and is the liaison between the Post and Butler High School.

Mr. Smith thanked everyone for their support, noting he is a fifth-generation military member and he is greatly honored to receive this award. He spoke of those with whom he served in the Coast Guard and with those he currently serves alongside with his volunteerism, and thanked those people for their work. He noted that anytime someone receives an individual recognition, it's because of a phenomenal team behind them.

**RECEIVE INFORMATION FROM MATTHEWS PLAYHOUSE**

Matthews Playhouse Executive Director Sarah Baumgardner and Executive Advisor June Bayless discussed the Playhouse's recent work and upcoming events. Ms. Baumgardner explained the theater's commitment to mainstage performances, theater education and community engagement. Seven mainstage performances have/will be held in the 2022/23 season, over 300 students participated in the school of theater, which teaches important life skills, and over 1,000 students participated in the summer camps. Community events includes performances at various Town and local events as well as a free performance in Stumptown Park and partnerships with local nonprofit organizations for every show. The theater also welcomed over 2,400 visitors to its Haunted Trail, and presented the BIPOC Playwrights Festival, celebrating playwrights who are black, indigenous and people of color and amplifying lesser-

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 96 of 259

heard voices in the community. Ms. Baumgardner noted the intent to bring more people to Matthews and make the arts more accessible to everyone.

Upcoming events include the programs *Seussical, Clue,* and *Hello Dolly,* along with the School of Theater show and summer camp. Ms. Bayless discussed plans for 2024 programming, which will include three shows, a community holiday celebration, and a new dinner theater experience. She noted the Matthews Playhouse has been in town for 28 years and would not be there without the support of the Town of Matthews. Over the last year, the Mecklenburg County region lost two of its major live theaters, so the Matthews Playhouse is serving a larger region than ever before. These events will bring increasing audiences to the region and bring patrons to local businesses.

Mayor Higdon noted the many great comments he's heard from children participating in the summer camps, and complimented the Playhouse performers' professional level of quality, saying it's phenomenal to see the level of talent here and the efforts everyone involved put into it.

### PUBLIC COMMENT

Brook Ephrem, Devan Shah, Pavan Thakkar, Sanjita Srinath, Iniya Illamparthi and Siddhant Mody representing the FIRST Tech Challenge Team 16461 Infinite Turtles robotic team from Matthews and performed a demonstration of their equipment and skills. They discussed their robotics program and explained the team wants to inform others about robotics and hopefully create funding opportunities for the team. Mayor Higdon noted he is an engineer and knows there are a lot of practical applications in manufacturing and other fields.

Mark Rieger of Stevens Ridge Road, off Reverdy Lane, stated that Reverdy Lane is a skinny, unmarked, dark road that is difficult to drive - cars are frequent and he's surprised there aren't more sideswipes. He asked if there were any plans for the Town to address Reverdy Lane. Town Engineer Susan Habina Woolard explained that the Town does not currently have any plans to improve Reverdy Lane, but can pursue lighting installation, which would be done through a petition process, and can investigate crash data for the area.

### REPORTS FROM ADVISORY COMMITTEES

### APPEARANCE/TREE ADVISORY COMMITTEE

Appearance/Tree Advisory Committee Chair Debbie Foster reviewed some of the committee's recent work. The Committee and Town worked with a North Carolina State University Masters-level student on the Town's tree canopy data. Matthews' tree canopy turned out to be 46.2%. The Committee is concerned about the impact of development, particularly the canopy that will be removed in relation to development projects that have been approved but not yet constructed. She explained it takes years to grow trees large enough to be visible in a canopy survey. The Committee has also run tree stores, which are tree giveaway programs for Matthews residents. They're funded through the fees in lieu program and allow native trees to be planted at no cost to residents. Unfortunately, the funding from the fee in lieu program comes from development projects that remove trees, so it means they were lost elsewhere. The community is also losing bigger trees because they're difficult to develop around.

Ms. Foster noted a concern that there may be some invasive species that were counted as part of a true tree save area. She didn't have confirmation of that, but wanted the Town to be aware it could be an issue. She then discussed some benefits of trees, including the environmental aspects of trees positively impacting water runoff and flooding concerns, their role in the removal of carbon dioxide, particulate matter and ozone, and the way they provide food and shelter for many animal species. Heath benefits include trees' impact on mental well-being and health-related costs due to obesity, and economic benefits including income from facility rentals, athletics and programs and higher property taxes and home sales due to the existence of trees in the area. The Committee drafted a list of recommendations, which include, but are not limited to updating canopy data using the existing tree canopy program;

Case 3:25-cv-00318-MOC-WCM Document 12 Filed 05/23/25   Page 97 of 259

consideration towards increasing the required amount of tree save area in the ordinance; and considering all aspects of the pay in lieu options and their impacts to the canopy over time.

## MATTHEWS COMMITTEE ON EDUCATION

Matthews Committee on Education (MCE) Chair Joanna Schimizzi reviewed the mission of the Matthews Committee on Education, which is to promote a strong, healthy, and cooperative relationship between the Town of Matthews, Charlotte-Mecklenburg Schools (CMS), and charter schools, private schools, and home schools in Matthews. The Committee has been very focused on student mental health and wants to focus on the issue of student mental health as it relates to learning. Schools are doing a great job of acknowledging that *how* the brain learns impacts whether or not the brain learns at all, but there are some things standing in the schools' way. The Committee has talked a lot about proactive support versus reactive support in crises. It seems like the Matthews area is in a mental health desert because there isn't much attention paid to mental health supports, particularly for students. Students are experiencing mental health needs, but they shouldn't wait until they're in crisis. North Carolina ranks 42nd overall for youth mental health. The Town may want to consider adding questions about this to its citizen survey.

The committee requests the Town to add to its legislative agenda to advocate to North Carolina General Assembly for increased funding for and reporting on mental health initiatives; and advocate to CMS and Mecklenburg County for increased funding for and reporting on mental health initiatives in schools.

Mayor Higdon asked the Town Manager to look into some of these suggestions, like adding questions to the citizens survey and adding some of those links to the Town website. He advised Ms. Schimizzi that he and Ms. Hawke recently met with new State Representative Laura Budd and asked about additional funding for mental health. In speaking with school resource officers, it's apparent that this is a mental health desert – the school resource officers are sometimes acting in support of mental health. Mr. McCool noted he's a member of the Committee and very supportive of these suggestions.

## CONSENT AGENDA

  A. Approve Board of Commissioners Meeting Minutes – January 9, 2023
  B. Approve Board of Commissioners Closed Session Meeting Minutes – December 12, 2022 & January 11, 2023
  C. Approve Revision to Matthews Veteran Advisory Committee Bylaws
  D. Appoint Amy Money to Parks, Recreation and Cultural Resource Advisory Committee
  E. Approve FY24 Budget Adoption Schedule
  F. Approve Resolution Supporting Paved Trails and Sidewalk Feasibility Study Grant Program
  G. Approve Request for Street Closures for Town-Sponsored Special Events
  H. Approve Resolution Supporting NCDOT Naming of Weddington Road Interchange
  I. Approve Commissioner Garner's Request to Attend Course
  J. Approve Budget Ordinance Amendments for:
    1) Installation of Speed Cushions and Signage on Morningwood Drive - $3,025.00
    2) Repairs to Seaboard Station Depot Visitor Center & Museum - $12,250.00
    3) Donations to Fire & EMS Department - $3,250.00
    4) NCLM Insurance Proceeds -13,560.00

Motion by Mr. Tofano to approve consent agenda items A-B and D-J4. The motion was seconded by Mr. McCool and unanimously approved.

## UNFINISHED BUSINESS

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 98 of 259

## CONSIDER CREATION OF ORDINANCE CHAPTER 104 – OUTDOOR SEATING

Senior Planner Nadine Bennett reviewed the history of this, noting that the Town created a temporary outdoor seating program during the COVID-19 pandemic to support local businesses. The temporary program ended when the emergency order ended. The Board then approved a parklet program in October 2021 and now must adopt an ordinance to make it effective. The draft ordinance is based on Raleigh's program, and the recommended action is to adopt the ordinance. Town Attorney Charles Buckley noted this this ordinance allows alcohol to be consumed, but with the parklets, the business's patrons will have to go into the building to obtain their alcohol and bring it back outside - they can't be served alcohol outside, per ALE (Alcohol Law Enforcement) law. He also noted there is another document – the encroachment agreement – that includes language about guidelines that need to be approved by the Town.

Mayor Higdon noted his son lives in New York City and parklets are a big thing there – they add so much vibrancy, and it's really nice to see people sitting out there and enjoying themselves. Mr. Tofano said he'd heard some concerns form business owners that this might allow people to bring in outside alcohol, but he is satisfied now that that is addressed in the ordinance. Ms. Bennett confirmed that would not be allowed. Mr. Urban asked if the guide allowed each applicant to come up with their own design; Ms. Bennett said it doesn't speak to that. Mr. Urban said the Town should probably talk about that to make sure there's some cohesiveness – maybe by including some basic design while allowing for some creativity from the businesses. Mr. Tofano noted that each application would go through a conditional approval process with the Board. Ms. Bennett agreed but said it would probably be best to include some guidelines before an application gets to that stage. Staff can update the referenced guidelines. There has been only one applicant so far so there's time to make revisions. Mr. McCool asked about the fee; Ms. Bennett explained staff had originally suggested a range of $500-$1,500 but now feels comfortable recommending an annual fee of $500. The applicants would be responsible for cleanup and any liability issues.

Motion by Mr. McCool to adopt the outdoor seating ordinance as presented. The motion was seconded by Mr. Whitley and unanimously approved.

## CONSIDER STUMPTOWN STATION PARKLET

Senior Planner Nadine Bennett reviewed the application from Stumptown Station for a temporary parklet in front of their business. In April 2022 the Board agreed to a term of two years. The applicants have worked on the parklet design and staff is comfortable with their plans. Staff believes this will be a good addition to downtown Matthews.

Mr. Urban asked if staff noted the parklet will be anchored with concrete pads; Town Engineer Susan Habina Woolard explained they looked at that. Mr. Urban referred to his comments in the previous item, saying staff could point to this parklet as the example to use for others that come after it. Mr. Tofano asked if there was a maximum number of people that could be located within this area; Ms. Bennett said no. Mr. Whitley pointed out the bench seating along the sides that will allow for more patrons. Mr. Urban said code would 13 people but likely fewer would do so.

Motion by Mr. McCool to approve the parklet application for Stumptown Station with a two-year duration. The motion was seconded by Mr. Urban and unanimously approved.

## NEW BUSINESS

## CONSIDER EXPANSION OF PUBLIC ART/OUTDOOR SCULPTURE GALLERY

Cultural Recreation Coordinator Melissa Johnson reviewed plans for the 2023-24 outdoor sculpture gallery display. Ten artists applied this year. There are currently five locations and staff would like to add three more, for a total of eight sculptures in the gallery. The new locations are planned for the greenway close to Fountain Rock Park, at Purser Hulsey Park near the dog park, and at Rice Park near the playground. The Parks, Recreation and Cultural Resource Advisory Committee reviewed all the applications and decided on the following eight sculptures: "Blended

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 99 of 259

Joy" by Tom Risser for the Town Hall location; "A Wheelie Good Gong" by Drew Coombes at the planter by Flying Biscuit Cafe; "Crimson Arcs" by Matt Amante at the corner of Trade Street & Charles Street:; "Prismatic Aura" by Jim Gallucci at the Matthews Community Center; "Sunset" by Scott Griffin at the greenway entrance; "Head Down" by Jonathan Bowling at Purser Hulsey Park; "Blue and White Armchair" by Olivia Hueble at Fountain Rock Park; and "The Upside Down" by Tom Risser at Rice Park.

She noted that the "Sunset" sculpture is planned to be located at the greenway entrance as long as it weighs less than 200 pounds, but if the finished sculpture weighs more than that it will have to be relocated to the corner of Trade and Charles Street as the greenway entrance area can only support so much weight. She also explained that adding the locations at Rice Park and Purser Hulsey Park, Matthews will be adding art to the side of town that currently doesn't have any. She also explained that if approved, each artist will receive a stipend of $1,000. The art will be loaned to the Town for one year. If any piece is sold during that time, the Town will retain 15% of the sale price. The sculpture would remain in place for the entire year, even if sold.

Mayor Higdon asked if there have been any incidents of vandalism on the existing pieces; Ms. Johnson said no. He asked how many submissions were received; she explained the Town received 19 submissions from 10 artists. He noted two were chosen from the same artist and said he'd prefer to see multiple artists given opportunities.

Motion by Mr. Tofano to approve the sculptures for the Outdoor Sculpture Gallery as presented. The motion was seconded by Mr. McCool and unanimously approved.

Mr. Urban asked about a guide map for the art. Ms. Johnson explained that a digital version is available on the Town website – visitors can click on the image and pull up information on each piece. QR codes will be added that will link to that page. Staff has been considering a brochure too. Mr. Whitley noted that staff and the Board had discussed a painted design for Crestdale Heritage Trail along Matthews Chapel Road about a year ago and requested an update. Ms. Johnson explained that the Town had been waiting on the traffic paint to become available, but because a lot of it would be needed, they've moved to another type of paint. The design that was chosen resembles stained glass, as a nod to the churches in the area.

## APPROVE REQUEST FOR EXEMPTION FROM ORDINANCES 93.06 AND 130.02 PROHIBITING ALCOHOL WITHIN PARK FACILITIES FOR CERTAIN SPECIAL EVENTS

Special Events Coordinator Lee Anne Moore reviewed the request to allow the sale of beer and wine at certain Town events: the St. Patrick's Concert, the Beats 'n Bites series, the Festival of India, Symphony Night in Stumptown Park, Musica Matthews, Pawsitively Matthews, the Cool Vibes concerts, and Jingle Jam. The brewery and winery will provide the off-site premises permits and their staff will check IDs at the point of sale.

Mr. Tofano asked about language guaranteeing that the vendors are local to Matthews, as he doesn't want outside vendors taking business away from local businesses. Ms. Moore explained that part of the legal requirement for the vendors' offsite event ABC permits is that the vendor must make the product they sell, and not all of the Matthews vendors do that. Staff has typically worked with Seaboard, a Matthews business, for beer, since they brew their own, but there are no Matthews wine vendors that make their own wine.

Motion by Mr. McCool to approve exemptions to Town Ordinances 93.06 and 130.02 to allow the sale/consumption of alcohol on Town property, for the 2023 concerts, festivals, and events listed per Ms. Moore's memo dated January 23, 2023. The motion was seconded by Mr. Urban and passed 5-2 with Higdon, McCool, Garner, Tofano and Urban in favor and Hoover and Whitley in opposition.

## REVIEW BOND PROJECT DATA AND CONSIDER NEXT STEPS

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 100 of 259

Town Manager Becky Hawke and Town Engineer Susan Habina Woolard reviewed data related to the Town's future bond projects. Ms. Hawke noted that in November, the Board discussed moving forward with some of the design work for these projects before moving forward on the actual construction. The Town would then be reimbursed to make projects shovel-ready. During that discussion the Board noted they'd like to see more details on costs and the timeline. There was also discussion about including public input but there wasn't consensus at that time. Ms. Habina Woolard reviewed information on the bond projects, which includes design timeline and costs as well as other criteria that may be beneficial when considering prioritization. She noted that the project labeled "E. John Street and I-485" is already designed and will be constructed by the North Carolina Department of Transportation. Staff has provided staff's rankings grouped by design periods, but the Board may decide differently.

Ms. Hawke said staff would like the Board to decide if it still desires a public component on the prioritization of the projects, or if it Board wishes to serve that function itself. If the Board wants that public component, the request is for the Board to come to a consensus on the method of public involvement. Mr. Tofano said the criteria pages in the memo would be helpful for the public to review. Mr. Urban said he'd like to have a meeting for the public to weigh in on the prioritization of projects, as the Board owes that to those people who asked about follow-up. He doesn't believe the Town needs to go to the level of a full survey. A separate meeting would be best, but it could be part of a regular Board meeting if necessary. Mayor Higdon noted there will still be opportunities for the public to weigh in on this even after such a meeting. He also said he wouldn't want to scuttle staffs' recommendations unless the public has a compelling reason. He thinks a separate meeting would be best, perhaps on a Saturday morning or afternoon.

Mr. McCool liked the idea of a Saturday meeting, but Ms. Garner said the Board should consider other days, as she's heard from people of Jewish faith that Saturdays are difficult. She would like to make the meeting accessible to people who are sometimes not able to participate. Mr. Whitley suggested looking at just the first four items on the sheet to start, and then look at the rest, as they reflect his priorities, which are always related to safety issues. The community could weigh in on the rest after that. Ms. Hoover was fine with everything discussed so far. Mr. Tofano suggested publishing the criteria information in the weekly newspaper and on social media.

By consensus the Board agreed to hold a separate meeting and let the public weigh in on the criteria pages.

## RECEIVE MONTHLY BUDGET REPORT

Finance Director Teresa Fulk reviewed the budget report through December 31, 2022, noting things are still looking very good. Ad valorem tax collections are a little lower than this time last year, but likely just due to the timing of payments, as this year people could make their payments during the first week of January without interest. Sales tax numbers for July were 22.07% higher than year over year last year – it reflects what we see every day - people are coming to Matthews. Tourism revenues continue to do well. There were some timing issues so some of the distributions have been slightly delayed.

## CONSIDER REPLACEMENT OF DIGITAL SIGN

Communications Coordinator Maureen Keith reviewed the request to replace the Town's digital sign outside Fire Station 1. It was installed in 2012 and is no longer functional. The vendor provided three options for a replacement. The different sized refer to pixel pitch – the smaller the millimeter, the better the image. It would be a one-time cost that includes the hardware and installation. Staff recommends the 10-millimeter sign – the middle option, which would cost approximately $28,000. The group discussed the benefits of the different versions, noting that the better version would cost only about $2,000 more.

Motion by Mr. Tofano to approve the purchase of the 8-millimeter digital sign as depicted in Ms. Keith's memo. The motion was seconded by Mr. McCool.

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 101 of 259
Plaintiffs' Complaint 000069

Mr. Urban asked about the age of the first sign; Ms. Keith explained it lasted ten years. He then asked how the new sign would be funded. Ms. Keith said it would be up to the Town Attorney to decide if Tourism funds could be used. Mr. Buckley said that would not be an eligible use, so Ms. Keith said general funds would be used instead. Mr. Tofano asked about security concerns and the possibility of outsiders hacking into the system; Ms. Keith explained that the Town's IT Manager would review those concerns. The group discussed the options for displays and the potential for similar signs to be placed elsewhere in Matthews.

Ms. Hoover expressed concern about the need for such a sign, saying many residents never drive in that area and so will never see it. Ms. Keith explained that the digital sign is a viable way to reach people with general town announcements and advertise special events. Mr. McCool noted that there are many amenities that people don't see depending on where they live. Ms. Garner said these types of signs are a great replacement for expensive mailers, especially for those who don't have access to the internet. She said she expects the future Fire Station 3 to have a similar digital sign at its location.

The motion was unanimously approved.

## CONSIDER DRAFT ANNUAL LEGISLATIVE PRIORITIES

Town Manager Becky Hawke explained the annual process to review what the Board would like its annual legislative priorities to be. Last year's list has been provided as a starting point, and the Board can add or remove items and provide input before the next meeting.

Staff suggested changes: removing the item calling for supporting efforts to allow municipalities to enact a quarter-cent local option sales tax, and adding items to request a lift of the cap on NCDOT (North Carolina Department of Transportation) projected cost limits, request approval to plant trees in NCDOT rights of way, and to request increased funding for and reporting on mental health initiatives in local schools. The group discussed each proposal and by consensus agreed with each of them.

Ms. Hawke requested Board members to forward their comments and suggestions to staff. The list will be finalized at the next meeting.

## APPROVE REVISION TO MATTHEWS VETERAN ADVISORY COMMITTEE BYLAWS

Mr. Urban explained he'd requested the removal of this item from the Consent Agenda for discussion as he was unsure of the need for an elected Board member who is appointed to an advisory committee to have voting rights at the committee level. The advisory committees bring information and recommendations to the entire Board so it seems like an individual Board member with voting rights in a committee would have additional influence in advisory committee recommendations. The group discussed matters relating to quorum, attendance and voting issues in advisory committees. By consensus the Board agreed that each advisory committee may make its own decision on the ability of appointed elected officials to be counted for quorum and voting purposes.

Motion by Mr. Urban to adopt the revisions to the Matthews Veteran Advisory Committee bylaws as proposed. The motion was seconded by Mr. McCool and unanimously approved.

## MAYOR'S REPORT

Mayor Higdon discussed the recent Martin Luther King, Jr. Day events, noting he'd discussed how North Carolina historically lead the charge with civil rights in integrating schools. He thanked Larry Whitley and everyone involved for their work in such a great event. Mr. Whitley thanked the community for their participation and noted a good article published about the events in the Matthews-Mint Hill Weekly.

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 102 of 259

**TOWN ATTORNEY'S REPORT**

None

**TOWN MANAGER'S REPORT**

None

**CLOSED SESSION PURSUANT TO NORTH CAROLINA GENERAL STATUTE 143-318.11(A)(5) TO CONSIDER ACQUISITION OF REAL PROPERTY**

Motion by Mr. McCool to go into closed session pursuant to North Carolina General Statute 143-318.11(a)(5) to discuss acquisition of real property, to include the Mayor, Board of Commissioners, Town Attorney, Town Manager, Assistant Town Manager, Planning Director, and Town Clerk. The motion was seconded by Mr. Whitley and unanimously approved.

**ADJOURNMENT**

Motion by Mr. McCool to adjourn. The motion was seconded by Mr. Tofano and unanimously approved. The meeting adjourned at 10:56 pm.

Respectfully submitted,

Lori Canapinno
Town Clerk

# EXHIBIT 13

Thanks so much, Maureen!

Collin Huguley

Staff writer, Charlotte Business Journal

Email: chuguley@bizjournals.com

Office: 704-973-1114

Mobile: 678-617-1565

Subscribe to CBJ's daily news updates

**From:** Maureen Keith <mkeith@matthewsnc.gov>
**Sent:** Thursday, May 11, 2023 1:18 PM
**To:** Collin Huguley <chuguley@bizjournals.com>
**Cc:** Jay Camp <jcamp@matthewsnc.gov>
**Subject:** Re: CBJ Inquiry: Monday rezoning

Hi Collin,

Thanks for checking in and for your interest in this. We're pretty excited about it. Below is a comment to be attributed to Matthews Town Manager Becky Hawke:

"This is an exciting time in the Town of Matthews. The Board's unanimous approval of this rezoning is the first step in a multi-year endeavor to bring an advanced manufacturing campus and public safety training center to Matthews. This is the most significant economic development opportunity in the history of Matthews and we are grateful to Hendrick Companies and CPCC for their partnership as we continue to work together to bring this project to fruition."

Yes, that was Marshall Carlson. I apologize for the terrible audio quality of our meetings - we are working on fixing it!

Let me know if you need anything further.

Thanks,
Maureen

On Thu, May 11, 2023 at 10:28 AM Collin Huguley <chuguley@bizjournals.com> wrote:
Good morning Jay and Maureen,

I hope you two are doing well and have had a nice week. I was reaching out to see if the

town had any comment after the rezoning was approved earlier this week for the property owned by Hendrick for the advanced manufacturing campus and new public safety training facility by CPCC. I see the rezoning was town initiated, so I just wanted to see if there was any further comment from the town on this.

Also, I wanted to confirm the speaker on behalf of Hendrick at the meeting this week was Marshall Carlson. It looked like him, but I couldn't hear clearly when the commissioners addressed him.

Thanks,

Collin Huguley
Staff writer, Charlotte Business Journal
Email: chuguley@bizjournals.com
Office: 704-973-1114
Mobile: 678-617-1565
Subscribe to CBJ's daily news updates

--
Maureen Keith
Communications Officer
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1278
Cell: 704-621-4163
mkeith@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

# EXHIBIT 14

| From: | Jeff Lowrance |
|---|---|
| To: | Becky Hawke |
| Cc: | Mike Whiteman; Jay Camp; Kenneth Reid |
| Subject: | Re: [EXTERNAL] Re: March 8th Neighborhood Meeting |
| Date: | Friday, March 3, 2023 12:15:14 PM |

Hi Everyone,

I talked with Jesse Essex earlier today. HAG and the college are aligned with our planned communication for Monday.

The land gift won't become official until the rezoning takes place, so HAG and the college agree that we'll make a big gift announcement and provide details for the Levine Campus expansion sometime after the April meeting.

For Monday's meeting, the college message will be that we're excited about the possibility to expand the Levine Campus. We are happy for the opportunity to partner with HAG again, providing the rezoning goes through. So many of the region's best automotive technicians have been trained at the Joe Hendrick Center on the Levine Campus. We're still developing our plans for how we might use the property, but we're excited about the possibilities to perhaps grow in Matthews. It's an honor to serve Matthews through the Levine Campus.

Thanks,
Jeff

On Fri, Mar 3, 2023 at 11:08 AM Becky Hawke <bhawke@matthewsnc.gov> wrote:
Thanks, Mike.

I just talked to Gene and we are good on that end. Sounds like he has also talked to Kandi, but I'm happy to talk to Jeff to make sure we are all aligned.

I'll also have Jay reach out to you, Mike, regarding plans/run of show for the presentations next week.

On Fri, Mar 3, 2023 at 10:27 AM Mike Whiteman <mike.whiteman@cpcc.edu> wrote:
Hi Becky, I'm out of the office today, but I've brought our comms person, Jeff Lowrance, into the loop. Jeff, could you reach out to Becky?


**From:** Becky Hawke <bhawke@matthewsnc.gov>
**Sent:** Friday, March 3, 2023 9:49 AM
**To:** Mike Whiteman <mike.whiteman@cpcc.edu>
**Cc:** Jay Camp <jcamp@matthewsnc.gov>; Kenneth Reid <kent.reid@cpcc.edu>
**Subject:** [EXTERNAL] Re: March 8th Neighborhood Meeting


Hi Mike,

I think this would be a good idea if you are prepared with this information.

I do think there might be a bit of a disconnect between the plans for the community meeting and the communications folks from CPCC, Hendrick, and the Town. I'd like to make sure we are all in alignment and I am up to speed on everything.

Mike - are you free for a conference call this afternoon or Monday morning? I will also reach out to Gene.

Thanks,

Becky

Becky Hawke

Town Manager

Town of Matthews

232 Matthews Station Street

Matthews, NC 28105

Town Hall: 704-847-4411

Direct: 704-708-1231

Fax: 704-845-1964

bhawke@matthewsnc.gov

www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

On Thu, Mar 2, 2023 at 12:14 PM Mike Whiteman <mike.whiteman@cpcc.edu> wrote:

Hello Jay and Becky,

Should we plan to bring any information related to the Public Safety Training Center to the March 8th meeting? Powerpoint slides or renderings of the proposed project?

--

Thank you,

Mike Whiteman CPA, MBA

Vice-President for Finance and Administrative Services

Central Piedmont Community College

C: 704-783-6467 O: 704-330-6706

--
Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

--

**Jeff Lowrance**
Vice President - Communications, Marketing & Public Relations
Central Piedmont Community College
**t** 704.330.6660 | **m** 704-650-0558
cpcc.edu



# EXHIBIT 15

| From: | Jay Camp |
|---|---|
| To: | Greg Hartley |
| Cc: | Karen Shea; gene.cocchi@hendrickauto.com |
| Subject: | Re: Matthews Hendrick Parcels |
| Date: | Friday, February 3, 2023 1:41:32 PM |
| Attachments: | image001.png |

Thank you Greg. We are in receipt of the rezoning documents and will let you know if we need anything else. Since the Town is processing this as a Zoning Motion (Town initiated rezoning), we will remove the first page and replace it with our zoning motion form.

Gene, I promised earlier this week that I would provide a summary of the process. Here's a general timeline of events between now and May 8th. We'll post rezoning signs on the property in late February or early March and will also mail notifications to the adjacent property owners.

February 13th - Town Board formally accepts zoning motion application. It is a consent agenda item which means there will be no discussion and no need for you all to attend.
March - A community will be held. A room at CPCC might be a good location. We'll work on the logistics.
April 10th - Public Hearing. Staff will provide a report and short presentation to the Board of Commissioners. You will also have an opportunity to speak and share a presentation.
April 25th - The request will go before the Planning Board for recommendation.
May 8th - Final decision.

Let me know if you have any questions. Thanks

Jay

On Fri, Feb 3, 2023 at 1:07 PM Greg Hartley <ghartley@acro-ds.com> wrote:

Jay,

Attached is the information we discussed for the Hendrick submittal. Let me know if you need anything else.

Thanks,

**Greg Hartley**

Partner

Plaintiffs' Complaint 000064



c: 980-417-4288

GHartley@ACRO-DS.com

Mailing Address

PO Box 32216

Charlotte, NC 28232

Physical Address:

601 S. Cedar St. Suite 101

Charlotte, NC 28202

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

--



Jay Camp, AICP
Planning Director
Town of Matthews
232 Matthews Station St.

Plaintiffs' Complaint 000065

Matthews NC 28105

(704) 708-1226

jcamp@matthewsnc.gov

Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

# EXHIBIT 16



Town of
**Matthews**
North Carolina

**MINUTES**
**BOARD OF COMMISSIONERS SPECIAL MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**FEBRAURY 13, 2023 – 5:30 PM**

**PRESENT:**     Mayor John Higdon; Mayor Pro Tem Ken McCool; Commissioners Renee Garner, Gina Hoover, Mark Tofano, John Urban and Larry Whitley

**ALSO PRESENT:** Town Manager Becky Hawke; Assistant Town Manager Melia Gordon; Fire & EMS Chief Rob Kinniburgh; Communications Coordinator Maureen Keith; Town Clerk Lori Canapinno

The Board met with Mecklenburg Emergency Medical Services Agency (MEDIC) Executive Director John Peterson and Deputy Director Jon Studnek to discuss MEDIC response times. Mr. Peterson reviewed MEDIC's existence as the sole ambulance provider for Mecklenburg County. It is a government agency overseen by board members appointed by the Mecklenburg County Board of Commissioners. MEDIC is proposing changed to its response methodologies to ensure appropriate resource allocation and patient prioritization.

Currently, 76% of 911 calls are dispatched as life-threatening situations when in reality only 5% are determined to be actually life-threatening. MEDIC must be able to respond as quickly as possible to the sickest patients – those deemed priority one patients. There's been a 33% increase in priority one calls in the last five years, and MEDIC is also seeing an increase in non-priority calls. MEDIC is also seeking to reduce the use of lights and sirens on responding vehicles, as the use of these tools increase the chance of crashes by 50%, when their use results in an average time savings of between 42 seconds and 3.8 minutes. Data shows only 6.9% of medical calls using lights and sirens resulted in life-saving interventions

Dr. Studnek reviewed the 911 call process. 911 calls are answered by dispatchers who determine the type(s) of service needed and those resources are then dispatched as needed. In Matthews, Fire & EMS responders are dispatched as well. Currently, response time targets range from 10 minutes 59 seconds to 60 minutes, and first responder resources are dispatched for some, but not all calls. The new plan would add tiers to the response configuration, and response time targets would range from 10 minutes 50 seconds to 90 minutes, with first responder resources dispatched for some, but not all calls. The plan introduces a 60-minute response time for low-acuity patient types, with no first responders, and no lights and sirens. This was created during Covid when resources were really stretched. The nurse advice line, poison control, and behavioral health crisis lines will continue.

MEDIC also has a rideshare program in place for patients who need only transportation to the hospital. MEDIC handles the scheduling for the patient and they've had good success with that in the year the program has been in place. These are regular Uber and Lyft drivers who choose to participate in the healthcare system. They transport nonacute patients only and provide no medical care. Those ride costs are paid by MEDIC, not the patient. He explained that MEDIC often deals with patients who use emergency services as their safety net. They often have some sort of supportive housing need or aren't enrolled in any type of program that would let them get easier access to healthcare. They may need services and programs, and MEDIC routes them to the right place. It's often a long and arduous process.

Dr. Studnek noted there are some calls within the community that have a high likelihood of not needing ambulance transport, such as minor traffic accidents or medical alarms, so first responder partners are sent, and an ambulance will be made available if the first responder partners deem one to be necessary. Medical Director Dr. Doug Swanson determines whether or not the protocols MEDIC follows are safe for the community. For the last year MEDIC has been operating the 60-minute response configuration and he has reviewed all the data. There were 12,901 60-munute responses between October 2021 and October 2022. 65% were transported to a local emergency department, meaning 35% were not transported, and less than 1% were transported as a high priority patient. Dr. Swanson has determined that no patients had a clinically-meaningful impact to their care based on response time.

Mr. Peterson summarized that rapid response to high priority emergencies will not change, and will actually improve. These changes will increase safety for providers and the motoring public due to the decreased use of lights and sirens and improves MEDIC's ability to respond to the sickest patients. Patients will receive a response that aligns to

the severity of the patient's condition, similar to hospital triage, which means that some will experience longer response times for non-life-threatening emergencies. MEDIC's website, medic911.com, has more information about response configuration, a public comment section there, and information about upcoming community meetings that will be held throughout the county to educate the public on this new approach.

Mr. Tofano asked if these changes were being made for bookkeeping purposes or if they have implications for reimbursement or reporting. Mr. Peterson said no, MEDIC is just making sure the right resources are going to the right patients at the right time. They need the flexibility to use the ambulances for higher acuity calls to respond to the sickest patients. In response to Mr. Tofano's questions, Mr. Peterson explained that MEDIC is a government agency created in 1997. The government employees report to an Agency Board of Commissioners appointed by the Mecklenburg County Board of Commissioners. MEDIC also acts as the county EMS authority on behalf of Mecklenburg County. MEDIC does not provide services outside of Mecklenburg County. Mr. Tofano asked if they've considered working with CATS (Charlotte Area Transit System) to provide free services. Mr. Peterson explained that CATS provides rides to some people with hospital appointments or to regular care, not emergencies.

Mayor Higdon asked if emergency vehicles could use lights or sirens instead of both. Mr. Peterson said no, explaining that using just lights or just sirens is confusing to drivers and pedestrians. Responding to emergencies is one of the most dangerous things their staff does, so anything to avoid accidents is helpful. Mayor Higdon noted MEDIC appears to be confident that patients will be properly vetted by the dispatchers. Mr. Peterson explained that their medical priority dispatch process uses the worldwide standard. They do rely on the information they get from the caller, so while it's unlikely, it's possible that the emergency will be something different than how it came through the dispatch process, but the dispatchers are trained professionals. Mayor Higdon asked about costs. Mr. Peterson explained that every insurance carrier is different and it's almost impossible to know in the moment if someone's insurance will cover an ambulance ride.

Ms. Hoover asked the average length of service for a medic. Mr. Peterson explained it's a physically and mentally challenging job, and the nationwide average is about five years in service. In response to Ms. Hoover's additional questions, Mr. Peterson explained MEDIC continues to experience a staffing shortage but has new programs that will bring new EMTs (Emergency Medical Technicians) into the system. They currently have about 65 vacancies and will bring on 40 new EMTs by July through a partnership with the community college. They've also received $1.2 million in ARPA (American Rescue Plan Act) funding to bring in people and train them to be EMTs. They're making great progress and the goal is to get as staffed up as possible this year. The minimum starting wage is $20 per hour, and $25 per hour for EMTs, with the opportunity to earn more as members rise through the ranks. Anyone interested in a job should go to medic911.com.

Town Manager Becky Hawke asked Mr. Peterson to discuss what Matthews-specific data will be available to the Town to help staff understand the baseline versus new data. Mr. Peterson noted MEDIC will track response times under the new configuration and compare and contrast those to the previous configuration, and has committed to doing that monthly, at least to start, with the fire chiefs. If there is anything MEDIC finds that it needs to pivot on, it will have the ability to do so. He committed to providing Matthews-specific data to the Town for review.

Mr. McCool asked if there are examples of other agencies going to a similar strategy; Mr. Peterson explained there are other services in the US and Canada doing something similar, but MEDIC is the first in North Carolina to do so. Mr. Tofano asked about MEDIC's financial status. Mr. Peterson explained that MEDIC receives about 25% of its funding from Mecklenburg County, primarily to cover calls for which they don't recoup payment, standby calls such as ambulances at football games, and capital improvements. MEDIC doesn't have a public balance sheet but it can't own real property or carry debt, and its expenses must match its revenue. The county subsidy is primarily used to match that debt. Ms. Garner noted some residents have questioned their calls being diverted to Union County. Mr. Peterson explained the agencies have mutual aid agreements in place with adjacent counties and calls coming from close to the border may be handled by an adjacent organization. That is common practice. Ms. Garner asked about an issue from several years ago in which the county was planning to institute wage garnishment on those who couldn't pay for their ambulance rides. Mr. Peterson explained that had been discussed but never implemented.

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 118 of 259

Matthews Fire & EMS Chief Rob Kinniburgh noted this has been a long process. The system MEDIC and the Fire & EMS department has been operating under is 25 years old and not current with a county of this size. In Matthews, EMS calls total 60% of what the department does. Of the 2,600 plus calls they responded to last year, 28% of them were priority one, showing that Matthews has a large share of priority one patients. These changes should result in about one less call to the Matthews Fire & EMS department per day. About 50% of their responses under this program will be non-emergency, so not using lights and sirens. He noted state law says emergency vehicles are only considered to be emergency vehicles when they display lights and sirens. Staff can upgrade the response to lights and sirens if they feel it's warranted.

He noted MEDIC has agreed to provide the notes so Matthews staff can review the data. Currently, their on-scene response time is 7 minutes, 17 seconds. He noted Matthews' citizens expect a high level of service and response, and he is concerned about the calls that his department won't be informed on. Matthews has a much older population than much of Mecklenburg County and his department will be meeting with the senior communities to discuss these changes with them so they understand what's going on. He noted there is usually an ambulance in the area due to the hospital location and that Matthews has a priority post location for MEDIC. Dispatch is an issue – the lowest paid person is the one who answers the phone, and it's a high-stress, high-demand position. The 911 system is overburdened. Matthews staff will be reviewing response times and fielding calls from citizens asking why they didn't show up. He worries about the calls they won't know about, the fact that 28% of the calls in Matthews are priority one calls, and that on 38% of their calls, they get double-called, meaning they get another call while they're on the first call.

**MINUTES**
**BOARD OF COMMISSIONERS REGULAR MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**FEBRAURY 13, 2023 - 7:00 PM**

**PRESENT:** Mayor John Higdon; Mayor Pro Tem Ken McCool Commissioners Renee Garner, Gina Hoover, Mark Tofano, John Urban and Larry Whitley

**ALSO PRESENT:** Town Attorney Charles Buckley; Town Manager Becky Hawke; Assistant Town Manager Melia Gordon; Public Works Director CJ O'Neill; Planning Director Jay Camp; Senior Planner Rob Will; Senior Planner Nadine Bennett; Planner Darin Hall; Planning Board Chair Jim Johnson, Vice Chair Howard Labiner, members Jonathan Clayton, Tom Dorsey, Bob Jackson and Doug Rose; Communications Coordinator Maureen Keith; Town Clerk Lori Canapinno

**REGULAR MEETING CALLED TO ORDER**

Mayor Higdon called the meeting to order at 7:04 pm.

**INVOCATION/MOMENT OF REFLECTION**

Ms. Garner recognized February as Black History Month and issued an invocation.

**PLEDGE OF ALLEGIANCE**

Mayor Higdon led participants in the Pledge.

## ADOPT AGENDA

Motion by Mr. Tofano to remove item G1 – budget ordinance amendment for replacement digital sign – from the Consent Agenda and list it as Unfinished Business item 10B. The motion was seconded by Ms. Garner and unanimously approved.

Motion by Mr. Whitley to adopt the agenda as amended. The motion was seconded by Mr. McCool and unanimously approved.

## PUBLIC COMMENT

Kress Query spoke about the history of zoning in Matthews, noting that he built his home here in 1967, there were no regulations to stop the construction of an office nearby. He was elected to the Board of Commissioners and then appointed as Mayor soon thereafter and worked with the for two years with the Institute of Government to draft a zoning ordinance to control growth and zoning. Zoning has been a major concern of him over the years he's served. There is a current zoning case near him and his neighbors asked for his assistance. He knows the importance of zoning.

## RECESS REGULAR MEETING FOR PUBLIC HEARINGS ON APPLICATIONS TO AMEND THE UNIFIED DEVELOPMENT ORDINANCE AND LAND USE MAP OF THE TOWN OF MATTHEWS

Motion by Mr. McCool to recess the regular meeting for public hearings on applications to amend the Unified Development Ordinance (UDO) and land use map of the Town of Matthews. The motion was seconded by Mr. Urban and unanimously approved.

Mayor Higdon noted that public hearings will be held until 10:00 pm, and those not heard by 10:00 pm will be continued to March 13, 2023. He also explained that there was some confusion earlier, and those who have previously spoken on the Santè Matthews rezoning item will not be allowed to speak again this evening. Town Attorney Charles Buckley explained that the Town is following case law that requires the Town to follow its own rules so as not to invalidate its decisions.

Planning Director Jay Camp introduced members of the Planning Board: Chair Jim Johnson, Vice Chair Howard Labiner, members Jonathan Clayton, Tom Dorsey, Bob Jackson and Doug Rose.

**Zoning Application 2022-749/Santè Matthews: to change the zoning from R-VS & R-15 to MUD, R-VS, BH(CD) on that certain 82+ acre site located at the intersection of Stallings and Idlewild Road and the I-485 Interchange and being designated as tax parcels 215-141-05, -09, -08, -19, -06, and 215-151-01, -02 -03 -11, -73, -78, -79, -05, and 215-141-07 and further identified as 14704 Idlewild Road** *continued from January 9*

Senior Planner Nadine Bennett reviewed this application to rezone approximately 83 acres located at the intersection of Stallings Road and Idlewild Road from R-15 and R-VS to MUD, R-VS and BH(CD) for a master planned community consisting of 570 residential units for sale and rent, with a mix of single-family detached housing, townhomes, cottages, and apartments. A portion of the residential area would be age targeted, and a wellness center would be associated with the entire neighborhood. The application also proposes up to 15,000 square feet of office uses, 40,000 square feet of retail uses, and up to 54,000 square feet for a grocery store.

In 2007, a portion of the area was rezoned for the Silver Oaks project, which proposed 38 single family homes and 96 pinwheel-style patio homes, with neighborhood entrances on Stallings Road and Davis Trace Drive. That project

Case 3:25-cv-00318-MOC-WCM Plaintiff's Complaint 000700 Filed 05/23/25    Page 120 of 259

wasn't built and a requested change of conditions was denied in 2010. An application for multifamily units and office uses on the other side of Stallings Road was denied in 2011.

Ms. Bennett reviewed the updated site plan and conceptual master plan, along with recommendations from the Town's Eastern Gateway Plan, a small area place that includes as an overall concept a mix of land uses within walking distance and a variety of housing choices. The proposed plan matches up with the Eastern Gateway Plan pretty well. The single-family housing is places up against the existing neighborhood so it's the least dense area and gets denser as it moves toward I-485, and the nonresidential uses are located up against Idlewild Road. The plan includes parks and a public gathering space. The applicants provided staff with their pattern book but staff needs to the elevations of the outparcel buildings. The Eastern Gateway Plan didn't anticipate drive through retail along Idlewild Road. Staff thinks it can be good for the neighborhood if it's done right.

The plan includes for-sale and for-rent products, with a variety of housing types even within the multifamily units. The residential units include single family attached and detached and multifamily with duplexes and smaller and larger apartment buildings that get denser as the development approaches I-485. The CMS (Charlotte-Mecklenburg Schools) indicates the project could add up to 136 students to schools in the area. 60 students would be going to the elementary school, which is not over capacity now, 50 to Mint Hill Middle School and the rest to Butler High School. The middle and high schools are currently over capacity. There will be a new fire station located at 3017 Matthews-Mint Hill Road, significantly closer than the Idlewild Volunteer Fire Department that would have served the area. Staff will continue to review the revised plan, but saw no significant problems on first review. The TIA (Transportation Impact Analysis) will require close attention by staff. Other departments will need to review the revised plan as well.

Applicant representatives Peter Pappas, Jim Schumacher and Tom Walsh of Pappas Properties addressed the Board. Mr. Pappas thanked the Board, staff and citizens who met with his group to review these plans. The team wanted to understand everything that's important to Matthews, and their efforts have been earnest to provide the best possible plan for this area. He said the plan is based on the preservation of open space, stringent architectural design guidelines, a focus on wellness with activities and engagement, and placemaking. One of their early objectives was to create a logical buffer from the existing single-family neighborhoods to the detached single-family housing provided by David Weekly Homes with a large buffer and open space in between. This plan would realign Stallings Road. The roundabout would ease traffic congestion and provide safer movements. The plan increases density to include neighborhood retail services – restaurant, grocery store, offices – and some multifamily units. This plan's overall density is significantly less than some previously-approved projects. He and his team are very proud of the work they've done, which includes the provision of attainable housing within the plan.

Mr. Schumacher reviewed the revised plan, explaining the number of housing units was decreased by 92, from 662 to 570, and the number of for-sale single family detached homes increased by 31, from 14 to 45. These would be located on the western edge of the plan. They've also added some green spaces. The edge along Idlewild Road now has an added landscaping buffer that will provide an improved look. David Weekly is their partner in building the 45 for-sale homes. The eastern portion of the site shows the roundabout located at Davis Trace Drive, and Stallings Road would be realigned from its existing location to meet the roundabout at Davis Trace. The applicants will provide all of the right of way needed to the south of Idlewild Road, to keep the roundabout from impacting existing properties on the north side of Idlewild Road, and right of way for the relocation of Stallings Road. This dedication is very important to the state's project for the roundabout. Without this dedication, the state would have to purchase all of the right of way for the roundabout project and the relocation of Stallings Road, which would limit the extent of the state's project.

The plan keeps the village park at the center of the commercial area, surrounded by restaurants and other retail spaces. Many residents in the Windrow neighborhood south of the project off of Light Brigade Drive are very supportive of the project, and would like to be able to walk or bike to the village. As a result, the revised plan extends the pedestrian and bike trail on Stallings Road further south to connect to the neighborhood at Light Brigade Drive. The multimodal trail would be on the west side of Stallings Road and it would extend beyond the limits of the project to get to Light Brigade Drive. The grocery store was reintroduced after community input.

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 121 of 259
Plaintiffs' Compliant 000601

The TIA proposes improvements at and away from the site. These road improvements are mitigation for the impact of traffic from the new project and can also address existing capacity and safety issues. NCDOT (North Carolina Department of Transportation) approved the original TIA modifications to the I-485 interchange bridge, northbound ramp, Idlewild and Thompson Roads to the west, Stallings and Phillips Roads to the south, and Stevens Mill and Idlewild Roads to the east. Shortly after the submittal of the original TIA, NCDOT canceled the diverging diamond project on I-485 and replaced it on Idlewild with the construction of a roundabout. As a result, this plan now incorporates the roundabout and the relocation of Stallings Road to meet the roundabout and related changes. The second version of the TIA is still under review by staff. The final agreements among the Town and NCDOT staff will be part of the design documents going forward.

Regarding Idlewild Road improvements, the recommendations of the TIA include a focus on multimodal components such as multiuse paths, sidewalks, crosswalks, lighting, and a connection across Idlewild Road towards the Stevens Creek Nature Preserve. The primary improvements include the realignment of Stallings Road with the roundabout, which would eliminate the existing Stallings/Idlewild intersection which has a history of a high number of accidents, The roundabout provides improved access and safety to enter onto Idlewild Road for neighborhoods to the north and south. Between the roundabout and I-485 would be a five-lane cross section for Idlewild Road – two through lanes in each direction and a center turn lane, with a planting strip, and a 10-foot-wide path on the south side of Idlewild Road. In the area west of the roundabout, the widening would be three lanes with a through lane in each direction and a center turn lane to provide turn lanes at Barney Drive. That cross section would have an additional planting strip to help screen the single-family homes in the area behind it. This is a good way to get trees on Idlewild Road, as the state won't allow them to be planted too close to the travel lanes. All the roadway improvements would be accelerated and completed by the state and Pappas Properties as part of the project – without it, only the roundabout would be completed by the state and based on their funding schedule, they wouldn't start construction until 2029.

Mr. Walsh discussed the attainable housing component of the plan, explaining they believe it would provide an increase in Matthews/ attainable housing stock and would be a tremendous benefit to the community. Pappas Properties is prepared to commit to 13 for-lease and 9 for-sale units, for a total of 22 attainable housing units. The 13 for-lease units, which total 5% of the multifamily units, would be offered to those at or less than 80% of the AMI (Area Median Income) for a period of 15 years. Rental rates would be set so residents spend no more than 30% of their gross income on housing. Today's attainable rents range from $1,380 for a one-bedroom unit to $1,904 for a three-bedroom unit. Today's market rates range from $1,500 to $2,500 for one- to three-bedroom units respectively. The 13 for-lease units would be spread throughout the multifamily community. The nine for-sale townhomes would be three-bedroom, two-bath units of about 1,500 square feet. They'd be deed-restricted for 99 years and would be sold to households earning between 60-100% of AMI, with first priority to teachers and first responders who work in Matthews, and active-duty military and veterans, and with second priority to individuals working for the Town of Matthews. The developer would make a direct cost subsidy of approximately $85,000 per home to make this possible. The nine for-sale townhomes would be spread throughout the townhome units and would have the same exterior design as the rest. Mr. Walsh presented examples of various qualifying individuals and monthly housing costs.

Mr. Pappas summarized the plan, saying it reflects the Eastern Gateway Plan very well. All four property owners are needed to achieve that vision for design compatibility and to deliver a transportation network, particularly the realignment of Stallings Road, and he has all four property owners working together. The proposed plan allows for the relocation of Stallings Road to a much better location to improve mobility, eliminate congestion and improve safety. There is a substantial amount of open space and natural area throughout the site. This plan includes a commitment to locate for-sale housing against the existing neighborhoods, which is a commitment that does not exist today. The attainable housing program is a major commitment. Transportation improvements have been discussed, and the active adult component would minimize the impact on schools. The CMS-calculated student numbers show 136 additional students, which is only 43 additional students over the existing zoning. The commitment to a wellness-focused community will position this as a forward-thinking development, and all of that results in a cohesive master plan.

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 122 of 259
Plaintiffs Compliant 000012

Mr. Tofano noted there are 125 residential units for sale out of 570 total, meaning approximately 80% of the development would consist of rental units. He asked how that ratio compared to the surrounding area and Mr. Pappas explained he didn't have that data immediately available. He noted there's much more land in this plan than the previous rezoning, and the majority of the density is in the active adult/over 55 housing. Town Attorney Charles Buckley noted that the Board may ask questions about for-sale and rental issues, but that ownership of property is not a zoning tool so decisions may not be based on ownership of property. Mr. Urban asked if the existing zoning conditions would allow someone to develop the property by right with all for-rent units, with any construction such as all-vinyl, with no buffer between residential zones. Ms. Bennett said yes. Mr. Urban said there's a lot that could happen by right, meaning developers could go in and do something that the Board and public didn't like, but they'd be allowed to do so. There is the potential that continually saying no could lead to more damage down the road. Mr. Urban then noted there are four or five significant trees called out on the tree survey, and he asked the applicants to preserve them. He noted the plans call for a 17% tree save – more than the 10% required under the current plan, along with 54 acres of open/green space – more than the eight acres required. He noted the significant amount of tree save, landscaping and green/open area this plan includes versus what could be built by right under the current zoning conditions. Mr. Pappas responded that his team has looked at trees in the buffer areas and looked at where we they enhance planting. People using the multimodal trail would have multiple green spaces they could walk to, including the wellness center, a park near the townhomes, the public park with a place to cross Stallings Road at the intersection, and another intersection with a signal that creates another place to cross, along with pedestrian-friendly connections to opens space and the multimodal trail that extends to the west and east.

Mr. Urban also asked about water runoff. Town Engineer Susan Habina Woolard explained that staff hasn't met yet on that. Mr. Urban noted the increase in water runoff/stormwater retention issues in the last few years, and the Board has talked about increasing the standards for future projects to make improvements to mitigate high rain instances. He then noted the agricultural component of the plan, which is currently tucked into a corner of the site; he'd like to see that better integrated. He noted the positive aspect of the project being located close to I-485 but would like to see if CATS (Charlotte Area Transit System) would consider more bus lines or add connectivity to downtown Matthews. He also noted his previously-discussed disagreements with the logistics of the retail components so he expects staff will be working on that with the applicants.

Mayor Higdon reviewed the concept of by-right zoning for the public, explaining it means that someone can come in and develop a property without any oversight by the Board as long as they follow the conditions of the previously-approved plan and the Town's ordinances. They could add small homes with vinyl siding with small setbacks. The proposed setback to the Creekside homes is large on this proposed plan, but by right it would be very close to the existing homes with minimum landscaping. The southwest corner has a huge tree save area. Single family homes tax the school system more than other styles. The roundabout at Davis Trace will be built by NCDOT no matter what. If it's done in association with the Pappas project, they will contribute the necessary land, but if DOT constructs it, some land from Davis Trace will be needed. Pappas developments are renowned for building high-quality developments. All this being said, he is not cheerleading for the project, but making the public aware of what could happen by right. He also noted that the Board wants to hear from the public – they don't want to vote for something that the community overwhelmingly doesn't want.

Mr. McCool noted the inclusion of a grocery store seems to be a hot-button issue for neighbors and asked about specifications on the amount of traffic it would cause. Applicant representative/Transportation Engineer Brady Finklea explained that a grocery store of the proposed size would generate 362 AM trips and 489 PM trips, both in and out combined. Mr. McCool asked how that would compare to housing of the same size. Mr. Finklea explained the residential unit count would be needed to compare those, but generally, one single family dwelling unit generates one trip during the peak hour on average.

Mr. Urban discussed traffic counts on East John Street, Fullwood Lane, Sardis Road, and Sam Newell Road in comparison to Idlewild Road. He noted Mr. Finklea's previously-provided documentation indicates the westbound peak-hour count of 725 vehicles AM and 725 PM, and the eastbound peak-hour count of 550 AM and 800 PM. East John Street's peak is 1,400; Fullwood Lane's peak is 900; Sardis Road's peak is 900; and Sam Newell Road's peak

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 123 of 259
Plaintiffs' Complaint 000073

is 850. The expected traffic count increase with the proposed project is 150 for the westbound AM peak and 175 PM, and in the eastbound AM peak it would be 270 AM and 270 PM. Adding those numbers together still doesn't total the numbers currently experienced on some of previously-discussed roads. He asked what would occur if Idlewild Road was widened to four lanes all the way. Mr. Finklea said widening it all the way from Highway 51 to I-485 would increase traffic volume – the idea of "if you build it, they will come" – and so by reducing the capacity, it also forces traffic to use other routes. Mr. Urban noted that means if nothing is done, the traffic peaks and starts going the other way, but if the road is widened to four lanes, the volume will just keep going. Mr. Finklea agreed. Mr. Urban noted that NCDOT has committed only to installing a roundabout, with no widening to the roundabout, no turn lane past the roundabout, and no help for Thompson Road.

Mr. Finklea noted that NCDOT's plan is to locate the roundabout at Hooks Road, which the community has said they don't want – they want it further away at Davis Trace Drive. Discussion regarding turning movements related to the roundabout location ensued. Mr. Finklea explained that the proposed location is better than the Hooks Road location because it would co-locate the roundabout between Hooks Road, Davis Trace Drive and Barney Drive, and would have further separation from I-485. The closer it is to the major I-485 intersection, the more likelihood of traffic problems with queuing in between. Part of the proposed plan's improvements include a third lane to help drivers at Barney Drive get in and out, and a realignment at Thompson Road to deal with the acute angle and add two turn lanes for safety. Currently, traffic is backed up partly due to a lot of left turns with the combined lane. Mayor Higdon said NCDOT has had discussions about moving the roundabout to Davis Trace Drive; Ms. Habina Woolard explained that would be contingent on the donation of right of way through the parcels.

Planning Board member Howard Labiner noted the plan's inclusion of affordable housing at 60-100% AMI and asked how that would be considered affordable if it was sold at the 100% level. He suggested the applicants increase the number of apartments and the length of time they'd be rented below market rate. He also asked for serious consideration to the 60% AMI level for the single-family homes. Mr. Walsh explained their holistic approach to providing a community They've discussed providing two of the units on the for-sale side at 60% AMI and two units at 80%, with the rest of them at 100% AMI. Mr. Pappas explained that the five at 100% AMI are attainable because they're donating the land and site work, and wellness center, and the $85,000 per-unit subsidy, which alone makes them more attainable

Mayor Higdon opened the floor to public comment. Brandon Mills, 407 Main Street spoke on behalf of the Matthews Chamber as its Vice President. The vision of the Matthews Chamber is commerce, and this plan proposes residential units and retail and office space, which would allow business growth in Matthews. They've added a cost-effective area for part-time retailers or startup businesses. The Matthews Chamber does support this project as it currently is presented. Steve Sanders, 2220 Providence Canyon Drive, Charlotte is one of the property owners of the land, which is family owned. They've been long-committed to the site and have a deep connection to the land and to the Town of Matthews. They really want to see this site developed in a way that would be the best for the community. They've been approached by many developers over the years but rejected them because the family didn't like their plans. They're thrilled with the proposed Santè Matthews plans, especially how closely their plan matches up with the Eastern Gateway Plan. He thinks this will be a great project and asked the Board to support it as well.

Jessica Tullar, 2013 Coatsdale Lane, Stallings is the Executive Director of the Matthews Chamber and expressed support for this project. She believes the developer has really listened to what the Chamber and business community wants, especially with short-term leases for small businesses. Trey Hendrick, 2300 Kimway Drive has a property owner in Matthews for six years and expressed support for this project. He's seen a lot of growth in Matthews but believes this development would fit well in the town. A mix of retail and residential is important to complete the community, and providing these options in the eastern portion of the town will reduce traffic. He likes the opportunity to travel just a short distance with his family to eat, shop and play safely, and without having to take them outside of Matthews. As an engineer he thinks the traffic improvements, including the roundabout, will be beneficial to the area. Zack Wyatt, Cornelius is the President, CEO and founder of Carolina Farm Trust. Urban sprawl is real and the country and this area is losing farmland faster than people can imagine. He has been working with Pappas Properties about

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 124 of 259
Plaintiffs' Complaint 000094

urban agriculture and urged the Board to think about the importance of urban agriculture. He is very much in support of this project and bringing regional resilience is part of that.

Bob Fesler, 3201 Windrow Lane has been a resident of the area for 35+ years. He distributed a document discussing the detrimental impact of the Santè Matthews project. Some of the ideas discussed today sound better than they did originally, but there's a lot to consider. He said he doesn't appreciate the scare tactic of saying the community should take what is here because it could be worse. He discussed transportation issues, saying they're not fully solutioned. He understands the donation of land is significant, but it doesn't address the overall issues of traffic. It takes 10 minutes to cross Idlewild Road. This plan doesn't address any of the overtaxed infrastructure around the area. Their solutions help them but don't address the traffic overflow. There is some benefit to the people who live in the general area but it will exacerbate the traffic problems. He's heard the funnel analogy but there is no elsewhere – where are they going to go? Overall, it's tone deaf. What has been presented here adds elements back in. He totally supports affordable housing but also think bringing out descriptive personas is unfair. Everyone is still talking about high density. The rental units are a core element of the disagreement. Schools are really overcrowded and increases the amount of parents who drive. The rezoning setbacks and property sizes are changing. He appreciates the green areas. He's not saying it shouldn't be developed, but the area needs thoughtful development and there is still room for more negotiations. He discussed traffic studies, the grocery store, and the claims that some neighbors support the projects. What he saw as a member of the Eastern Gateway Plan review committee was different than what he saw as the result, and it seems that they cherry-picked the comments they wanted. He asked for clarification on the definition of a 55+ community, saying if it's not regulated to only those aged 55 and up, there could be people of all ages there. He also questioned what would happen if those properties don't get rented. He feels there's still work to be done and asked the Board to not approve this as submitted.

Michael O'Connor, 16024 Clear Creek Farm Road lives in the nearby Epcon community. He understands urban growth and congestion. Charlotte has been one of the fastest growing cities for a long time. There are good things here but if everyone just works harder and finds some compromises it can improve. The Pappas Group does really beautiful work, but he does share some concerns regarding density, student generation and school impacts, the number of grocery stores in the immediate area, and the traffic issues. He recommended requiring the road improvements to be completed before any Certificates of Occupancy were issued. David Hoerl, 15117 Sustar Farm Drive said this is a beautiful plan, but he has big concerns about density and traffic. He would like to see the studies showing what the traffic would be versus what it is now. He discussed his experiences with traffic in the area now and is worried about worsening that with so much new housing. Leroy Flowers lives off Stallings Road and Light Brigade Drive on Pommel Lane and supports this project. He discussed his interest in walking or biking to amenities with his family instead of getting in their car. He discussed the importance of community and spending time with neighbors, which this plan would support. He said he was the one who asked for the path to be extended down to his area and the developers did that. He supports this project.

Spero Nixon, 1510 Kirkbridge Court supports this project. He said the Pappas Group has followed what was asked for from the Town's plans and he urged the community to take into consideration what could be there instead. Krissy Merritt, 1901 Light Brigade Drive, spoke of her concerns, particularly relating to traffic. A lot of people already use Stallings Road as a cut-through and her and her neighbors' driveways as turnarounds. She thinks there will be more traffic with the trail. She is a realtor and there are so many people looking to buy a home, so she doesn't think more rentals are needed here. She would like to see it all as for-sale product instead of for rent. She supports discounts for service people to make it more affordable for them. She also doesn't think the area needs another grocery store. Dan Vorgel, 15021 Ron Allen Court lives off Davis Trace Drive and is a new resident. He discussed his history living in various communities and said those who live in rental units are generally temporary and have no connection to the community. He likes community involvement and said renters see themselves as passing through and may not be as concerned with the upkeep of property and community. He has also been a landlord and has seen what his renters did. He is concerned about renters and very concerned about the density.

Tom Aarons, Davis Trace discussed the entrance of the roundabout at Davis Trace and the way it's positioned. He heard the correction that the roundabout was targeted to be built at Hooks Road but NCDOT is accepting if staff

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 125 of 259
Plaintiffs' Complaint 000075

proposes the roundabout at Davis Trace. He said he has a hunch that it's being proposed there to aid in the retail development of this project, as it would be straight line from I-485 to the retail. He questioned how many roundabouts service a small development on one of its spokes. The developer has removed the screening, brought that retail to his community's entrance, and put ingress and egress directly on Idlewild basically in front of them. He doesn't believe that's best practice. He is a real estate developer and real estate attorney and asked the Board not to trade safety for that extra retail. Linda Harmon, 1900 Light Brigade Drive lives at the intersection of Stallings Road and Light Brigade Drive. She said everyone knows that land won't sit empty, and Mr. Pappas does beautiful work. They're not saying don't develop it, but that too much density is going to be chaotic. The backup is from Idlewild Road to Light Brigade Drive, so traffic will still be there, but it will be going through the new development. She doesn't think anyone would want to live there with bumper-to-bumper traffic. All that traffic has to go somewhere. She likes the idea of walkability but would prefer not to see the multifamily units there.

Victoria Namishia, 14001 Mill House Drive lives in the Windrow Estates neighborhood. She discussed the small-town. Atmosphere that drew here to the area. She said she came to voice her opposition to this plan, but then heard about what could be developed by right and is concerned – she doesn't want to see 200 vinyl sided homes there either. She feels that the Town didn't listen to the community when the Eastern Gateway Plan was developed. She doesn't think another grocery store is needed in the area and suggested using that land for a community garden instead. She prefers to have people owning homes so they have investment in the community. She discussed crime that occurs in her neighborhood now and her worries that it will increase with more renters nearby. She knows not all renters are that way but people who don't care about their community are like that. She's worried about what the walking trail might bring to her neighborhood, as they already have issues with Windrow II users trying to access their amenities She said the traffic count on Phillips Road has increased considerably and people have discovered it as a cut through. If this development is approved, more drivers will drive on Phillips Road to avoid the roundabouts. She is worried about the traffic and people coming down Phillips Road to catch the light. Carol Mill Iron, 13848 Idlewild Road expressed concerns about traffic, saying there's a crash daily at the roundabout at Idlewild Road and Highway 51. People can't get out of their property with the traffic. It's a horrible situation and she's worried about crime as well. She said this development is beautiful but it shouldn't be in Matthews.

Lianne Evans, 3212 Winding Trail lives off Phillips Road. She thinks the development is beautiful but she's very concerned about traffic on Phillips Road, saying it's awful trying to get onto Highway 51 on Saturdays. She is also concerned about crime and schools, especially since there aren't even enough school bus drivers right now. The infrastructure should be put in place first. Cynthia Harrington, 2211 Citation Court lives in Windrow Estates and said she hates to think what will happen with this. There is so much traffic and she can barely get out of Phillips Road now. People don't obey the speed limit. There will be issues with construction and congestion. The community is seeing a lot of crime now and she feels like they'll see a lot more. It's a very nice plan but she thinks it's just not right for right now. Gretchen Gaertner agreed with previous comments and said the plan is beautiful but would be better if the homes were for sale and not for rent. She lives on Springwater Drive and said people will come straight down Springwater, Tracelake and Windrow to get to Stallings and down to Phillips. Her neighborhood will be unsafe. She has four children, one who should be moving out but can't afford to, a driver who she doesn't allow to make left turns out for the neighborhood, and a younger son and daughter who play outside. She is afraid of all the safety issues that have been discussed. The traffic study doesn't refer to streets inside her neighborhood - it refers to Windrow but not Springwater, Window II or Villages at Windrow. Windrow Estates and Springwater have 90 and 248 homes, so that's about 350 homes that she thinks were excluded from the traffic study.

Tyler Howard, 7710 Knights Fairway Lane, Mint Hill said he really wanted to encourage the community part of this plan. Multigenerational living is great – having the opportunity to enjoy some amenities without having to drive somewhere is great. He is a young professional who doesn't want to live in Charlotte. Having something like this would allow him to get to know my neighbors in a positive way. Town Clerk Lori Canapinno then read written comments (Exhibit #1 hereby referenced and made a part of these minutes) from David Malcolm, Natisha Rivera-Patrick, Laura Johnston, Billy Sustar, Thomas Stevens, Jake and Becca Walker, Georgia Nixon, Alexandra, Mike and Diana Miles, Summer Sneed, Michael Slavotinek, and Daniel Wright. All letter writers supported the project.

Mayor Higdon asked Ms. Habina Woolard about the comment regarding the safety of the roundabout being built at the entrance of a small community. Ms. Habina Woolard said she'd consult with the Town's TIA consultant and provide that information by the next meeting. Mr. Pappas noted that their plan in the TIA and notes requires them to make most of the transportation improvements on the front end of this project, and that is their intent. There were a lot of comments about the grocery store, and they will address that with an additional note to place a maximum size restriction on that anchor tenant to make it clear that it wouldn't be a Walmart as suggested. There were other comments about the streetscape in front of Hooks Road and which address some of Mr. Urban's comments. The school study and facts were provided by the school system. He understands the existing zoning would add 99 students, while the proposed project would add 136 students, for a delta of 37 additional students. They have also provided the Board with crime statistics, which show apartment communities do not generate more crime. He said they find that people who move to their communities are making lifestyle decisions rather than economic decisions. He appreciates the thoughtful comments from those who spoke about the quality of their projects. If the plan is approved, people will see that the Pappas group's interests are aligned with the neighbors to increase the value of the properties around the development.

Mayor Higdon asked for clarification about the 55+ adult community restrictions; Mr. Pappas explained that would be age-targeted with an objective to lease to that demographic for that component of the project. Mayor Higdon asked about a phasing plan; Mr. Schumacher explained their intention is for the area west of Stallings Road, with the single family, townhomes, and active adult community would be phase 1, along with most of the traffic improvements. The village park surrounded by commercial would be done quickly because it would be an asset to the community. Ms. Garner asked for the TIA questions asked by Ms. Evans to be addressed. She'd expressed concerns about some of the streets in her neighborhood not being included. Mr. Finklea explained that the Mint Hill intersections – Hooks Road, Davis Trace Drive, Barney Drive, and Thompson Road - are directly connected to the site this project would tie into and the other intersections were not included. Not every intersection is included in any TIA. Regarding the roundabout tying in at Davis Trace Drive, he explained that they'd previously located the roundabout at Hooks Road, but the people living on Davis Trace Drive and Barney Drive didn't want to drive through another neighborhood to get to their own, so the developer moved the roundabout further west. That was also in response to comments from the Town and NCDOT that they'd rather see Stallings Road realigned to tie directly into Davis Trace.

Ms. Garner asked if the TIAs take into account the houses adjacent to the roads. Mr. Finklea explained that they start with existing counts. All of the existing homes are traffic. Then they project traffic up to the buildout year, and think about any projects that are approved but not yet developed. That gives a representation of what traffic volumes will be in the future. They identify the new project impacts and mitigate those. All the homes in there today are accounted for. Ms. Garner asked if the inclusion of a restaurant and coffee shop drive-throughs are necessary for the development, as she thinks the drive-throughs will entice drivers on the interstate to visit and immediately hop back onto the highway. She also envisions potential interest of businesses like Brakeman's who don't want a drive-through. Mr. Pappas explained that it's a market condition - some stores are just not developing without drive-throughs. He feels there are neighborhood services that would be positives. Mr. Schumacher confirmed that the roundabout and transportation improvements at Stallings Road and Thompson Road would be included in the first phase. Mr. Urban expressed concerns about phasing the work, suggesting have something saying when the work gets to a specific point on the west side, they'd have to start work on the east side. He asked Mr. Finklea to clarify id all of the existing homes in the area, including those in the Springwater Drive area, were included in the TIA; Mr. Finklea confirmed they were. Mr. Urban requested the screening on Idlewild Road be improved. He also noted several comments made about traffic around the Waverly development in Charlotte and crime in the subject area, and asked for additional information to be shared about those issues.

The public hearing was closed. The application will be heard by the Planning Board on February 28 and come back to the Board of Commissioners for decision on March 13.

*The following public hearings were continued due to the time.*

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 127 of 259

**Zoning Application 2022-765/text amendment**: to amend the text of section 155.504.3.C.3 by adding language that allows more than 600 dwelling units in the ENT-O District to receive construction permits and certificates of occupancy prior to the date on which 40,000 square feet of new commercial space has been completed or is under construction in the ENT-O District provided that each development project that includes dwelling units contains a specified minimum amount of new commercial space *continued from January 9*

**Zoning Application 2022-766/ENT-NRP Group**: to change the zoning on that certain property from R-15 to ENT on that certain property designated as 11330 Brigman Road and further identified as tax parcel 215-081-43 *continued from January 9*

**Zoning Application 2022-768/car wash**: to change the zoning from I-1(CD) to B-H(CD) on that certain property located on the east side of East Independence Boulevard between Matthews-Mint Hill Road and Matthews Township Parkway and being further designated as tax parcel 193-311-82 *continued from January 9*

**Zoning Application 2022-752/Matthews Gateway**: to change the zoning classification and change in conditions from R-9 & MUD to a single MUD district on that certain property designated as 1205 East John Street near the I-485 interchange to accommodate a multi-use development with a maximum of 240,000 square feet of office space, retail, restaurant and other commercial uses, a maximum of 150 hotel rooms, a maximum of 120 single-family attached dwelling units, and a maximum of 285 multi-family dwelling units, and further designated as tax parcels 215-042-19 & -12 & -13 *continued from January 9*

**Zoning Application 2022-772/NAI Southern RE**: to change the conditions on those certain zoning districts designated O (CD) & B-1SCD on that certain property designated as 1640 Matthews Township Parkway and further designated as tax parcel 193-291-45

Motion by Mr. McCool to continue the public hearings for Zoning Applications 2022-765, 2022-766, 2022-768, 2022-752, and 2022-772 to March 13, 2023. The motion was seconded by Ms. Garner and unanimously approved.

**RECONVENE REGULAR MEETING**

Motion by Mr. McCool to reconvene the regular meeting. The motion was seconded by Ms. Garner and unanimously approved.

**PLANNING AND DEVELOPMENT BUSINESS**

**PLANNING BOARD REPORT**

Planning Board Chair Jim Johnson presented the report of the January 24, 2023 Planning Board meeting. (Exhibit 2 hereby referenced and made part of these minutes.) Mayor Higdon asked about the Planning Board's Youth Voice position; Mr. Johnson explained that position is not currently filled but has been in the past.

**Zoning Application 2021-742/Matthews Medical Building**: to change the zoning from I-1 & I-1 (CD) to B-3 (CD) and being property designated 720 Lyle Crews Circle and 641 Sam Newell Road and further being designated as tax parcel 193-245-24 and a portion of 193-245-08

Mr. Urban recused himself as he owns property adjacent to this property.

Senior Planner Rob Will explained the applicant proposes to construct a 45,000 square foot medical/general office building. As staff worked through the details, they found the applicants can comply with all of the requirements of the

Case 3:25-cv-00318-MOC-WCM   Document 1-5   Filed 05/23/25   Page 128 of 259
Plaintiffs' Complaint 000098

UDO, so the previously-discussed eight-foot planting strip and ten-foot multiuse path along the site's Highway 51 frontage will be constructed if the application is approved. Staff recommends approval.

Applicant representative John Carmichael noted the public hearing was held about eight months ago and the applicants have been working in the interim on the approval process. This plan complies with the ordinance. The rezoning to B-3(CD) and elevations are part of the approval. Ms. Hoover expressed concerns with the status of the easement related to the private Lyle Crews Road that property owners along the road pay to maintain. The owners share in the cost of maintenance, calculated on each's square footage, but the easement she read says it should not grant any rights to the public in general. She said the Board shouldn't approve a plan that would override this easement when the public will use that road. Town Attorney Charles Buckley explained that's not uncommon in commercial areas when the road remains private. The Board wouldn't be overriding anything but rather just voting on the zoning. Ms. Hoover said she has an issue approving this when it'll put a burden on the Crawford White Group. Mr. Buckley explained that the Board can't take those private issues into consideration in this rezoning decision.

Ms. Hoover said she'd asked the applicants in July 2022 to get an agreement settled but nothing was done, saying she couldn't approve this if it puts a financial burden on someone when it's out of their hands. Mr. Carmichael explained that there is an easement agreement that gives this property the right to use this road, and there's a maintenance provision. That clause in the easement doesn't mean the people coming to the medical office can't use the road. The concern has been about connectivity, and applicant Thorn Basich wrote to the other attorney saying he'd be willing to have another traffic study done and, if there is an impact, he'd be willing to bear just voting on the zoning. The motion by Mr. Basich confirmed that if approved, Flagship Healthcare would fund an additional traffic analysis to see if there is a change and shoulder the additional burden it indicates regarding maintenance. There is a letter stating that. Mr. Carmichael clarified that the letter states that if the association decides, Mr. Basich would be willing to bear a greater percentage of the additional cost if the study shows additional impact.

Motion by Mr. McCool to approve Zoning Application 2021-742, as the change in zoning is consistent with the Land Use Plan because it contains development that is consistent with the surrounding uses. The change in zoning is reasonable in that it will add more non-residential uses to the Highway 51 corridor. The motion was seconded by Ms. Garner and passed 4-2 with Higdon, McCool, Garner and Whitley in favor and Hoover and Tofano in opposition.

*Mr. Urban rejoined the meeting.*

**Zoning Application 2022-770/Crown Point Commons:** To change the zoning from O (CD) to MUD (CD) on that certain property located on the corner of Sam Newell and Claire Dr, north of Rice Rd., east of E. Independence and being further designated as tax parcel 193-19-109

Senior Planner Rob Will noted the requested revisions have been made and both Planning Board and staff recommend approval.

Motion by Mr. Urban to approve Zoning Application 2022-770 as most currently amended, as the change in zoning is consistent with the Land Use Plan because it contains development that is consistent with the surrounding uses, and the change in zoning is reasonable in that it will provide parking and stormwater in conjunction with an approved mixed-use development. The motion was seconded by Ms. Garner and unanimously approved.

**Zoning Application 2022-771/335 E. Matthews Street:** to change the zoning from R-20 to HUC on that certain property designated as 335 E. Matthews Street and being further designated as tax parcel 215-011-04

Planner Darin Hallman explained that the neighbor who spoke at the public hearing has been contacted by staff and information was shared with him. He was more interested in the future expansion of the Historic Urban Core further down from this lot. Staff recommends approval.

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 129 of 259
Plaintiffs Complaint 000079

Motion by Mr. Urban to approve Zoning Application 2022-771 as the rezoning is consistent with the Matthews Land Use Plan and the Downtown Master Plan for increasing the usability of property in and expanding the boundary of the Downtown area. The rezoning is reasonable in that it exhibits an opportunity to expand the Downtown area into an adjacent area. The motion was seconded by Mr. McCool and unanimously approved.

**Zoning Application 2022-762/The Ridge: to change the zoning from R-12 to I-1(CD) on that 45.03-acre parcel of land located on Campus Ridge Road and being further designated as tax parcel 215-221-02**

Senior Planner Rob Will explained the applicants have requested to withdraw this application. Staff is in favor of allowing the application to be withdrawn. A withdrawal means there would be no waiting period for resubmittal.

Motion by Ms. Garner to approve the withdrawal of Zoning Application 2022-762. The motion was seconded by Mr. Urban and unanimously approved.

## CONSENT AGENDA

A. Approve Board of Commissioners Meeting Minutes – January 23, 2023
B. Approve Board of Commissioners Closed Session Minutes – January 23, 2023
C. Approve Disposal of Surplus Apparatus and Equipment
D. Consider Exemption from Qualification-Based Selection Process for Traffic Signal Design Work
E. Disseminate Engineers Week Proclamation
F. Accept Zoning Applications and Set Public Hearing Dates:
1) Motion 2023-1/Town of Matthews & Hendrick Properties: Campus Ridge Road, CPCC Lane, Matthews-Indian Trail Road and Johnson Lane; Tax Parcel IDs 215-072-02, -03, -04, -05, -06, -07, -08, -11, -12, -13, -14, -15, -16, -17, -18, -21, -22, -23, -24, -26, -27, -28, -29, -30, -31, -32, -35, 215-073-01, -02, -04, -05, -06, -07, -09, 215-241-03, -04, -05 and -07; from R-9, B-H, B-H(CD) and O(CD) to I-2; and Set Public Hearing for April 10, 2023
2) Zoning Application 2023-773/Lemma: 1718 Matthews-Mint Hill Road, Tax Parcel 215-102-16; from R-12 to R-VS; Set Public Hearing for April 10, 2023
3) Zoning Application 2023-774/text amendment: UDO Text Amendment Food Trucks; Set Public Hearing for March 13, 2023
G. Approve Budget Ordinance Amendments:
1) Digital Sign Replacement - $30,085.00 *item moved to Unfinished Business for discussion*
2) Insurance Proceeds from NCLM - $11,985.00

Motion by Mr. Tofano to approve consent agenda items 9A through G2 except for G1 as modified. The motion was seconded by Ms. Garner and unanimously approved.

## UNFINISHED BUSINESS

## CONSIDER DRAFT ANNUAL LEGISLATIVE PRIORITIES

Town Manager Becky Hawke reviewed the draft legislative priorities, noting staff did not receive any additional suggestions from Board members.

Motion by Mr. Tofano to approve the Town's legislative priorities as presented. The motion was seconded by Mr. McCool and unanimously approved.

Case 3:25-cv-00318-MOC-WCM   Document 1-2   Filed 05/23/25   Page 130 of 259

Mayor Higdon noted he'd recently spoken with North Carolina Representative Laura Budd, who spoke to NCDOT representatives about allowing the Town to plan trees alongside sound walls. She believes she's making good progress on that.

## CONSIDER BUDGET ORDINANCE AMENDMENT: DIGITAL SIGN REPLACEMENT - $30,085.00 *moved from Consent Agenda*

Mr. Tofano explained that after deliberation at the last meeting, he thought there might be a way to improve the digital sign rather than just replace the existing one. If the Town chooses the 10-millimeter option instead of the 8-millimeter option as previously decided, that would free up a few thousand dollars to use to improve the sign in other ways, and perhaps move it to another location. He noted Chief Kinniburgh had said he gets a little relief from insurance costs by having it in front of the fire station but Mr. Tofano didn't have details on that.

Mayor Higdon asked if Mr. Tofano wanted to completely tear down and replace the sign. Mr. Tofano said he wasn't sure what could be done, but perhaps expanding the size of the sign panel in height to allow four lines of text would be enough, and some of the decorative surrounding material could be reused. Mr. Urban noted it's a branded sign for the Town of Matthews and was opposed to relocating it. He said modifying the sign would increase the cost – it's brick and he wasn't sure how much, if any, modifications could be done. Mr. Urban cautioned against having too much for passing drivers to read as that could be a safety issue. Mr. McCool agreed that the current sign has a small display area and asked if the new sign could be fully LED. Discussion continued.

Motion by Mr. Tofano to direct staff to look at alternative methods of improving the sign at the fire station, to make the display larger. The motion was seconded by Mr. McCool and unanimously approved.

Ms. Garner asked for additional information about lights and the warranty to be included with the information at the next discussion, as she wants to be sure the technology doesn't cause problems.

## NEW BUSINESS

## CONSIDER SOLID WASTE CONTRACT

Public Works Director CJ O'Neill explained that the Town has been under contract for solid waste services with Republic Services for seven years. That contract is coming top and end but includes two, two-year extensions beyond that. Republic has asked for some changes if the Town chooses to extend the contract. Those changes are:

- An increase in the Fiscal Year 2024 (FY24) residential rate from $14.30 per residence per month (prpm) to $19.50prpm
- An annual rate of adjustment for FY25 to be the greater of the Consumer Price Index (CPI) for water/sewer/trash, or 5%
- Yard waste could no longer be placed in disposable plastic bags
- The maximum time allowed for yard waste pickup per residence would be 20 bags
- Republic would be reimbursed the driver and truck time spent during the Matthews Alive and BeachFest festivals

Mr. O'Neill explained that staff asked for the fuel rates to be reset to the current market rate for diesel fuel, as currently the Town is paying about $100,000 in fuel surcharges. He noted he'd spoken to other municipalities and competitor companies to gauge current pricing and service levels, and both he and the Environmental Advisory Committee recommend staying with Republic Services. They've been good partners with the Town for many years.

Mayor Higdon expressed dissatisfaction with the proposed rate increase. Mr. Tofano requested clarification on costs. Mr. O'Neill explained the Town has about 9,600 residential structures; Mr. Tofano noted that would result in an increase of about $50,000 per month/$600,000 per year and asked where the additional funding would come from. Ms. Hawke noted that the Town doesn't charge a monthly or annual solid waste fee so the costs are absorbed by the

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 131 of 259
Plaintiffs Complaint 000001

tax rate. The current service costs about four cents on the tax rate, and these increases would increase that to about five cents.

She noted that the numbers provided are the rate for renewal only, and that the Town is not guaranteed the same rate if it goes through an RFP (Request for Proposals) process. Staff is hesitant about the quality of service Matthews might receive from other providers based on feedback received from other municipalities. She explained that she too is unhappy with this rate change, but by and large the community is happy with the level of service they receive. There have been issues in the past that Republic has worked through. Other communities have lower levels of service, and staff isn't sure that they'd received better numbers through an RFP process. By consensus the Board agreed that additional quotes were desired. Ms. Garner suggested that if the Town stays with Republic Services, the charges relating to Matthews Alive should be passed on to that organization.

Motion by Mr. Tofano to direct staff to start the RFP process for the Town's solid waste contract. The motion was seconded by Mr. McCool and unanimously approved.

## MAYOR'S REPORT

Mayor Higdon discussed Black History Month, noting that it's important for people to do more than just watch programs. He encouraged people to participate in the next Racial Bridge Building community forum, which will take place at Matthews Presbyterian Church at 7:00 pm on February 28.

## TOWN ATTORNEY'S REPORT

None

## TOWN MANAGER'S REPORT

None

## CLOSED SESSION PURSUANT TO NORTH CAROLINA GENERAL STATUTE 143-318.11(A)(4), TO CONSIDER ECONOMIC DEVELOPMENT, AND 143-318.11(A)(5), TO CONSIDER ACQUISITION OF REAL PROPERTY

Motion by Ms. Garner to go into closed session pursuant to North Carolina General Statute 143-318.11(a)(4), to consider economic development, and 143-318.11(a)(5), to consider acquisition of real property, to include the Mayor, Board of Commissioners, Town Attorney, Town Manager, Assistant Town Manager, Planning Director, and Town Clerk. The motion was seconded by Mr. McCool and unanimously approved.

## ADJOURNMENT

Motion by Mr. McCool to adjourn. The motion was seconded by Ms. Garner and unanimously approved. The meeting adjourned at 11:59 pm.

Respectfully submitted,

Lori Canapinno
Town Clerk

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 132 of 259
Plaintiffs' Complaint 000082

**EXHIBIT 1**

To:     Town of Matthews Elected officials, staff and others

From:   J. David Malcolm

        1121 Ashely Creek Drive

        Matthews, NC 28105

Re:     Rezoning Case: 2022-749: Santé Matthews

Dear Town of Matthews Elected Officials,

I am writing this letter to express my personal support of the rezoning case 2022-749 Santé Matthews. It has come to my attention that this project has received a lot of attention on social media and in other places, which appears to be unwarranted and negative. I read through many comments on the Next Door app and felt that most of the negative comments were from the position of individuals who feel that any development that is near them, or adjacent to them, is in some way inherently bad or will negatively affect their property values, simply because it is development and change. I felt it important to point out that this type of development which is derived from a well thought out planning process includes a variety of land uses for different housing types, support business, open spaces, community amenities, natural areas, buffers, etc. all connected with a hierarchy of roadways, would be a welcome improvement to this area and Matthews. It is very impressive that the Town of Matthews would take a proactive step towards studying this parcel and creating a small area plan titled "Eastern Gateway Plan", dated November 2021, which is thoroughly vetted and available on the town's website and included within the Town's adopted Land Use Plan. This plan documents an inclusive public engagement process which achieved a community supported plan for making this parcel a development project with a mixture of uses and proposed density which would take full advantage of land well positioned along the on the I-485 corridor at the existing Idlewild Road interchange. Matthews has been growing at fast pace for several decades and the Town of Matthews has done an excellent job in continuing to prepare for this growth by employing talented planning staff who recognize the importance of being forward thinking about the future of our community and taking the initiative to help share our future by carefully planning for growth. The Eastern Gateway Plan is professionally prepared and provides thorough analysis of the existing conditions, provides a concept that is supported through community consensus, and brings forward a creative plan that can be a sustainable approach for development of this key parcel within the town limits.

The project Santé Matthews is well thought out and follows the intent of the Eastern Gateway Plan. I am pleased to see that the concept plan and pattern book has continued to evolve and improve beyond the Eastern Gateway Plan and that the plan can be invested in and developed by a trusted, professional land developer, who has experience and a solid track record to execute this plan. I appreciate the thoughtfulness and forward thinking that the elected officials and town staff have in representing the town's best interest with respect to development by being proactive in preparing plans that make it possible to attract high quality development to our community. I am afraid many communities do not have this kind of leadership and quality staff and therefore must suffer development that is opposite of

the values of the full community and are unable to bring quality development to their town. The alternative to the proposed plan could be on that of a sprawling, single use, low density housing development which could lack the ability to raise property value over time since it only would add similar houses, increase sprawl, increase vehicle trips, and offer zero opportunities for shopping and convenience services. I believe that all the homes within a quarter mile will find that their property values will increase with this type of quality development, that they will enjoy the benefits of having additional shops and stores that will make their lives safer through convenience and easier by providing some options and ultimately better off with this proposed plan than just a single use type of development. There is no better place than this parcel, which is located at a key interstate interchange, to create a vibrant mixed use plan adding homes, jobs, and quality development to the built environment of Matthews. I am grateful that Matthews leadership is forward thinking about growth and development and not willing to be swayed by a few, loud voices who oppose anything that is different than a low-density housing community. By approving this plan, you will help to stop sprawl, create housing choices, help to shorten car trips for all, and help raise property values and increase the tax base. These are all positives in my humble opinion and why I choose to live in Matthews...the best town in Mecklenburg County.

Thanks for your time and consideration. Feel free to contact me if you have any questions.

Sincerely,

J. David Malcolm

Plaintiffs' Complaint 000084



Greater Matthews
**Habitat** We build strength, stability, and
for Humanity® self-reliance through **shelter.**

February 9, 2023

Dear Mr. Mayor, Town Commissioners, and Planning Department:

I am writing to express my support for the Sante Matthews Development project that has been submitted for your review and approval.

I have had the opportunity to speak with Mr. Pappas and his team members about this project and ascertain their intentions to help the community are genuine. Sante Matthews allows for a mixed-income, mixed-use, active, walkable community. In reviewing the design and the proposed plans, this development would be an asset to Matthews and provide much-needed housing opportunities for those wanting to call Matthews home.

As you are keenly aware, the Town of Matthews does not have enough attainable housing units – for purchase or rent. The majority of the individuals that work in Matthews cannot afford to live in Matthews. Town employees, teachers, firefighters, and police officers – all working to provide support to the Matthews community are priced out of living where they serve.

We continue to discuss the need for attainable housing in the Town of Matthews. The Sante Matthews development has taken an intentional approach to ensure equitable access to housing. Their commitment to providing 9 for-sale attainable homes and 13 for-rent units is commendable. This continues to be an ongoing challenge with other developers who are unwilling to include attainable housing options as part of their development.

Greater Matthews Habitat for Humanity is the only attainable home builder serving the Matthews community. The Sante Matthews development works in parallel with Habitat's mission of ensuring hardworking families have access to homeownership opportunities. The for-sale units will be transformational for individuals and families seeking to fulfill the American dream of homeownership. The rental units meet a glaring unmet need for limited-income renters.

We need more of this. Please don't forgo another opportunity to be proactive in helping make Matthews accessible to all.

Respectfully submitted,

*Natisha Rivera-Patrick*

Natisha Rivera-Patrick
President & CEO

P.O. Box 2008 Matthews, NC 28106 • 704.847.4266 • www.greatermatthewshabitat.org



**EQUAL HOUSING
LENDER**

February 8, 2023

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

Re: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

My name is Laura Johnston and I live at 3118 Windrow Lane Matthews, NC 28105. I have lived in Matthews since I was 3 years old, and I am now 26 with a family of my own. My roots are in Matthews, and I can truly say I love where I live.

The new Pappas plan has excited me from day one. I truly think having additional restaurants and stores in our immediate area will be an asset to myself and others around me. I like that the new development will feature a variety of housing targeted towards various age groups. The new development will make Matthews an even more desirable please to live.

Again, I believe that the new development by Pappas will be an asset to my community. I understand that many have reservations, but as a young, working individual I can truly say my family supports the vision. I think people like myself will continue to funnel into this direct area, and likely share my views. Thank you to the commissioners for supporting the community vision for the area. Many of us are very excited at the potential.

Sincerely,

Laura Johnston and Family
3118 Windrow Lane Matthews, NC 28105

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

February 2, 2023

Re: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

On behalf of the Sustar family, I am writing to say that I am pleased with the proposed Santé Matthews development, of which our property is a part of. We feel it is a well-planned project, and when completed, will be a wonderful community space and asset to the Matthews Community. Also, I want to acknowledge that my family is also pleased with the oversight, by the Board, Mayor, and Staff Members, of the overall development within the jurisdiction of the Town of Matthews.

As long-time property owners in Matthews and Mecklenburg County, since the early 1900's, we have seen tremendous growth and change to the Town and surrounding areas, yet it is still a great place to live and work. Our family has supported all of the growth over the past many years because we have felt that it has been an asset to the community. In fact, I have been a party to other transactions, representing other family members, such as the Epcon project, and have been very careful to select a developer and project that would continue to be a benefit to the area.

We recognize we live in a popular area and that change is not only inevitable, it is also what brings a diversity of people, thoughts, places, and undergirds a healthy community. We also feel the proposed project represents the best we have seen that addresses concerns, we have heard expressed, and allowing growth to continue. We, the Sustars, therefore, ask the Town of Matthews and its leadership to approve this proposed project for the benefit and enjoyment of the Matthews Community.

Thank you for your service and thoughtful consideration.

Very truly yours,

Billy H. Sustar

Billy H. Sustar

1

Dear Mayor Higden and the Matthews Board of Commissioners,

I am writing on behalf of Valley Development, a company owned by my wife and I, and as owners of the 45 acres known as the Silver Oaks subdivision. We have waited many, many years to sell this property. We've paid taxes, maintained the property, and been told time and time again that the Town wants a plan for the whole eastern gateway area, including our property. To be clear, we have paid taxes since 2007, and have eagerly anticipated a town plan/vision for the area. Now, after the Town adopted the Eastern Gateway Plan, we have been told that the Town Council might not support a development coming forward that embodies that plan. This is simply not fair.

During the 16 years that Valley Development has owned the property, we were never delinquent with taxes. There was an on-going problem with vandalism and trespassing on the property as well as dumping of household trash and construction debris. Valley Development worked with the neighbors and the police department during this time to keep the property from becoming an eyesore. It was secured with gates and barriers on many occasions. Although development around the property caused these problems, we did not object to the development and, as we try to develop our property, we'd like to ask for the same respect from neighbors.

Over the years we have been contacted by builders and developers interested in a rezoning, but none were able to provide a cohesive, defined over-all development plan for the parcel (which is what the Town said was important). In 2021, we met with the Pappas Properties group. They provided us with information about their business and showed us examples of their previous and on-going developments. Our research showed Pappas Properties was the firm we believed most capable of designing and developing the Matthews site with first-class results. They have spent countless hours working on this project, fine-tuning their plans during this time to accommodate the needs of the municipality and the neighboring communities. They went to the meetings for the Eastern Gateway Plan and kept us informed all along. We have waited two additional years for this project, which is consistent with the town's adopted plan for the area, to be approved. What more can we do? We were told to wait until there was an overall plan, we waited and now, after more than two years, the Pappas plan has yet to be approved. Two more years of paying taxes, two more years of trying to sell this property.

The 2007 plan for Silver Oaks included single family homes along the western border with the Windrow neighborhood. Likewise, the Pappas plan shows single family homes along the western border. We are discouraged that the neighbors are objecting to this plan.

It is our sincere hope that, as leaders of the Town, you will positively consider the Pappas plan for this area. We also encourage the Town Council and Planning Board to do what is right for the long-term growth of Matthews by accommodating this proposed development and others like it that reinforce the Town's long-range goals and plans.

Sincerely,
VALLEY DEVELOPMENT

*Thomas M. Stevens*

Chief Executive Officer

February 7, 2023

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

Re: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

I'm writing on behalf of my family, in support of Pappas Properties new Sante development project in Matthews. My husband and I are both in our early thirties and chose to settle down in Matthews in 2018 before we had our first daughter. The reason we gravitated to Matthews and not other suburbs around the Charlotte Metro area is simply because of the sense of community. Matthews has been the perfect place to start and grow our family, and we are excited for the opportunities that Pappas Properties can bring to this area to enhance the quality of living for other young families like us.

We believe that the development of Sante will bring a vibrant, young energy to Matthews. Not only will the additional retail and restaurants be convenient, but it will give families a place to socialize and interact with their community. The additional single-family housing/townhomes are an important addition to diversify the housing market in the area to allow younger families the opportunity to live in an area that is safe, has commendable schools, and a comfortable atmosphere for their children to grow up in. This would be the perfect development to assist Matthews in becoming a hot spot for families and will attract new residents.

I want to thank you, for supporting the community vision for the area, and we are so excited to be a part of the vision for the future of Matthews.

Sincerely,

Jake and Becca Walker

1201 Clover Lane
Matthews, NC 28104

Plaintiffs Complaint 000089

Georgia Nixon
1510 Kirkbridge Court
Matthews, NC 28105

February 7, 2023

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

RE: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

On behalf of the Nixon family, I am writing to support Sante Matthews development proposal. We have lived in Matthews for the last 12 years and feel that this is a well-planned project that when completed will be an asset to the Matthews community.

As property owners in Matthews, we have seen growth and change during the last decade which has brought more diversity and has been an asset to the Matthews community. Even with the continued growth, Matthews has retained its small town feel and the Sante Matthews proposal will bring us more options in retail and restaurants, which we greatly look forward to. In addition, the updated traffic plan with the roundabout will help to ease traffic on Idlewild Road which is needed.

Mathews is a popular area to live and change and growth is inevitable. The proposed Sante Matthews allows growth to continue but also addresses the concerns of our wonderful town. We, the Nixon's therefore, ask the town of Matthews and its leadership to approve this proposed project for the benefit of the Matthews community.

Thank you for your consideration and your service to Matthews.

Sincerely,

Georgia Nixon

Georgia Nixon

February 1, 2023

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

Re: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

My name is Alexandra ██████. My husband and I are in our mid-30s, and my family and I have been living in Matthews since 2017. When my husband and I found out we were pregnant in February 2017, we were currently living in NoDa. It became a mission of ours to find a place where we were still accessible to activities and social events while also being in an area that was family centered. We settled in Matthews about a mile and half from downtown and have never looked back. We currently have three children: ████ (5), who will be starting at Matthews Elementary in the fall of '23, ████ (3), and ████ (1).

I attended the open house that was organized by Pappas Properties because I was interested in the development plan that they were promoting. My first impression is that it was going to be an amazing addition to an area of Matthews that could use more economic and social support. The project itself not only brings shopping and new housing to Matthews, but it also brings a place where I can bring my family while also supporting Matthews's economy. Right now, my family and I travel to Waverly or Blakeney if we want to go out to eat or socialize with friends. It would be so great if we could get the opportunity to do these activities within our own community. We would be around other families whose children might go to the same schools as my children. It only deepens our roots within our Matthews community. As with any new development, there are always issues to address. However, I believe strongly that places like this are the "new normal" when trying to uplift an area. Pappas Properties is trying to work with the Matthews community in order to make this a family friendly and economically conscious project. In the end, this development brings revenue to the people of Matthews, resulting in economic growth. Having a mix of small business and big-box stores will entice people to come for their daily needs and then stay and explore what this place has to offer. I'm excited to see developers excited about Matthews, and I'm looking forward to spending time here with my family and friends.

With any new plan, there are always concerns. And, I understand the desire to keep Matthews feeling "small-town." But, the reality is that Matthews isn't a small town. It is growing; young people want to raise families here and businesses want to invest. Small town charm is about its people. We moved here because of that reason. I'm proud to be a Matthews resident, and I want others to see how great this place can be.

Thank you for your time, and I hope that you consider approving this project.

Sincerely,
Alexandra ██████

Plaintiffs' Complaint 000091

February 12, 2023

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

Re: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

*My name is Michael Miles and my Wife's name is Diana. We live at 964 Blarney Court,
Matthews, NC 28104 (Shannamara Subdivision).*

*We have seen the plans for the new development to be located in Matthews known as "Sante
Matthews." https://asksantematthews.com*
*We both feel strongly that this will be a huge welcome and improvement to our community. We
are so glad that a developer such as this will be building an upscale project that will increase the
appearance of our community. Currently we have nothing that compares to this within the local
area. We are glad that this is not just another apartment complex. These are popping up
everywhere. When they are first built, they look nice, but we all know that after a few years they
turn into a breeding ground for crime. Infrastructure improvements are also needed in the area.
We also like this developer's plans to improve the traffic issues we currently face every day. We
need to move ahead to ensure our property values are protected.*

*We strongly support the approval of the rezoning for this project. Many of my neighbors feel the same
as we do.*

*I would like to thank the commissioners for hearing our voices in this important matter.*

Sincerely,

*Diana Miles*

Mike and Diana Miles
803-487-7377

Dear Matthews Board of Commissioners and Mayor Higdon,

I am a resident of Matthews and wanted to provide comments in support of the Sante development proposal. I have seen this project go through the rezoning process and am impressed with and excited about the plans for this site.

As a mother of two children who now are in college, I could see myself downsizing to a home in a place like Sante. I like that this proposed community has a heavy focus on health and wellness, which is a unique amenity that I have not seen anywhere else. I would much rather see a mixed-use type of development at this location than another big box store or more single family homes (we have plenty of single family homes in Matthews).

Please help bring unique developments and amenities to us in Matthews like this Sante proposal.

Thank you,


Summer Sneed
813 Black Oak Drive
Matthews, NC 28105

February 2, 2023

Mayor and Board of Commissioners
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

Re: Pappas Properties, LLC Rezoning Application 2022-749

Dear Mayor and Commissioners,

My name is Michael Slavotinek and I live at 2300 Tanfield Drive, Matthews and I support the Pappas Properties rezoning 2022-749 for multiple reasons. I frequently pass this property and would welcome the additional development to our community.

This plan will add more retail and restaurant options for a portion of the Town that is currently underserved. The updated traffic plan and the roundabout would help ease the traffic added from the development. We are always looking for additional options for grocery stores and restaurants, so I think this plan is well suited for the area. The additional residents will also help strengthen the tax basis for Matthews.

I support this plan because as Matthews continues to grow and develop, as a community all we can do is hope that it is well thought out and planned. I believe this property does that and is being executed by a reputable local developer that has a history of high-quality developments throughout the Charlotte region. Overall, I think this development will help increase property values in the area and help Matthews continue to grow as a premier town within Mecklenburg County. I hope to see it approved to move forward and look forward to watching the progress.

Sincerely,

Michael Slavotinek
2300 Tanfield Drive, Matthews, NC
410-707-3543

January 24, 2023

Dear Mayor Higdon and Matthews Board of Commissioners,

My name is Daniel Wright. I'm a former resident of Matthews. It's a wonderful place. I am writing this letter to give support to the Pappas Properties development called Sante' Matthews. I support the project as a citizen and as a real estate and development expert.

I'm the Program Director for the Master's in Real Estate program at UNC Charlotte. I've been actively involved in the real estate industry since 2004 and have experience in all aspects of development. My interests are primarily in the connections and conversations associated with the built environment and its impact on financial and social capital.

As a citizen, I support this project because it is consistent with the Eastern Gateway Small Area Plan which plan provides an important direction for the future of Matthews. Citizens rely on the planning staff and elected officials to guide good development. We rely on our leaders to provide long term visions for the entire town—the fulfillment of which can only occur when we account for the long term needs of the entire town, sometimes in conflict with short term desires of individual citizens. The area plans help this happen.

As a real estate expert, I support this project because it is consistent with the Town's vision for development of the area. The community planning decision-making process should, first and foremost, be concerned with long-term sustainability of communities and the economy. In 2021, the Town adopted the Eastern Gateway Plan as the Town's vision and community plan for one of the last large areas of vacant land. The Eastern Gateway Plan was adopted after many meetings and input from citizens. I have reviewed the Pappas Sante' Matthews plan and, in my opinion, it meets the purpose of the Eastern Gateway Plan and it follows its draft structures closely.

The Eastern Gateway Plan has ten goals. The Sante' Matthews Plan addresses all of these goals. It envisions a community that is shaped by parks, open space, different housing types, retail, and options for pedestrians and non-motorized transit.

Cities across the state are working to create walkable cities. Their goal is to create community centers, and to connect greenways and bikeways to enhance the quality of life for anyone living there or visiting. New communities should include community gathering spaces, and housing alternatives for people of all incomes. Complete communities should also provide convenient access to modern amenities such as restaurants and shopping.

For years, the Town has needed traffic improvement in the Idlewild/Stalling area. The Sante' Matthews Plan proposes to build the NCDOT improvements and donate land south of Idlewild for the right of way. Not often are developers willing to build road improvements in advance of the Department of Transportation. Improvements to Idlewild Road, including a roundabout at Davis Trace, to keep traffic moving, benefits all of Matthews.

To summarize, I encourage you, as the Matthews town leaders, to support the Gateway Plan's long-term vision for this area by supporting the Santé Matthews plan. The vision and the Pappas plan bring many public benefits that will make the community a quality place to live for generations to come.

Respectfully,

Daniel Wright
Program Director—UNC Charlotte

EXHIBIT 2



Town of
**Matthews**™
**Planning and Development**

232 Matthews Station Street
Matthews, NC 28105
704.847.4411

## PLANNING BOARD REPORT
## ON THEIR MEETING OF
## JANUARY 24, 2023

### FOR TOWN BOARD ACTION:

I.      **ZONING APPLICATION 2022-770/Crown Point Commons: To change the zoning from O (CD) to MUD (CD) on that certain property located on the corner of Sam Newell and Claire Dr, north of Rice Rd., east of E. Independence and being further designated as tax parcel 193-19-109**

Members of the Planning Board reviewed the updates that included the continuation of the ten-foot multi-use path, the addition of a conditional note that 35 feet of right of way as measured from the center line of Sam Newell Road be dedicated to NCDOT, a note requiring landscape screening be added along the detention pond and Sam Newel Road, and the addition of allowed uses to be simplified to allow parking, stormwater detention, and open space. The Planning Board recommended approval finding the request consistent with the Matthews Land Use Plan because it contains development that is consistent with the surrounding uses. The change in zoning was found reasonable in that it will provide parking and stormwater in conjunction with an approved mixed-use development.

II.     **ZONING APPLICATION 2022-771/ Town of Matthews 335 E Matthews Street: to change the zoning from R-20 to HUC on that certain property designated as 335 E. Matthews Street and being further designated as tax parcel 215-011-04**

The Planning Board reviewed the Town's request to rezone the property at 335 E Matthews Street to Historic Urban Core for the purpose of improving the property. Members discussed different uses in the HUC zoning district and the neighboring properties. The Planning Board found that the HUC zoning designation was appropriate for the site and recommended approval. The request was found to be consistent with the Matthews Land Use Plan because it would increase the usability of the property and expand the boundary of the Downtown area. The change in zoning was found reasonable in that it exhibits an opportunity to expand the Downtown area.

### FOR TOWN BOARD INFORMATION:

I.      **ADMINISTRATIVE AMENDMENT VISIONWORKS: Request to allow placement of sign in a Conditional District located at 9623 E Independence Blvd, Unit P and further being designated as tax parcel 193-303-09**

The Planning Board approved the request for the new sign placement in the conditionally zoned shopping center. The requested sign was consistent to other past sign requests and intent of the original zoning.

II.     **COMPREHENSIVE PLAN: Appoint a Member of the Planning Board and make suggestions for other community members to be representatives on the Comprehensive Plan Community Advisory Committee**

Sarah Walker was appointed to represent the Matthews Planning Board on the Comprehensive Plan Community Advisory Committee

PlBdRpt 1/24/23

www.matthewsnc.gov

# EXHIBIT 17

Please plan to join members of the Board as they tour the Hendrick Motorsports headquarters and adjacent advanced manufacturing facilities.

The following tour times are available with corresponding planned Board attendance:

May 5, 9:30-12:30: John Urban, Renee

May 5, 2:00-5:00: Ken, Mark

May 12, 9:30-12:30: John Higdon, Gina

The tour will consist of: Hendrick Motorsports Race Facility (1 hour), the GM Charlotte Technical Center (1 hour) and the Hendrick Heritage Center (optional, 45 minutes).

Please plan to leave 45 minutes prior to the tour start.

Tour location: 4400 Papa Joe Hendrick Blvd., Charlotte

Please let me know which session you plan to attend by Wednesday, 4/12. I will likely be at all three.

Thank you,

Becky


Becky Hawke
Town Manager
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105
Town Hall: 704-847-4411
Direct: 704-708-1231
Fax: 704-845-1964
bhawke@matthewsnc.gov
www.matthewsnc.gov



Pursuant to North Carolina General Statutes Chapter 132, Public Records, this electronic mail message and any attachments hereto, as well as any electronic mail message(s) that may be sent in response to it may be considered public record and as such are subject to request and review.

# EXHIBIT 18



**MINUTES**
**BOARD OF COMMISSIONERS SPECIAL MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**MAY 8, 2023 – 5:30**

**PRESENT:** Mayor John Higdon; Mayor Pro Tem Ken McCool; Commissioners Renee Garner, Gina Hoover, Mark Tofano, John Urban and Larry Whitley

**ALSO PRESENT:** Town Manager Becky Hawke; Assistant Town Manager Melia Gordon; Finance Director Teresa Fulk; Fire & EMS Chief Rob Kinniburgh; Human Resource Director Tonya McGovern; Parks, Recreation and Cultural Resource Director Corey King; Planning Director Jay Camp; Interim Police Chief KD Williams; Public Works Director CJ O'Neill; Communications Coordinator Maureen Keith; Town Clerk Lori Canapinno

The Board met with staff to receive the Manager's recommended budget for Fiscal Year 2023-24. Town Manager Becky Hawke presented her recommended budget, with a few items that changed since the Board held its recent planning conference and had a preliminary conversation about the budget at that time. Since then, the proposed budget has been revised to remove funding for affordable housing; adjust the solid waste budget; reintroduce some grant funding; and reduce the tax rate from 27.5 cents to 26.65 cents per hundred dollars of valuation.

This recommended budget would set a strong foundation for the upcoming fiscal year as the Town continues to provide high quality services to the community. Operational expansions would be funded through increased revenues, retiring debt service and conservative funding across many budget line items. This recommended budget totals $34,364,889, with a proposed tax rate of 26.65 cents per hundred dollars of valuation. The revenue neutral tax rate – the rate that would raise the same amount of property tax as the previous year, using the new assessment values – is 22.69 cents. The proposed rate of 26.65 cents reflects a 17.5% increase over the revenue neutral rate. The proposed property tax rate positions the Town to effectively fund operations in fiscal year 2024 and helps ensure sufficient funding for future fiscal years.

The last Mecklenburg County property tax revaluation was in 2020. Revaluations look to bring assessed property values in line with fair market values. Property owners can appeal values; the county suggests an appeal loss factor of 3.1%. After revaluation and the projected appeal loss, Matthews properties are expected to be valued at $7.2 billion. That represents a 33.6% increase in growth over last year's actual values. The revenue neutral tax rate is calculated by taking the property valuation for the current year compared to the new values, determining how much would be needed to roll the tax rate back to get to an equivalent levy, then adding in the average tax growth rate. The revenue neutral tax rate is 22.69 cents.

Mr. McCool asked if the overall property valuation will grow due to some of the bigger development projects that have been approved in the last year and a half. Ms. Hawke explained it fluctuates from year to year depending on what's actually out of the ground. Matthews is growing slower than some of its neighbors in Mecklenburg County. Mr. McCool asked if the assessed values change when developers sell their land for a significant increase after receiving zoning approval; Ms. Hawke said any such change wouldn't be seen until the next revaluation. Mayor Higdon asked if a revenue neutral rate meant the Town would take in the same amount of tax dollars as the previous year. Ms. Hawke explained that even at a revenue neutral tax rate, it doesn't mean someone's individual tax bill will stay the same.

Ms. Hawke reviewed revenue sources, the most significant of which are ad valorem taxes, local option sales taxes, and unrestricted intergovernmental funds. Investment earnings is the big needle mover here, but they're not a stable funding source. As proposed, one cent on the property tax rate will now generate about $720,000. About $425,000 in debt service – for two Fire Department engines and public safety radios - is retiring. Significant recommended expenditure increases include the previously-approved pay plan/market adjustment, solid waste service, and state retirement contribution increases. Others include increases to risk management premiums, organization-wide software system upgrades, debt service payments for the Fire Department's Rescue 8 vehicle, and organization-wide fuel increases. These items have been included in the proposed budget. Mayor Higdon noted that those items alone contribute to almost five cents of the tax rate.

Ms. Hawke then reviewed key proposed additions to expenditures, including funding Fire Station 3, the paving maintenance program, replacement of the Town Hall HVAC system, a 1% COLA (cost of living adjustment/2% merit pool for employees, Police vehicle replacement program, and Public Works Engineering project manager position. The original plan for Fire Station 3 was to fully fund operations in Fiscal Year 2024 (FY24), hire halfway through, and send the remaining funds to construction. Now she is recommending the Town pause on the hiring so it can take that $1.5 million and put it toward construction costs, to help mitigate the impact on ARPA (American Rescue Plan Act) funds, lessen the amount of any construction loan, and serve against the still unknowns. Next year the Board would see that $1.5 million on the operational side of the budget. Regarding the paving maintenance program, staff would like to increase the program by $500,000. That's a large jump, but even with that, the Town still is not fully funding the program. She is recommending using $500,000 of investment earning revenue for the Town Hall HVAC replacement, as that is a one-time cost, so if investment earnings are reduced in the future, it wouldn't adversely affect anything else. The COLA/merit pool is intended to keep up with inflation and be competitive within the market. Mr. Whitley asked if the Board was included in that; Ms. Hawke explained the 1% COLA would be applied to the Board stipend.

Ms. Hawke continued to review department budgets. Mayor Higdon noted fuel prices have been dropping; Ms. Hawke explained staff based the recommended numbers from last year on anticipated actuals from this year. Ms. Garner asked if old Town vehicles were sold; Ms. Hawke explained they're repurposed throughout the organization whenever possible and then go up for sale. Ms. Garner asked if the Town could apply for county grants; Public Works Director CJ O'Neill explained that staff has applied in the past but hasn't been approved. Ms. Hawke reviewed the Capital Improvement Plan and Tourism fund. She also noted items that are not included in this budget; fully funding paving, which would require an additional $1.2 million; affordable housing initiatives; a mid-year adjustment to the solid waste contract, if needed; and bond project design work, which would be reimbursed with future bond issuances.

Mr. Tofano asked about the previously-requested inventory of town property and valuations. Ms. Hawke explained that has been started and staff is reviewing conditions and future intended uses now. The information will be distributed soon. Mr. Urban asked if the Town needed to hold more discussions with its local legislators about loosening up the restrictions regulating the use of Tourism funds. Ms. Hawke explained that Senator Hunt seemed particularly interested but neither she or Representative Laura Budd have addressed it with the Town again. Staff can follow up. She noted it could be a challenge if the allowed uses became less restrictive as that would just put more pressure on that fund. Mayor Higdon noted the Town is using pretty much all it can now, so he's not sure there's much more to it.

Mayor Higdon said the budget Ms. Hawke has submitted is a pretty tight budget. He and the Board want to make sure they're being good stewards of the taxpayer's money. He encouraged the Board to review the budget and advise if they see any items they think can be cut out or reduced. Ms. Hawke noted the Board will meet again next Monday at 6:00 pm to continue the budget discussion.

Case 3:25-cv-00318-MOC-WCM   Plaintiffs' Complaint   Document 1-2   Filed 05/23/25   Page 152 of 259   000100

### MINUTES
### BOARD OF COMMISSIONERS REGULAR MEETING
### HOOD ROOM, MATTHEWS TOWN HALL
### MAY 8, 2023 - 7:00 PM

**PRESENT:** Mayor John Higdon; Mayor Pro Tem Ken McCool; Commissioners Renee Garner, Gina Hoover, Mark Tofano, John Urban and Larry Whitley

**ALSO PRESENT:** Town Attorney Charles Buckley; Town Manager Becky Hawke; Assistant Town Manager Melia Gordon; Finance Director Teresa Fulk; Fire & EMS Chief Rob Kinniburgh; Human Resource Director Tonya McGovern; Interim Police Chief KD Williams; Planning Director Jay Camp; Senior Planner Rob Will; Senior Planner Nadine Bennett; Planner Darin Hall; Planning Board Chair Jim Johnson, Vice Chair Howie Labiner, members Jonathan Clayton, Doug Rose, Bob Jackson and Chris Huzar; Communications Coordinator Maureen Keith; Town Clerk Lori Canapinno

### REGULAR MEETING CALLED TO ORDER

Mayor Higdon called the meeting to order at 7:00 pm.

### INVOCATION/MOMENT OF REFLECTION

Mayor Higdon issued an invocation.

### PLEDGE OF ALLEGIANCE

Mayor Higdon led participants in the Pledge.

### ADOPT AGENDA

Town Manager Becky Hawke explained the audit presentation – new business item 10A – must be removed from the agenda and rescheduled to the next meeting on May 22 due to the auditor's illness.

Motion by Mr. McCool to adopt the agenda as amended. The motion was seconded by Mr. Urban and unanimously approved.

### RECOGNIZE TOWN EMPLOYEE OF THE YEAR

Town Manager Becky Hawk recognized Police Department Administrative Services Manager Talia Hood as the Matthews Employee of the Year. Ms. Hood has Talia continues to step up and perform in ways that far exceed the expectations of her position. She does so much for the Town in a behind-the-scenes job that sometimes goes unnoticed. She is a great leader who knows the value of teamwork. The Mayor and Board thanked Ms. Hood for her hard work.

### RECOGNIZE NATIONAL POLICE WEEK AND PEACE OFFICER MEMORIAL DAY

Mayor Higdon read a proclamation recognizing May 9-15, 2023 as National Police Week and May 15, 2023 as Peace Officer Memorial Day.

## RECOGNIZE NATIONAL PUBLIC WORKS WEEK

Mayor Higdon read a proclamation recognizing May 21-27, 2023 as National Public Works Week.

## PUBLIC COMMENT

Jim Dedmon of 1330 Golden Hill Road noted this weekend also marked the recognition of International Firefighters Day. He then discussed the Town's proposed food truck program, which would allow food trucks to be located on the public right of way. He said he's not against food trucks, but said the first responsibility of any municipality is public safety. He doesn't think food trucks should be allowed to use public property and doesn't think ordinances should be changed for the benefit of one business owner. He would like the Town to prove that food trucks have an overall positive impact. He noted there is a petition in favor of food trucks in circulation but it doesn't allow comments in opposition and it includes people from outside Matthews. The applicant claimed on the news that he wasn't aware of the ordinance, but he applied for a change so he must have been aware.

Jim Hardzinski of 619 Meadow Lake Drive said he believes food trucks are fine as long as they're not in the public right of way. He then discussed Matthews property taxes, saying that based on the previously-proposed tax rate of 27.5 cents, it would be a 21% property tax increase over the revenue neutral number of 22.69 cents. Town spending is at the heart of this increase. He presented numbers regarding Matthews taxes only without Mecklenburg County taxes, saying the impact on many Matthews taxpayers will be greater than 21% because revaluation was not consistent across Matthews. Matthews can't control the revaluation numbers but the Town can control the budget. Residents will see taxes increasing in a wide range. For example, in the Crestdale neighborhood, Ablow and Amir Circle numbers show an increase of 53%. The Matthews School Road area went up 67%. Off Phillips Road, the Winding Trail neighborhood property taxes are up 85%. The Town government has committed to or are planning on committing to spending to drive this average 21% increase, including by agreeing to more wants than needs. Reducing the mill rate to 27.5 is not a reduction. This must be looked at in comparison to the revenue neutral rate. Affordability is more than just being able to purchase or rent the property, but also pay the annual cost of living there. Inflation continues impacting everything, and all of these numbers don't include any impact due to the bonds that were approved – that would be another 12%. The Town needs more fiscal responsibility. Mayor Higdon clarified that the recommended budget delivered by the Town Manager this evening includes a tax rate of 26.65 cents.

Legan Collins of 1126 Willow Oaks Trail in Weddington discussed the importance of skating as a sport, and offered her assistance to the Town to develop a skate park in Matthews. Billie McChesney of 1120 Red Porch Lane discussed food trucks, saying they block the road and cause children and adults to unsafely gather around the truck in the roadway. No one pays attention and drivers can't see them until they're turning onto the road. She is very concerned about safety and parking issues.

## RECESS REGULAR MEETING FOR PUBLIC HEARINGS ON APPLICATIONS TO AMEND THE UNIFIED DEVELOPMENT ORDINANCE AND LAND USE MAP OF THE TOWN OF MATTHEWS

Motion by Mr. McCool to recess the regular meeting for public hearings on applications to amend the Unified Development Ordinance (UDO) and land use map of the Town of Matthews. The motion was seconded by Mr. Urban and unanimously approved.

Mayor Higdon noted that public hearings will be held until 10:00 pm, and those not heard by 10:00 pm will be continued to June 12, 2023.

Planning Director Jay Camp introduced members of the Planning Board: Planning Board Chair Jim Johnson, Vice Chair Howie Labiner, members Jonathan Clayton, Tom Dorsey, Bob Jackson, Dough Rose and Chris Huzar

Plaintiffs' Complaint 000102

**Zoning Application 2022-752/Matthews Gateway: to change the zoning classification and change in conditions from R-9 & MUD to a single MUD district on that certain property designated as 1205 East John Street near the I-485 interchange to accommodate a multi-use development with a maximum of 240,000 square feet of office space, retail, restaurant and other commercial uses, a maximum of 150 hotel rooms, a maximum of 120 single-family attached dwelling units, and a maximum of 285 multi-family dwelling units, and further designated as tax parcels 215-042-19 & -12 & -13**

Senior Planner Rob Will reviewed the existing plan for the site that was approved in 2009. It consists of four pods that include a mix of uses – up to 220 multifamily residential units; up to 50,000 square feet of retail, office, daycare, restaurant, and bank uses with additional daycare; up to 354,000 square feet of retail, office, daycare, restaurant, bank and hotel uses, with a 100-room hotel; and up to 100,000 square feet of university and office uses. The proposed plan does not include the entirety of the acreage of the original – the university pod is not included it. The proposed plan includes a maximum of 240,000 square feet of office, retail, restaurant, and other commercial uses; a maximum of 150 hotel rooms, which would not be extended stay; a maximum of 130 one-family attached dwelling units and a maximum of 285 multi-family dwelling units. The application proposes a phased plan, with Phase 1 to include some of the town center concept, townhomes, multifamily residential and some commercial in one area.

Staff comments include the following: street lighting will be a part of the project, but pedestrian lighting should be installed by the developer; additional right of way is needed to build the Greylock Ridge Road extension and this should be dedicated to the Town by the developer; the developer should add some diversity of product into the multifamily sections; and a suggestion for the developer to share in the cost of mast arm traffic signals on John Street, as they would directly benefit this project. Mr. Will noted pros and cons for this application: portions of the new proposal are better than the old plan, such as the townhomes and town center concept; the proposal calls for a portion of greenway to be constructed; and the inclusion of an affordable housing component. Cons include the fact that the plan doesn't have the greenway extended along the creek/sewer easement; the mixed uses are horizontally, not vertically integrated; and the phasing of the town center concept means a portion is speculative, which is a concern.

Mr. Camp added that staff has been working with the developer for a year and a half now, and a lot of positive progress has been made, but staff is asking for the Board's feedback to assist in the continued development of the plan. There is a gas station proposed at the site. Staff initially wasn't too concerned but have heard from some members of the Board that they're not keen on that so additional feedback would be helpful. He noted this is a more traditional design for the multifamily component – that doesn't make it bad, but it is different some the varied typologies that Mr. Pappas included in his other recent development project. He then noted the parts of the project that would generate the most excitement – the office component and town center – are speculative aspects of the project. The project is not without merit and staff will continue to work with the applicants to get the best outcome for Matthews.

Ms. Garner noted that the property has been slated for development since 2009, so the Town is trying to get to the best outcome. She noted that the newer proposal has more residential units while the old plan has more office/retail uses and asked how that would impact vehicle traffic counts. Mr. Will explained that the applicants will discuss that as well as other road network information. Mayor Higdon asked about the greenway coming through this property. Mr. Will explained that the proposal shows the greenway coming along the future Greylock Ridge Extension. The developer would bring greenway in along the creek area and cross underneath the Selma Burke Extension. It would turn into a natural surface trail. There would be a greenway pedestrian connection between the multifamily and townhomes. This will also bring the greenway as a multiuse path up to Greylock Ridge Extension to the railroad crossing. Ms. Garner asked if staff has asked the developer to extend the sidewalk to the property to the northwest – the portion that had previously been included in the development; Mr. Camp explained that property has recently been acquired by NCDOT (North Carolina Department of Transportation).

Applicant representatives John Carmichael Robinson of Bradshaw & Hinson; Lat Purser of Lat Purser & Associates; Jeff Smith of Terwilliger Pappas; Keith Fenn of True Homes and Engineer Jonathan Guy of Kimley-Horn and Associates addressed the Board. Mr. Carmichael reviewed the plan, explaining that of the approximate 60 total acres, about 53 acres is currently zoned MUD and 7 acres at the northern portion of the site is zoned R-9. On the MUD

Plaintiffs' Complaint 000103

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 155 of 259

acreage, it would allow for the uses previously mentioned. There is a portion of the original site that is not part of the new proposal – it's still owned by Wingate University. Mr. Carmichael reviewed the existing and proposed plan entitlements, summarizing that what is being requested now is a change of conditions for the MUD section, a rezoning of the 7 acres to MUD to the same uses currently approved, and the addition of a convenience store. The plan proposes a reduction of 184,000 square feet of commercial space; an additional 65 multifamily units; an additional 50 hotel rooms; an additional 130 townhome units; and adds an affordable housing component; convenience store, greenway connection, signalized pedestrian crossing, and dedication of right of way for the extension of Greylock Ridge Road.

Transportation Engineer Jonathan Guy explained that the project site is at the confluence of a lot of NCDOT projects that are in construction or planned for construction within one year. The construction of Greylock Extension, widening Old Monroe Road, and extension of McKee Road is planned for 2024; and the Weddington Road interchange is currently under construction. He reviewed the 2009 plan's daily vehicle trips: a daily total of 13,696 trips, with an AM peak of 1,168 and a pm peak of 1,046. The proposed plan, based on the changes to the land uses previously discussed, calculates to a total of 8,772 daily trips, with an AM peak of 723 and a PM peak of 915 based on the proposed land uses. The old plan pushed about 6,000 trips per day toward downtown, while the proposed plan moves more trips to I-485 and eases congestion and traffic placed on Greylock Ridge Extension. There's a reduction of 3,734 trips from the 2009 to the proposed plans. Mr. Guy explained that the NCDOT forecast models run to the year 2040. The 2040 estimates run both with and without Greylock Ridge Road extension indicate that Greylock Ridge Road Extension would remove 7,600-10,000 vehicles per day from East John Street with the proposed development.

Mr. Carmichael reviewed the plan's inclusion of a HAWK signal pedestrian crossing on East John Street at the greenway, and the applicant's commitment to construct a bridge over the creek/greenway at Selma Burke Lane. The applicant would also dedicate the area adjacent from Four Mile Creek from East John Street to the railroad right of way, would construct the trail to the Carolina Thread Trail standards from east John Street to Selma Burke Lane/ The trail would then go up onto the road as a multiuse path to the eastern portion of the site. A natural trail would then be established from Selma Burke Lane back to the railroad right of way, and then a pedestrian connection from the townhome component to to the natural trail and pedestrian connection from the multifamily component to the natural trail. The natural trail would be a grass trail. Mr. Carmichael also noted that per Mr. Tofano's request, the townhome porches would have a minimum depth of eight feet. Mr. Camp noted that the elevations would have to be approved by the Board for the convenience store and commercial development.

Jeff Smith of Terwilliger Pappas reviewed the development vision, explaining that the four-story buildings will step to five stories close to the creek to make up for the grade change. In response to some comments about the wall being too large close to the creek, the applicants stepped the buildings down closer to the creek. They see this as an extension of downtown Matthews, with more 24-hour traffic to the downtown and more people living within walking distance to downtown. Mayor Higdon asked about the Town's desire for right of way dedication for the additional area for Greylock Ridge Road Extension; Mr. Carmichael explained that the applicants have committed to dedicating that right of way. He clarified that the NCDOT took the offsite land that Ms. Garner mentioned earlier, so the applicants aren't able to commit to a sidewalk in that area as she requested. Mr. McCool said he is excited about the affordable housing component but less excited about the phasing aspect. It's a heavily traveled road, so it seems unlikely that the residential aspect is needed first. He's concerned that the residential units will get built and then nothing will come after that. Mr. Tofano asked if the project could move forward without the R-9 portion. Mr. Carmichael said he doesn't think that's preferable as the applicants was a diversity of development. Mayor Higdon appreciates the 80-year clause for affordable housing and said he'd like to see the trail paved all the way throughout the development.

Ms. Hoover asked about the development's stormwater plans, saying the application requests a bigger development with a reduced stormwater plan. Mr. Carmichael and property owner Lat Purser had no information on that but will find out. Mr. Purser said there had been some initial comments on the stormwater related to the hotel and there were changes made when they performed a land swap. That created some confusion, but in the end, they're committed to doing whatever is needed based on the current regulations, not the 2009 regulations. Ms. Hawke said it is her understanding is that it was the county that had to sign off on everything and the county ultimately signed off based

Plaintiffs' Complaint 000104

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 156 of 259

on alignment with today's regulations. Mr. Tofano asked about the ratio of purchase to rental homes; Mr. Carmichael explained there's no commitment to whether the townhomes would be for sale or for rent at this point. Mr. Tofano said the R-9 portion could fit almost 25 single family homes, and said that would be an attractive addition to the plan for him. Mr. Urban noted Ms. Hoover's concerns about stormwater issues in perpetuity, and he would like to address stormwater prevention during construction. He recommended the applicants discuss that further with Public Works Director CJ O'Neill. He then requested more details on the building elevations, noting that the porches should be raised up to visually separate the private and public spaces. He agreed with Mr. McCool's concerns about the phasing plan. He expressed appreciation for the affordable component on the townhomes, but wondered if the Board should take a harder stance on the multifamily units too. He also wondered why the units can't be kept affordable in perpetuity. Mr. Urban then discussed issues with the greenway and said he doesn't think some aspects intertwine properly. There's nice green space but then someone would have to cross a parking lot to get to the greenway. The level of execution isn't there yet. This is a unique gateway into Matthews and right now it consists of several components that may not really speak to each other.

Mayor Higdon noted some communities around Matthews are doing a lot more with affordable housing and he would like to see projects in Matthews expand their affordable housing offerings. He also expressed discomfort with the uncertainties associated with the speculative nature of the future phases of the project. Mr. Tofano reiterated his desire for some single family detached homes to be added to the plan. Ms. Garner asked for clarification on the issue of less traffic when there's more housing in the plan. Mr. Guy said when the mixed uses create internal capture between the uses – townhome residents could walk to the project's town center or could take an easy walk to downtown Matthews. The trips also come down because the office and shopping center numbers are reduced. Mr. Guy noted that something that's not included in the traffic study is the importance of walkability. The analysis doesn't consider any reductions for bike or pedestrian activity. The applicants have been working with NCDOT and Town Engineer Susan Habina Woolard on the HAWK crossing on East John Street. Pedestrians take the path of least resistance, so having that crossing will better secure a safe crossing. There's already quite a lot if use. In that area. All of these things will help bring a more balanced mobility plan. Ms. Garner expressed concerns, especially because of the lot DOT took. If there's no sidewalk, people aren't going to want to walk on John Street. Not having the sidewalk there means people will get in their cars instead of walking. Mr. Guy noted that they just found out about the NCDOT taking that land, so they will get more information and get back on that. He said the design of Greylock Ridge Extension will encourage people to be more comfortable walking instead of driving, and people will likely be walking in that direction instead of on John Street. Ms. Garner noted that having the grass separation from vehicles on John Street helps. She said the Greylock extension is a selling point for her. She also questioned the inclusion of a grocery store because the plan doesn't look like it has a space big enough for one. Mr. Guy said people they're seeing national trends of smaller spaces for grocery stores.

Mayor Higdon said he doesn't think the HAWK beacons are as safe as some people think they are – he's seen drivers not stop when someone is walking across the road using the beacon. They're not foolproof. Mr. Tofano again encouraged the applicants to stand on John Street in the morning and watch how the traffic backs up. He believes a development of this magnitude on this spot will have nothing but a negative impact on this area. Ms. Garner said she certainly understands Mr. Tofano's point, but noted there is an approved plan prior to this one, so the Board should be trying to come to a better solution. She noted the pedestrian signal is between two traffic signals, so that will help with safety, and the median will too. Mr. Purser noted that the improved John Street will be four lanes with a dedicated turn lane, so congestion will be reduced, and Greylock will help improve how traffic flows. Mr. Urban asked if the townhomes will be individually metered and serviced; Keith Fenn of True Homes confirmed they would be individually metered. Mr. Urban noted there may be some legislation coming from Raleigh regarding four-plexes and six-plexes – their designation may be moved from commercial to residential. Planning Board member Tom Dorsey said he's heard in the past that there's an expectation that the Weddington Road interchange will reduce traffic on John Street. Mr. Guy said that is true - the forecast from NCDOT has that baked in, as well as the extension of McKee Road. Planning Board member Jim Johnson asked if the bridge on Selma Burke would have two lanes with sidewalk on both sides; Mr. Guy said yes. Mr. Johnson said it seems like that would be busy and is concerned about safety. Mayor Higdon opened the floor to public comments. Jennifer Lynch of 7621 Greylock Ridge Road expressed her opposition, explaining she chose her home in the Greylock neighborhood due to its close proximity to the downtown

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 157 of 259

area, greenway and schools, and the town's small-town feel. She doesn't believe the proposed changes would be good for the area. John Street is a gateway to downtown and people can't go anywhere in Matthews in the last few years without seeing a lot of big apartments. She thinks the project would lead to a loss of the small-town feel and it would lower property values, increase traffic, and negatively impact schools. She's also concerned about the destruction of greenspace, even though there's green space on the plan. She thinks the gas station will increase the traffic and she's also concerned about the five-story apartment building. She asked for the development to be made similar to what is already have in the downtown area – red brick and in the Craftsman style.

Pat Robinson of 518 Deer Creek Drive expressed opposition, saying she's spoken to over 100 people about this and all were against the project. Traffic is a big concern and people already can't get out onto John Street. She said Matthews doesn't need more multifamily homes or townhomes. She submitted a petition opposing the application. Joseph Martin of 425 Pinecrest Drive noted the plans call for two new traffic signals, meaning there would be three stoplights within three tenths of a mile. He questioned what that would do to traffic. He also expressed concern about the number of trips generated by the proposed uses and does not believe the numbers presented are accurate. He said the renderings are beautiful but the project will contribute to the loss of the desired small-town feel. He said no one in the area wants this and would prefer to see a better plan, perhaps with single family homes and a couple commercial uses. He also expressed concerns about the impact on wildlife.

Ms. Garner noted there's been discussion on the comparison between the previously approved plan from 2009 and the proposed plan. That plan does not include single family homes. She would like to hear from citizens on whether they prefer the 2009 plan or the proposed plan, as that are the Board's two choices. She said she would love to see single family homes there, but it's already past that point. Mr. Tofano said there's a single-family component that's missing. He questioned if the Board would even be discussing this if the R-9 portion stayed R-9 and the rest stayed MUD. Mr. Camp explained that the layout and some property lines have changed, along with uses and some other conditions, so a rezoning action would still be required. Billie McChesney of 1120 Red Porch Lane said Matthews has something special but the town is losing that. She can't get out of her development now and believes the proposed plan will make traffic much worse and much more dangerous. She believes the residents are losing what makes Matthews special, and if huge developments keep getting built, they'll lose more of that specialness.

Town Clerk Lori Canapinno read written comments from Kylie Rowlson, Kelli Espaillat, Tammy Vernon and Jessica Tullar. Ms. Rowlson expressed multiple concerns about the project, including those relating to traffic, safety, loss of community character, school overcrowding and destruction of green space and trees. Ms. Espaillat expressed concerns about safety, traffic, overpopulated schools, possible trafficking at the hotel and the gas station. As the Executive Director of the Matthews Chamber of Commerce, Ms. Tullar expressed the Chamber's support of the project as it will provide housing for the area workforce and allow for business growth in Matthews. Ms. Vernon expressed concerns relating to loss of community character, decreasing market value for homes near this development, increased traffic, overcrowding schools, and destruction of green space and trees. *The full comments are listed as Exhibits 1-4 and hereby referenced and made a part of these minutes.*

The public hearing was closed. This application will be reviewed by the Planning Board on May 23rd and come back to the Board of Commissioners for a decision on June 12th.

**Zoning Application 2023-773/Lemma: to change the zoning from R-12 to R-VS on that certain property designated as 1718 Matthews-Mint Hill Road and further being designated as tax parcel 215-102-16**

Senior Planner Nadine Bennett reviewed this application for the rezoning of a wooded, 1.06-acre site adjacent to Butler High School from R-12 to R-VS to build four two-story townhomes. The applicant had a similar request that ended up being withdrawn last year. The plan proposes four townhomes with ten parking spots – more than required.

Planning staff has some concerns about the queuing for Butler High School. By right they could probably get two homes there with two accessory structures, so there could be four homes with cars getting in and out. Twice a day they'd have trouble, but it seems reasonable other times. The Transportation Advisory Committee encouraged the

Plaintiffs' Complaint 000106

applicant to seek cross access with the apartment complex adjoining the lot so people accessing the site could avoid Matthews-Mint Hill Road. Town Engineer Susan Habina Woolard had also noted that the driveway stem doesn't appear long enough to conform to driveway standards. Public Works Director CJ O'Neill explained that if the driveway stem isn't long enough, it could back traffic up into adjacent drive aisles.

Applicant representative Josh Butler of Gateway Design Group addresses traffic concerns, explaining that townhomes generate about half as many trips as single-family homes, so the trips generated by the four townhomes are comparable to those generated by two single-family homes. This parcel is about an acre, and about half is NCDOT right of way. The applicant has tried to accommodate getting some additional parking spaces. If they reduced some spaces, they could probably get a longer stem. Regarding the potential for cross access – he understands the idea behind it, but there's already road frontage on the front, and the applicants don't necessarily want to lose privacy afforded by the tree buffer and undisturbed open space by making that connection. That might also might trigger a need for a BMP (best management practices for stormwater).

Mayor Higdon asked about elevations. Mr. Butler explained that he is the engineer and can't speak to that, but will get that information in time for the Planning Board meeting. Mr. Tofano suggested putting the parking spaces behind the buildings, thereby increasing the driveway stem. Mr. Butler said they looked at that but felt it made more sense to lay it out as presented. He feels confident they've worked with staff to come up with the best plan for the site. Ms. Bennett noted that with the previous plan, which was withdrawn, the plan did have the parking in the back and staff felt the units lost their back yards. Mr. Butler explained they use a program called Auto Turn that programs exactly where the cars need to turn. He is confident he can show that the plan meets the turning requirements

Mr. Urban asked if these units would be platted as fee simple townhomes. Mr. Camp explained that the R-VS designation does require a lot to be platted, so it's considered single family attached. The requirement is for 2,000 square foot lots, which means they'd have to project the lots back to meet that minimum, or they'd have to request that as a condition. Mr. Urban asked how the utilities would be meted; Mr. Butler said they could have four individual taps if needed. Mr. Urban said that's important to know if they're townhomes or apartment units. Mr. Urban then said he wasn't enthusiastic about the elevations, saying if they're going to build a modern building, it should be a good one. Mr. McCool agreed about the elevations.

Ms. Hoover noted the 62-unit Harkey project on the other side of the school and asked why this site's driveway stem issue is different from that one. Mr. Camp explained that the morning queue into the school is the issue. When that backs up, cars might not be able to get out of the subject site. The applicants could post signage to disallow left turns out of their parking lot during peak times for the school if the Board is worried about accidents from left turn movements. Mr. Whitley asked if there are two parking spaces assigned per unit. Ms. Bennett explained that when the applicant came in last year, that plan included exactly the number of required spaces, and there were comments about guest parking. Mr. Whitley said there's some space to move spaces around to satisfy the concern about the driveway stem issue, and the turns should be right in, right out only to take care of some concerns.

Mayor Higdon opened the floor to public comment. No one spoke.

The public hearing was closed. This application will be reviewed by the Planning Board on May 23rd and come back to the Board of Commissioners for a decision on June 12th.

**Zoning Application 2023-775/Indian Trail Plaza LLC:** to change the zoning classification from R-20 to Office (CD) on that certain property designated as 2116 East John Street and further designated as tax parcel 227-221-31 *continued from April 10, 2023*

Senior Planner Rob Will reviewed this application for the 4.28-acre site located on East John Street near the Duke Power easement and the Steady Eddy's Pumphouse restaurant. The undeveloped property is currently zoned R-20 and the application proposes a rezoning to O(CD) for the development of a 20,000 square foot office building and

Plaintiffs' Complaint 000107

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 159 of 259

associated parking. A SWIM buffer affects the site. The East John Small Area Plan covers this area. While the proposed use isn't consistent with the area plan map, there are some action items that make the rezoning consistent with the intent of the plan, including the following: parking should be located to the side and rear of buildings to the greatest extent possible; the development should establish natural buffers along the Brightmoor and Matthews Plantation subdivisions; and properties along East John Street should maintain or create a tree buffer along the road frontage, and parking or vehicular use areas should not be located between new buildings and the tree buffer. Staff recommends Planning Board advise and comment on the overall consistency with the Land Use Plan. The Board is allowed to approve applications that are not consistent. Staff believes this is consistent with the intent of the Land Use Plan.

Mr. Will noted that an NCDOT plan will create a bulb-out on the parcel. The majority of the parcel will be left untouched. There's a stream and SWIM buffer to the rear of the site. The development does not require a TIA. (Transportation Impact Analysis). NCDOT project U-4714AC will impact the driveway location. Staff notes that connectivity to the southern parcel is recommended in the Small Area Plan. A public improvement variance will be required if the applicant doesn't want to construct frontage improvements. The NCDOT plan will come in and rip it up so it makes sense to seek a variance. Staff will be continuing collaboration with NCDOT on the final location of the driveway access.

Mr. Tofano asked about the zoning on adjacent land; Mr. Will explained it's R-20 to the north and R-12 to the south. Mr. Urban asked if the office building would have to be out of the street edge with parking behind the building; Mr. Will said yes. Mr. Urban pointed out that the submitted graphic is wrong based on his quick calculations. It's not a good representation as that 20,000 square feet doesn't calculate out – there's a technical error on the drawing and the footprint of the building. As shown, it looks like it's about 4,500 square feet per floor rather than 10,000. Applicant representative Nevin Gentry of Urban Design Partners said they will double check the graphic. He believes it's supposed to be a 10,000 square foot building with 5,000 square feet per floor.

Mr. Tofano asked if there were any future plans for the unused portion of the land; Mr. Will explained there will be a substantial amount of buffer against the three single family lots to the rear. Mayor Higdon appreciates the great tree save but isn't a fan of the architecture, particularly the high-pitched rooflines on each end. Mr. Gentry explained this is a preliminary vision. The client is the owner of J and J Custom Homes and they plan to have their office here. They own the property and want their employees to come and work there. The building would be more of a representation of what their products are, with a residential style. Mr. Urban recommended they show off their work on this site. He recommended removing the columns in the center. Planning Board member Bob Jackson asked when the NCDOT work be scheduled; Mr. Gentry explained that the schedule hasn't been confirmed yet. The project's been pushed several times. The applicants intend to submit for the variance. Ms. Garner noted that this portion of John Street has been funded so it'll happen sooner rather than later.

Mayor Higdon opened the floor to public comment. No one spoke.

The public hearing was closed. This application will be reviewed by the Planning Board on May 23rd and come back to the Board of Commissioners for a decision on June 12th.

**Zoning Application 2023-777/Davis: to change the zoning from O(CD) to B-1(CD) on that certain property designated as 541 West Charles Street, and further designated as tax parcel 193-251-13**

Senior Planner Rob Will explained the applicants requested a withdrawal.

Motion by Mr. Urban to allow withdrawal. The motion was seconded by Mr. McCool and unanimously approved.

APPROVED 5/22/2023

10

Plaintiffs' Complaint 000108

**Zoning Application 2023-778/text amendment: to change the text of the Town code regarding the Crestdale Conservation District, to change the side yard setback on properties less than 5 acres, and deleting the requirement that only one entrance shall be on the front elevation**

Senior Planner Rob Will reviewed this application from Matthews Habitat for Humanity for two text amendments: one to UDO section 155.503.2.C.5, to reduce side yard setbacks for the CrC zoning district to from eight feet to five feet on each side, which would allow for more moderately sized homes on the smaller CrC lots; and the second to UDO section 155.503.2.C.8.e, to eliminate the special design criteria about entrances on the front elevation in the CrC zoning district, which would then allow two entrances on the front elevation. Duplexes are already allowed with a five-foot setback so staff feels this is appropriate.

Mayor Higdon asked if that means there would be two entrances on the front of the house and share a driveway; Mr. Will said yes. Mr. Tofano asked for renderings; staff will provide that. Mr. Whitley noted his familiarity with the lots in the area and commented on retention pond issues. Town Attorney Charles Buckley noted that this application is for text amendments and not a site-specific application, so those comments are not germane to the application. Mr. Urban asked if the text could include diagrams of door entries so applicants could see what is acceptable. Mr. Camp noted that the North Carolina General Statute Chapter 160D doesn't allow for a lot of architectural standards, and if this requirement is removed, the doors could be on any elevation. Ms. Garner expressed concerns about five-foot side yards, saying there could be property access issues, such as sufficient access if work needed to be done on a house. Planning Board member Tom Dorsey asked how the setback is measured; Mr. Will explained it is measured from the face of the house.

Mayor Higdon opened the floor to public comment. No one spoke.

The public hearing was closed. This application will be reviewed by the Planning Board on May 23rd and come back to the Board of Commissioners for a decision on June 12th.

## RECONVENE REGULAR MEETING

Motion by Mr. Tofano to reconvene the regular meeting. The motion was seconded by Mr. McCool and unanimously approved.

## PLANNING AND DEVELOPMENT BUSINESS

### PLANNING BOARD REPORT

Planning Board Chair Jim Johnson presented the report of the April 25, 2023 Planning Board meeting (Exhibit #5 hereby referenced and made part of these minutes.)

**Motion 2023-1/Town of Matthews: to change the zoning from B-H(OCD) and R-9 to I-2(CD) on those certain properties located in the southeasterly quadrant of US 74, I-485, the railroad tracks and the Union County line, that being property designated as tax parcel 215-241-05, 07, 04, 03; 215-073-04, 05, 06, 07, 09, 01, 02; 215-072-30, 31, 32, 16, 08, 07, 06, 21, 11, 05, 18, 04, 03, 02, 29, 12, 13, 24, 26, 28, 22, 27, 17, 35, 23, 14 & 15**

Planning Director Jay Camp reviewed this application, noting the Town is partnering with CPCC (Central Piedmont Community College) and Hendrick Automotive for a public safety training facility and advanced manufacturing campus. The advanced manufacturing campus could be the largest economic development and job creation project in the Town's history. He noted the public safety campus would be located in Development Area A, near the planned expansion of CPCC. Hendrick has submitted voluntary conditions as part of the zoning motion. Permitted uses generally would be what's allowed in the I-2 list but they've pared back the list. They need heavy manufacturing but

Plaintiffs' Complaint 000109

there is a reference that any manufacturing uses would meet NCDEQ (North Carolina Department of Environmental Quality) requirements. There is a list of prohibited uses. This does not require future Board approval of elevations or site plans, but there's a note about a campus appearance with complimentary materials and features throughout the advanced manufacturing campus. There is also a commitment for a 70-foot permanent right of way reservation and an additional 30-foot right of way reservation for construction purposes.

Motion by Mr. Tofano to approve Zoning Motion 2023-1 as it is consistent with the Land Use Plan recommendation to consider an employment center in this area of the Town, and the rezoning is reasonable in that it will create a 200-acre development area with the potential to bring significant investment and job creation to the Town. The motion was seconded by Mr. McCool

Mayor Higdon said he thinks this is the most exciting economic driver that has ever happened in Mathews. It will provide jobs for people's children and grandchildren, and he's happy that Hendrick wanted to do this here. Mr. Urban asked if staff could prepare a site plan package that the Board could see in the future, just for review purposes, so the Board could understand what the look and feel of the brand would be. Ms. Hawke noted that Hendrick would not be the entity that actually constructed the campus. Hendrick Automotive representative Marshal Carlson explained that typically, a large major user would be the first anchor coming in. It's unlikely, but possible that one manufacturer could take the whole campus. In Research Triangle Park, IBM was the first to come in and they shaped the campus design. That's the same type of approach here. Standards would be set by the first major tenant, and those would go with the declarations of the park. That future continuity is assured with the noted included in the petition.

The motion to approve Zoning Motion 2023-1 was unanimously approved.

**Zoning Application 2022-765/text amendment: to amend the text of section 155.504.3.C.3 by adding language that allows more than 600 dwelling units in the ENT-O District to receive construction permits and certificates of occupancy prior to the date on which 40,000 square feet of new commercial space has been completed or is under construction in the ENT-O District provided that each development project that includes dwelling units contains a specified minimum amount of new commercial space** continued from April 10, 2023

Planner Darin Hallman reviewed the application for a text amendment to the Entertainment District (ENT) to remove the *Residential to Commercial Ratio* within the Entertainment Overlay District and add requirements for street level activation of new buildings within the Overlay District. The applications have identified the primary and secondary streets within the district. The primary streets would be Matthews-Mint Hill Road, Independence Pointe Parkway, the extension that runs through Briley and out to the Sportsplex, and a planned east-west street The applicant does have drawings to showcase where they'd be within the district. Since the Planning Board meeting, the applicants have changed the requirement for the 50% ground floor fronting a primary street and 25% for those fronting secondary streets. By right those are limited to just permitted nonresidential uses. The live/work units and convertible residential units were moved down back into the conditional noted. The Board has the ability to replace the nonresidential uses on the ground floor with live/work or convertible units. Mr. Hallman noted the ENT overlay is paired with the ENT base district, which is a conditional process. It would be at the pleasure of the Board to decide what site plans and layouts are appropriate. Staff recommends approval.

Mr. Tofano said his position on this remains unchanged: he believes passing this text amendment will lead to the demise of the ENT district and he cannot support it.

Motion by Mr. Urban to adopt Zoning Application 2022-765 as currently amended, as the text amendment is consistent with the Family Entertainment Small Area Plan by incrementally codifying mixed use concepts to the overlay area, and reasonable in that it emphasizes and reinforces the zoning requirements for the Entertainment District zoning ordinance. The motion was seconded by Ms. Garner and passed 5-2 with Higdon, McCool, Garner, Urban and Whitley in favor and Hoover and Tofano in opposition

APPROVED 5/22/2023

12

Plaintiffs' Complaint 000110

**Zoning Application 2022-766/ENT-NRP Group: to change the zoning on that certain property from R-15 to ENT on that certain property designated as 11330 Brigman Road and further identified as tax parcel 215-081-43**

Planner Darin Hallman reviewed updates to the application: the five-foot sidewalk has been upgraded to a ten-foot multiuse path; the application proposes live-work units in compliance with the text amendment that was just passed; and there's a commitment to public art with the art installation being be coordinated with Park and Recreation staff during the permitting process. Staff received the updated Charlotte-Mecklenburg Schools student counts today – these are updates for the current school year, and the numbers decreased from last year, with Matthews Elementary School at 110% capacity, Crestdale Middle School at 94% capacity, and Butler High School at 102% capacity. The multimodal station location will be determined during permitting. The Transportation Impact Analysis has been completed but still has not been approved as there is one outstanding factor. At Matthews Mint-Hill Road heading into Highway 74, there's some dispute about the best practice for traffic management. Town staff has requested the addition of a second through lane, while the applicant is proposing alternatives to that.

Mayor Higdon asked if there were restrictions placed on the life of the live-work units. Applicant representative Jason Mochizuki explained they will be retained as live/work units in perpetuity; Applicant representative John Carmichael said they'd add a note to that effect. Mayor Higdon asked about the affordable housing aspect; Mr. Carmichael noted they've increased that from 5% to 7.5% of the units at 80% AMI (Area Median Income), and that a minimum of two of those would contain at least two bedrooms. Mr. McCool asked if the applicants would consider increasing that to 10% at 60% AMI. Mr. Mochizuki explained that he didn't think that would be finically feasible with all their other commitments. Mayor Higdon asked if they would consider increasing the affordable housing component from a term of 15 years to 20 years; Mr. Mochizuki committed to the 20-year term.

Mr. Urban asked about the live/work units; Mr. Mochizuki confirmed there would be 17 live/work units total. Mr. Urban said he thinks they would be retail instead of live/work. Mr. McCool agreed, saying that would really activate the area and get people to do business in Matthews. He's concerned that there wouldn't be any public-attracting businesses in those live-work units. Mr. Tofano said this is step one to converting the ENT district to a residential district and he cautioned that it would open the door to future developments exactly like this. Ms. Garner asked for details on the Planning Board's comments about the multiuse path; Planning Board Chair Jim Johnson explained they were hoping it could be constructed by the applicants all the way up to the Bowlero site and get reimbursed from the Town, as a way to accelerate the construction. Ms. Hawke clarified that the Town doesn't currently have funding for that section of the multiuse path. There is some funding set aside for a different section that could possibly be diverted. It would be helpful to have a cost estimate.

Ms. Garner asked if Public Works staff had any traffic improvement comments to share regarding road improvements along Matthews-Mint Hill Road. Public Works Director CJ O'Neill explained that the TIA included extending some turn lanes on Highway 74 with right and left turn lanes and another through lane along Matthews-Mint Hill Road crossing Highway 74. Mr. Carmichael explained that the traffic study prepared the applicant's traffic engineer Andrew Eagle called for the applicant to install a left turn lane on Matthew-Mint Hill Road to Brigman Road, and that is committed in the plan. Traffic Engineer Andrew Eagle explained that their study identified some impacts at Highway 74 and Matthews-Mint Hill Road, but looking holistically at the area and the end results, they didn't ultimately recommend and turn lanes at that intersection. It operates at a Level of Service (LOS) F without any of the site trips added in from the proposed development. There was one impact to the northbound Matthews-Mint Hill northbound approach, increasing a delay from a LOS F to a worse LOS F. Issues would be there whether or not this development was there. Looking at the number of trips this site would add to the intersection of Highway 74 and Matthews-Mint Hill Road, it's about 9%. That doesn't include any of the volume on Highway 74, which is much greater. For those reasons, they didn't recommend any turn lanes in the TIA. After talking more with Town staff, they are considering increasing some of the storage lengths on Matthews-Mint Hill Road.

Mr. Carmichael clarified that a through lane on Matthews-Mint Hill Road across Highway 74 is what is in question. That is very challenging from a right of way and utility standpoint, so since the traffic study didn't recommend the

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 163 of 259

developer do that, they looked for alternatives. One alternative would be to pay a fee to the Town for a percentage share of a future through lane. He noted that would be ripped up by NCDOT in the future. Mr. Hallman had recently proposed an alternative to extend the existing right and left lanes on Matthews-Mint Hill Road at Highway 74 as far as possible within the existing right of way. The applicant would prefer to pay a fee to the Town to be held in escrow to be applied to a future improvement of that intersection. Mr. Hallman noted that the TIA has been completed but not approved. There's a list of items that have to be agreed upon by the applicant and Town. Everything has been agreed on except the through lane. Staff has discussed extending the existing right turn lane back down Brigman Road so the applicant wouldn't be responsible for acquiring more right of way. They also discussed paying some type of fee, but the cost of those improvements is unknown. The 9% mentioned is the applicants' contribution to the traffic. Mr. Whitley noted that NCDOT plans for an overpass in this area. Mr. O'Neill confirmed that, but noted the timing or if it will ever actually happen is unknown. Mr. Whitley said there is lane that turns right onto Highway 74 to Union County and questioned if that could be turned into a right turn and through lane. He said there's no need to make the developer make another lane when that could be used instead. He also said the future overpass would solve a lot of the issues being discussed tonight. Mr. O'Neill noted that vehicles turning right are more numerous than those going straight, so that would block traffic even more.

Ms. Garner said this housing will be important in conjunction with the Hendrick plan. She asked if the Town moved forward with asking the petitioner to escrow funds, would that obligate the funds to be spent on Matthews-Mint Hill Road. She said she'd hate to hedge this money into this tight corridor if it could be used for something else. Mr. Buckley noted that fees in lieu are specifically authorized, and are usually reserved for improvements "in the area". Mr. O'Neill said he believes the turn lane improvements are really needed at that intersection. Perhaps there could be a combination of approaches. Mayor Higdon asked if the application could be continued while staff continued to work on this with the applicant; Mr. Carmichael agreed.

Motion by Mr. McCool to continue to June 12. The motion was seconded by Ms. Garner and passed 5-2 with Hoover and Tofano in opposition.

**Zoning Application 2022-774/text: to amend the text of Section 155.503.43.C.3 food trucks to permit food trucks within the public rights of way in front of businesses that do not have their own parking lot or private parking spaces**

Planning Director Jay Camp explained staff's recommendation is to approve the text amendment with an effective date in tandem with when the mobile vendor program is approved by the Board, which would be no later than June 12. The program would address the issues raised during these meetings and staff will have recommendations on what the fees should be. This would be a pilot program to see how things go with the new regulations in place. He noted the Planning Board had some concerns about making a change to the code without having the program in place. He also noted that staff and the Board has heard from a lot of residents and citizens, and he noted that this program would not be for the benefit of one business - people generally expect to see food trucks downtown.

Mr. Tofano said he spoke today to some businesses on Trade Street who were under the impression that this was going to be postponed until June 12th. Mr. Camp said he didn't know where that came from. Mr. Tofano said he finds it impossible to pass something pursuant to something that doesn't exist. There seems to be confusion. Businesses are under the impression that the program would be in place first. Mr. Camp said the Board could choose to continue this item to June 12 if that's the will of the group. Mr. McCool asked which business owners Mr. Tofano spoke to; Mr. Tofano said he wouldn't say as they specifically asked him not to. Ms. Garner said the business owners she spoke to are in favor - they do have businesses on Trade Street and feel food trucks do bring businesses to them.

Motion by Ms. Garner to approve 2023-774, effective upon the approval of the pilot mobile vendor program, as the text amendment is consistent with the goal to create and maintain a vibrant environment in the downtown area, and is reasonable in that it will allow for the creation of a vendor program that provides for a limited number of reserved

Plaintiffs' Complaint 000112

spaces for food trucks while preserving important customer parking for permanent businesses in the downtown area. The motion was seconded by Mr. McCool.

Mayor Higdon asked about hours of operation, saying 3:00 pm to 10:00 pm is earlier than he would have expected. He suggested staff vet that more with the local business owners. Mr. Tofano said he has never been against food trucks, only against unauthorized use of public property. He reiterated his desire to wait until the program is approved. Mr. Whitley agreed that 3:00 pm might be too early and suggested 5:00 as a good start time. He also is concerned about safety issues, saying he likes food trucks but not when they're in the street. Ms. Hoover said her concern us safety as well, and she also has a genuine concern about changing an ordinance for one person based on who he is or who he knows. She asked if the Board would change the UDO to show the same consideration for other citizen requests. She said the Board needs to be fair to everyone. Mr. Camo noted that the UDO is a fluid document, and changes can be made as needed. Ms. Hawke noted that the application for this text amendment was contacted about the code violations. As any community member, he had the right to bring forward this request for a UDO change. Mayor Higdon said he supports this and doesn't believe it's for one individual – it's for anyone who wants to bring a food truck to downtown.

Mr. Urban made a substitute motion to direct staff to work on the mobile vendor program and return for decision on June 12. The motion was seconded by Mr. Whitley and unanimously approved.

## Public Improvement Variance – Rehoboth Eritrean Church; 3700 Margaret Wallace Road

Senior Planner Rob Will reviewed this request for a variance that would allow the applicant, Rehoboth Eritrean Church, to not have to construct the curb, gutter and six-foot-wide-sidewalk that would normally be required along the site's frontage due to the church's planned construction of a new sanctuary building at 3700 Margaret Wallace Road. Staff and Planning Board recommend granting the variance for curb and gutter but to recommended requiring the sidewalk to be constructed. The site has 760 feet of frontage.

Public Works Director CJ O'Neill noted that in a similar circumstance, the Board previously allowed a five-year delay in the sidewalk construction. That causes an issue with staff and there's little mechanism to force the applicants to construct at that time. Mr. Tofano said to make a religious organization install an expensive sidewalk to nowhere wouldn't be fair when the Board didn't require that of others in their situation. Mayor Higdon clarified that the Board didn't remove the requirement to build the sidewalk, but gave them five years to do so. Applicant representative Joshua Rine explained that it's a funding issue for the church right now. A delay of five years would help them tremendously. Mr. Whitley said it's not fair to make a small church struggle to pay this money, and said the Board should treat all of them equally. Mr. O'Neill noted that he wasn't advocating either way, but that the Town builds things piecemeal all the time. Town Attorney Charles Buckley explained that if the applicant refused to construct the required sidewalk at the appropriate time, they be in violation of the UDO and could ultimately be sued. Mayor Higdon said he can appreciate the financial burden this could have, but if the Board totally negates the requirement, then the Town would never have any sidewalks. He's okay with giving them time to raise the funds. Ms. Garner agreed, saying one of the things the Town may sell bonds for is to fix sidewalk gaps. Churches don't pay into the tax base so this could be a way for them to give back to the community. She said the Board should recognize that this does cause issues and consider not doing this again should it be requested.

Motion by Mr. McCool to grant the Public Improvement Variance for curb and gutter, but require the construction of the sidewalk within five years. The motion was seconded by Mr. Urban and unanimously approved.

## Administrative Amendment – Matchpoint Sports; 2110 Pleasant Plains Road

Senior Planner Rob Will reviewed this application to allow coverings to be raised over three padel sport courts located at the Matchpoint Sports site at 2110 Pleasant Plains Road. The structure would be between 33-45 feet high at the

Plaintiffs' Complaint 000113

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 165 of 259

peak. Planning Board recommended the height be reduced if possible, and for the applicant to install landscape buffering along the road frontage.

Applicant representative Miguel Correa explained the purpose of the coverings is to keep the courts dry. The color would be white. Mr. Tofano asked about the surrounding area; Mr. Will explained there's a single-family property zoned R-20 adjacent to this site and a development across the street. Mayor Higdon said 45 feet is too tall as that would tower over everything there. He could support a shorter structure. Mr. Correa noted the schematic he presented shows a 40-foot-tall peak. Mr. Urban asked about lighting and its impact on nearby drivers; Mr. Will explained there are stipulations in the UDO for full cutoff at the property line. Mr. Correa said the lights shown in the application packet aren't the ones they'd actually use.

Planning Board member Bob Jackson noted that the Planning Board agreed that this would be an outrageously tall thing sitting out by the road. The Planning Board asked for there to be some shrubbery to help block it off from the road. They also asked if it could be a different color, since white would stand out. The applicants were going to see if the manufacturer had other colors. Planning Board Chair Howard Labiner noted the applicant told the Planning Board that the padel tournament rules would allow 34 feet in height. Mr. Tofano asked if the courts could be moved; Mr. Correa said no. Mr. Tofano pressed on the lowest height the applicants could go; Mr. Correa said 40 feet is the lowest without going to a custom solution.

Motion by Mr. McCool to approve the Administrative Amendment with the conditions consistent with the Planning Board recommendation, with the caveat of a height restriction of a maximum of 41 feet.

Ms. Garner noted the applicants could pay for a custom product for a shorter peak and suggested the Board approve it at 34 feet. Mr. Whitley noted the requirement for a minimum of 34 feet for tournaments.

Mr. Correa explained that the covers do come in green, but the durability is not the same as the white covers, so the green ones would have to be replaced much more frequently.

Mr. McCool made a substitute motion to approve the Administrative Amendment with the conditions consistent with the Planning Board recommendation, with the caveat of a height restriction of a maximum of 35 feet. The motion was seconded by Mr. Whitley.

Ms. Garner agreed that some landscaping could lessen the visual impact. Mr. Tofano asked if the courts and coverings would conform to the required setback; Mr. Will said staff would have to verify that the covering structure wouldn't infringe on the 50-foot setback. Mr. Whitley said it would be a waste of money to put shrubbery there as suggested. Mayor Higdon said it's unfortunate that these are so close to the road. He would like to be supportive but the visual impact would be too great.

The motion to approve the Administrative Amendment failed 4-3 with McCool, Garner and Whitley in favor and Higdon, Hoover, Tofano and Urban in opposition.

## CONSENT AGENDA

    A. Approve Board of Commissioners Meeting Minutes – April 24
    B. Approve Disposal of Surplus Fire Rescue Truck
    C. Approve Renewal of Town's Participation in Mecklenburg County Community Development Block Grant Program
    D. Approve Resolution Adding Streets to Town's Street System and Ordinance Setting Speed Limit and Stop Signs
    E. Approve Travel Reimbursement to Mayor Higdon - $131.75
    F. Approve Easement Agreement for Sam Newell Road Multiuse Path

Plaintiffs' Complaint 000114

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 166 of 259

G. Approve FY23 Audit Contract

H. Approve Temporary Road Closure Requests from Matthews Chamber

I. Approve Budget Ordinance Amendments:
1) Matthews-Mint Hill Road Traffic Signal - $125,000
2) Community Center Programming - $36,000

Motion by Ms. Garner to approve consent agenda items A-I2. The motion was seconded by Mr. Whitley and unanimously approved.

## UNFINISHED BUSINESS

### CONSIDER CONTRACT FOR POLICE DEPARTMENT CAD/RMS PROGRAM

Interim Police Chief KD Williams noted this item had been discussed at the recent planning conference. The request is for the purchase of a record management system and computer-aided dispatch (RMS/CAD) system. The current legacy systems are inefficient and the new system would streamline processes and ensure performance and accessibility since it's a cloud-based system.

Motion by Ms. Garner to approve the use of $346,352 in ARPA Funds and $200,000 in Asset Forfeiture Funds to purchase and install the ProPhoenix Law Enforcement CAD/RMS system for use by the Matthews Police Department, and to approve the related budget amendment. The motion was seconded by Mr. Whitley and unanimously approved.

Mr. Tofano asked if the program could also be uses by the Fire Department; Fire & EMS Chief Rob Kinniburgh said his department will need a software system as well, but they haven't looked at this system. They're currently looking at expanding a system that was purchased county-wide.

### CONSIDER CONTRACT FOR FIRE STATION 2 IMPROVEMENTS

Fire & EMS Chief Rob Kinniburgh noted this item had also been discussed at the recent planning conference. The estimate has been refreshed since then and it's still valid. The needed improvements to Fire Station 2 include a kitchen remodel, creation of a locker room, updates and reconfigurations of multiple rooms, replacement of floor coverings and electrical work. These projects are estimated at $155,680. If approved, work would not start until late June or July.

Motion by Ms. Garner to authorize the Manager to contract with The Maintenance Team and Regal Cabinets for renovation work at Station 2, for a cost not to exceed $155,680, and to utilize General Fund proceeds from the American Recovery Plan Act, and to approve the corresponding Budget Amendment transferring the funds to the Fire Department's FY23 budget. The motion was seconded by Mr. Whitley and unanimously approved.

## NEW BUSINESS

### RECEIVE FISCAL YEAR 2021-22 AUDIT REPORT (removed)

This item was removed from the agenda and rescheduled to the May 22 meeting.

Plaintiffs' Complaint 000115

**MAYOR'S REPORT**

Mayor Higdon noted that the Board had a budget workshop before this meeting. The cost of doing business has gone up and there will be a tax increase. He and the Board are committing to making that increase as small as possible. They will be looking at the budget very carefully in the next few weeks. He then congratulated his son, Jed Higdon, who will be graduating next week from New York University with a Master's degree in Public Administration with a concentration in transportation.

**TOWN ATTORNEY'S REPORT**

None

**TOWN MANAGER'S REPORT**

None

**ADJOURNMENT**

Motion by Mr. McCool to adjourn. The motion was seconded by Mr. Urban and unanimously approved. The meeting adjourned at 12:18 am.

Respectfully submitted,

Lori Canapinno
Town Clerk

APPROVED 5/22/2023

Plaintiffs' Complaint 000116



Town of

**Matthews**
North Carolina

Lori Canapinno <lcanapinno@matthewsnc.gov>

## Development across from Greylock neighborhood
1 message

**Ky** <kylie.rowlson@gmail.com>    Thu, May 4, 2023 at 6:42 PM
To: lcanapinno@matthewsnc.gov

Lori,

My name is Kylie Rowlson and I live at 1232 Rockwell View Road, Matthews, in the Greylock neighborhood. I would like to express deep concern regarding the developers new plans that are designed to take effect and ultimately negatively impact my community. We moved to Matthews in 2008 for a large list of reasons. The top reasons were; desire to raise our children in a safe environment, easy access to green space, focused on an area that had a small town community feel, and to give our children a better education then what we felt like we could get in Florida. When we moved into Greylock our developers (Ryan Homes), did inform us that there would be development across the street in the near future. 15 years later, the land across form us has still to be developed and Matthews has exploded in growth.

I have almost been in multiple car accidents attempting to make a left out of our neighborhood. When we moved in, we were told that a light would get put in at the front of our development. This option seems to have been scratched/overlooked numerous times. A light is desperately needed. Not only to make a left out of the neighborhood, but also to ensure the safety of the pedestrians that are attempting to enjoy the greenway. Which leads me into my next issue.

The greenway was developed so that people could get outside and move, enjoy GREEN space, and be active. The proposed new greenway expansion running behind buildings is atrocious. Who wants to look at more cement while they're trying to enjoy nature. The Town has consistently allowed for the destruction of trees and greenery throughout Matthews which has sadden me to no end. We specifically moved into our development due to all of the trees and outdoor space. The area around the highway is just awful and it use to look beautiful even with a a highway running through it. I understand the need to bring in tourism and money to our Town. What I don't understand is why the board has allowed so much destruction of trees and green space. On top of our green space shrinking, the small town feel that had Matthew is disappearing.

Any developer that creates a design within Matthews should be focused on not only bringing money to our Town, but also to maintaining that small town feel and sense of community. A large increase in multi-use housing will not create this feeling. There are not enough jobs in the area to support so many individuals. This will lead to the majority of people commuting. Traffic is SO BAD as it is with no resolution to date. The idea that one way streets with no round about or lights is just crazy in my opinion. John Street is a nightmare on a daily basis. Some of the current buildings with shops can not keep permanent tenants. And this developer wants to put in more retail? Who could afford the rent? I believe that I also saw a proposal for a 5 story apartment building. There is no small town feel with that. How is this area going to support all of those people? What about all of the children that come into all of the new housing. I think that I saw a number of projected increase in children to be 141 kids. Who gave that person statistics? People are living multi-generational due to cost and many lower income families have numerous kids due to more reasons than I care to discuss in this letter. Our schools are already over crowded, teacher retention is an issues, along with school overall performance. Even with all of that, people will still flock here because despite our school district decreasing in performance, it's better that the West side.

On to my last point. I saw a proposal for a small hotel that would not be an extended stay. I am pleased that the hotel would not be an extended stay but realistically, do we need a hotel? I seriously doubt it would be utilized as projected. Independence is one exit up. Please do not approve the developers proposed plans. Please consider keeping as much green space as possible and having that space give one the sense of being directly in touch with nature. Please do not allow so many housing structures or structures over 3 stories into this area. Can you also please give Greylock ridge Rd a light as was promised so many years ago, widen John street but with a median down the middle that has green space within the median such as what is on Rea Rd.

Thank you for your time.
Kylie Rowlson

Plaintiffs' Complaint 000117



Town of

**Matthews**
North Carolina

Lori Canapinno <lcanapinno@matthewsnc.gov>

---

## Board of Commissioners Meeting 5/8/23 Public Comments
1 message

**C and T Vernon** <ctvasv@yahoo.com>                Mon, May 8, 2023 at 12:55 PM
To: "lcanapinno@matthewsnc.gov" <lcanapinno@matthewsnc.gov>

To Whom it may Concern,

Please accept this letter as my public comment for the Matthews Gateway development project.

I am a homeowner in the Greylock subdivision. My husband, children, and I have lived here for over 13 years. We moved from Charlotte to Matthews with toddlers and hope: hope for great schools, hope for walking and biking paths, hope for a safe community, hope for a small town environment.

Before purchasing in late 2009, I scoured all details on Matthews Gateway and other planned developments and town vision. They were encouraging. I envisioned my kids biking to the sportsplex to watch soccer games and playing beach volleyball with their friends. Something happened along the way besides the real estate crash and covid. The plans changed drastically! I expect delays and changes, but the current proposal is far from the approved 2009 plans and far from the vision the Town of Matthews publicizes and elected officials touted in their campaigns.

I am requesting the Board of Commissioners to say no to the current plans. My main issues with the current proposal are:

    **A gas station in a highly residential area** – This will significantly increase traffic on this side of 485 in an area where the town is doing all possible to preserve the John Street corridor and not let it become a super-street. It will increase safety issues for those trying to cross John Street, specifically for walkers and bike riders, which is in direct conflict with the majority of the Envision Matthews survey results. A gas station is much better suited on the other side of 485 which is becoming more commercial, not residential.

    **5 story apartments** – The height does not fit with the existing downtown Matthews streetscape. The majority of buildings are two story with a few three story. This keeps the buildings at or below mature tree height. Bexley apartments look huge in the winter and those are only three stories. If apartments are a must, they should be limited to two or three stories only.

    **Increasing living units from a max of 220 to over 400** – Traffic, traffic, and more traffic! Projected school enrollment is often understated when in a decent school zone, leading to even more overcrowding. There are additional safety issues with more people and more traffic. I believe a mix of patio homes, town homes, and small two story condos would be a much better fit for the area with no more than the previously approved 220 units.

    **Missing greenway** – A sidewalk that passes behind buildings, through parking lots, and beside streets is not a greenway. The greenway should be maintained along the sewer easement with trees maintained on both sides. The greenway should be safe to travel on bike or foot from Matthews Community Center all the way to the Sportsplex without having to maneuver around commuters, gas station traffic, and shoppers.

Plaintiffs' Complaint 000118

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 170 of 259

**Focus on housing, not community** – For the Sportsplex, the Town of Matthews pushed multiple projects to support bringing people to Matthews to visit, providing a small hotel and more restaurants, encouraging visitors to shop our small business and provide educational opportunities. The Greylock Ridge extension and other connecter roads were designed for traffic flow to the Sportsplex and lowered impact on the John St and Trade St intersection, while still keeping visitors in downtown Matthews, not just on Independence. The current plans shift that focus to residential only. This is apparent not only through the increased number of housing units and removal of the educational building, but through the phasing that moves the small business locations to phase two, and Greylock Ridge extension running through the middle of townhomes. The 2009 plans maintain the promises of the Sportsplex as a tourist and community destination, the new plans do not.

I have included links below from some of the past published Matthews Vision documents to refresh your memories. From 2005 to 2019, the vision did not change to justify the changes for Matthews Gateway. The current survey comments also do not support the changes. Please listen to your constituents that filled out the surveys, not just me, and stop the current proposal.

Thank you,

Tammy Vernon

1123 Williamstown Rd
Matthews NC 28105


Microsoft PowerPoint - 00 Our Town Our Vision Cover [Read-Only] (matthewsnc.gov)

Celebrating the Vision (matthewsnc.gov)

StrategicPlan20231561021529030823PM.pdf (matthewsnc.gov)

Plaintiffs' Complaint 000119

**EXHIBIT 3**

Attn: Laurie Canapinno, CMC

Town Clerk
Town of Matthews
232 Matthews Station Street
Matthews, NC 28105

Kelli Espaillat
7916 Greylock Ridge Rd.
Matthews, NC 28105

Laurie,

    This letter is to express my concern over the proposed plans that have been Amended from the 2009 plan for the Town of Matthews. I have lived in Matthews now since 2007 and have lived in Greylock since 2020. My children are teenagers and are able to go to downtown Matthews and walk John Street and I do not have concern for their safety, due to the small-town feel. When living in Matthews many of the families know each other and frequent Matthew events together. I would like the small town feel to stay and have the safety and security for my kids and kids in the future.

    The first concern I would like to point out is the increase in size for the residential Multi-family units from 220 to 285. While I understand the need for growth, this area is not equipped to handle the number of vehicles or students that this Multi-family unit will place into Matthews. John street is a disaster every day and is a death trap for anyone leaving or trying to enter Greylock. The street recently received a crossing with flashing yellow lights that individuals ignore and drive thru. Adding more individuals and vehicle to this area will make this area even more of a difficulty. Let me add that this is all proposed, but there is still no discussion of a much-needed traffic light at the entrance of Greylock. Why I know that motor vehicle death is what it takes to get a light, let us not get to that point. Secondly, the projections of students that will attend Elementary, Middle School, and Highschool, appear to be low, but even at those numbers it will affect the already overpopulated schools. Crestdale currently has class sizes over 40 due to limited number of teachers and overcrowding. Matthews Elementary school has a building capacity of 800 students and appears to have 843 students enrolled, already causing overcrowding. The properties that are suggested will just exaggerate the issues, with no plans for a larger school building. These concerns do not appear to have been taken into consideration.

    The second major concern is that there is a proposal for a hotel in the area that would have 150 rooms. This would add close to 600 people at any given time, again affecting the flow of traffic and safety of individuals in the area. A hotel in the area would raise safety issue due to the hotel being off a highway and in a very transit area. Sex trafficking is already a large concern in the Charlotte Area, and it is a proven fact that most sex-trafficking occurs in hotels and motels off the highway, making it easier to move people. This is not needed in the Matthews area. The hotel will further take away from the small-town feel dumping many new patrons into the restaurants and bars that are loved by the locals. Lastly, the location of the proposed gas station will just further create issues for the traffic on John Street. The location for the gas station, would be better placed on the opposite of 485 allowing traffic to flow more smoothly. Increase

of traffic, the placement of the gas station and no light at the entrance of Greylock will cause an increase in traffic in the neighborhoods and cause safety concerns due to the number of vehicles cutting in and out of the neighborhood to avoid the traffic and inability to turn out of the neighborhood.

Sincerely,

Kelli Espaillat/s/

EXHIBIT 4

Date: 5/8/23
RE: Matthews Gateway Project

Mr. Mayor Higdon and Board of Commissioners:

The Vision of the Matthews Chamber of Commerce, in part, focuses on business advancement and economic growth. This well thought out and comprehensive plan proposed by Lat Purser in the Matthews Gateway Project will serve to provide residential units to assist in providing housing for those in the workforce in our area. Equally important, is the proposed retail and office space, which will allow for business growth to take place in the Matthews area rather than business locating elsewhere in the Greater Charlotte area. Lat Purser has taken into consideration not just the large retailers in this plan but is also proposing cost effective space for part-time retailers and/or entrepreneurs.

The Matthews Chamber of Commerce supports the need for a hotel that will serve the needs of travellers as well as those businesses within Matthews who need space to meet.

Given the opportunities this project will afford to area businesses, the Matthews Chamber of Commerce is pleased to support this project.

Sincerely,

Jessica Tullar
Executive Director
Matthews Chamber of Commerce

EXHIBIT 5



Town of
**Matthews**™
**Planning and Development**

232 Matthews Station Street
Matthews, NC 28105
704.847.4411

### PLANNING BOARD REPORT
### ON THEIR MEETING OF
### APRIL 25, 2023

## FOR TOWN BOARD ACTION:

I. **ZONING MOTION 2023-1: Town of Matthews: to change the zoning from B-H(OCD) and R-9 to I-2(CD) on those certain properties located in the southeasterly quadrant of US 74, I-485, the railroad tracks and the Union County line, that being property designated as tax parcel 215-241-05, 07, 04, 03; 215-073-04, 05, 06, 07, 09, 01, 02; 215072-30, 31, 32, 16, 08, 07, 06, 21, 11, 05, 18, 04, 03, 02, 29, 12, 13, 24, 26, 28, 22, 27, 17, 35, 23, 14 & 15.**

The members of the Planning Board were presented with uses that the property owner committed to removing from the I-2 zoning district. Stricken uses included: Animal Grooming, Building Material Storage, Retail Sales, Crematorium, Exterminator/ Pest Control, Greenhouse, Kennels, Outdoor Sales, Second Hand Goods, Utility Trailers, Motor Vehicle Service Centers, Acton House, Packing Sheds, Quarry, Demolition Disposal Site, and Short-Term Festivals or events use. The Planning Board voted unanimously to recommend approval of the Zoning Motion conditional on detailed uses and conditions be present by the time of the Board of Commissioners decision. The request was found to be consistent with the land Use Plan recommendation to consider an employment center in this area of Town. The rezoning was found reasonable in that it will create a 200-acre development area with the potential to bring significant investment and job creation to the Town.

II. **ZONING APPLICATION 2022- 766/ ENT- NRP Group: to change the zoning on that certain property from R-15 to ENT on that certain property designated as 11330 Brigman Road and further identified as tax parcel 215-081-43.**

Planning Board reviewed the site plan proposal and the updated elevations. Members unanimously recommended approval because the request was found to be consistent with the Family Entertainment Small Area Plan by providing new mixed-use development within the area. The change in zoning was found reasonable because the ENT District was created for this geographic area.

III. **ZONING APPLICATION 2023- 774/ Text to amend the text of Section 155.503.43.C.3 food trucks to permit food trucks within the public rights of way in front of businesses that do not have their own parking lot or private parking spaces.**

Planning Board discussed concerns with updates to the Mobile Vendor Pilot Program. It was explained that the updated program was not part of the UDO text but would put a policy in place in the Downtown overlay to assign a few spaces that would be managed by the Town for the purpose of parking mobile vendors. The members of the Planning Board motioned that the Text Amendment 2023-7774 be recommended for approval subject to being paired with a Mobile Vendor Program. The request was found to be consistent with the goal to create and maintain a vibrant environment in the Downtown area The text amendment is reasonable in that it will allow for the creation of a vendor program that provides for a limited number of reserved spaces for food trucks while preserving important customer parking for permanent businesses in the downtown area.

www.matthewsnc.gov

IV.  **ADMINISTRATIVE AMENDMENT/ Matchpoint Sports: request to add roof structure to three existing sports courts located at 2110 Pleasant Plains Road and further identified as tax parcel 227-173-06 and -08.**

The Planning Board heard the request for the addition of a 45-foot-tall arched structure to cover the three Padel tennis courts that were recently built along Pleasant Plains Road. Members were concerned about the height and visual impact of the covering on neighboring properties. The applicant said that 45- feet was the ideal height but they could reduce the height to 34-feet which was the minimum requirement for tournaments. Members voted six to one, with Mr. Labiner in opposition, to recommended for approval with the suggestion that a lower height be considered and landscaping shrubs be added. The changes were found to be consistent with the Land Use Plan as it increased the usability of recreation opportunities for Matthew's citizens. The changes were found to be reasonable because they did not significantly impact the intent of the original rezoning.

V.  **PUBLIC IMPROVEMENT VARIANCE/ Rehobot Eritrean Church: request to waive the installation of curb, gutter, and sidewalk along Sam Newell Road and 3700 Margaret Wallace, designated as tax parcel 193-141-16.**

Rehobot Eritrean Church was constructing a new sanctuary that would require curb, gutter, and sidewalk to be constructed along Sam Newell Road and Margaret Wallace. Members unanimously recommended that a Public Improvement Variance be granted for the placement of curb and gutter, but require the Church to install a sidewalk along the property.

PlBdRpt 4/25/23

Plaintiffs' Complaint 000124

# EXHIBIT 19

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

## CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.

### HENDRICK AUTOMOTIVE GROUP GIFT AGREEMENT

This Gift Agreement ("Agreement") is by and among HEP Investment Company, LLC and Hendrick Automotive Group, LLC, North Carolina limited liability companies (collectively, "Donor"), Central Piedmont Community College ("College"), and Central Piedmont Community College Foundation, Inc. ("Foundation"), a North Carolina non-profit corporation established to further the mission of the College, and provides:

### 1. *Subject of Gift*

In exchange for the potential tax advantages that may be derived by doing so and in further consideration of the covenants, conditions, warranties, stipulations and agreements herein contained, plus other good and valuable consideration, the receipt and sufficiency thereof being hereby acknowledged by the parties hereto, the Donor shall make a gift to the Foundation of the real property approximately described and depicted in Exhibit A which is attached hereto and incorporated herein (the "Property"), EXCEPT FOR THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE PROPERTY WILL BE CONVEYED AS-IS AND WHERE-IS, AND DONOR DISCLAIMS ALL IMPLIED WARRANTIES APPLICABLE TO THE PROPERTY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. The Foundation has thoroughly inspected and examined the Property to the extent deemed necessary by the Foundation and College to enable the Foundation and College to evaluate the acceptance of the Property.

### 2. *Manner of Transfer; Closing*

The Donor shall fulfill the gift upon Closing (hereinafter defined), by assigning, transferring, and conveying all of its rights, title, and interest in and to the Property to the Foundation pursuant to a gift deed based on the standard North Carolina form special warranty deed attached hereto and incorporated herein as Exhibit B ("the Deed"), but subject to the reservations and restrictions set forth herein. "Closing" means the time at which (i) all obligations and contingencies described in Sections 4, 5 and 6 below have been completed, satisfied, or waived, (ii) the Donor delivers the Deed to the Foundation, and (iii) the Foundation will, upon receipt of the gift, complete, properly execute and deliver all Internal Revenue Service forms and other documents necessary to properly recognize the Donor's gift of the Property as a charitable contribution to the Foundation. If the Closing does not occur on or before December 31, 2023, then the Donor or the Foundation may terminate this Agreement and the parties shall have no further obligation to each other.

The parties hereto agree that the deemed value of the Property as of Closing will be the appraised fair market value determined by the appraisal obtained by Donor, and the parties shall reflect such value in all documentation, reports and filings related to the transactions contemplated hereby.

On the Closing date, the parties hereto shall record appropriate documents to establish the utility easements, and setbacks as set forth on Exhibit A and any mutually agreeable amendments to the other rights, duties and restrictions currently set forth in the public record. The College and the Foundation acknowledge that their development on the Property must retain and treat all stormwater on site. On the Closing date, as detailed on the settlement statement executed by the parties at Closing, each party shall pay the Closing costs as detailed

Plaintiffs' Complaint 000125

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 178 of 259

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

in the chart below. Any other Closing costs not allocated to a Party below will be paid by the Party that customarily pays such cost in commercial real estate closings in Charlotte, North Carolina as directed by the Charlotte office of Chicago Title Company.

| Donor | Cost/Expense | Foundation |
|---|---|---|
| Yes | Any transfer tax, tax certificates or documentary stamp tax | No |
| Yes | Cost of releases associated with Seller's existing loans, if any | No |
| No | Owner's Title Policy | Yes |
| No | Survey | Yes |
| 50% | Escrow Agent's Fees | 50% |
| Prorated | Ad valorem and any other applicable taxes for the year in which Closing occurs will be prorated as of the Closing Date | Prorated |
| No | Costs to record the Deed | Yes |
| No | All Due Diligence | Yes |

3. *Purpose of Gift*

The Foundation shall hold the Property for use in furthering its mission of supporting the College. Specifically, the Foundation shall only hold the Property for use by the College, or transfer the Property to the College to be used to construct and operate on the Property a facility (the "Training Facility") with the primary purpose of providing training and teaching of public safety to law enforcement, fire department, emergency medical technician personnel and other first responders (the "Permitted Purpose").

4. *Pre-Closing Donor Obligations*

Prior to Closing, the Donor agrees to work collaboratively with the Foundation and College to obtain any necessary governmental approval to facilitate the Property being used for the Permitted Purpose, including without limitation, approval from the Town of Matthews, North Carolina, the Charlotte Area Transit System, and North Carolina Department of Transportation. The Donor further agrees to work collaboratively with the Foundation and College to obtain any necessary zoning classifications to facilitate the Property being used for the Permitted Purpose, including without limitation, petitioning the Town of Matthews, North Carolina to rezone the Property as I-2 (General Industrial) and any necessary subdivision or recombination plat approvals. Obtaining the proper zoning classification and approvals as described in this Section 4 is a condition precedent to Closing.

5. *Funding*

The College and the Foundation represent and warrant that the College has the requisite funding to construct and operate the Training Facility on the Property.

6. *Naming Opportunities*

In consideration of the Donor's gift of the Property, the Foundation and the College shall recognize the Donor's contribution by naming the facility (whether it is the Training Facility or another facility) constructed on the Property as designated by Donor and approved by the College's Board of Trustees subject to its naming

Plaintiffs' Complaint 000126

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

policies and procedures or other donor recognition program guidelines then in effect. Obtaining the necessary approvals described in this Section 6 is a condition precedent to Closing.

## 7. *Changed Circumstances*

In the unlikely event that at some future time, the use of the Property for the Permitted Purpose becomes impossible or impractical to achieve (either by a change in circumstances, law or otherwise), then the College or the Foundation, as applicable, shall either (i) use the Property for another purpose consistent with the wishes and intentions of the Donor and as approved by the Donor; or, (ii) if the Property is not developed for a Permitted Purpose within seven (7) years after the Closing, at Donor's election, sell the Property to Donor or its designee(s) for its fair market value (to be determined by a qualified appraiser to be mutually selected by the parties) on the same terms and conditions as herein.

If at any time within fifty (50) years after the date of Closing the College or the Foundation receives a *bona fide* offer to purchase the Property that the College or Foundation intends to accept, then the College or Foundation shall notify Donor in writing of the terms and conditions of such offer. Then the Donor will have a unilateral right for thirty (30) days after receipt of that notice to enter into a contract with the College and Foundation (and upon such election the College and the Foundation shall enter into a contract with the Donor) to purchase and sell the Property on the same financial terms as the third-party offer. If the parties cannot agree on the form of real estate contract, then the parties shall use a State of North Carolina Realtors or Bar Association form of commercial real estate contract.

On the Closing date, the parties hereto shall cause a memorandum summarizing these conditions, the option and the right of first refusal to be recorded in form and substance acceptable to Donor.

## 8. *Amendments*

This Agreement may be modified, altered, or amended at any time by the written consent of each party hereto.

## 9. *Miscellaneous*

This Agreement contains the entire understanding of the parties with respect to the subject matter of this Agreement. This Agreement supersedes and cancels all other agreements and understandings, both written and oral, between the parties relating to the subject matter of this Agreement. This Agreement shall be governed by the laws of the State of North Carolina. This Agreement shall be binding on and inure to the respective benefit of the parties and their successors, assigns, estates, and personal representatives, including such individuals not yet named.

*[Balance of Page Blank]*

Plaintiffs' Complaint 000127

IN WITNESS WHEREOF, the parties have executed this Agreement on this 17th day of August _____, 2023.

**DONOR:**

HEP Investment Company, LLC, North Carolina limited liability company

███████████████████████████████████████

A. Scott Ennis, Senior Vice President

Hendrick Automotive Group, LLC, North Carolina limited liability company

███████████████████████████████████████

A. Scott Ennis, Senior Vice President

**COLLEGE:**

**CENTRAL PIEDMONT COMMUNITY COLLEGE**

By: _____
Title:

**FOUNDATION:**

**CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.**

By: _____
Title:

CHAR\20851634v1

Page 4 of 13

IN WITNESS WHEREOF, the parties have executed this Agreement on this 17th day of August _____, 2023.

**DONOR:**

HEP Investment Company, LLC, North Carolina limited liability company

_____

A. Scott Ennis, Senior Vice President

Hendrick Automotive Group, LLC, North Carolina limited liability company

_____

A. Scott Ennis, Senior Vice President

**COLLEGE:**

CENTRAL PIEDMONT COMMUNITY COLLEGE

By: Jessica Boyle
Title: Interim Vice President-Finance & Facilities Services

**FOUNDATION:**

CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.

By: LISA SCHLACHTER
Title: VICE PRESIDENT OF INSTITUTIONAL ADVANCEMENT

Plaintiffs' Complaint 000129

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 182 of 259

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

## EXHIBIT A

Being all of that certain tract or parcel of land, located in Mecklenburg County, North Carolina, and being described as follows:

Being portions of those tracts as conveyed to HEP Investment Company LLC by deeds of record in Deed Book 9555, Page 243, Deed Book 17914, Page 377 and Deed Book 8445, Page 19;

Beginning at the intersection of the easterly right-of-way line of Campus Ridge Road with the southerly right-of-way line of Interstate 485/Interstate 485 Off Ramp;

Thence with said southerly right-of-way line, with the arc of a curve to the right having a delta of 37° 15' 13", a radius of 2427.39 feet, an arc length of 1578.28 feet, having a chord bearing and distance of South 68° 14' 58" East, 1550.62 feet to a point;

Thence across said HEP Investment Company LLC tracts, the following five (5) courses and distances:

South 30° 00' 00" West, a distance of 337.23 feet to a point;

North 80° 00' 00" West, a distance of 890.87 feet to a point;

South 20° 00' 00" West, a distance of 172.87 feet to a point;

North 90° 00' 00" West, a distance of 402.86 feet to a point; and

North 70° 00' 00" West, a distance of 282.71 feet to a point in said easterly right-of-way line;

Thence North 25° 41' 19" East, with said easterly right-of-way line, a distance of 582.02 feet to a point on the arc of a curve to the left;

Thence, continuing with said easterly right-of-way line, having a delta of 15° 51' 58", a radius of 963.26 feet, an arc length of 266.74 feet, having a chord bearing and distance of North 17°45' 22" East, 265.89 feet to the Point of Beginning, containing approximately 23.16 acres of land, more or less.

This description is not based upon a boundary survey and is not intended for transfer of real property.

The above-described tract consists of the following and is depicted on Exhibit A-1 attached hereto by reference:

(i)     All of Mecklenburg County Parcel 21524105, containing approximately 2.248 acres, and being Tract I of that certain North Carolina General Warranty Deed recorded in Book 17914, Page 377 of the Office of the Register of Deeds of Mecklenburg County, North Carolina;

(ii)    Most, but not all of Mecklenburg County Parcel 21524107, and being most, but not all, of Tract II of that certain North Carolina General Warranty Deed recorded in Book 17914, Page 377 of the Office of the Register of Deeds of Mecklenburg County, North Carolina; and

(iii)   Portions of Mecklenburg County Parcel 21524104, being portions of the property described in that certain North Carolina General Warranty Deed by Margaret E. Phillips and Mary Louise Phillips to HEP Investment Company, LLC recorded in Book 8445, Page 19 of the Office of the Register of Deeds of Mecklenburg County, North Carolina.

CHAR2\2851634v3

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

**Exhibit A Continued**



| LINE TABLE | | |
|---|---|---|
| LINE # | DIRECTION | LENGTH |
| L1 | S30°00'00"W | 337.23 |
| L2 | N80°00'00"W | 890.87 |
| L3 | S20°00'00"W | 172.87 |
| L4 | N90°00'00"W | 402.86 |
| L5 | N70°00'00"W | 282.71 |
| L6 | N25°41'19"E | 582.02 |

| CURVE TABLE | | | | | |
|---|---|---|---|---|---|
| CURVE # | DELTA | RADIUS | ARC LENGTH | CHORD BEARING | CHORD DISTANCE |
| C1 | 37°15'13" | 2427.39 | 1578.26' | S88°14'58"E | 1550.62' |
| C2 | 15°51'58" | 963.26 | 266.74' | N17°45'22"E | 265.89' |

Notes:
1.  Setbacks per Matthews I-2 zoning.
2.  Stormwater BMP's to be located on-site to the donated premise. Outfall location(s) to be coordinated with HEP Investment Company Representative.

Scale: 1" = 400'

**Site Exhibit**

Matthews, NC

Project Number: 2022-026  •  Date: 06/15/2023

Plaintiffs' Complaint 000131

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 184 of 259

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

## EXHIBIT B

*[attach copy of Deed]*

## NORTH CAROLINA SPECIAL WARRANTY GIFT DEED

| | |
|---|---|
| Excise Tax: | $0.00 |
| Parcel ID: | 21524105, p/o 21524107 and p/o 21524104 |
| Mail/Box to: | Grantee |
| Prepared by: | Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202-4003 (Miriam A. Dixon, Esq.) **No title search performed, no title opinion given or implied nor closing conducted by preparer.** |
| Brief description for the Index: | 23.16 acres – Campus Ridge Road |

THIS SPECIAL WARRANTY GIFT DEED ("Deed") is made on the _____ day of _____, 2023, by and between:

| GRANTOR | GRANTEE |
|---|---|
| **HEP INVESTMENT COMPANY, LLC,** a North Carolina limited liability company and **HENDRICK AUTOMOTIVE GROUP, LLC,** a North Carolina limited liability company | **CENTRAL PIEDMONT COMMUNITY COLLEGE FOUNDATION, INC.,** a North Carolina non-profit corporation  Address: _____ |
| 6000 Monroe Road, Suite 100 Charlotte, NC 28210 | |

*Enter in the appropriate block for each Grantor and Grantee their name, mailing address, and, if appropriate, state of organization and character of entity, e.g. North Carolina or other corporation, LLC, or partnership. Grantor and*

CHAR2\2851634v3

Page 7 of 13

Plaintiffs' Complaint 000132

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

*Grantee includes the above parties and their respective heirs, successors, and assigns, whether singular, plural, masculine, feminine or neuter, as required by context.*

FOR NO CONSIDERATION paid by Grantee and as a gift from Grantor to Grantee, Grantor by this Deed does hereby grant, bargain and convey to Grantee, in fee simple, all that certain lot, parcel of land in Mecklenburg County, North Carolina and more particularly described as follows (the "Property"):

See Exhibit A attached hereto and incorporated herein by reference.

"AS IS, WHERE IS" CONVEYANCE: GRANTEE AGREES THAT GRANTEE HAS ACQUIRED AND ACCEPTED THE PROPERTY IN ITS CURRENT, "AS IS," "WHERE IS" CONDITION AND "WITH ALL FAULTS" WITHOUT REPRESENTATION OR WARRANTY BY GRANTOR, EXPRESS OR IMPLIED, WHATSOEVER AS TO (1) THE VALUE, CONDITION, NATURE, CHARACTER, SUITABILITY, MERCHANTABILITY, HABITABILITY, MARKETABILITY, PROFITABILITY OR FITNESS OF THE PROPERTY; (2) THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR OTHER ENVIRONMENTAL CONDITION, PROVIDED THAT IF GRANTEE SHALL DISCOVER A PRE-EXISTING ENVIRONMENTAL CONDITION OR THE PRESENCE OF HAZARDOUS MATERIALS, GRANTEE SHALL HAVE NO LIABILITY FOR THE REMEDIATION THEREOF IF GRANTEE: (A) IMMEDIATELY STOPS ALL WORK WITH RESPECT TO THE INSTALLATION IN THE AREA WHERE SUCH CONDITION OR HAZARDOUS MATERIALS IS PRESENT AND PROVIDES GRANTOR NOTICE IN WRITING ABOUT SUCH DISCOVERY AND (B) DOES NOT NEGLIGENTLY CONTRIBUTE TO ANY FURTHER CONTAMINATION OR RELEASE OF THE HAZARDOUS MATERIALS; (3) THE COMPLIANCE OF THE PROPERTY WITH OR VIOLATION OF ANY LAW, STATUTE, ORDINANCE, RULE OR REGULATION; OR (4) ANY OTHER MATTER AFFECTING OR RELATING TO THE PROPERTY. GRANTOR AND GRANTEE EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PROPERTY IS SUITABLE FOR GRANTEE'S INTENDED PURPOSE. THIS PROVISION SHALL SURVIVE THE RECORDATION OF THIS DEED.

See instruments recorded in Book 17914, Page 377, Book 9555, Page 243 and Book 8445, Page 19, for chain of title.

All or a portion of the Property ☐ includes or ☒ does not include the primary residence of a Grantor.

TO HAVE AND TO HOLD the Property and all privileges and appurtenances thereto belonging to Grantee in fee simple.

Grantor covenants with Grantee that Grantor has done nothing to impair such title as Grantor received, and Grantor shall warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor, other than the following exceptions:

1. 2023 ad valorem taxes, and taxes for subsequent years, not yet due and payable.

2. All easements, covenants, conditions, restrictions and other matters of record

3. Such state of facts as would be disclosed by a current, accurate, physical survey and/or inspection of the subject property

CHAR2\2851634v3

Plaintiffs' Complaint 000133

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

4. All local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect.

[remainder of page intentionally blank]

Plaintiffs' Complaint 000134

IN WITNESS WHEREOF, Grantor has duly executed this North Carolina Special Warranty Gift Deed, if an entity by its duly authorized representative.

**GRANTOR:**

**HEP INVESTMENT COMPANY, LLC,**
a North Carolina limited liability company

By: _____
Name: A. Scott Ennis
Title: Senior Vice President

STATE OF NORTH CAROLINA

COUNTY OF _____

I certify that the following person personally appeared before me this day and acknowledged to me that he or she signed the foregoing document: A. Scott Ennis.

Date: _____, 2023      _____

_____, Notary Public
(Print or Type Name)

[NOTARIAL STAMP OR SEAL]

My Commission Expires: _____

[signatures continue on following page]

CHARZ2860144CHARZ2851634v3

Plaintiffs' Complaint 000135

**GRANTOR:**

**HENDRICK AUTOMOTIVE GROUP, LLC,**
a North Carolina limited liability company

By: _____
Name: A. Scott Ennis
Title: Senior Vice President

STATE OF NORTH CAROLINA

COUNTY OF _____

I certify that the following person personally appeared before me this day and acknowledged to me that he or she signed the foregoing document: A. Scott Ennis.

Date: _____, 2023

_____

_____, Notary Public
(Print or Type Name)

[NOTARIAL STAMP OR SEAL]

My Commission Expires: _____

[end of signatures]

CHAR2\2860144CHAR2\2851634v3

Page 11 of 13

Plaintiffs' Complaint 000136

DocuSign Envelope ID: 0355CAF5-0ABE-432A-A642-709EED7B303A

Summary of Questions/Comments and Responses:

There was a question about the ecological and traffic impacts that would result from the buildout of the properties. Mr. Carlson said that the ecological impacts would not be much different from what was already zoned for the parcels of land. There would be a reduction of back and forth traffic as this would be more of a work place environment. Mr. Camp reviewed the Town's Unified Development Ordinance Traffic Impact Analysis process. Once a party was interested in the site, the TIA would be reviewed by Town Staff and the North Carolina Department of Transportation and improvements would be determined.

Neighboring property owners in Stallings and Union County were concerned about the buffer area and the property that was owned by the Hendrick Group at the County line. Mr. Camp said that the property was outside of Matthews but staff would reach out to the Town of Stallings for more information and discussion.

Respectfully submitted,

Shana Robertson
Deputy Town Clerk/ Senior Administrative Officer

2

# EXHIBIT 20

**From:**  Google Calendar on behalf of Kenneth Reid
**To:**  bhawke@matthewsnc.gov; Brian Shoemake; sharont@medic911.com; greg.hildreth@idlewildvfd.org; babooaess@fbi.gov; Patricia Brown; garry.mcfadden@mecklenburgcountync.gov; Amanda Capobianchi; Jessica Boyce; rkinniburgh@matthewsnc.gov; pinevillefiretraining@gmail.com; Vicki Saville; ldotoli@huntersvillefd.com; dbaucom@corneliuspd.org; jason.byrnes@usss.dhs.gov; mgerin@pinevillenc.gov; Luke Sell; phillip.bryant@steelecreekvfd.com; rsisk@matthewsnc.gov; Michael Ripoll; dingram@pinevillenc.gov; jmonteith@townofdavidson.org; brandon.caputo@charlottenc.gov; chris.hardin@steelecreekvfd.com; Kandi Deltemeyer; Karen Summers; jphillips@fire.minthill.com; mdescori@matthewsnc.gov; gene.cocchi@hendrickauto.com; Heather Hill; Lewis Mcswain; gbarbee@coneliusfd.org; bgraham@huntersville.org; kputney@cpisecurity.com; bennie.mims@atf.gov; jeffrey.richardson@charlottenc.gov; jp@medic911.com; johnny.jennings@cmpd.org; steven.gutierrez@usss.dhs.gov; bradford.koch@cmpd.org; shelby.jones@mecklenburgcountync.gov; bshick@corneliusfd.org; jhatley@police.minthill.com; eearnhardt@corneliusfd.org; kyle.d.burns@ice.dhs.gov; zerubabel.chickoree@cmpd.org; ronnie.a.martinez@ice.dhs.gov; eric.l.conaway@dea.gov; mhudgins@pinevillenc.gov
**Subject:**  Invitation: New Public Safety Training Facility - Planning Workshop (... @ Tue May 14, 2024 (bhawke@matthewsnc.gov)
**Date:**  Wednesday, May 8, 2024 12:04:33 PM
**Attachments:**  invite.ics

## Meeting Location:

The meeting will be held in the Levine II
building, on the third floor in room # 3316.
*See attached Campus Map and Building Floor
Plan.*

**Attachments**

☐  Levine II - Thrid Floo...

☐  CPCC Levine Campus

☐  Final CPCC PSTC

☐  Schedule for Workshop

☐  Stakeholder - Planning...

## Meeting Purpose:

The purpose of the meetings is to create the
opportunity to discuss project goals and
aspirations with all of the identified project
stakeholders (internal and external). This is an
important information and data collecting
process that helps the design team get a
better understanding of what types of training
facilities may be needed to be included into
the design.

Our design team will manage this process
over a 3-day period. They have provided the
attached schedule for those three days. All of
these meetings are intended to be in
person. **Please take a minute to carefully
review the schedule as there are specific
time slots for specific attendees.** *See
attached schedule.*

*Public Safety Officers / Outside Agencies:*
*Please be aware that we have provided several time slots throughout the day in an attempt to accommodate your busy schedules. Hopefully you can find a time slot that works for your schedule.*

Day One: CPCC Leadership, Faculty & Staff
**Day Two: Outside Agencies, Forensics, Drones, Public Safety Admin, and Walk Ins**
Day Three: CPCC Leadership, Faculty & Staff The Design Team has also provided a programming memo and workshop questionnaire to help prepare your mind prior to attending the meetings. Please feel free to add your comments / response and bring it to the meeting.

I have also included a copy of the Stakeholder/Planning Committee for everyone's reference.

Thanks in advance for your willingness to participate in the process.

We look forward to seeing you next week.

**When**
Tuesday May 14, 2024

**Location**
Central Piedmont Community College - Levine Campus, 2800 Campus Ridge Rd, Matthews, NC 28105, USA
**View map**

**Guests**
Kenneth Reid - organizer
Brian Shoemake
sharont@medic911.com
greg.hildreth@idlewildvfd.org
baboggess@fbi.gov
Patricia Brown
garry.mcfadden@mecklenburgcountync.gov

Plaintiffs' Complaint 000139

Amanda Capobianchi
Jessica Boyce
rkinniburgh@matthewsnc.gov
bhawke@matthewsnc.gov
pinevillefiretraining@gmail.com
Vicki Saville
jdotoli@huntersvillefd.com
dbaucom@corneliuspd.org
jason.byrnes@usss.dhs.gov
mgerin@pinevillenc.gov
Luke Sell
phillip.bryant@steelecreekvfd.com
rsisk@matthewsnc.gov
Michael Ripoll
dingram@pinevillenc.gov
jmonteith@townofdavidson.org
brandon.caputo@charlottenc.gov
chris.hardin@steelecreekvfd.com
Kandi Deitemeyer
Karen Summers
jphillips@fire.minthill.com
mclesceri@matthewsnc.gov
gene.cocchi@hendrickauto.com
Heather Hill
Lewis Mcswain
gbarbee@coneliusfd.org
bgraham@huntersville.org
kputney@cpisecurity.com
bennie.mims@atf.gov
jeffrey.richardson@charlottenc.gov
jp@medic911.com
johnny.jennings@cmpd.org
steven.gutierrez@usss.dhs.gov
bradford.koch@cmpd.org
shelby.jones@mecklenburgcountync.gov
bshick@corneliusfd.org
jhatley@police.minthill.com
eearnhardt@corneliusfd.org
kyle.d.burns@ice.dhs.gov
zerubabel.chickoree@cmpd.org
ronnie.a.martinez@ice.dhs.gov
eric.l.conaway@dea.gov
mhudgins@pinevillenc.gov

**View all guest info**

**Reply** for bhawke@matthewsnc.gov

| Yes | No | Maybe |

More options

Invitation from Google Calendar

You are receiving this email because you are subscribed to calendar notifications. To stop receiving these emails, go to Calendar settings, select this calendar, and change "Other notifications".

Forwarding this invitation could allow any recipient to send a response to the organizer, be added to the guest list, invite others regardless of their own invitation status, or modify your RSVP. Learn more

# EXHIBIT 21

| | |
|---|---|
| **From:** | Art Horton |
| **To:** | rsisk@matthewsnc.gov; dmcguirt@matthewsnc.gov |
| **Cc:** | Eric Coe; Joseph Agati; Jeffrey Niven; Melissa Wilson; Luke Sell |
| **Subject:** | FW: new "cop city" training facility (Levine Campus) |
| **Date:** | Wednesday, September 25, 2024 5:13:53 PM |

Good evening, Major Sisk. Thank you so much for taking the time to speak with me on the phone earlier.

As promised, below is what we received from CMPD in terms of intel on Charlotte Uprising. I have included Captain McGuirt on this email as well. We will continue to share all information and intel we receive on this topic.

Thank you again for your teamwork, support, and commitment to provide additional presence and vigilance! We appreciate it!

Best Regards,
Art

Arturo J. Horton, MBA
**Associate Vice President, Safety & Security**
Central Piedmont Community College
Central Campus, Drumm Building
P.O. Box 35009
Charlotte, NC 28235

Office: (704) 330-6078
Mobile: (704) 500-3341
email: art.horton@cpcc.edu

---

**From:** Mark Short <Mark.Short@cpcc.edu>
**Sent:** Wednesday, September 25, 2024 12:04 PM
**To:** Art Horton <Art.Horton@cpcc.edu>
**Subject:** Fw: new 'cop city' training facility

FYI you may want to make MPD aware and ask for additional drive-bye's.

Get Outlook for iOS

---

**From:** Jessica Boyce <jessica.boyce@cpcc.edu>
**Sent:** Wednesday, September 25, 2024 11:19:31 AM
**To:** Luke Sell <Luke.Sell@cpcc.edu>; Vanessa Stolen <Vanessa.Stolen@cpcc.edu>; Heather Hill <Heather.Hill@cpcc.edu>; Kandi Deitemeyer <Kandi.Deitemeyer@cpcc.edu>; Lisa Schlachter <Lisa.Schlachter@cpcc.edu>; Mark Short <Mark.Short@cpcc.edu>
**Subject:** Re: new 'cop city' training facility

Thank you for sharing, Luke.
Casey H. informed Amanda C. for awareness in the event people attempt to come to the site.
Also, cc'ing @Mark Short in the event he wants to bring Art H. into the loop.

---

**From:** Luke Sell <Luke.Sell@cpcc.edu>

Plaintiffs' Complaint 000142

**Sent:** Wednesday, September 25, 2024 11:11 AM
**To:** Vanessa Stolen <Vanessa.Stolen@cpcc.edu>; Heather Hill <Heather.Hill@cpcc.edu>; Kandi Deitemeyer <Kandi.Deitemeyer@cpcc.edu>; Lisa Schlachter <Lisa.Schlachter@cpcc.edu>; Jessica Boyce <Jessica.boyce@cpcc.edu>
**Subject:** FW: new 'cop city' training facility

Good Morning,
One of my former Intelligence Detectives sent me this earlier.  This group, Charlotte Uprising, is fairly organized and there are connections with Atlanta Cop City protests as well as the Charlotte riots.  I have made a request from CMPD's Intel team to flag anything regarding the PSTF and help us determine if any movement gains traction.  On the surface, this alone is not overly concerning, but definitely something to watch and to plan accordingly.
Luke

**From:** Kelly, Amy <Amy.Kelly@cmpd.org>
**Sent:** Wednesday, September 25, 2024 10:51 AM
**To:** Luke Sell <Luke.Sell@cpcc.edu>
**Cc:** CMPD Crime Intel <CMPDCrimeIntel@cmpd.org>
**Subject:** new 'cop city' training facility

Hi Luke,
You are probably already aware, but Charlotte Uprising is posting about the new CPCC law enforcement training facility....trying to compare it to Atlanta's Cop City.  If you remember, James Marsicano from Charlotte Uprising was arrested in Georgia as part of the Cop City protests. Marsicano was also one of the main agitators in the 2020 riots in Charlotte and was arrested then as well. https://www.instagram.com/charlotteuprising/
Take care and let us know if you need anything.

Plaintiffs' Complaint 000143



charlotteuprising

**'A growing need.' Training center dubbed Cop City planned for Meck County**

**Janet Parker**
Tue. September 24, 2024 at 6:50 AM EDT
3 min read

MATTHEWS!

RED FLAG

'A growing need.' Training center dubbed Cop City planned for Meck County

Cop Cities will kill us and our forests.

Reply to charlotteuprising



**CENTRAL PIEDMONT**
charlotteuprising

# RICK HENDRICK AND HENDRICK AUTOMOTIVE GROUP MAKE GIFT OF LAND TO CENTRAL PIEDMONT FOR NEW TRAINING CENTER

**JUNE 17, 2024**

@centralpiedmontcc wants a cop city in our town.

CHARLOTTE, N.C. – Hendrick Automotive Group and local business leader Rick Hendrick have given Central Piedmont Community College approximately 23 acres of land adjacent to the college's Levine Campus in Matthews. Central Piedmont will use the donated property to build a new first responder training facility



All of this is.

**charlotteuprising** · Follow
Original audio

**charlotteuprising** We won't stop until Jamie and all defendants are completely freel Political prisoners are still being held in Atlanta jails, including Jack in Fulton County. Link to support him on the comments! Watch full video at @atlpresonflective

Transcript:
What do these words even mean, right? Going to a music festival is called being a terrorist. but when the police in Atlanta murdered Tortuguita with their hands up. that's called public safety. A bunch of people who don't know each other–or I don't know anyone until I got to jail with them–can be in a racketeering organization. But the real conspiracy is that the City Council in Atlanta are suppressing people's votes in trying to Stop Cop City through a referendum. So I think that we use these words like conspiracy, racketeering, terrorism–we're not actually talking about anything but power and disempowerment. And the state, the police, the voter repression that's happening. all of this is obscured when these state actors can point to us and blame us for problems in our community that, in reality. we're just trying to care for each other where the state falls short of that.

#freejamie
12w

**sugar_in_the_tank** Talk about it! 🙌
12w  6 likes  Reply

**charlotteuprising** https://givebutter.com/tLAxDE
12w  1 like  Reply

**instastangram** 😮😮😮
12w  2 likes  Reply

*V/r,*
*Amy Kelly*
*(980) 383-0457*
*CMPD Criminal Intelligence*
*amy.kelly@cmpd.org*
CMPDCrimeIntel@cmpd.org

# EXHIBIT 22

# UNDING AND FUTURE GROWTH

- current project budget: $118 million (subject to change as the project continues)

- funding sources: $116 million appropriated by Mecklenburg County as well as private donations, including Hendrick Automotive Group's land donation

- long-term vision: expand public safety training, workforce development, and technology integration



Plaintiffs' Complaint 000147

# EXHIBIT 23



**PRESENT:** Mayor John Higdon; Mayor Pro Tem Gina Hoover; Commissioners Renee Garner, Ken McCool, Leon Threatt, and Mark Tofano

**ABSENT:** Commissioner John Urban

**ALSO PRESENT:** Town Manager Becky Hawke; Assistant Town Manager Melia James; Finance Director Teresa Fulk; Parks, Recreation & Cultural Resource Director Corey King; Planning Director Jay Camp; Public Works Director CJ O'Neill; Assistant Public Works Director Lief Fitzpatrick; Town Engineer Susan Habina Woolard; Project Manager Chrisean Hardy; Communications Officer Maureen Ryan; Town Clerk Lori Canapinno

The Board met with staff and representatives from First Tryon Advisors to discuss funding options for the Town's storm water fees and General Obligation (GO) bonds.

Stormwater Fees

Public Works Director CJ O'Neill continued the discussion on stormwater fees, which the Board discussed at a prior meeting. Staff is suggesting five options with different levels of service, which would require an increase in fees. For residential properties, the fees are calculated based on the properties' impervious surface area. The total bill includes the Town's fee, the County's fee, and the bill processing fee:

- Tier 1 for properties with impervious surface area up to 2,000 square feet – the Town's fee would be $1.67 and the total monthly fee would be $3.98
- Tier 2 for properties with impervious surface area of 2,000-2,999 square feet – the Town's fee would be $2.58 and the total monthly fee would be $5.52
- Tier 3 for properties with impervious surface area of 3,000-4,999 square feet – the Town's fee would be $3.64 and the total monthly fee would be $7.55
- Tier 4 for properties with impervious surface area of 5,000 or more square feet – the Town's fee would be $5.98 and the total monthly fee would be $12.31
- All other property is calculated on a per-acre of impervious surface area basis at a Town fee of $43.56 and a total fee of $76.98 per acre.

The Town maintains 65 miles of storm pipes, 36 culverts, 3,367 inlets, 538 outfalls, an over 55 miles of ditches. Fiscal Yer 2025 estimated revenues are $926,000 and estimated expenditures of $1.3 million – a $400,000 difference. There are options on how to move forward:

- Option 1: Add neighborhood Stormwater Control Measures (SCM) – the cost will vary annually
- Option 2: Add a ditch crew - $260,000 annually
- Option 3: Add a survey/GIS (Geographic Information System) crew - $300,000 annually
- Option 4: Add a ditch crew and survey/GIS crew - $300,000 annually
- Option 5: Add the SCM Maintenance and ditch crew and survey/GIS crew

Mr. O'Neill discussed each option in detail. Mayor Higdon asked how the Town came to this point; Mr. O'Neill explained the history of the Town's rates and how it's not sustainable. Mr. Threatt asked if the Town normally seeks community input before raising rates; Mr. O'Neill said the Board has not done that in the past because it is authorized to make the change, but can do so. Mr. Threatt said it would be wise to invite public input. He then said option 5 would be the most prudent and complete task, but reiterated that the public would need to be part of the discussion. The group discussed the cost impact for each option. Mr. O'Neill reviewed the rate increase table, explaining most residences fall in the Tier 2 category, which would increase the monthly fee from $5.57 to $9.13, or about $40 per

Plaintiffs' Complaint 000148

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 205 of 259

year. Mayor Higdon noted the program can't operate on a deficit, so the decision needs to at least make the department whole.

Ms. Garner asked about the GIS position. Mr. O'Neill explained that option would add staff – a surveyor, survey helper and GIS analyst. Staff had investigated contracting work out and it would be more costly. Ms. Garner asked if there was enough work to sustain multiple employees for years; Mr. O'Neill explained the need will always be there and the positions will always have things to do. Mr. McCool said option 5 makes the most sense because it covers the most ground, agree that the Town should get public input. He asked how other communities handle stormwater issues. Mr. McCool said it depends on what they do – some don't even have a stormwater department. Some just use General Funds to pay for the staff positions while Matthews covers that with the stormwater revenue. Ms. Garner noted there also are differences between towns just in the amount of stormwater utilities they have. She said having community input is good, but the Town will need to educate people on why the cost is what it is, and what Matthews residents get for their money versus what the other towns offer.

Mayor Higdon said option 5 option is the Cadillac version but wondered if a lesser tier would be enough. The Town would need some thorough community feedback. He thinks the surveying aspect may not be needed. Ms. Garner said she thinks about the waves of development that come through Matthews, and it seems that the Town might be on the cusp of having some problems. As developments came online and age, they may need more infrastructure renewal. Fixing problems on the back end is always more expensive than correcting them proactively. Matthews has been building for decades and we need to be proactive in dealing with the aging infrastructure.

Town Engineer Susan Habina Woolard noted the group is talking about stormwater now but this new staff could work throughout the department - there's a lot of GIS analysis that is involved with the Vision Zero project, resource deployment for work orders, support for transportation planning, and mapping to provide education for the public. Grant applications too would benefit from this work. Ms. Hoover agreed that the public should be engaged in this process. She reminded the Board about other impacts to citizens' tax bills – Matthews' GO bonds, the CMS bond, and the possible one cent sales tax. She said option 5 is a good choice, but the Board must keep those things in mind.

Ms. Hawke asked the Board how they'd like to present the option to the public. By consensus the Board directed staff to put together a public input plan. Once staff has results, the information will be brought back to the Board for further discussion. Staff will sit down to consider options to gather as much public input as possible, so there probably will be multiple avenues used.

<u>GO Bonds</u>

First Tryon Advisors representative Chazzo Habliston discuss funding options for the Town's General Obligation (GO) bonds, which were approved by the voters in 2022 for up to $35 million for transportation and parks and recreation projects. The Town has seven years to issue the bonds but can extend that to ten years if necessary. At the time of the referendum, the projected property tax rate increase to fund all $35 million of projects was 3.7 cents. Projects under consideration include the following:

Transportation – total $21 million
- Downtown Parking Improvements
- Downtown Streetscape and Mobility Improvements
- E. John St. and I-485
- Greylock Ridge Road Extension
- Sidewalk Connections

Parks and recreation – total $14 million
- Purser-Hulsey Park
- Park Improvements

APPROVED 11/25/2024

Plaintiffs' Complaint 000149

2

- Riverbanks Greenway Connector
- Matthews Downtown Loop

Two items to note with regard to East John Street: new numbers came in last week and it's lower than originally estimated, and the Riverbanks Greenway Connector was not part of the original referendum discussions but has popped up as an option so was added in.

Mr. Habliston discussed funding scenario assumptions: the Town can issue as many bond issuances as needed, though First Tryon recommends every two to three years due to the cost of issuance; the issuance amount will depend on the projects chosen; the first principal and interest payment would occur in the next fiscal year following issuance.; the term would be 20 years with a level principal structure for the amortization; First Tryon estimates the interest rate for anything issued in the current fiscal year at 4.25%, and is using an estimated planning rate of 5% for future years.

Mr. Habliston reviewed four options for funding scenarios, with the projects listed as prioritized by various groups:

- Scenario 1 (staff options) - 3 tranches: $13.26 million in FY2025 (Fiscal Year 2025); $9.53 million in FY2028 and $12.21 million in FY2030
- Scenario 2 (staff options) - 2 tranches: $13.26 million in FY2025 and $21.74 million in FY2028
- Scenario 3 (Board priorities) - 2 tranches: $29.15 million in FY2025 and $5.85 million in FY2028
- Scenario 4 (community priorities) - 2 tranches: $19.82 million in FY2025 and $15.18 million in FY2028

For each of the scenarios, First Tryon has evaluated the tax impact two different ways: one as a single tax increase in FY2026 which would cover the initial issuance and all future issuances, and the other with stepped increases over time in line with the issuance of the different tranches. The project amounts listed are in today's dollars. Town Manager Becky Hawke noted the bonds were built in 2022 anticipating an FY24 construction, and anything beyond that gets into additional cost escalations. The sooner the Town can issue debt, the sooner it can move on the projects and the less impact inflation has, but then the Town is taking on debt more quicky. Staff is happy to move as fast as the Board would like to. Mr. Habliston noted the Boar could save money overall by adjusting the property tax rate up front to cover all tranches. If the Boar chose to do that, a rate increase of 2.7 cents in the FY26 budget would cover all $35 million of bond issuances

Discussion ensued. Mayor Higdon asked if an issuance could be recalled, noting that it's possible that the Town will receive funding for roads if the county's proposed one-cent sales tax is approved, which means the Town won't need as much bond revenue for the transportation projects. Mr. Habliston explained the Town could refinance or pay off a debt after the first ten years of issuance. Ms. Hawke noted another option to use revenue from the one cent sales tax for the debt service. Mr. Tofano asked when the decision will be made on the one cent sales tax; Ms. Hawke explained the earliest would be November 2025, but Matthews wouldn't start to get revenue until 2026. That could be used to pay the debt service only on the transportation bonds, not for the park and rec bonds. Mr. Habliston said the numbers shown now could probably be reduce by 60% if the one cent sales tax passes. He discussed options for increasing the tax rate upfront versus incrementally.

The average value of a home in Matthews is $429,275, with a current Town tax of $95.33 per month. Mr. Habliston displayed various calculations for tax impacts based on the different scenarios, with the monthly increase ranging from $9.66 to $12.34 for the complete $35 million bond package. This would be the increase to the property tax in order to service the debt for these taxpayer-approved bonds. Mr. Threatt said he didn't vote for the bond increase because he is challenged by this growing increase. Mr. Tofano calculated the potential tax implications as a 10% increase. Mayor Higdon noted the majority of people who live here voted for that. Ms. Garner said the biggest interactions she had at the information table was from people eager to see Purser Hulsey Park activated. She agreed it's hard to talk about tax increases, but people expect it to happen, trepidation or not.

Ms. Hawke noted the Town had talked about a potential tax rate impact of 3.7 cents, and there was some concern that it could be higher. Even the most aggressive approaches to issuance show a rate lower than that. In addition,

Plaintiffs' Complaint 000150

Case 3:25-cv-00318-MOC-WCM     Document 12     Filed 05/23/25     Page 207 of 259

the Town has become AAA-bond rated since then, which will help when taking on debt. Ms. Hoover asked when the tax rate would increase. Ms. Hawke explained that it takes a couple of months to issue the debt. The tax rate is set for the FY25 budget, so the first tax rate impact would be in next year's budget – the FY26 budget. Ms. Hoover asked if citizens would be refunded if the one cent sales tax passes and Matthews receives funds for transportation. Ms. Hawke said no, explaining that the Town wouldn't be banking anything – it would go to service debt that was due prior to the Town receiving revenue from the one cent sales tax. The Board could choose to roll the tax rate back to what it was before, or the Board could decide what to do with the new revenue, such as paving, new sidewalks, or other project, or it could just service the debt for the projects that were already approved. Staff would need to get confirmation that that would be allowed under the legislation. She noted everything First Tryon is doing is conservative. A lot of communities just leave the tax rate, but it's a Board decision.

Mr. Habliston described the steps involved in a bond issuance: the Board must first provide input on what options it wants to consider. It takes about 60-90 days for the financing process. The LGC is involved with the issuance process and would draft a Preliminary Official Statement. There would be calls and meetings with rating agencies. The Board would need to adopt a Sale and Issuance resolution. The bonds would be sold and the interest rate would be locked in. The Town would close on the bonds two to three weeks later. Ms. Hawke advised that if there is Board interest in issuing bonds prior to the start of FY26, the Board will need to decide which approach to take (size and number of tranches) and which projects would be included. Staff feels they can get through all the projects in the time left, but there's the potential to bump into the seven-year timeline if three tranches are desired.

Mayor Higdon asked if the first tranche could include just the design work. Ms. Hawke said scenario one is a good example of that. The two largest projects are Purser Hulsey Park and the downtown streetscape and mobility improvements, and design work would be done with the first tranche. Purser Hulsey Park construction would occur in the second tranche, and the streetscape improvements in third tranche. Staff was trying to see how projects could be stretched to get the lowest tax rate implications. The design window is short enough for the other projects to include both design and construction in the same tranche. She noted a GO bond just allows the Town to increase the property tax rate to complete the projects described in the referendum. The Board is not obligated to use tax revenue - if a new revenue source became available, the Town wouldn't have to keep the tax rate at the same level. The Board will continue to discuss this during the November 9 mini planning conference.

**MINUTES**
**BOARD OF COMMISSIONERS REGULAR MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**OCTOBER 28, 2024 - 7:00 PM**

**PRESENT:**     Mayor John Higdon; Mayor Pro Tem Gina Hoover; Commissioners Renee Garner, Ken McCool, Leon Threatt, and Mark Tofano

**ABSENT:**     Commissioner John Urban

**ALSO PRESENT:** Town Attorney Daniel Peterson; Town Manager Becky Hawke; Assistant Town Manager Melia James; Finance Director Teresa Fulk; Parks, Recreation & Cultural Resource Director Corey King; Town Engineer Susan Habina Woolard; Transportation Planner Dana Stoogenke; Communications Officer Maureen Ryan; Town Clerk Lori Canapinno

**REGULAR MEETING CALLED TO ORDER**

Mayor Higdon called the meeting to order at 7:00 pm.

APPROVED 11/25/2024

Plaintiffs' Complaint 000151

4

**INVOCATION/MOMENT OF REFLECTION**

Ms. Garner spoke of the diversity of Matthews' population.

**PLEDGE OF ALLEGIANCE**

Mayor Higdon led participants in the Pledge.

**ADOPT AGENDA**

Motion by Mr. McCool to adopt the agenda as presented. The motion was seconded by Ms. Hoover and unanimously approved.

**RECOGNIZE FINANCE DEPARTMENT'S RECEIPT OF GFOA AWARD FOR EXCELLENCE IN FINANCIAL REPORTING**

Town Manager Becky Hawke noted the Finance Department's 26th consecutive receipt of the Government Finance Officers Association's Award for Excellence in Financial Reporting. Finance Director Teresa Fulk, Senior Finance Specialist Michael Garrison and Finance Specialist Donna Pitts were recognized for their work on the Town's 2023 Comprehensive Annual Financial Report and their commitment to transparency. This is the highest recognition of government accounting and reporting and indicates the team's high quality of work.

Ms. Fulk just returned from assisting Yancey County as the Finance Section Chief in their Emergency Operations Center after Hurricane Helene and she discussed the significant need for continued support for western North Carolina. 39 states sent people to help North Carolina after this hurricane. The devastation and disruption to daily life is high, but the people there are resilient. Ms. Hawke noted that the Town also had 18 volunteers from the Police Department providing security in Burnsville and two crews and equipment from Public Works in the Henderson area. The Fire Department assisted at Matthews United Methodist Church helped load trucks, and remaining staff picked up the slack. It was a real team effort that proves staff's commitment to service.

**RECEIVE INFORMATION FROM MATTHEWS ALIVE**

Matthews Alive Board of Directors member Julie Bee reported that the 2024 festival allowed 30 area nonprofit organizations to receive $67,800, even with two days of heavy rain during the event weekend. The Board decided to also distribute small donations to smaller organizations that can't participate directly in the festival each year. She thanked the Board and Town staff for their ongoing support of the festival. Matthews Alive Executive Director Lee Anne Moore reiterated her thanks to all those who help with the festival each year. This year was particularly difficult with all the weather issues. Mayor Higdon thanked them, all the other volunteers, and everyone else who works to make Matthews Alive a success.

**PUBLIC COMMENT**

None

**RECESS REGULAR MEETING FOR RECESS REGULAR MEETING FOR PUBLIC HEARING ON JOHN STREET PEDESTRIAN AND BICYCLE PLANNING STUDY**

Motion by Mr. McCool to recess the regular meeting for a public hearing on the John Street Pedestrian and Bicycle Planning Study. The motion was seconded by Ms. Hoover and unanimously approved.

Plaintiffs' Complaint 000152

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 209 of 259

Transportation Planner Dana Stoogenke introduced Kittleson Urban Designer/Associate Planner Scott Correll to discuss the work related to the John Street Pedestrian and Bicycle Planning Study, which focuses on the John Street corridor from NC-51 to I-485 and the safety needs of those who walk and ride bicycles within the corridor. Kittleson started this effort in October 2023 and there's been a robust process to discuss all aspects of this plan. Staff's goal is to request action from the Board in November. Mr. Correll reviewed the plan, explaining the scope of the project covers John Street between Highway 51 and I-485. It evaluates conditions for pedestrians and bicycles and makes short- and medium-term recommendations for policies and infrastructure changes to improve pedestrian and bicycle safety, and provides concept designs and cost estimates to inform funding discussions.

Key takeaways of the Town's existing plans and studies include the following: a strong desire to support Matthews' small-town character and improve walkability; a desire to evolve John Street to function more like a downtown street, and a need for a safer environment for pedestrians and bicyclists with improved crossings, filling sidewalk gaps, improving the Trade/John intersection, and addressing speeding.

There's noticeable pedestrian traffic in downtown between Trade Street and NC-51, and high pedestrian traffic at the intersection of Trade Street and John Street, with pedestrian traffic increasing significantly during events. A lot of people cross mid-block. John Street doesn't have many signalized crossing opportunities, but there are a lot of pedestrians and many special events in the area. Speed limits vary in the corridor, and driver speeds are consistently 3-14 miles above the posted speed limit. Higher vehicular speeds result in greater injuries and fatalities in crashes.

Kittleson engaged with the public in various ways, included during special events, at the farmers market, at an open house, and with walking meetings. Issues presented by participants included concerns about speeding, sidewalk gaps, cyclist safety, and requests for more, safer pedestrian crossings.

Policy recommendations include the following:
1. Coordinate with NCDOT (North Carolina Department of Transportation) and CRTPO (Charlotte Regional Transportation Planning Organization) to pursue shared goals
2. Prioritize pedestrian and bicycle infrastructure investments
3. Create additional pedestrian crossing opportunities
4. Fill sidewalk gaps and prioritize pedestrian movements
5. Improve driveway design and locations regulations
6. Change signal phasing at Trade Street
7. Reduce driver speed in downtown
8. Implement Heritage Lane (BB&T alley)
9. Coordinate with NCDOT to create an ADA noncompliance inventory and transition plan

He discussed renderings, including one for Lois Street, explaining the current median configuration is a bit confusing for drivers and there's not a great way for people to cross the street. They propose creating a Z crossing to break up the crossing onto two locations and shifting the bus stop. At the intersection of Trade & John, Trade Street would be a localized implementation of some of the larger concepts, such as extending the curbs to match what's near Zab's Place to make it easier to cross. At John Street near White Duck Taco, they propose shortening the turning lane and adding a median, and adding a signalized pedestrian crosswalk. He noted that the plan includes a prioritized list of projects that can be built incrementally over time. The total project package is $10,929,900.

Mayor Higdon noted this corridor suffers greatly from a lot of traffic, and asked if pedestrians could have unfettered access to stop traffic to cross. Mr. Correll explained the push button technology would be in three locations, but at Trade and John, they don't work quite the same way – they let the signal control cabinet know there are pedestrians that want to cross, and it's built into the signal phasing. Mr. Threatt asked if the Town was still NC DOT to know what will happen with this roadway; Ms. Stoogenke explained this project was created in its current configuration, and these projects will help the immediate pedestrian. If the widening comes, NCDOT will build back the amenities. Ms. Hawke explained that the Town has received word from NCDOT that the Board will take up at its next meeting. They want to build the road as a four-lane road. The Town could build as many of these as possible, and if the Town turns down NCDOT's plan, there are federal dollars that may be available to help with the improvements the Town wants.

Plaintiffs' Complaint 000153

It's possible that process would NCDOT could move faster in any account.

Mayor Higdon said he saw a pedestrian almost get hit near Matthews Station Street this weekend. Signalized lights would make it more obvious that drivers have to stop. Ms. Garner said she's seen many near-accidents, and said anything that makes using transit easier is good. Ms. Hoover asked about signs stating it's state law to stop for pedestrians; Town Engineer Susan Habina Woolard explained those signs are present in many locations but you can't sign every crosswalk. Mayor Higdon said they aren't very effective anyway - people need to slow down and stop at these crosswalks. He said the Board needs to fund funding for these projects.

Mayor Higdon opened the floor to public comment. No comments were made.
Motion by Mr. McCool to close the public hearing. The motion was seconded by Mr. Threatt and unanimously approved.

The public hearing was closed. The decision on this item is scheduled for the November 25, 2024 Board of Commissioners meeting.

## RECONVENE REGULAR MEETING

Motion by Mr. McCool to reconvene the regular meeting. The motion was seconded by Mr. Threatt and unanimously approved.

## CONSENT AGENDA

A. Approve Board of Commissioners Meeting Minutes: October 14, 2024
B. Approve Board of Commissioners Closed Session Minutes: September 23, 2024
C. Accept Zoning Motion 2024-3/Town of Matthews: 1932 CPCC Lane; Tax Parcel 21506115, B-3 (CD) to R/I; Set Public Hearing for December 9, 2024
D. Accept Zoning Application 2024-804/ECP LLC: 9727 E. Independence Blvd; Tax Parcel 19330311, B-1 (CD) Change of Condition; Set Public Hearing for December 9, 2024
E. Approve Resolution Requesting NCDOT Advance Vulnerable User Projects to Fiscal Year 25
F. Reschedule Decision on Partial Pleasant Hill Road Closure to January 27, 2025
G. Approve Application for Accessible Parks PARTF Grant for Squirrel Lake Park Improvements
H. Approve Budget Ordinance Amendments to Appropriate Funds for:
    1) Lobbying Firm
    2) Area Transit Summit - $4,250

Motion by Mr. McCool to approve consent agenda items A-H2. The motion was seconded by Mr. Threatt and unanimously approved.

## NEW BUSINESS

## RECEIVE MONTHLY BUDGET REPORT

Finance Director Teresa Fulk reviewed the budget report through September 30, 2024. All the state projections for sales tax this year were more conservative than reality. The July sales tax is 17% higher year over year. Investments earnings are doing well, with $3 million placed into CDs to lock in the interest rate. She thanked the Board for adopting the investment policy that's allowing these returns. Mr. Tofano said sales taxes are continually increasing because the cost of foods has doubled, and said sales tax will go up as inflation makes its mark. That's a positive side of inflation, but an unfortunate side effect at the same time.

Plaintiffs' Complaint 000154

**AWARD TOURISM GRANTS**

Parks, Recreation and Cultural Resource Director Corey King reviewed the purpose of the grant program, which was design to support nonprofits in an effort to bring people and tourism into Matthews. Based on the Board-approved calculation, this year's available funding totaled $94,729. The Parks, Recreation and Cultural Resource Committee reviews applications and makes recommendations for Board approval. Parks, Recreation and Cultural Resource Committee Chair Susan Chambers noted that they see many of the same applicants each year, and they will work to expand that in the future. She reviewed the committee's recommendations, which totals $94,730:

- Matthews Playhouse requested $60,000; the committee recommends $40,000.
- NC Youth Rugby requested $20,000; the committee recommends $18,000
- MARA requested $72,000; the committee recommends $19,330
- Matthews Chamber of Commerce requested $14,500; the committee recommends $14,500
- Hooks-Orr American Legion Post 235 requested $2,900; the committee recommends $2,900

She noted that there was more funding available last year, and MARA and Matthews Playhouse were both reviewed in light of the change in funding, what they received last year, and their planned programming.

Town Attorney Daniel Peterson noted the need for members to be recused from voting if they have a conflict. Mayor Higdon explained his wife serves on the Board of Matthews Playhouse; Mr. Peterson advised him to recuse himself. Mr. McCool just finished his term on the Board of Matthews Playhouse; Mr. Peterson said he could vote. Ms. Hoover noted American Legion Post 235 was named in part after a family member; Mr. Peterson said she could vote. Mr. Tofano noted he had to recuse himself as an officer of Hooks-Orr American Legion Post 235.

Mr. Tofano said that he will not be voting for any of these because he's been asking for years for audits from every of these organizations, and the Board doesn't receive any detailed analysis of where this money goes. Ms. Hawke explained that documents are requested annually from entities that confirm their nonprofit status, an audit if they have one or a financial statement if they don't, and an operating budget that demonstrates how the funds are being used. The Board has not made a policy to require an audit. Those can cost several thousand dollars, and in the past the Board had discussed how that's not financially feasible for many of these organizations. Mr. Threatt asked about the funding for the Chamber, noting that the Board already approved funding in the annual budget. Ms. Hawke clarified that for something else. This is different – 5% of the tourism money that was earned in the most recent completed fiscal year. The advisory committee makes a call for applications for events that are bringing tourists into Matthews. The C$14,500 is for special events they're putting on.

Matthews Playhouse: Mayor Higdon recused himself due to his conflict. Motion by Mr. McCool to award $40,000 to Matthews Playhouse. The motion was seconded by Ms. Garner and passed 4-1 with Hoover, Garner, McCool and Threatt in favor and Tofano in opposition.

NC Youth Rugby: Motion by Mr. McCool to award $18,000 to North Carolina Youth Rugby. The motion was seconded by Ms. Garner and passed 5-1 with Higdon, Hoover, Garner, McCool and Threatt in favor and Tofano in opposition.

MARA Motion by Mr. McCool to award $19,330 to Matthews Athletic Recreation Association. The motion was seconded by Ms. Hoover and passed 5-1 with Higdon, Hoover, Garner, McCool and Threatt in favor and Tofano in opposition.

Matthews Chamber of Commerce: Motion by Mr. McCool to award $14,500 to Matthews Chamber of Commerce. The motion was seconded by Ms. Garner and passed 4-2 with Higdon, Hoover, Garner and McCool in favor and Threatt and Tofano in opposition.

Hooks-Orr American Legion Post 235: Mr. Tofano recused himself due to his conflict. Motion by Mr. McCool to award $2,900 to Hooks-Orr American Legion Post 235. The motion was seconded by Ms. Garner and unanimously approved.

Ms. Garner asked Mr. Tofano if he would be comfortable with asking organizations who don't have audits to submit a letter of good standing from a CPA. Mr. Tofano said what he's requesting doesn't have to be a certified public audit, as an audit doesn't have to be certified. Ms. Garner noted that might still be unaffordable and asked if the letter would be enough; Mr. Tofano said no.

## CONSIDER REQUEST FOR ADDITIONAL CRTPO FUNDING FOR SAM NEWELL ROAD MULTIUSE PATH

Transportation Planner Dana Stoogenke discussed the need for addition funds for the Sam Newell Road multiuse path that would run from Crown Point Elementary School to Williams Road. The school currently has no walkers and the hope is to change that, and to get more pedestrians onto the greenway. Design work and right of way work has been requested. CRTPO (Charlotte Regional Transportation Planning Organization) typically has two calls for projects each year, but recently decided to remove their spring call. Staff had planned to make the request in the spring call, but since that is no longer an option, is asking the Board to allow a request for additional funds to be made in the fall call. This project needs to follow NCDOT rules, and this is one of the reasons for the shortfall. If approved, Matthews would receive an 80/20 match from CRTPO, which would reduce the Town's cost of the shortfall from $497,090 to $99,418. This is the best estimate of costs until bids are opened in the spring.

Ms. Stoogenke noted that if approved, the Town would pay the entire amount of $497,090 and get reimbursed 80% of that. Ms. Hawke explained that applicants will find out the results in the spring. The Board would then have to commit to funding with a budget amendment. Construction would occur in Fiscal Year 2026 (FY26) and it would be budgeted in the FY26 documents, showing as a $497,000 expense and a grant for the 80%. The total hit to the FY26 budget would be only $99,418. Ms. Stoogenke noted the Town is typically reimbursed by NCDOT on a quarterly schedule. Ms. Hawke noted that a total cost of $2.47 million for a mile and a half long path is difficult to think about, but it's due to requirements from NCDOT and cost escalations due to delays. It's still cheaper doing it this way than if the Town constructed it all itself.

Mr. Threatt asked about the future of Sam Newell Road. Ms. Stoogenke explained there's an NCDOT project that is currently unfunded. A piece is supposed to be widened at some point but the funding is likely not going to happen any time soon. NCDOT will have to concentrate a lot of funds in western North Carolina. If NCDOT does eventually widen the road, they'd have to rebuild the path. She clarified that the path is planned for the west side of the street – the same side as Crown Point Elementary School. Pedestrians will be able to walk under Sam Newell Road via the Irvins Creek Greenway and tie into the multiuse path. Mr. Tofano asked about the curve closer to US074; Ms. Stoogenke clarified that the path isn't planned for that area. Mr. Tofano asked if NCDOT plans to do any curbing or repaving; Ms. Stoogenke will find out. Ms. Garner said Crown Point Elementary is a school in need, and this path will connect to the greenway, which connects to Idlewild Park, so it'll be great for students and families. This amount of money is a small investment to bring a lot of upgrades to this corner of Matthews.

Motion by Mr. McCool to authorize staff to submit a CRTPO shortfall request for additional funding in the amount of $497,090 -$397,672 (80% Federal) and $99,418 (20% Local). The motion was seconded by Mr. Threatt and unanimously approved.

## CONSIDER VISION ZERO TRAFFIC CALMING POLICY

Town Engineer Susan Habina Woolard reviewed staff's request to revise the Town's Traffic Calming Policy. The Vision Zero plan highlights the need for safety. An update to the existing Traffic Calming Policy can improve the process of implementing safety measures. Currently, the policy requires a lengthy multi-step process that includes a member of the community seeking out individual petitions from neighboring property owners. The proposed change would streamline the process and eliminate the need for the requester to collect signatures. Staff would like the Board to repeal the old policy and implement the revised policy as drafted.

Mayor Higdon said he's aware that speed humps are somewhat controversial and many neighborhoods don't want

Plaintiffs' Complaint 000156

them. He expressed concern that there will be a rigorous review by staff so ensure there's a true safety concern, and is worried that the elimination of the petition process would allow one neighbor to implement changes that the rest of the neighborhood doesn't want. Ms. Habina Woolard said staff will thoroughly review each application and consider impacts. Mr. Tofano asked if there's been any consideration of Newtonian fluid speed bumps; Ms. Habina Woolard said she wasn't familiar with it but can research them. She noted the Town is moving away from speed humps and toward more aesthetically-pleasing options. Mayor Higdon said he wants to err on the side of safety. Ms. Garner noted the current plan puts an increased burden to go door-to-door to get signatures on those who live in neighborhoods where there are a higher rate of people living under the poverty threshold and working multiple jobs. Ms. Hawke noted the revision also removes the requirement for the neighborhood to hep bear the burden of these devices - there is no cost share in the revised policy.

Motion by Mr. McCool to rescind the current Speed Hump and Traffic Calming Policy Adopted March 1998, amended August 1999, August 2000, July 2003, January 2022; and to allow staff to enact new implementation procedures for traffic calming in the Town of Matthews as outlined in the Vision Zero Traffic Calming Implementation Procedures, October 2024. The motion was seconded by Ms. Garner and unanimously approved.

## MAYOR'S REPORT

Mayor Higdon noted the Infinite Turtles robotics team won an international world championship. He suggested inviting them back to celebrate them at a future meeting. He then read a letter from Joe Parks, who expressed concern about the amount of litter in Matthews. He requested the Town clamp down on this behavior and suggested an awareness campaign and enforcement. Mayor Higdon agreed, saying enforcement by the police department is needed and some more volunteer efforts are probably needed to help clean things up. Ms. Garner noted that NCDOT has a *Report a Litterbug* program for litterers on state roads.

Mayor Higdon noted that the Town has received an official opinion from NCDOT Division 10 Engineer Brett Canipe regarding the John Street widening project. The Board has told NCDOT that Matthews does not want a four-lane road coming through downtown, but NCDOT has said it would be a four-lane road or nothing. Many communities are struggling with NCDOT on this issue. NCDOT just wants to move traffic and isn't concerned about preserving communities. It is his recommendation that the Town walks away from this project. Matthews can try to fund projects on its own to make it a beautiful two-lane road. The Board will discuss this at its next meeting.

He noted November 11 is Veterans Day, and there will be a ceremony in Stumptown Park at 11 am. Mayor Higdon will be out of town but Mayor Pro Tem Hoover will award the Veteran of the Year award during the ceremony. He also noted today is his and wife Penny's 35th wedding anniversary.

## BOARD-APPOINTED COMMITTEE REPORTS

Ms. Garner explained she attended the last MTC (Metropolitan Transit Commission) meeting as the Matthews alternate. The proposed transit tax legislation was presented and Brent Cagle (Interim Chief Executive Officer of the Charlotte Area Transit System) said he hadn't seen the funding model since a week prior to that meeting, and he wasn't aware of the 40-40-20 (40% of the tax revenue to roads, 40% to rail transit, and 20% to buses) model. Also, the understanding was that the only rail line that could be funded in the 40-40-20 is the Red Line, and the rest would be bus. Ms. Hawke clarified that the model the managers were shown indicated there was insufficient funding for all lines to be built as rail. The Matthews and Silver Line East sections would move to bus rapid transit. It was discussed in the meeting last week that the 20% for bus didn't actually account for the expected costs of better bus improvements. That means the models previously shown were not an accurate reflection of what was shown. It will require more funding for bus to expand bus as needed, which further cuts into the 40% that could be available for rail.

The legislation would mean even less funding available for rail projects than the managers were led to believe. If bus service is expanded the way CATS says it needs to be, it would mean additional cuts to projects in the 2030 plan. In that meeting she requested an accurate model to show what is actually needed for bus. The bottom line is that the

40-40-20 plan does not actually deliver everything except Silver Line East as rail – it delivers less. If that had been fully understood and articulated, it's possible other communities would have been having different conversations. Ms. Garner noted there are two transit stations that haven't been funded. Mayor Higdon said the 40-40-20 model was not even remotely well thought out. He's thankful Matthews didn't endorse it, and the towns that did have no idea what they actually endorsed. In its current form it's a very bad deal for Matthews and not something he can support.

## TOWN ATTORNEY'S REPORT

None

## TOWN MANAGER'S REPORT

Ms. Hawke noted the upcoming min planning conference, which will take place at the town hall on Saturday, November 9 from noon to 5:00 pm. The Board will not meet on Veteran's Day, so the next Board meeting will be on November 25.

## CLOSED SESSION PURSUANT TO NORTH CAROLINA GENERAL STATUTE 143-318.11(A)(3) TO MAINTAIN ATTORNEY-CLIENT PRIVILEGE

Motion by Mr. McCool to go into closed session pursuant to North Carolina General Statute 143-318.11(a)(3) to consider matters relating to attorney-client privilege, to include the Mayor, Board of Commissioners, Town Attorney, Town Manager, Assistant Town Manager and Town Clerk. The motion was seconded by Mr. Threatt and unanimously approved.

*Closed session discussion*

## ADJOURNMENT

Motion by Mr. McCool to adjourn. The motion was seconded by Mr. Threatt and unanimously approved. The meeting adjourned at 8:55 pm.

Respectfully submitted,


Lori Canapinno
Town Clerk

Plaintiffs' Complaint 000158

# EXHIBIT 24



**MINUTES**
**BOARD OF COMMISSIONERS SPECIAL MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**JANUARY 13, 2025– 6:00 PM**

**PRESENT:**    Mayor John Higdon; Mayor Pro Tem Gina Hoover; Commissioners Renee Garner, Ken McCool, Leon Threatt, Mark Tofano and John Urban

**ALSO PRESENT:** Town Attorney Daniel Peterson; Town Manager Becky Hawke; Assistant Town Manager Melia James; Town Clerk Lori Canapinno

Motion by Mr. McCool to go into closed session pursuant to North Carolina General Statute 143-318.11(a)(3) for attorney-client discussion, to include the Mayor, Board of Commissioners, Town Attorney, Town Manager, Assistant Town Manager and Town Clerk. The motion was seconded by Mr. Threatt and unanimously approved.

*Closed session discussion.*

**MINUTES**
**BOARD OF COMMISSIONERS REGULAR MEETING**
**HOOD ROOM, MATTHEWS TOWN HALL**
**JANUARY 13, 2025 - 7:00 PM**

**PRESENT:**    Mayor John Higdon; Mayor Pro Tem Gina Hoover; Commissioners Renee Garner, Ken McCool, Leon Threatt, Mark Tofano and John Urban

**ALSO PRESENT:** Town Attorney Daniel Peterson; Town Manager Becky Hawke; Assistant Town Manager Melia James; Planning Director Jay Camp; Senior Planner Rob Will; Senior Planner Nadine Bennett; Planner Darin Hallman; Planning Board Chair Howard Labiner, members Matthew Eitel, Bob Jackson, Lisa Sanchez, Martin Todys, and John Tonello; Public Works Director CJ O'Neill; Communications Officer Maureen Ryan; Town Clerk Lori Canapinno

### REGULAR MEETING CALLED TO ORDER

Mayor Higdon called the meeting to order at 7:00 pm.

### INVOCATION/MOMENT OF REFLECTION

Mr. Tofano issued an invocation. He spoke about new year resolutions and how people can choose to make every day the first day of the year, in which they treat others well, tell people they are loved, get healthy, or whatever they wish to work on.

### PLEDGE OF ALLEGIANCE

Mayor Higdon led participants in the Pledge.

Plaintiffs' Complaint 000159

**ADOPT AGENDA**

Motion by Mr. McCool to adopt the agenda as presented. The motion was seconded by Mr. Threatt and unanimously approved.

**RECOGNIZE ROADS SCHOLARS ALLEN FOX AND SCHLAIN RIVERS**

Town Manager Becky Hawke spoke about the Road Scholars program, which provides a curriculum of training to enable transportation workers to study road fundamentals and stay current in the latest practices. Public Works staff members Allen Fox and Schlain Rivers continued their education through the North Carolina State University Roads Scholar Program. Mr. Rivers has worked for the Town for more than four years and Mr. Fox for more than three years. Mayor Higdon and Public Works Director CJ O'Neill thanked Mr. Rivers and Mr. Fox for all the work they do to keep Matthews safe and beautiful.

**PUBLIC COMMENT**

None

**RECESS REGULAR MEETING FOR PUBLIC HEARINGS ON APPLICATIONS TO AMEND THE UNIFIED DEVELOPMENT ORDINANCE AND LAND USE MAP OF THE TOWN OF MATTHEWS**

Motion by Mr. McCool to recess the regular meeting for public hearings on applications to amend the Unified Development Ordinance (UDO) and land use map of the Town of Matthews. The motion was seconded by Ms. Hoover and unanimously approved.

Planning Director Jay Camp introduced members of the Planning Board in attendance: Planning Board Chair Howard Labiner, members Matthew Eitel, Bob Jackson, Lisa Sanchez, Martin Todys, and John Tonello

**Zoning Application 2023-781/BrookeChase: 4420 Margaret Wallace Road; Tax Parcel 193-051-20; R-15 to C-MF** *continued from December 9, 2024*

Senior Planner Rob Will explained this item will need to be continued to allow time to address outstanding issues with the site plan, Transportation Impact Analysis, and notes.

Motion by Ms. Garner to continue the public hearing to March 10, 2025. The motion was seconded by Mr. Urban and unanimously approved.

**Zoning Application 2024-800/Epic Hospitality: 7903 Council Place; Tax Parcel 227-371-88; B-1(CD) to B-3 (CD)** *continued from December 9, 2024*

Senior Planner Rob Will explained the applicants are requesting a continuance to February 10 to allow time to address outstanding issues from the previous meeting.

Motion by Mr. McCool to continue the public hearing to February 10, 2025. The motion was seconded by Mr. Urban.

Mr. Urban asked Mr. Will to remind the applicants about comments relating to aesthetic issues as discussed at the previous meeting.

Plaintiffs' Complaint 000160

The motion was unanimously approved.

**Zoning Application 2024-801/John Street Townhomes**: 1700, 1720, 1724 E. John Street; Tax Parcel 227-501-63, 64, and a portion of 227-501-62; R-12 to R-VS

Senior Planner Rob Will reviewed this application for a 9.4-acre site on John Street. The site is currently zoned R-12 and the request seeks a rezoning to R-VS for the development of 72 townhomes. The future land use designation is *Neighborhood Activity Center*. There's a large neighborhood abutting the rear of the site; there's also vacant land across John Street that will be seeking its own rezoning action.

The plan calls for a density of 7.9 units per acre and includes a proposed tree save area of 8%. Proposed amenities include public and private walking paths, a dog park, bike repair stations, central gathering spaces, and 14 guest parking spaces. Proposed amenity areas include stormwater controls with a publicly-accessible walking trail, a 10-foot-wide multiuse path across the frontage, and some internal amenity areas. Proposed elevations show rear load garages.

Transportation improvements from a TTM (Transportation Technical Memorandum) include a right-in, right-out turn that will be established with the construction of NCDOT STIP project U-4714AC - the major widening of East John Street – to a multilane RCI (reduced conflict intersection) corridor from east of I-485 to west of Morningside Meadow Lane. The TTM states the project would generate approximately 552 daily trips, with 35 AM peak hour trips and 43 PM peak hour trips. Mr. Will noted that Town staff questions what interim improvements will be needed if the completion of the U-4714 project lags. Also, the driveway is shown in an area of the U-4714AC section that is right-in, right-out restricted, but the TTM states that a full movement access is proposed. Finally, there are some street stubs indicated on the plan that would require public access easements. Mayor Higdon asked who authored the TTM; it was drafted by Randy Goddard, PE. Mr. Will explained that staff has noted concern to the applicants about the ingress/egress. There's an intersection very close to the right in/right-out of this project. Staff has requested connectivity to the Crosland project to the north of the site – that project is proposing townhomes with access to a traffic signal within 100 feet.

The proposed development is designated as a Neighborhood Activity Center - land reserved for small nodes of activity along collector or arterial streets in the town act as neighborhood focal points. This plan is strictly residential, but a mix of uses would conform more with the Envision Matthews Plan. The future land use map would have to be amended to remain consistent if this application is approved. The featured design elements include the amenity areas, which would add to the resident experience. Staff does not some areas for improvement: the rear buffer could be increased from the current approximately 25 feet and the proposed gated entrance would negate any connectivity gained by connecting to the southern parcel. Other notes include the need to individually plat the lots; show the minimum lot size; develop the conditional notes, and have the plan reviewed by county fire staff. Staff recommends continuing the public hearing to allow the applicant time to consider these concerns.

Mr. McCool asked about a CMS (Charlotte-Mecklenburg Schools) student impact report; Mr. Will explained one has not yet been received. Mr. McCool then said the proposed 25-foot buffer does not seem remotely large enough. He also expressed concerns about the traffic impact to John Street and suggested the Board have more conversation about the impact of potentially over 1,000 housing units in this corridor. He then asked if the proposal includes an affordability component. Ms. Hoover said she would like to recuse herself from this item as she has a connection with the land owner. After some discussion, Town Attorney Daniel Peterson said they can discuss it further before the next meeting. Ms. Garner noted the Brightmoor neighborhood, which abuts the proposed development site, is holding a meeting tomorrow to discuss this project. She encouraged a continuance of the public hearing to allow them time to have that discussion.

Applicant representative Brittany Lins of Alexander Ricks said they're aware of the Brightmoor meeting and are happy to continue these conversations. She also noted there may be some confusion from the Brightmoor neighbors

Plaintiffs' Complaint 000161

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 219 of 259

between this project and the Crosland project, which is also adjacent to Brightmoor, but which is not associated with this townhome project. Ms. Lins reviewed the project, noting a pond onsite that is now in a degraded form toward the frontage of the site. Part of the development process would be to restore it and make it an amenity. She noted that the density started at over 10 dwelling units per acre, but once the conversations with the community began, that dropped. Front porches are a main aspect of the design – they all face walkways that flow though the site to create a sense of place. The plan exceeds parking standards - each unit would have four spaces and the plan includes another 14 guest spaces. The tree save area includes a 25-foot rear buffer, and the plan includes pedestrian connectivity through the site and connecting to the multimodal path to East John Street.

The units would be three stories closest to East John Street and furthest away from the Brightmoor neighborhood, and transition to two stories closer to Brightmoor. The three-story units were placed in response to some comments from Planning staff and some commissioner feedback requested a varied style. Two stub streets are included to the south for future connectivity, and it is her understanding there's a traffic signal planned for the future intersection.

The voluntary 25-foot buffer includes a six-foot privacy fence. The home sites are aligned with no rear or side yards facing the Brightmoor homes – they're aligned to be perpendicular so the neighbors will see the smallest side of the building adjacent to the single-family homes. The landscape plan includes a minimum of three, three-inch caliper large maturing trees, four small maturing trees, and ten evergreen shrubs for every 100 linear feet. Placemaking amenities include a dog park, public and private bike repair stations, fire pit seating area, and gathering areas.

Ms. Lins discussed why the applicants chose this site. The policy map recommends a mix of uses, but they don't feel that makes sense here. Townhomes serve as a buffer between the lower density Brightmoor neighborhood and the higher intensity uses across John Street. This site isn't marketable for commercial use, and the East John Street frontage is obstructed by the natural water feature. Also, they've heard many comments from neighbors who don't want to see commercial use there. She noted this project would bring sewer to the site.

Tom Brasse of RK Investments Charlotte LLC explained that they want to work with the neighbors. Some of the changes they've made thus far show they're willing to make changes, including their reduction from 10 units per acre earlier in their planning. They recognize this is a gateway into Matthews and want to continue meeting with commissioners and neighbors.

Mr. Brasse said the orientation of the buildings is an important point. The Brightmoor neighborhood is a little higher than these would be. This project would give some certainty to what might happen here. Regarding architecture, the color scheme was intentional to try to fit in with the community and serve as that buffer transition. The three-story product closest to John Street is a little more modern. There are commitments to blank wall spaces, front porches, rear load garages, walkways.

Ms. Lins reviewed issues raised by staff: the applicants will individually plat all the homesites and will add the minimum lot size. They will work with NCDOT on transportation issues and the right-in, right-out access, and will install the median themselves if necessary. Regarding the distance from the proposed Crosland project: there isn't really another place for this project's access point to go unless they removed the water feature. The stub connections to the south, once those parcels are developed, would bring drivers out to a traffic signal. The plan includes a gate at the front entrance as a direct response to some of the Brightmoor neighbors' desires. The applicants are aware of staff's connectivity questions; the gate will help monitor traffic from East John Street and the only people accessing the site would be these neighbors. The applicants are happy to keep talking through the issues relating to the rear buffer, and he noted a neighbor had requested bee-friendly plantings and they're working through that.

Mayor Higdon said the 25-foot rear buffer isn't much and he's interested to hear what the Brightmoor neighbors say about having to rear or side yards backing up to their homes. He thinks the stub streets won't be good for Brightmoor. He's concerned there's no easement agreement for connectivity and he'd like to see some effort made to get that. He said he doesn't see anything about this project that's inspiring - it's another high-density townhome neighborhood that's not any better than the hundreds one can see anywhere.

Plaintiffs' Complaint 000162

Mr. Tofano asked if the Brightmoor meeting is open to all Brightmoor residents; an unidentified audience member said they didn't know if all residents received notification but the meeting is open to all residents. Mr. Tofano commended the applicants on the three-inch caliper trees, then said the 25-foot buffer seems to be mitigated by the fence and asked about the material. Mr. Brasse said it would be vinyl or something aesthetically pleasing. In response to other questions from Mr. Tofano, Mr. Brasse said they can consider increasing the fence height from six feet to eight; that the issue of for sale versus rent was not yet decided; that the porches are currently five feet deep but they're seeing if that can increase.; that the unit size will be around 1,800 square feet; and with Hardi or brick-faced siding. He will need to check on the distance between the porch facings. Mr. Tofano said he likes the plan for a gate and wanted to hear the Brightmoor feedback at the next meeting.

Ms. Garner pointed out that the initial plan showed 79 units, and four or five of them were in the SWIM buffer, so those had to be removed anyway, not due to listening to community feedback. She then opined that sound will be an issue, and a six-foot fence and the buffer won't be enough. She said the lack of connectivity with the road network is a big problem, and that the Crosland project is far enough along that the applicants should be able to do something there. She said the 8% tree save is sad and dismal, especially when there's an existing neighborhood used to seeing mature trees there. This shows a lack of community consideration. The R-VS spirit is supposed to be thoughtful and imaginative, but this development is neither of those things. She suggested having single-family homes abutting single-family homes so there's less of a dramatic shift. She then said that without the CMS report it's more difficult for the Board to make any decision, but she thinks it's funny that there's a dog park but no amenities for children.

Mr. Urban suggested rotating some units on the back side and use the extra distance of the back yards of the townhomes to add to the buffer, and the fence and shrubbery could block the car lights, or turning the units could visually increase the buffer. He supports staff's recommendations, especially on the connectivity aspect. There's no commitment on paper for connectivity, so he agrees with staff's recommendation to seek connection at the Pappas project to the north. He thinks this is an uninspired site plan – the applicants made a good effort on the amenities, but they're almost by default with the pond. He likes the three-story elevations but not the two-story, and there's no connection between the two. The two-story elevations have no vertical or horizontal articulation, and the side elevations need help. There are a lot of side units with the bland side facing the street, and asked why there aren't the entries on the wraparound side. He's concerned about porch depths and said a variation of materials is important too, not just a variation of color. The three-story elevations have a freshness to them, but the two-story units are outdated. He doesn't see what's R-VS about this plan. He noted that fence height is limited to six feet, so the fence can't be taller than that. He's a little concerned about a gated community due to exclusivity and how deep inside the site it is, so that it doesn't cause issues on John Street if there's more than one car at the gate.

Mayor Higdon noted they're proposing to plant 10 evergreen trees, but recommended increasing that, so there's privacy when leaves fall from deciduous trees. Mr. McCool asked if the plans include an affordable component, saying this is a non-starter for him without a workforce or attainable aspect to me. Mr. Brasse said that it's all market price. Mr. Threatt asked about the estimated cost per unit; Mr. Brasse said it wasn't certain yet but probably in the $400-$500,000 range.

Mr. Brasse discussed connectivity, saying the logical connection spot would go through an area of significant grade change, which would require the clearing of a lot of trees and wetland impacts. There isn't much in that area on the Crosland plan. The two stubs on the lower area makes more sense to allow people to make an exit at the light. They applicants could make a connection at the northern end but it doesn't make much sense to them. He explained that when they met with neighbors, the trees and fencing was their preference. The applicants shifted the buildings at the rear based on neighbor feedback. Mayor Higdon said there are some concerns about the number of curb cuts on John Street, and then where the drivers will go with the right-in/right-out ingress and egress. Mr. Brasse noted they're limited in how they can access the property due to wetlands. Mayor Higdon asked about public amenities; Mr. Brasse said the multiuse path and bike repair station at the front will be publicly accessible.

Ms. Garner noted are no trees at the frontage of the property since NCDOT took them out, but the applicants' plans depict a lot of trees. Planning Board member said the planned 296 car parking spaces seems like a lot for a parcel

Plaintiffs' Complaint 000163

of that size. Mayor Higdon clarified that the four spots per unit include two in the garage and two in the driveway, so there's only 14 visitor spots. Mr. Brasse said most people living in townhomes don't have four cars.

Mayor Higdon opened the floor to public comments. Kristine Smith said she's been part of Brightmoor for five years. She and her husband love Matthews' small-town feel. It's great to share good things with other people, but the influx of traffic is a big problem. They avoid certain roads on certain days and times because the roads are practically impassible. She was in a car accident and it reminds her how important it is to be aware of what these new developments will bring in terms of traffic. She is happy the Board is considering that aspect. Hundreds of cars of residents and visitors will impact the roads. She is also concerned about noise. She lives far away from I-485 but she can still hear it every night. Once all the trees are removed for this project, it removes even more noise buffer. Once those trees are removed there won't be anything to block the noise. Scott Vallandingham of 3012 Crescent Knoll Drive said he'd been a resident of Matthews for 30 years. He's very concerned about density, the 25-foot buffer, traffic, and possible rentals.

Jim Dedmon of 1330 Golden Hill Road said he met with the applicants and was encouraged by their willingness to listen to Brightmoor input. He keeps hearing about the desire for affordable homes, especially for town employees, but explained he was a firefighter for years and said they don't want to live in the town they serve. It would be nice to have a bigger buffer. He said putting mixed use in this location wouldn't make sense because it wouldn't be seen from the road, and when the Pappas development is built across the street, people will go there. He doesn't want to hear trucks every morning. He likes the idea of a gate for security and to show people are invested in the community. He wouldn't be in favor of rental properties due to their adverse impact on the Brightmoor neighborhood. The HOA has said they're not going to make a statement on this.

Jennifer and her husband have lived in Brightmoor for 20 years, and it's a great, established neighborhood. She appreciates that the developer has tried to model their designs to be more in line with Brightmoor but would rather see the front or side of their homes than the driveways. The buffer seems inadequate. She appreciates the fence and landscaping, but 25 feet just isn't enough. If they removed the last unit of that whole row that might help. She doesn't want to see this become a rental market. She doesn't think there should be connectivity, saying it's wonderful to live on an island. She believes a gate is good for security for this community as well as Brightmoor but wondered what would stop someone from coming in on the side where there isn't a gate. She'd like both sides to be gated. Mayor Higdon clarified that there is nothing in this proposal that would connect to the Brightmoor neighborhood.

Dennis Gray of 2509 Brightmoor Ridge Drive agreed with the previous comments. He's lived in Brightmoor since 1987 and wants the properties behind Brightmoor to retain their current residential status. There are other possible plans for this site. A neighborhood activity center would be at least 17 different forms of a use plus of building types. The activity center concept is out of character for this residential area and property values could suffer. The Envision Matthews plan loses site of the need to adequately protect and buffer existing residential sites. He said that can be seen in the Ashley Creek neighborhood, which received additional buffering when the newer neighborhoods were developed. Instead of trying to redesign the corridor between John Street and Pleasant Plains, it should give the same consideration it gave to Ashley Creek to his and other neighborhoods. He reviewed other R-VS sites in town: Avington, Fullwood Station and Eden Hall. They're not the same as what's being proposed now but they gave him a good background of the zoning designation. He believes the proposed project could be improved, but he prefers it to an activity center. He believes the nearby Crosland development will make this Matthews' very own Waverly development at the southern gateway of the small town of Matthews. There will be several new signal lights on John Street because of that development and this stretch of John Street will become a chokepoint. He suggested the Board keep things simple and guard the residents of the John Street corridor. He asked about 10-foot sidewalks and notification for nearby property owners. Ms. Hawke explained that ten feet is the new standard for sidewalks, particularly when they're adjacent to a thoroughfare. Regarding notification, property owners within a 300-foot radius of the subject property receive notification. Mr. Gray said he'd like it if the entire neighborhood could be notified.

Brent Metcalf of 1307 Old Pond Lane said the 25-foot barrier is inadequate at best. The light can be managed by a fence and trees, but the noise can't be mitigated. That forest has a lot of Carolina pines, which are known for their

Plaintiffs' Complaint 000164

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 222 of 259

sap, their smell, and the fact that they're safer when more of them are there. Removing some of them makes the situation less safe for the nearby neighbors. He also believes a right-in/right-out turn is not a good solution. Lindsay Sawyer doesn't live in Brightmoor but questioned where are all the children are going to go to school, saying the schools here are already overstuffed and the busses are at max capacity. Mr. McCool explained that the report from CMS with that information hasn't been provided yet. Lou Rodriguez of 1329 Golden Hill Road said he lives along the minimal buffer and 25 feet is laughable. He is concerned about light pollution. He asked about the existing brook and if it will be destroyed. He noted the wildlife that comes through the area and noted how this proposed project will impact them. He hopes everyone's concerns are not taken lightly. Janice Carpenter of 1029 Weeping Willow Lane said there's been a lot more noise since NCDOT has taken out trees, and if this development goes through, it will be even worse. The buffer needs to be a lot larger.

Town Attorney Daniel Peterson advised the public that he understands the public's desire for information related to the issue of rental versus for-sale status, but that information can't be used in the Board's decision-making.

Motion by Mr. McCool to continue the public hearing to February 10. After some discussion and agreement by the applicants, he amended the motion to continue the public hearing to March 10, 2025. The motion was seconded by Mr. Urban and unanimously approved.

**Zoning Application 2024-808/Carrabbas**: 10408 E. Independence Boulevard; Tax Parcel 193-292-11; C to B-1(CD)

Senior Planner Nadine Bennett reviewed this application for site on Independence Boulevard on which Carrabba's Italian Grill sits. The parcel is still zoned Conditional – an old zoning designation from the 1980s. The Town approaches property owners with this designation to see if they're interested in rezoning to a current designation. The property owners were amenable to this request to change the zoning to B-1(CD). The property owners are aware that whatever is there now will be included in the zoning conditions for the site, and any changes they want to make in the future will require Board approval for a change in conditions. The site is currently legal, nonconforming, and changing from an outdated zoning designation to a modern one is generally better for the applicants. There are no unintended consequences for either the owners or the Town.

Mayor Higdon opened the floor for public comments; there were none.

The public hearing was closed. This item will be heard by the Planning Board on January 28 and come back to the Board of Commissioners for a decision on February 10.

### RECONVENE REGULAR MEETING

Motion by Mr. McCool to reconvene the regular meeting. The motion was seconded by Mr. Urban and unanimously approved.

### PLANNING AND DEVELOPMENT BUSINESS

### Planning Board Report

Planning Board Chair Howard Labiner provided a report of the December 17, 2024 meeting (Exhibit #1 hereby referenced and made a part of these minutes).

Plaintiffs' Complaint 000165

**Motion 2024-3/Town of Matthews:1932 CPCC Lane; Tax Parcel 215-061-15; B-2(CD) to R/I**

Planning Director Jay Camp noted there have been no changes to the proposal since the public hearing. The Planning Board recommended approval.

Ms. Garner noted some comments made during the public hearing indicated concerns about this. While she has different opinions than the conclusions they drew, she thinks there's an opportunity to try to bridge the gap in the relationship between the police department and the school's students, and asked if the department would work to do that. Town Manager Becky Hawke said she'd first work with CPCC (Central Piedmont Community College) leadership to be sure the Town is respectful in asking for outreach to their student body. She said the Town has a great police department and she believes these plans will be positive for the community.

Motion by Mr. McCool to approve Motion 2024-3 as the amendment is consistent with the Comprehensive Plan as it expands institutional uses as called for in the Employment Activity Center designation; and it's reasonable because of the property is part of the Central Piedmont Community College campus. The motion was seconded by Mr. Threatt and unanimously approved.

**Zoning Application 2024-804/ECP LLC: 9727 E. Independence Boulevard; Tax Parcel 193-303-11; B-1(CD) Change of Conditions**

Senior Planner Rob Will reviewed the request for a change in conditions to allow medical/dental office as a use on this site. The Planning Board reviewed the future tenant's lease agreement for 105 parking spaces and was advised about some restrictive covenants on a collection of four parcels in the Windsor Square development that must adhere to the shared parking plan. Staff and the Planning Board recommend approval. recommends approval.

Mr. Urban asked about landscaping, saying the plan includes a sea of asphalt. Two or three trees would be able to provide the tree canopy. The Board requested additional parking lot islands in the same shopping plaza near the At Home store and it made a world of difference. Discussion ensued. Mr. Will noted that the site could lose four parking spaces and still be in compliance; Mr. Urban said that would allow for the addition of two trees. That could be two trees in two islands, which will basically eliminate four parking spaces, or one bigger island in the middle with two trees in it.

Mr. Will noted that's not a requirement of the Unified Development Ordinance and so the applicants would have to agree. They'd also need to submit a revised site plan showing the locations. They're only asking to add a use to the use table, doesn't normally trigger such a request. Mr. Urban argued that this would sacrifice a retail center for a dental office - a high-dollar operation that waters down what that center was about. People going to the dentist probably won't then go to the nearby restaurant. This center could eventually turn into a business park instead of a retail center.

Applicant representative Rob Eagle said he'd plant some trees there or elsewhere if he must and explained his costs to date. Mr. Urban said he'd prefer to see trees in the parking lot – one options is with a mountable curb. Applicant representative Adam Web explained there are two declarations on this property, both of which state the parking lots are common areas, and neither allow them to make changes without the property owners' consent. They would need the consent of potentially two parties before planting trees. The parking areas are common, shared areas and you can't make improvements without declaring consent. They will make that request of the declarant but there's a potential litigation from them if the applicants moved forward without their consent. Mr. Peterson suggested having the motion include a reference to the applicant making reasonable and good faith efforts to gain consent of the declarants.

Mr. Tofano said he'd like some description of what will go there if they receive approval, and if they're willing to foot the cost. Ms. Hoover said adding trees there would be great, but since the cost is unknown, she didn't think the

Plaintiffs' Complaint 000166

Board should punish the applicants for that, when the problem was caused by poor planning years ago. Ms. Garner said the Board sometimes needs to make better decisions than those made in the past. She said Windsor Square is a shopping center that is reaching the end of its beauty, and she doesn't believe this is too much of a request.

Motion by Mr. Urban to approve Zoning Application 2024-804 for a change in zoning conditions to add medical/dental office as a permitted use, and for the applicant to make every reasonable and good faith efforts to plant two tree islands, following the Town's treescape requirements, as the amendment is consistent with the Land Use Plan because it brings the opportunity for a mix of uses to the Independence Boulevard corridor and is reasonable because it does not substantially alter the currently approved plans. The motion was seconded by Mr. McCool and unanimously approved.

### Elevations – Matthews Gateway, Building 1; 1101 East John Street

Planning Director Jay Camp explained the applicant requests a continuance to February 10.

Motion by Mr. McCool to continue this item to February 10, 2025. The motion was seconded by Mr. Urban and unanimously approved.

### Administrative Amendment - Matthews Animal Clinic; 10600 Monroe Road

Planner Darin Hallman noted that last September, the Board approved a new site plan and building elevations for this site. The applicants now want to eliminate a section of curb and gutter on the north side, eliminate the sidewalk leading to the multiuse path toward the back of the site, and change some stone feature material on the building to cementitious siding. Per Planning Board's request, the applicant has added back the sidewalk connection leading back to the larger parking area. Originally there was a sidewalk connecting to the park. The topography drains to the south, and they'd leave the curb and gutter to the south so everything would go to the catch basin. They've also requested changes to the building elevations. They removed several building material features including some stone feature and a change from masonry in the small addition.

Mayor Higdon asked about the portion of sidewalk connecting the parking lot to the multiuse path. Mr. Hallman explained that the applicant isn't required to install that multiuse path, and once the Development Review Committee and Planning Board heard that, they weren't too concerned. Mayor Higdon asked if someone could easily walk from there to the parking lot; Mr. Hallman said the walk would include some gradual grade change. Mr. Urban said he wasn't in favor of the elevations before and isn't now. He's disappointed in the proposed changes. Mr. McCool said he didn't like the dark gothic look. Mr. Threatt agreed and suggested adding the stone back.

Ms. Hoover asked why the changes are being requested. Applicant Michael Newman explained that funding is an issue. The building is $300,000 over budget and it's the secondary building – they still need to get to the main building, and he anticipates that one will go will over budget. These changes are being requested to cut budget. They tried to maintain cohesiveness by looking at other sites in town. Ms. Garner said she didn't mind the loss of the stone but suggested a different color scheme, and thinks the look of this building should be carried on to the other building. Mr. Urban noted that the stone is just decorative and the same look could be achieved with cementitious siding in a cream color. He suggested box-wrapping the panels in cementitious siding. There's also a thinner stone – about 1.5 inches thick and less expensive. The cream-colored stucco could be Hardi. The post is popping out through the top of the column. – the applicant could create that same shape and mass and frame it in Hardi or cementitious product.

Discussion ensued. Mr. Threatt suggested adding stone to a portion to make it look less barracks-like on at least the side facing Monroe Road. Mr. McCool said he'd like to see a different color scheme and some Hardiplank; Mayor Higdon said a simple color change would satisfy him. Mr. Urban suggested reactivating the stone on the front façade. Ms. Garner said she doesn't care for the fake stone aesthetic and suggested just requesting a different color and

APPROVED 1/27/2025

9

Plaintiffs' Complaint 000167

letting the applicant come back with their own ideas. Mayor Higdon said he thinks the Board is getting too prescriptive. After more discussion, the Board agreed by consensus that just changing the color scheme would be acceptable – the applicant can apply the colors from the original scheme into the new scheme in their respective locations.

Motion by Mr. McCool to approve the Administrative Amendment, with the caveat to apply the colors in the original scheme into the new scheme in their respective locations, as the changes are consistent with the Land Use Plan as it maintains and enhances the commercial character of Monroe Road and are reasonable in that they do not significantly impact the intent of the original rezoning. The motion was seconded by Ms. Hoover and passed 6-1 with Higdon, Hoover, Garner, McCool, Threatt, and Tofano in favor and Urban in opposition.

## CONSENT AGENDA

    A. Approve Board of Commissioners Meeting Minutes: December 9, 2024
    B. Approve Board of Commissioners Closed Session Meeting Minutes: December 9, 2024
    C. Approve Annual Board/Committee Meeting Schedule
    D. Appoint Alternate Members to Planning Board
    E. Appoint Member to Public Transit Advisory Committee
    F. Endorse Event and Approve Temporary Road Closure – Mount Moriah Missionary Baptist Church MLK Walk
    G. Award Service Weapon and Badge to Retiring Police Major Roy Sisk

Motion by Mr. McCool to approve consent agenda items A-G. The motion was seconded by Mr. Threatt and unanimously approved.

## UNFINISHED BUSINESS

## CONSIDER BOND PROJECTS/ISSUANCE AMOUNT

Town Manager Becky Hawke noted that in the December discussion, the Board elected to secure a bond sale date with the LGC (Local Government Commission) for April 1. That's not a binding date – it can be cancelled if the Board chooses not to move forward. The goal tonight is to confirm if the Board is still interested in a bond sale, and if so, for what amount, so it can act at a future meeting to move forward with the bond sale on April 1. The Board can review possible scenarios as presented by First Tryon. The Board would not be bound by them. The Board has been talking mostly about park and recreation projects with some smaller transportation projects. The tax impact would be locked in once the sale occurs, but the numbers shown on the presentation are close to what it would be.

Mayor Higdon said the Board isn't limited to the four scenarios shown – it can choose other project combinations. He thinks the third option is the most reasonable - it includes design and construction for Purser-Husley Park; the Riverbanks greenway connector, the funding for the town's portion of E John and 485, and other park improvements. Mr. McCool asked when Purser-Hulsey Park could be opened; Ms. Hawke explained that the design work is anticipated to take 12-18 months and construction 24-36 months. Staff could start crafting an RFP (Request for Proposals) for design services if this project will be part of the bonds. It could take three to four and a half years for design and construction. She doesn't recommend phasing in the design work – construction could be phased, but the design shouldn't be done in pieces. She said the Town could add a dedicated webpage showing the progress and there will likely be opportunity for public input on the park. Mayor Higdon noted that if the Board chose to move forward with the design and wait on construction, the result would be that the Town would be able to build less due to rising costs. Designing and constructing it is a good use of public money.

Mr. Urban likes the third option too, but asked how park improvements would be addressed if bond funds were not available. Ms. Hawke explained that they would compete with other CIP (Capital Improvement Plan) needs. That's

Plaintiffs' Complaint 000168

Case 3:25-cv-00318-MOC-WCM   Document 12   Filed 05/23/25   Page 226 of 259

why they haven't been funded to date. The problem is the annual budget for capital improvements is very low, and some critical needs outweigh other projects. Mr. Tofano asked about costs; Ms. Hawke explained that the only cost now would be the cost to secure bond counsel, and First Tryon, but all those costs are rolled into the bond sale. If the Board were to decide not to sell bonds, the bond counsel and First Tryon would send invoices for their time. Mr. Tofano asked when the state legislature is expected to vote on the one cent sales tax for transit; Ms. Hawke said that wasn't yet known. Mr. Tofano said there are a lot of variables in the federal and state governments. Matthews is tax-happy right now, and the Board is talking about adding another 5% tax to the public, and there's the impact of the one cent sale tax, federal tax rates, and more to deal with. He cautioned against moving forward until those variables are known – another four months are so. Mayor Higdon noted that the result of the one-cent sales tax referendum won't be known until November - 11 months from now. Mr. Tofano reiterated his desire to be cautious moving forward.

Ms. Garner asked when the bonds were approved by the voters; Ms. Hawke noted that occurred in 2022. Ms. Garner said the Board has spent two years thinking about bond projects. She appreciates Mr. Tofano's caution but the Board has narrowed down the projects to the essentials for $11 million. People want Purser-Hulsey Park built - they voted on it, and now it's up to the Board to fulfill their wishes. She liked the third option. She asked about funding the Riverbanks greenway connection with interest revenues and said she's like to dedicate the interest from the parks dollars to that project, noting it would make a negligible impact to the tax rate, but it's a first step. Ms. Hawke explained it would be very negligible. She noted another option – if the PARTF (Parks and Recreation Trust Fund) grant for Squirrel Lake Park is approved it will require a Town match, and the interest could be used for that grant. Funding for the shade structures and Squirrel Lake Park play structures isn't included in the $916,486 but were included in the grant application. She clarified that contingency funds are built into all these totals, but the more in the interest account gives more of a buffer. She cautioned against cutting it too much.

Ms. Hoover said she's curious to see how voters feel about a current tax increase, since the bonds were approved two years ago. She heard people agree it would be nice to see Purser Hulsey Park done, but not now. Someone said they've spent years just trying to afford groceries. This would be burdensome. The CPI has increased, and the school bonds are coming, the Board doesn't know what the next budget will look like, and the Town is still paying on the 2015 bond. People don't have the money for all these increases. She will not be voting in favor of this. Mayor Higdon said she and Mr. Tofano have made good points, but if the Board keep delating these projects they'll never get built. The voters approved the bonds and the Board should act. Mr. Threatt said he's also concerned about the multiple increases the taxpayers are facing and wants the Board to be watchful and conservative whenever possible. He's more comfortable waiting to see if there's more insight in a few months. Mayor Higdon noted that in a few months, everyone may know if the legislature will allow the referendum to be held, but the results won't be known until November. Mr. Urban noted that people who can't afford to take their children out to activities could be helped by amenities like improved park equipment. The pain of paying for things is spread across all the citizens of Matthews. It's a quality-of-life issue, especially for those who can't afford to do other things.

Mr. Threatt asked if there's ever been any discussion with Mecklenburg County Parks and Recreation to buy Purser-Hulsey Park. Ms. Hawke said the very brief discussion was that it's not for sale. Mr. Tofano asked if anyone has asked if they'd completely take it over and assume the costs to upfit it. Ms. Hawke explained that the Town has an agreement with the Mecklenburg County for the County to purchase the land and for the Town to develop the park. The County has since put their focus on other parks. Ms. Garner noted the County has a huge list of priorities across a huge swath of land - they've bought two properties in Matthews and have invested in Idlewild Park. She doesn't think they will prioritize anything with Purser-Hulsey since the Town has that agreement with them. Ms. Hawke noted that the County has already stated it wasn't interested in purchasing the property at the corner of the park to expand the park. The County has expressed interest in having some space carved out for a county facility in the park, but they don't have interest in the overall facility.

Ms. Garner made a motion to move forward with Scenario 3, totaling $11,049,512 for a desired Spring 2025 bond issuance and allow staff, First Tryon, and bond counsel to continue to move forward with preparing for the bond sale. The motion was seconded by Mr. Urban and passed 4-3 with Higdon, Garner, McCool, and Urban in favor and Hoover, Threatt and Tofano in opposition.

APPROVED 1/27/2025

Plaintiffs' Complaint 000169

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 227 of 259

## CONSIDER PUBLIC INPUT RECEIVED ON STORMWATER SERVICES/FEES

Communications Officer Maureen Ryan reviewed the results of a public input survey regarding stormwater fees and services. Staff held a public meeting, issued an online survey, and advertised the desire for feedback in multiple digital locations. Only one person attended the in-person meeting, which is an indicator of the difficulty in getting in-person attendance. The survey ran from December 9 to January 5 and 128 responses were received, which is a reasonable response rate for a survey of this type.

- When asked if they'd support a fee increase of approximately $1.05 per month to help the Town more proactively clear and maintain ditches, 65% said yes, 30% said no and 5% were unsure.

- When asked if they'd support a fee increase of approximately 61 cents per month to fund stormwater control measures, 57% said yes, 33% said no and 10% were unsure

- When asked if they'd support a fee increase of approximately $1.24 to fund both an initial and ongoing stormwater system survey and assessments, 57% said yes, 34% said no and 9% were unsure.

Respondents were asked to rank priorities:

Regularly clearing and maintaining ditches
- 70 people ranked #1
- 42 people ranked #2
- 16 people ranked #3
- *This was the highest priority for respondents, with 70 individuals ranking it first.*

Funding repairs of neighborhood stormwater control measures (SCMs)
- 23 people ranked #1
- 60 people ranked #2
- 45 people ranked #3
- *While still an important priority, it ranked second overall, with the majority of respondents placing it second or third.*

Completing an initial and ongoing stormwater system assessment
- 35 people ranked #1
- 26 people ranked #2
- 67 people ranked #3
- *This was seen as the least urgent priority, with the majority of respondents ranking it third.*

Respondents are generally supportive of an increase in fees for an improvement in services, regularly clearing and maintaining ditches is the highest priority for respondents, and 48% of respondents are either very satisfied or satisfied with the current level of stormwater services.

Public Works Director CJ O'Neill said if it were up to him, he'd prioritize things differently, ranking the most important as the stormwater system assessment, followed by the clearing and maintaining of ditches, followed by the funding of neighborhood SCMs. In response to a question about developer responsibilities, Mr. O'Neill explained that developments over an acre in size requires mitigation of certain levels of storm water.

Ms. Hawke noted that the Board requested this information. If the Board is willing to move forward in directing staff tonight about the level of rate increase, it can do so. Charlotte Water will need to be advised by March for implementation of any changes in July. She noted that the fees will need to increase by $2 just to maintain the current level of operation. If the Board wants to add any additional options it will have to direct that, and if it doesn't want to

Plaintiffs' Complaint 000170

increase the fees at all, the Board will have to decide which services to cut. The last fee increase was seven years ago. Discussion ensued.

Ms. Garner said none of the Board members are eager to add more fees onto constituents, but this work seems essential and has been put off for far too long. She asked what services would have to be cut to make this work without an increase. Ms. Hawke explained that stormwater services are operated as an enterprise fund, and there's a delta of a few hundred thousand dollars a year. About 25% or so of the fund would have to be cut. Salaries are the biggest needle mover in that fund. Ms. Garner noted some towns pay for this in their annual budget and asked if Matthews could do that. Ms. Hawke said she would vehemently disagree with using this as anything but an enterprise fund. She can't put this up against police and fire. She'd look for a fund balance appropriation before cutting services. She'd probably look to cut across the entire budget. She reiterated that the Town treats this as an enterprise fund and the fees haven't increased in seven years. She noted that the cost of everything is going up. The budget for next year already includes pressures from other sources, and just being able to afford the cost of business on the General Fund side is going to be difficult. To pass the burden of stormwater onto the general fund would be a significant burden. Matthews must remain competitive because all the neighboring communities are increasing in salaries. It would be incredibly difficult to not increase the stormwater fees and not cut services.

Mayor Higdon noted the Board has discussed incremental annual fee increases instead of these significant increases, and he'd like to see that as an option in the future. Ms. Hawke said those scenarios have been run by First Tryon but noted that Matthews has fallen significantly behind. The increase seven years ago was planned to last only seven years, and now it's time to increase it.

Mayor Higdon explained this will be discussed again at the next meeting.

## NEW BUSINESS

## CONSIDER NORTH CAROLINA LEAGUE OF MUNICIPALITIES LEGISLATIVE GOALS

The North Carolina League of Municipalities (League) requested its member communities choose up to ten legislative goals from its draft list. It held community input meetings and calls to narrow it down to the 16 options on the list and will finalize its list from the majority chosen. The options are as follows:

1. Expand funding opportunities for disaster resiliency and recovery efforts.
2. Establish long-term funding streams that adequately address water, sewer, stormwater, transportation, and other infrastructure needs.
3. Expand state transportation funding streams for construction and maintenance of municipal and state-owned secondary roads.
4. Increase funds to remediate contamination in local water supplies.
5. Expand incentives and funding for local economic development.
6. Create incentives to encourage the development of diverse housing options.
7. Provide resources to rehabilitate or purchase blighted properties.
8. Create incentives that encourage and adequately fund regionalized water and sewer solutions.
9. Reduce regulatory conflicts between state agencies that discourage voluntary consolidation, merger, and interconnection of municipal utility systems.
10. Create an orphan road program whereby the state improves those roads to N.C. Department of Transportation
11. Provide local revenue options beyond the property tax.
12. Support technical assistance programs to assist municipalities with securing or maintaining grants or other necessary municipal resources.
13. Address the needs of a changing municipal workforce through state assistance that supports employee retention, including training and recruitment.

Plaintiffs' Complaint 000171

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 229 of 259

14. Update the annexation petition thresholds to make voluntary annexations easier to initiate.
15. Preserve authority for extraterritorial jurisdiction to ensure that growth is well-planned and investments by homeowners and business owners are protected.
16. Protect the ability of municipal elected officials, acting on behalf of local voters, to determine election formats, districts and other election matters currently under their purview.

Ms. Garner noted that the League's draft goals include six that are equivalent to some on the Town's own legislative agenda. Ms. Hawke noted that the Board doesn't have to choose ten – it could just endorse the six that most closely align to its own legislative agenda if desired. Discussion ensued.

Motion by Mr. McCool to start with the inclusion of the following seven goals: numbers 2, 3, 5, 6, 11, 12, and 13. The motion was seconded by Mr. Threatt.

Ms. Hoover said she didn't agree with item 11; Mr. Tofano agreed and requested it be removed. Discussion ensued, and by consensus the group agreed to remove that item now and will see if it receives enough votes to be added back later. By consensus the Board agreed to include six goals that closely align to the Town's existing goals and then add goals as ranked individually by Board members. Each Board member will rank the remaining in order of importance to them and submit to staff. Those that receive four or more votes will be ranked accordingly, and the top ten will be submitted to the League. The six goals agreed upon by all Board members are numbers 2, 3, 5, 6, 12 & 13.

Mr. McCool amended his motion to start with the inclusion of the following seven goals: numbers 2, 3, 5, 6, 12, and 13, and direct Board members to choose four others in ranked order, and to submit those items to staff by Wednesday. The motion was seconded by Mr. Tofano and unanimously approved.

## RECEIVE UPDATE ON ENFORCEMENT OF SHORT-TERM RENTAL ORDINANCE

Town Attorney Daniel Peterson reviewed the issue of recent General Assembly legislation passed in December that further restricted the ability to downzone properties, to include a prohibition on local governments doing this and requiring the collective written consent of all property owners to downzone property. Part of the definition of downzoning is by reducing the permitted uses of land that are specified in the zoning ordinance or land development regulation of fewer uses than were allowed under its previous usage. The new law also has a reach-back period that covers the Town's short-term rental ordinance. The Town can continue to accept applications but cannot restrict those applications by zoning district or otherwise enforce the ordinance in such a way to deprive an owner of their rights. He noted this means the Town cannot enforce its two-strike rule.

Mr. Tofano asked for Mr. Peterson to draft language about this in layman's terms so the public can understand what's happening. By consensus the Board directed Mr. Peterson to do that. Mr. Urban asked if the Town could apply regulations to all the zoning districts, since short-term rentals had previously been allowed in all districts before being restricted to certain districts. Mr. Peterson will research that. Ms. Hawke clarified that the Town will continue to accept applications from property owners of short-term rental units, and that no application will be turned away if it is in a residential district, because the current restrictions are currently invalid sue to the recent state legislation. The Town also can't enforce the two-strike rule – it can collect applications and information if there is a violation, but there's no mechanism to revoke an approved application until Raleigh clarifies this legislation. The General Assembly is working to straighten this out, so the prudent action is to pause until legal clarification comes through. Mr. Peterson noted that if the General Assembly doesn't straighten this out in a timely manner, he will investigate other options.

Mayor Higdon noted this stay in action is due to the actions of the General Legislature, not the Matthews Board. This is yet another example of Raleigh taking away the power from municipalities to govern themselves.

Plaintiffs' Complaint 000172

Case 3:25-cv-00318-MOC-WCM    Document 12    Filed 05/23/25    Page 230 of 259

**MAYOR'S REPORT**

Mayor Higdon thanked staff, volunteers, and everyone else who contributed to all the wonderful holiday celebrations in town.

**TOWN ATTORNEY'S REPORT**

None

**TOWN MANAGER'S REPORT**

None

**ADJOURNMENT**

Motion by Mr. McCool to adjourn. The motion was seconded by Mr. Tofano and unanimously approved. The meeting adjourned at 11:39 pm.

Respectfully submitted,

Lori Canapinno
Town Clerk

APPROVED 1/27/2025

Plaintiffs' Complaint 000173

15

Town of 
**Matthews**™
Planning and Development

**EXHIBIT 1**

232 Matthews Station Street
Matthews, NC 28105
704.847.4411

### PLANNING BOARD REPORT
### ON THEIR MEETING OF
### DECEMBER 17, 2024

## FOR TOWN BOARD ACTION:

I. **MOTION 2024-3 Town of Matthews:1932 CPCC Lane; Tax Parcel 215-061-15; B-2(CD) to R/I**

The members of the Planning Board considered the Town's Motion to rezone a portion of property located on the CPCC campus. The Planning Board had some concerns about the R/I allowed uses but unanimously recommended approval. The Motion was found to be consistent with the Comprehensive Plan as it expands institutional uses as called for in the Employment Activity Center designation. The amendment was reasonable because the property is part of the Central Piedmont Community College campus.

II. **ZONING APPLICATION 2024-804/ECP LLC: 9727 E. Independence Boulevard; Tax Parcel 193-303-11; B-1(CD) Change of Conditions.**

The Planning Board reviewed the request to add Medical Office as a permitted use and the minor changes to the elevation of the building. The Board was informed of the future tenant's lease agreement for 105 parking spaces and of a restrictive declaration the four parcels in the development had to adhere to with the shared parking areas. The Planning Board voted six to one to recommend approval of the change of use as the request was found to be consistent with the land use plan because it brings the opportunity for a mix of uses to the Independence Boulevard corridor. The amendment was reasonable because it does not substantially alter the currently approved plans.

III. **ZONING APPLICATION 2024-804/ECP LLC: 9727 E. Independence Boulevard; Tax Parcel 193-303-11; B-1(CD) Change of Conditions.**

The members of the Planning Board unanimously agreed to forward the Administrative Amendment to the Board of Commissioners with the following recommendations:
1. The Planning Board unanimously voted to recommend that the applicant be allowed to eliminate the curb and gutter except where it is needed for drainage conveyance and use wheel stops at the end of the parking stalls.
2. The Planning Board unanimously voted to recommend that the applicant not be allowed to eliminate the sidewalk connecting the larger parking field located at the rear of the site to the parking located directly behind the building
3. the Planning Board voted six to one to eliminate the sidewalk leading down to the multi-use path.

www.matthewsnc.gov

Plaintiffs' Complaint 000174

# EXHIBIT 25

---------- Forwarded message ---------
From: **Xavier T. de Janon** <torresdejanon@gmail.com>
Date: Wed, Apr 9, 2025 at 9:04 AM
Subject: Re: [External]Questions about CPCC's Cop City - $116 Million?
To: Meier, Laura <Laura.Meier@mecklenburgcountync.gov>

Good morning Commissioner Meier,

Thank you for sending this information over.

I would like to reiterate my question: **how can taxpayers like myself get involved with the budget process of Mecklenburg County to object to $116 million being given to CPCC for this project?**

In addition, I am unable to locate any of the assessments, permits, or studies referenced by Dr. Deitemeyer. **Could you please request:**

- The "robust assessments to ensure [they] are being good stewards of this land"
- "Phase 1 environmental site assessments on both tracts of land"
- The "state and local permits for grading activities, including approval of the erosion and semination control plan"
- Their arborist's "descriptions, overall health status and the specimens" of the trees

CPCC's branding of the project as "The Community Lifeline" and preservation of 20% of the trees do not address my concerns.
Thank you again,
- Xavier Torres de Janon

On Wed, Apr 9, 2025 at 8:52 AM Meier, Laura <Laura.Meier@mecklenburgcountync.gov> wrote:

This is the reply from Dr. Deietemeyer.

Commissioners Altman, Meier, Powell, and Rodriguez-McDowell, & Manager Diorio:
We recently received several questions regarding the public safety training facility that Central Piedmont, in partnership with Mecklenburg County, is building at our Levine Campus in Matthews, N.C. I am writing to share several updates and address the questions.

Overview of the project

In partnership with Mecklenburg County and generous donors, Central Piedmont is investing to expand and strengthen the county's emergency response capabilities with new programs and a state-of-the-art training facility. This comprehensive initiative, *The Community Lifeline*, represents one of the largest workforce development projects in the college's history. With advanced training, access to cutting-edge tools and cross-agency coordination, the first

responders, including EMS, fire and law enforcement, that we rely on in our community will be best positioned to respond to everyday emergencies as well as extraordinary situations.

The new programs at the public safety training facility will provide training locally to existing first responders so that first responders are not traveling outside service areas for necessary training and certifications, thereby reducing costs and ensuring adequate public safety coverage in our community. In addition, the new programs at the public safety training facility will prepare the next generation of first responders and help increase the pipeline of those interested in the field, all of which will benefit our community.

The new facility will include replicas of many real-life situations, so first responders can practice, coordinate and test response efforts in a safe, controlled environment. These include a single-family residential home, a townhouse, a convenience store, a burn building, a vehicle burn area, an entrapment space, an indoor practice firing range and a driving course.

The critical response driving course will allow our agency partners to practice navigating through obstacles to reach our community members and ultimately increase their response times.

The curriculum will also include mental health awareness and conflict resolution technique training.

The main public safety training facility will be located on just over 23 acres of land, which was graciously donated to the college by the Hendrick Automotive Group. The driving course will be located on a 14-acre tract of land, which the college already owned.

The project will be built in phases and is expected to be fully operational in 2028.

Permitting, construction and sustainability

As with any major construction project we undertake, Central Piedmont is committed to complying with required federal, state and local processes. We have taken a comprehensive approach to our permitting and environmental assessment of the land.

- Based on current state and county requirements, an environmental impact study (EIS) is not required for this specific type of project. That said, we have conducted robust assessments to ensure we are being good stewards of this land.
- We completed Phase 1 environmental site assessments on both tracts of land. No adverse findings were identified in either assessment and no streams or wetlands are present on either tract of land designated for this project. The recent assessment for the 23-acre property has been signed off by the U.S. Army Corps of Engineers.
- We submitted and received the required state and local permits for grading activities, including approval of the erosion and semination control plan, for the first phase of the public safety training facility project.
- The college also hired an arborist to survey and inventory the trees, providing descriptions, overall health status and the specimens.

In addition to the permitting efforts, we are also proactively preserving trees. We expect to preserve nearly 20% of the trees on the 23-acre area and more than 50% of the trees on the 14-acre area. We are also evaluating tree-planting options once the project is complete.

As we continue to move forward, we recognize there will be community interest in this project, and we look forward to sharing more updates as the construction progresses. In the meantime, the site is an active construction zone and is not open to the public during construction. This

will ensure our community, as well as our construction crews, remain safe during our build. Central Piedmont has always been and continues to be a steward in the community. This includes our stewardship of the land used to facilitate learning and development opportunities for the region's workforce.

Thank you for your interest in this transformational public safety project. We look forward to sharing more updates in the coming months. If you have any further questions, please know that Andy is in touch frequently with Catherine Butler on the Central Piedmont team regarding this project.

Warm regards,

Kandi W. Deitemeyer, Ed. D.
President
Central Piedmont Community College
P.O. Box 35009 Charlotte, NC 28235
t 704-330-6566
cpcc.edu



**Laura J. Meier**
County Commissioner
District 5
Mecklenburg County Government
980-279-0112 | MeckNC.Gov

**From:** Xavier T. de Janon <torresdejanon@gmail.com>
**Sent:** Friday, April 4, 2025 2:21 PM
**To:** Meier, Laura <Laura.Meier@mecklenburgcountync.gov>
**Subject:** Re: [External]Questions about CPCC's Cop City - $116 Million?

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Commissioner Laura,

Thank you for the prompt response.

I look forward to getting more information about this extremely expensive project, as well as

how taxpayers can get involved with objecting to this budget allocation.

The lack of public information about this is startling. The 2025 Mecklenburg County budget mentions $75 million approved for CPCC for a capital project with no details at all. CPCC has offered no information at all. It's unclear to me where the $116 million from Mecklenburg County are even coming from.

Sincerely,
- Xavier Torres de Janon

On Thu, Apr 3, 2025 at 4:10 PM Meier, Laura <Laura.Meier@mecklenburgcountync.gov> wrote:

Hi Xavier,

I am happy to get you more information. I do want to note that it wasn't until this morning that some of us commissioners just learned about some environmental concerns and we are already ringing the alarm bells.

I'll be in touch!

Regards,
Laura



**Laura J. Meier**
County Commissioner
District 5
Mecklenburg County Government
980-279-0112 | MeckNC.Gov

---

**From:** Xavier T. de Janon <torresdejanon@gmail.com>
**Sent:** Thursday, April 3, 2025 9:35:46 AM
**To:** Meier, Laura <Laura.Meier@mecklenburgcountync.gov>
**Subject:** [External]Questions about CPCC's Cop City - $116 Million?

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Commissioner,

My name is Xavier, and I am a resident of District 5.

I learned about the Cop City that CPCC wants to build next to Levine Campus, a large militarized police training facility with huge environmental consequences. I've also learned that our taxpayer dollars will fund $116 million of this project, with seemingly no public input. Meanwhile, CMS is facing budget cuts from these same taxpayer dollars.

Could you please provide me with more information about this? In particular, I would like to know how taxpayers like myself can object to this terrible budget allocation.

Sincerely,
- Xavier Torres de Janon
Resident at 28210

# EXHIBIT 26



Central Piedmont
Parking Deck 4
1225 E 4th St
Charlotte, NC 28204

Parking Lot Exit

CPCC Faculty
Staff Parking Lot

Disher Building
1300 E 4th St
Charlotte, NC 28204

Plaintiffs' Complaint 000180

# EXHIBIT 27

November 13, 2024 CPCC Board Meeting Entrance Video

Link to Access Video: t.ly/7pFsk

-

# EXHIBIT 28



Plaintiffs' Complaint 000182

# EXHIBIT 29

March 12, 2025 CPCC Closed Session Video

Link to Access Video:

https://southerncoalition.org/wp-content/uploads/2025/04/IMG_3520.mov

# EXHIBIT 30

March 12, 2025 CPCC Audio Recording Part 1

Link to Access Video:

https://southerncoalition.org/wp-content/uploads/2025/04/Part-1-recording.m4a

# EXHIBIT 31

Link to Access Video:

https://southerncoalition.org/wp-content/uploads/2025/04/Part-2-recording.m4a

# EXHIBIT 32

Campus Ban Video

Link to Access Video:

https://southerncoalition.org/wp-content/uploads/2025/04/IMG_6162.mov

# EXHIBIT 33



# EXHIBIT 34

Janki,

On either April 2nd or 3rd, I received a call from CMPD Officer Senate. Below are my notes from the conversation: Officer Senate informed me that one of our employees had been disruptive during a CPCC board meeting at the Main CPCC location. The board meets on the first Wednesday of each month in the morning, and only 14 individuals are allowed to speak per session. During the meeting, attendees were protesting the new BLET building set to be located at the CPCC Matthews campus. Information regarding the incident was reported to Officer Senate as he was not a witness.

Mina was identified as one of the individuals who was swearing in a disrespectful and abusive manner toward the board members and/or CPCC security. As a result, she, along with others, was removed from the premises. Mina was identified from photographs taken at the meeting, possible from security footage. Either someone provided her name or recognized her as an attorney in our office. Officer Senate used LinkedIn to search for Mina's name, matching her photo from CPCC with LinkedIn profile picture. After confirming her identity and employment, Officer Senate informed me that Mina has been banned from all CPCC campuses by CPCC security. He was unsure whether this ban had been communicated to her at the time.

While Mina is not facing any criminal charges, Officer Senate thought I should be made aware of the situation, as he felt her behavior, as reported to him, might not reflect well on county employees. He wanted to give me a heads-up. I thanked him for the call and assured him I would pass the information on to Mina. That concluded my notes.

If you have any further questions, please don't hesitate to contact me.

Thanks,
Charlena

**From:** Janki Kaneria <janki@scsj.org>
**Sent:** Thursday, April 10, 2025 2:46 PM
**To:** Harvell-Carter, Charlena A. <charlena.a.harvell-carter@nccourts.org>
**Cc:** James Huey <James@scsj.org>; Mina Ezikpe <mina.ezikpe@gmail.com>
**Subject:** Mina's Ban from CPCC

You don't often get email from janki@scsj.org. Learn why this is important.

**CAUTION: External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.**

Hi Charlena,

I hope you are doing well! SCSJ is representing Mina on the issue of her being banned from CPCC. Our understanding is that a CPCC representative reached out via a phone call to let you know that Mina was banned from their campus. Can you provide us with more information? Who was the person who called? What was disclosed in the conversation?

Any information you can provide will be helpful!

Best,

**Janki Kaneria**
**Counsel, Justice System Reform**
**Southern Coalition for Social Justice**
janki@scsj.org
www.southerncoalition.org

E-mail correspondence to and from this address may be subject to the North Carolina public records laws and if so, may be disclosed.

# EXHIBIT 35

| | |
|---|---|
| **From:** | Eboni Exceus |
| **To:** | Janki Kaneria |
| **Subject:** | [External]Fw: Visiting Student request - follow-up |
| **Date:** | Wednesday, March 12, 2025 7:31:41 PM |

**From:** Advising <advising@cpcc.edu>
**Sent:** Tuesday, September 17, 2024 2:02:11 PM
**To:** Eboni Exceus <eexceus1@email.cpcc.edu>
**Subject:** Visiting Student request - follow-up

Hi Eboni

Thanks for submitting our form. We are excited to have you with us as a Visiting Student!

We have submitted the form to the Admissions Office to update your account to reflect your Visiting status, and we have waived your Advising requirement for the Fall.

We have added a prereq override for BIO 169 (BIO 166 has been replaced by BIO 169 at Central Piedmont) and you can search for available sections in Student Planning and register. Check out this handy tool for what the section numbers mean to be sure you are registering for the section delivery format that fits your needs.

Please note the deadline to register for classes in-progress has ended. Students can now only register for sections with open seats that begin in October.

Once you are registered, be sure to pay your balance in MyCollege under Student Finance by the next payment deadline or your registration will be cancelled. Students owing more than $200 can sign up for a tuition payment plan https://www.cpcc.edu/admissions/tuition-and-payment/tuition-payment-plan. For upcoming payment deadlines, visit https://www.cpcc.edu/admissions/tuition-and-payment/payment-dates-for-college-credit-courses

Best of luck!